UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRISCILLA LEFEBURE, *an individual*<br>*Plaintiff* | CIVIL CASE NO.: 3:17-cv-1791-JWD-EWD |
| VERSUS | |
| BARRETT BOEKER, Assistant Warden<br>Louisiana State Penitentiary, *individually*<br>*and in his official capacity*, WEST<br>FELICIANA PARISH, SAMUEL D.<br>D'AQUILLA, 20th Judicial District,<br>*individually and in his official capacity*<br>District Attorney, J. AUSTIN DANIEL,<br>Sheriff, West Feliciana Parish, THE<br>PRINCETON EXCESS AND SURPLUS<br>LINES INSURANCE COMPANY,<br>INSURANCE COMPANY DOES 2-5,<br>DOES 6-20, | |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

1.      In the early morning hours of December 1, 2016, Louisiana State Penitentiary

Assistant Warden Barrett Boeker violently raped Plaintiff Priscilla Lefebure at his home on the

prison grounds. Mr. Boeker told Ms. Lefebure that no one would be able to hear her scream and

insisted she watch in a mirror as he assaulted her. The next day Mr. Boeker called Ms. Lefebure

and told her not to tell anyone what had happened.

2.      To further intimidate her into silence, Mr. Boeker again sexually assaulted Ms.

Lefebure on December 3, 2016, this time with a foreign object. Only hours after this assault, Mr.

Boeker stood in the doorway of his children's bedroom, where Ms. Lefebure had been trying to

sleep in an attempt to protect herself, and masturbated while staring at her.

3.     Ms. Lefebure was able to get herself to physical safety the next day and had a sexual assault examination and rape kit done at Woman's Hospital in Baton Rouge on the morning of December 8th.

4.     The examination noted the assaults on December 1st and 3rd. It showed bruising on Ms. Lefebure's inner and upper thighs and her right arm and left shin in the pattern of finger and hand prints. It noted that her cervix was red and irritated. The exam included photos of the bruising.

5.     Sadly, Ms. Lefebure's nightmare did not end once she was physically safe and given medical treatment. While Mr. Boeker was arrested for second degree rape on December 20, 2016, he was never indicted or convicted. Instead, Ms. Lefebure was treated as the accused from the beginning, and Mr. Boeker was able to use his official position and connections to law enforcement and parish officials to ensure he would not be held accountable for his actions.

6.     From the moment of his arrest, Defendant Boeker was not treated as a suspect in a crime, but instead given preferential treatment by Defendant West Feliciana Parish District Attorney Samuel D. D'Aquilla and his office and West Feliciana Parish Sheriff J. Austin Daniel and his office.

7.     Within 24 hours of his arrest, Mr. Boeker's attorney Jerome Cy D'Aquilla — relative of Defendant District Attorney Sam D'Aquilla—secured two bond reductions totaling $77,000.00. Mr. Boeker did not spend a single night in custody and his remaining, reduced bond was paid largely by an unknown source from Ascension Parish.

8.     After his release, Defendant Boeker faced no investigation or scrutiny from the District Attorney or the Sheriff.

9.      Both the District Attorney and the Sheriff refused to examine or pick up Ms. Lefebure's rape kit and sexual assault examination, which showed bruising consistent with trauma.

10.     Defendant D'Aquilla's markup of the police report highlighted only possible discrepancies in Ms. Lefebure's description of the events. His handwritten notes cast only doubt on Ms. Lefebure, with "drinking" written out and heavily underlined, and the words "go get the stuff," "where are the texts," and "NO [*illegible*] plead 5" and "plead 5th." None of these phrases were included in the police report itself or Ms. Lefebure's description of the events and Mr. and Mrs. Boeker are the only parties alleged to have been drinking at the time of either assault.

11.     Prior to the grand jury hearing, Defendant D'Aquilla did not meet with Ms. Lefebure in person or speak with her about the assaults. He told reporters he was "uncomfortable" speaking with her. No one from Defendant D'Aquilla's office or staff met with Ms. Lefebure either.

12.     The two officers from Defendant Sheriff Austin's office who investigated the case were not called as witnesses. The nurse who conducted the sexual assault examination was not asked to testify. And no expert from the coroner's office that stored the rape kit for months was called to testify, something that is done in other cases.

13.     Finally, neither witness who could corroborate Ms. Lefebure's state of mind, fear, anxiety, and retelling of events in the days between and after the assaults was called, even though they were at the courthouse and available to testify while the grand jury was meeting.

14.     Indeed, Defendant D'Aquilla even attempted to proceed to the grand jury hearing without Ms. Lefebure's testimony when he reneged on a promise to her lawyer that he would accept her request to continue the hearing so she could prepare with her recently-retained counsel.

15.     When Defendant D'Aquilla told Ms. Lefebure's lawyer the morning of the grand jury proceeding that he would not uphold his promise to get a continuance, he explained that Mr. Boeker needed to return to his family and his job and he wouldn't delay the proceedings any longer. Ms. Lefebure had also been ill over the weekend and asked only for a day or two continuance.

16.     With the rape kit and physical evidence sitting in the East Baton Rouge coroner's office, without corroborating witness testimony, and having watched Defendant D'Aquilla impugn Ms. Lefebure's credibility on the stand while bolstering Defendant Boeker's, the grand jury failed to return an indictment. Although the victim of a brutal and violent crime, Ms. Lefebure had become the accused.

17.     Defendant D'Aquilla told reporters afterward that the issue in the case was credibility and he did not have photos or witness cooperation. The case, he explained, rose and fell exclusively on the statements from Defendant Boeker and Ms. Lefebure and their respective credibility.

18.     Defendant D'Aquilla made clear he never believed Ms. Lefebure and that, even though he had never met with her, he believed she was there to be deceptive. "If somebody's squirming around, not paying attention, you are smart enough to know [they are] trying to be deceptive. That's why she was there."

19.     District attorneys and sexual assault experts agree that victims of trauma often demonstrate confusion or forget details. This is because trauma has a chaotic effect on the brain and memory.

20.     When asked by reporters why he did not pick up or examine the rape kit, Defendant D'Aquilla said it was not necessary to review the kit or exam because, although the victim reported she did not consent and was physically forced to have sex with Defendant Boeker, the issue in the

case was consent. According to Defendant D'Aquilla, nothing in the kit or exam could shed light on whether Ms. Lefebure consented to sex with Defendant Boeker.

21.    Ms. Lefebure never once told law enforcement or anyone she spoke with that she ever had consensual sex with Defendant Boeker. The only person to have reported consensual sex was Defendant Boeker. As Defendant D'Aquilla told reporters, "[i]t was not a question of whether or not she had bruises. [Boeker] got up there and told his side of the story, 'We had sex and it was consensual, we got kind of rough,' … It was just credibility."

22.    On information and belief, the West Feliciana Parish District Attorney's Office does not have a policy requiring rape kits and sexual assault examinations to be picked up and reviewed or sent to the state crime lab for testing.

23.    On information and belief, at the time of the assaults and through June 2017, the West Feliciana Parish Sheriff's Office did not have a policy requiring rape kits and sexual assault examinations to be picked up and reviewed or sent to the state crime lab for testing.

24.    Rape kits and sexual assault examinations are known to be evidentiary linchpins in sexual assault cases and former district attorneys, defense attorneys, and victim's advocates agree that proper investigation always includes review of the rape kit and assault examination. They further agree that departmental protocol in both law enforcement and district attorney's offices should require examination and analysis of the kit or exam. Even in cases where DNA testing will not be determinative of whether an assault occurred.

25.    As retired East Baton Rouge assistant district attorney Sue Bernie told reporters, "[i]f there's a rape exam done, I can't imagine not looking at the sexual assault exam." East Baton Rouge Coroner Beau Clark noted that when the cops get the kit can change (from case to case), but they always come get the kit and they're the ones that submit it to the crime lab."

26.     Only days after WBRZ reported that the rape kit and examination had never been picked up or examined, Defendant D'Aquilla curiously told the Advocate that his office had actually called the East Baton Rouge Parish coroner to ask for the kit multiple times. He could not confirm how or when someone from his office contacted the coroner's office.

27.     Defendant D'Aquilla also noted that "[e]very time we have a grand jury, we present everything we have in our file." If Defendant D'Aquilla's office had retrieved the rape kit as any other prosecutor would have, the photos of the bruising and the exam would have been presented to the grand jury.

28.     Defendant Sheriff Austin admitted to reporters at WBRZ that his office made an error by not picking up Ms. Lefebure's rape kit and exam and that it should have been processed sooner. He told the news station on June 26, 2017, that he had recently issued a verbal protocol to everyone in his office that rape kits need to be sent to the crime lab when they are collected.

29.     Defendant Sheriff Austin and Defendant District Attorney D'Aquilla did not pick up the rape kit and examination until, at the earliest, March 10, 2017. *See* Exhibit B. This was only days after WBRZ reported that the kit had not been retrieved or tested.

30.     Ms. Lefebure's rape kit did not make it to the state crime lab until six months after her assault and two months after Mr. D'Aquilla refused to do his job as a district attorney and investigate and seek the indictment of Defendant Boeker.

31.     The examination and kit included this documentation of bruising on Ms. Lefebure's body (each mark is a 1-2 centimeter bruise):



Exhibit A.

32.    Instead of protecting her rights as the victim of a violent crime, the Defendants derided Ms. Lefebure throughout the process, denied her information about and access to victim resources, and violated her rights to equal protection and due process of the law by willfully refusing to do their jobs and instead colluding protect an alleged rapist from prosecution.

33.    Ms. Lefebure has lived in constant fear and emotional stress ever since the grand jury returned a "no true bill." She has seen her familial relationships torn apart, she has been homeless, and forced to drop out of nursing school. Having been denied any assistance from the victim impact fund because of the Defendants' actions, she has been without the medical and mental health care she needed.

34.    In spite of the physical injury and severe emotional trauma, she has fought tirelessly through traditional and social media to hold Mr. Boeker, Mr. D'Aquilla, and Mr. Daniel accountable. She has continued to tell the details of what happened to her and how she fears that Mr. Boeker will find her and assault her again, fears that he has and will continue to assault other women, and fears that members of the Sheriff's Office or the District Attorney's

Office, including the Sheriff and the District Attorney themselves, will retaliate against her for continuing to speak openly about the assault. Ms. Lefebure now brings this action for violation of her civil rights and the horrible assault against her.

## JURISDICTION AND VENUE

35.     This is a civil rights action arising under Title 42 of the United States Code Sections 1983, 1988, 12131, 12205, and the Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred on this Court by Title 28 of the United States Code, Sections 1331 and 1343.

36.     Plaintiff further invokes the supplemental jurisdiction of this Court under Title 28 of the United States Code, Section 1367, to hear and decide related claims arising under state law. The amount in controversy, excluding interests and costs, exceeds the minimum jurisdictional limit of this Court. A jury trial is requested.

37.     Venue is proper in the United States District Court for the Middle District of Louisiana pursuant to 28 U.S.C. § 1391 because all parties reside in the State of Louisiana and the acts and omissions giving rise to this lawsuit occurred in a parish covered by the Middle District.

## PLAINTIFF

38.     Plaintiff **PRISCILLA LEFEBURE** is a person of full age and majority and a resident of the State of Louisiana.

39.     Plaintiff brings her claims individually under 42 U.S.C. §§ 1983, 1985, and 1988, the United States Constitution, federal and state civil rights laws, and the laws of the State of Louisiana, including but not limited to Louisiana Civil Code articles 2315, 2316, 2317, and 3493.

## DEFENDANTS

40.    Defendant **BARRETT BOEKER** is an Assistant Warden at the Louisiana State Penitentiary. He is a resident of West Feliciana Parish, living in tax payer funded housing for correctional officers within the prison grounds. Defendant BOEKER is sued in his official and personal capacity.

41.    Defendant **SAMUEL D. D'AQUILLA** is the present District Attorney of the 20th Judicial District, a position he has held since 2002. Defendant D'AQUILLA is sued in his official and personal capacity. Defendant D'AQUILLA directly and in conspiracy with other defendants deprived Plaintiff of her constitutional rights.

42.    Defendant **J. AUSTIN DANIEL** is the Sheriff of West Feliciana Parish, a position he has held since 2006. Defendant J. AUSTIN DANIEL is sued in his official and personal capacity. Defendant J. AUSTIN DANIEL directly and in conspiracy with other defendants deprived Plaintiff of her constitutional rights.

43.    Defendant **PARISH OF WEST FELICIANA** is a political subdivision of the State of Louisiana. Defendant's Daniel and D'Aquilla were at all pertinent times and remain employed by the Parish.

44.    Defendant **THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY** is an insurance company incorporated under the laws of the State of Delaware and doing business in the State of Louisiana. Defendant Princeton Excess is the Parish of West Feliciana's insurance carrier.

45.    **INSURANCE COMPANY DOES 2-5** are as yet unknown insurance companies who, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more Defendants named herein.

46.     Plaintiff is ignorant of the true names and capacities of Defendant **DOES 6-20** and therefore sue these Defendants by such fictitious names. Plaintiff is informed and believe and on that basis alleges that each Doe Defendant so names is responsible in some manner for the injuries and damages she sustained, as set forth herein. Plaintiff will amend her complaint to state the names and capacities of DOES 6-20 when they have been ascertained. DOES 6-20 are sued in their official and personal capacities.

47.     Plaintiff is informed and believes and thereon alleges that each Defendant was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged. At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's constitutional rights and other harm.

48.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of Louisiana.

49.     This complaint may be pled in the alternative pursuant to Federal Rule of Procedure 8(d).

## <u>GENERAL ALLEGATIONS</u>

50.     Plaintiff re-alleges each and every paragraph in this complaint as if fully set forth here.

51.     Plaintiff Priscilla Lefebure is the first cousin of Defendant Barrett Boeker's wife. In late 2016, Ms. Lefebure was a guest in Mr. and Mrs. Boeker's home on the grounds of the Louisiana State Penitentiary as she had to evacuate her home in Baton Rouge after flooding in August of 2016.

52.     On or about November 16, 2016, Ms. Lefebure was retrieving things from the trunk of her car at the Boeker's home. Mr. Boeker came out of the home and grabbed a lanyard she was wearing around her neck and pulled her towards him, trying to kiss her. Mr. Boeker was intoxicated, as he was most nights during Ms. Lefebure's stay. Ms. Lefebure pushed him away and told him to stop. When she asked him why he was doing that, Defendant Boeker only smirked and pulled on the lanyard again. Ms. Lefebure pushed his hands away and told him not to do that again.

53.     Mr. Boeker did not listen. On or about the late evening of November 30 and early morning of December 1, 2016, Defendant Barrett Boeker raped Plaintiff Priscilla Lefebure at his home on the grounds of the Louisiana State Penitentiary.

54.     Mr. Boeker's wife, Plaintiff's first cousin, was away from the home for a few nights during this first assault, and had left Ms. Lefebure in charge of her two young children.

55.     During the December 1 assault, Ms. Lefebure had gone into Mrs. Boeker's room to retrieve a phone charger that Mrs. Boeker had borrowed from her. When she turned around to exit, Mr. Boeker was standing in the room. When she tried to exit, Mr. Boeker grabbed her and threw her on the bed. She begged him not to touch her, saying no over and over again and trying to push him off of her. He had, to Ms. Lefebure's knowledge, at least half a pint of whiskey that night.

56.     Ms. Lefebure is approximately 5'5'' and weighs around 115 lbs. Mr. Boeker is 6'2'' and weighs approximately 220 lbs. She was unable to force Mr. Boeker off of her even as she kicked and screamed.

57.     Mr. Boeker proceeded to hold both of Ms. Lefebure's arms down and pin her to the bed. He told her "I tried to be a gentleman, but I couldn't help myself." He then forced his penis into Ms. Lefebure's mouth.

58.     Ms. Lefebure froze from shock and fear. Mr. Boeker became angry that she was not cooperating with his assault and forced Ms. Lefebure on her stomach. She begged him to stop and pleaded for her cousin to return. Defendant Boeker told her "[g]uess what, [she] isn't here and she will not be back until Sunday. No one can help you. No one can hear you screaming."

59.     Defendant Boeker then grabbed Ms. Lefebure by both of her arms and yanked her up, telling her to get on her knees. He then forced her legs apart and forced his penis into Ms. Lefebure's vagina, pulling her hair back so hard that her neck hurt and forced her to watch him raping her in the mirror while telling her how beautiful she was.

60.     As soon as Mr. Boeker was no longer physically restraining Ms. Lefebure, she ran into the bathroom and took a bath. The next day, Mr. Boeker called Ms. Lefebure and told her not to tell anyone what happened. Ms. Lefebure had stayed the night only to ensure the Boeker children were not left alone until their mother returned the next day.

61.      Fearing for her safety, but without a home to return to, Ms. Lefebure left on December 1st to stay with friends in New Orleans. After two nights, those accommodations ran out and Ms. Lefebure was forced to return to Defendant Boeker's home on December 3rd. She hoped that with his wife back in the home she would be safe enough to retrieve her things and

her two pets. Unfortunately for Ms. Lefebure, Mr. Boeker would not be deterred and in the early

morning hours of December 4, 2016, Mr. Boeker again sexually assaulted Ms. Lefebure, this

time with a foreign object.

62.     On that December 3rd Saturday, the Boekers had several neighbors over to their

home at the prison for drinking and partying. Ms. Lefebure was not in a position to challenge

Defendant Boeker at this time, but needed her things, her pets, and safety. At some point, when

Mrs. Boeker went to bed and passed out, Ms. Lefebure went into the bedroom with her, where

her two children were also sleeping. She thought that if she was with her cousin, she would not

be harassed or assaulted.

63.     Again, Defendant Boeker would not be deterred. He entered the room where Mrs.

Boeker, their children, and Ms. Lefebure were and told Ms. Lefebure to get up. She refused, and

he grabbed her by the arms and tried to pull her out of the room. Faster this time, Ms. Lefebure

escaped his clutches and Mr. Boeker left the house.

64.     Ms. Lefebure had tried earlier in the evening to get a ride off the prison grounds

with Mr. Boeker's sister and her husband. Officer and Warden housing at the prison is behind the

security gates, which is the only way in and out of the prison.

65.     Trapped for the night, but only needing to pass a few hours until her cousin woke

up and she could leave, Ms. Lefebure locked herself in the Boeker children's empty bedroom.

66.     At some point, Defendant Boeker picked the lock to his children's bedroom and

around 2:00 a.m. on December 4, 2016, Ms. Lefebure awoke to find Defendant Boeker standing

over her, telling her he had picked the lock on the door.

67.     He then assaulted Ms. Lefebure again, this time forcing her legs apart with his

hands and using a sex toy to penetrate her vaginally. Ms. Lefebure begged and pleaded with him

to stop, finally freeing herself enough to kick him off of her. The two assaults left her with at least eleven fingerprint shaped and other bruises.

68.    With no way to leave, Ms. Lefebure locked the door again to try and get through the remaining hours. She awoke once more to find Defendant Boeker again having picked the lock, standing in the doorway. This time he was masturbating while staring at Ms. Lefebure in his children's bedroom.

69.    Ms. Lefebure remained the next day to complete the chores she promised her cousin she would do in exchange for staying at her home. She then was able to leave and returned only to get the remainder of her things on Wednesday December 7th.

70.    During that December 7th visit Mrs. Boeker was intoxicated, but questioned Ms. Lefebure about her mood and why she was leaving. Ms. Lefebure told her Defendant Boeker had raped her. To which Mrs. Boeker replied, "I knew this was going to happen."

71.    The two left together to go to Baton Rouge, during the drive Mrs. Boeker told Ms. Lefebure that Defendant Boeker had also raped her sister six years ago and another girl at a party a few years back.

72.    On information and belief, Defendant Boeker has also sexually assaulted a number of the inmates at the Louisiana State Penitentiary and has been the subject of numerous Prison Litigation Reform Act (PRLA) claims. He is known by inmates to be a dangerous and violent warden.

73.    Ms. Lefebure and Mrs. Boeker met up with Defendant Boeker's sister in a bar in Baton Rouge that Wednesday and stated she was not surprised it happened and apologized.

74.    Before Ms. Lefebure went to Woman's Hospital for an exam and treatment, Mrs. Boeker begged her not to report the rape or tell anyone who did it or where it happened.

75.     Ms. Lefebure was given a sexual assault examination at Woman's Hospital the morning of Thursday December 8, 2016. Exhibit A.

76.     The examination documents the pattern of fingerprint bruises on Ms. Lefebure's inner and upper thighs, and the fingerprint bruises on her arms and shin. *Id.*

77.     Mr. Boeker's defense counsel was Attorney Jerome Cy D'Aquilla, a relative of the elected District Attorney and Defendant Sam D'Aquilla.

78.     Defendant Boeker was given two bond reductions, totaling $77,000, and only posted a fraction of his bond with $40,000 in equity from his home.

79.     At the time of the assaults, Defendant Boeker was an Assistant Warden at the prison, living in tax payer funded housing on the prison's "B-Line."

80.     On information and belief, after he was arrested Mr. Boeker met with Defendant D'Aquilla and/or Defendant Austin, and his lawyer and an unknown Warden from the prison to ensure that he was given preferential treatment and not required to stay in jail for any length of time.

81.     During this meeting Defendant Boeker claimed that he and Ms. Lefebure had been having consensual sex and that she was lying. On information and belief, the unknown DOE Warden colluded with Defendant Boeker to corroborate his false claim of a consensual relationship.

82.     During this meeting, and at other times since, but before the convening of the grand jury, Defendants Boeker, D'Aquilla, and Austin conspired to ensure that Mr. Boeker was not investigated for the alleged rapes.

83.     During this meeting, and at other times since, but before the convening of the grand jury, Defendants Boeker, D'Aquilla, and Austin conspired to ensure that Mr. Boeker would not be convicted of the alleged rapes.

84.     During this meeting, and at other times since, but before the convening of the grand jury, Defendants Boeker, D'Aquilla, and Austin conspired to ensure that Ms. Lefebure's constitutional rights to equal protection, due process, and a property right in her rape kit.

85.     Defendants D'Aquilla and Austin are the elected and effective policy makers for the District Attorney's Office and the Sheriff's Department, respectively.

86.     Since the assault Ms. Lefebure has experienced severe emotional distress and trauma. She was denied access to the Louisiana Victim Compensation Fund and was informed by the fund coordinator that Defendant D'Aquilla repeatedly denied his requests to obtain the case file so that he could provide assistance to Ms. Lefebure.

87.     Since the assault and grand jury hearing, Ms. Lefebure has had flashbacks, nightmares, loss of sleep and appetite. Her social and familial relations have been strained. She was forced to drop out of nursing school because of the emotional trauma and her lack of funding for mental health care. She has been unable to find or maintain employment and continues to suffer from post-traumatic stress disorder, depression, and other mental and physical health issues. In short, Ms. Lefebure's life has been completely altered since Defendant Boeker violently assaulted her and the grand jury failed to return an indictment.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Violation of Fourteenth Amendment Equal Protection and
Louisiana Constitution Article I, Section 3, Right to Individual Dignity
(Defendants West Feliciana Parish, D'Aquilla, and Austin in individual and official capacities)

88.     Plaintiff repeats and realleges each allegation of the complaint.

89.     At all relevant times, Defendants D'Aquilla and Austin acted individually, officially, and under color of law.

90.     Defendants D'Aquilla and Austin knew that Ms. Lefebure had provided evidence of sexual assault and further knew that neither Defendant was taking steps to properly investigate her allegations.

91.     Defendants D'Aquilla and Austin had a duty to diligently investigate the allegations and to collect the rape kit, submit it to the crime lab for examination, and review it and the sexual assault examination as part of their own investigation.

92.     Defendants D'Aquilla and Austin acting individually and together conspired to and engaged in a course of conduct that deprived Ms. Lefebure of her constitutional property right in her DNA samples and rape kit, her right to seek redress in the courts, and of her rights to equal protection and due process by failing to investigate the accused and failing to pick up, analyze, examine, or submit rape kit and/or sexual assault examination evidence.

93.     Defendants D'Aquilla and Austin are the elected and effective policy makers for the District Attorney's Office and the Sheriff's Department, respectively.

94.     With deliberate indifference Defendants D'Aquilla and Austin failed to draft or implement procedures in either the Sheriff's Department or the District Attorney's Office to ensure proper investigation of rape cases and proper review, examination, collection, and handling of rape kits and sexual assault examinations.

95.     Defendants D'Aquilla and Austin's deliberate, and willful and wanton conduct created a danger of an increased risk of harm to Plaintiff and other victims of sexual assault, which are disproportionately women, by failing to investigate sexual assault crimes, by fostering an

environment whereby perpetrators of sexual assault are allowed to prey on victims without fear of investigation by the West Feliciana Sheriff's Department or District Attorney.

96.    On information and belief, Defendant Boeker knew of Defendant D'Aquilla's long-standing refusal to properly investigate sexual assault crimes against women and/or female-identified individuals.

97.    At all relevant times, Defendants D'Aquilla and Austin's conduct was intentional, under color of law, and motivated by Plaintiff's gender.

98.    On information and belief, Defendants have a history of discriminating against women and/or individuals who identify as female. Defendants have failed to investigate or take seriously reports of sexual assault from women and generally treat these allegations with less priority than other crimes not involving sexual assaults against women.

99.    Defendants D'Aquilla and Austin, acting individually and collectively, had the duty and ability to prevent the violation of Ms. Lefebure's constitutional rights, but failed to do so. Indeed, their acts lead to the direction violation of Ms. Lefebure's rights.

100.    Defendants D'Aquilla and Austin's conduct violated the Fourteenth Amendment's promise of equal protection of the laws and 42 U.S.C. section 1983.

101.    As a direct and proximate result of Defendants D'Aquilla and Austin's actions, omissions, policies, practices and customs, Plaintiff was denied the rights afforded to her by the state and federal constitutions.

102.    As a direct and proximate result of Defendants D'Aquilla and Austin's actions, Plaintiff suffered extreme emotional pain and suffering.

103.    A departmental policy established or enacted by either Defendant D'Aquilla or Defendant Austin in their respective municipal organizations requiring collection and examination of rape kits would have prevented plaintiff's injury, and extreme emotional pain and suffering.

## SECOND CAUSE OF ACTION
42 U.S.C. §§ 1983 – Fourteenth Amendment Substantive Due Process and
Louisiana Constitution Article I, Section 2, Due Process
(Defendants West Feliciana Parish, D'Aquilla, and Austin in individual and official capacities)

104.    Plaintiff repeats and realleges each allegation of the complaint.

105.    At all relevant times, Defendants D'Aquilla and Austin acted individually and together, and under color of law.

106.    Defendants D'Aquilla and Austin knew that Ms. Lefebure had provided evidence of sexual assault and further knew that neither Defendant was taking steps to properly investigate her allegations.

107.    Defendants D'Aquilla and Austin had a duty to diligently investigate the allegations and to collect the rape kit, submit it to the crime lab for examination, and review it as part of their own investigation.

108.    With deliberate indifference Defendants D'Aquilla and Austin failed to implement procedures in either the Sheriff's Department or the District Attorney's Office to provide for proper investigation of rape cases and proper review, examination, collection, and handling of rape kits and sexual assault examinations.

109.    On information and belief, Defendant Boeker knew of Defendant D'Aquilla's long-standing refusal to investigate allegations against Wardens, Assistant Wardens, and/or correctional officers and employees at the Louisiana State Penitentiary.

110.    Defendants D'Aquilla and Austin, acting individually and collectively, had the duty and ability to prevent the violation of Ms. Lefebure's constitutional rights, but failed to do so.

111.   Defendants D'Aquilla and Austin's deliberate indifference and willful and wanton behavior created a danger and increased risk of harm by sexual assault.

112.   Defendants D'Aquilla and Austin's conduct violated the Fourteenth Amendment's promise of substantive due process and 42 U.S.C. section 1983.

113.   As a direct and proximate result of Defendants D'Aquilla and Austin's actions, omissions, policies, practices and customs, Plaintiff was denied the rights afforded to her by the state and federal constitutions.

114.   Defendants violated Plaintiff's civil rights by having an express policy to not collect evidence or rape kits and/or to not investigate when a female or female-identified person makes a rape or sexual assault allegation. This policy, when enforced, caused a constitutional deprivation to Plaintiff. Even if Defendants' conduct did not rise to the level of an express policy, the practice of failing to properly collect and review rape kits and/or the practice of failing to investigate sexual assault allegations by women was so widespread and/or custom that, although not authorized by written law or express municipal policy, was so permanent and well settled as to constitute a custom or usage with the force of law.

115.   Defendants D'Aquilla and Austin are the elected and effective policy makers for the District Attorney's Office and the Sheriff's Department, respectively. Plaintiff's constitutional injuries inflicted by Defendants were caused by individual's with final policymaking authority in West Feliciana Parish, the West Feliciana Parish Sheriff's Office, and/or the West Feliciana Parish District Attorney's Office.

116.   As a direct and proximate result of Defendants actions, Plaintiff suffered extreme emotional pain and suffering.

**THIRD CAUSE OF ACTION**
42 U.S.C. §§ 1983 and 1985 – Civil Conspiracy to Violate Civil Rights
(All Defendants)

117.    Plaintiff repeats and realleges each allegation of the complaint.

118.    Each Defendant, acting in concert with one another and other yet-unknown co-conspirators, conspired to violate Ms. Lefebure's civil rights and ensure that Defendant Boeker walked free.

119.    Defendants Boeker, D'Aquilla, Austin, Warden DOE, and other DOES met shortly after Defendant Boeker's arrest on December 20, 2016, and as yet unknown other times, and agreed that Defendant Boeker was telling the truth and the Plaintiff Lefebure was lying. They further agreed at that meeting and, on information and belief, at likely other meetings to not investigate the case against Defendant Boeker and/or to ensure that Defendant Boeker would not face criminal liability for raping Ms. Lefebure.

120.    On information and belief, Defendants D'Aquilla and Austin agreed they would not retrieve the rape kit or examination until after the grand jury convened.

121.    On information and belief, Defendant Austin told his investigating officers that they were not to investigate the case or question Defendant Boeker.

122.    On information and belief, Defendant D'Aquilla told his staff that they were not to investigate the case or question Defendant Boeker.

123.    On information and belief, Defendant Boeker represented that he was being investigated by Defendants D'Aquilla and Daniel so as to hide the conspiracy and ensure he would not face criminal liability for raping Ms. Lefebure.

124.    Defendants each made and took concrete acts in furtherance of the agreement to use their official positions and power under color of law to violate Ms. Lefebure's federal and state

constitutional rights to, *inter alia*, due process, equal protection, and the property interest in her rape kit.

125.   As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of enjoyment, and loss of income, as set forth more fully above.

126.   Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

### FOURTH CAUSE OF ACTION
42 U.S.C. §§ 1983 – Abuse of Process
(All Defendants)

127.   Plaintiff repeats and realleges each allegation of the complaint.

128.   Defendants are jointly, severally, and *in solido* liable to Plaintiff for the state tort of abuse of process, as more fully set forth above.

129.   Defendants, each acting in concert with the other, did willfully, unlawfully, maliciously, and feloniously use the Court's process, including but not limited to the grand jury process, primarily for an ulterior and illegal purpose—to protect Defendant Boeker from criminal liability and to violate Ms. Lefebure's state and federal constitutional rights.

130.   Defendants each acting in concert with the other, did willfully, unlawfully, maliciously, and feloniously fail to comply with the proper procedures or rules set out by law for conducting official actions.

131.   As a direct result of these acts and omissions and abuse of the Court's process, Plaintiff suffered great pain, distress, anguish, humiliation, fear, and monetary damages.

132.   Plaintiff repeats and realleges each allegation of the complaint.

## SIXTH CAUSE OF ACTION
Intentional and Negligence State Torts – Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Assault, Battery, False Imprisonment, Rape, Sexual Battery
(Against Defendant Boeker)

133.    Plaintiff repeats and realleges each allegation of the complaint.

134.    Defendant Boeker's conduct was extreme and outrageous. Knowing that the emotional distress suffered by the Plaintiff was severe, Defendant Boeker desired or acted with recklessness to inflict severe emotional distress and/or knew that severe emotional distress would be certain or substantially certain to result from his violent sexual assault. Defendant Boeker maliciously assaulted Ms. Lefebure not once, but twice, then made every effort to ensure he would never be held accountable. On information and belief, Defendant Boeker has inflicted similar sexual assault, harm, and emotional distress on numerous other victims.

135.    Defendant Boeker committed intentional offensive contact with Plaintiff without right, and put her in apprehension of such contact.

136.    Defendant Boeker's actions were the cause-in-fact of Plaintiff's injuries.

## SEVENTH CAUSE OF ACTION
State Law Direct Action Claim
(All Defendant Insurance Companies)

137.    Plaintiff repeats and realleges each allegation of the complaint.

138.    Defendant Princeton Excess has issued and/or currently has in effect one or more insurance policies covering Defendants D'Aquilla and Daniel, named herein. For valuable consideration received, these policies obligated Defendant Princeton Excess, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

139.    Defendant DOE Insurance Companies, on information and belief, have issued and/or currently have in effect one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

140.    By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries Plaintiff has suffered as a result. Upon information and belief, Defendants Princeton Excess and DOE Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

141.    On information and belief, Defendants Princeton Excess and DOE Insurance Companies are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

142.    Under Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendants Princeton Excess and DOE Insurance Companies to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## **DAMAGES**

143.    As a result of the acts and omissions of the Defendants as described above, the Plaintiff has damages including, but not limited to conscious and severe physical, mental, and emotional distress, and pain and suffering; economic and other monetary injury including, but not

limited to, loss of earnings, loss of work prospects, loss of future income, and loss of past income; and, any other such damage cognizable under these laws and statutes and provable at trial.

## **PRAYER FOR RELIEF**

144.    WHEREFORE, Plaintiff prays that after due proceedings there be judgment rendered in her favor and against all Defendants individually and jointly as follows:

    i.   A declaration that Defendants' policies and procedures, or lack thereof, allowing sexual assault cases brought by women, or those who identify as female, to remain uninvestigated and which allow rape kits and sexual assault examinations to go without review or analysis violates the Fourteenth Amendment to the United States Constitution;

   ii.   Granting permanent injunctive relief enjoining Defendants and their predecessors, successors, present or former agents, representatives, those acting in privity or concert with them, or on their behalf, from violating the Fourteenth Amendments of the United States Constitution;

  iii.   Granting permanent injunctive relief requiring Defendants to present a plan to the Court within 60 days that provides for:

        1.   A written policy requiring the West Feliciana Sheriff's Office and the West Feliciana District Attorney's Office to collect and review rape kits and sexual assault examinations, send them to the crime lab for testing, and present them as evidence in grand jury proceedings;

2.  A plan for implementing the policies;

3.  Training for all members of each office on the written policy;

4.  Training for all members of each office on sexual assault awareness.

iv.  Compensatory and punitive damages as prayed for herein;

v.  Reasonable attorney's fees, all costs of these proceedings including expert witness fees under 42 U.S.C. 1988 and 12205, *et seq.*, and legal interest at the standard rate;

vi.  Prejudgment and post-judgment interest at the standard federal rate;

vii.  That this matter be tried by jury;

viii.  All other relief that this honorable Court deems just and proper.

Respectfully submitted,

*/s/Michelle M. Rutherford*
Michelle M. Rutherford, La. Bar No. 34968
RUTHERFORD LAW
1700 S. Rampart St.
New Orleans, LA 70113
Telephone:    (323) 641-0784
Email:          michelle@rfordlaw.com

**Counsel for Plaintiff Priscilla Lefebure**

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel registered for electronic service.

*/s/ Michelle M. Rutherford*