The Deposition of

# PRISCILLA LEFEBURE

In the Matter of

# PRISCILLA LEFEBURE

## vs

# BARRETT BOEKER, ET AL

Taken On

# NOVEMBER 02, 2022



**Exhibit A**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

```
* * * * * * * * * * * * * * *
PRISCILLA LEFEBURE,          *
AN INDIVIDUAL                *    CASE NO.:
     PLAINTIFF,              *    3:17-CV-1791-BAJ-EWD
VS.                          *
                             *
BARRETT BOEKER, ASSISTANT    *    JUDGE BRIAN JACKSON
WARDEN LSP, INDIV. AND IN    *
HIS OFFICIAL CAPACITY, J.    *
AUSTIN DANIEL, SHERIFF,      *
WEST FELICIANA PARISH,       *
INDIVIDUALLY AND IN HIS      *
OFFICIAL CAPACITY, WEST      *
FELICIANA PARISH, PRINCETON  *
EXCESS AND SURPLUS LINES     *
INS. COMPANY, INSURANCE CO.  *
DOES 2-5, DOES 6-20          *
* * * * * * * * * * * * * * *
```

DEPOSITION OF

PRISCILLA LEFEBURE

TAKEN AT THE OFFICES OF ERLINGSON BANKS, PLLC,

301 MAIN STREET, SUITE 2110, BATON ROUGE LOUISIANA

70801, ON WEDNESDAY, THE 2ND DAY OF NOVEMBER, 2022,

BEGINNING AT 1:07 P.M.

REPORTED BY:

    LINDSAY I. GIBNEY
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 2018008

```
 1              A P P E A R A N C E S

 2

 3    REPRESENTING THE PLAINTIFF:

 4         JACK G. RUTHERFORD, ESQ.
          JESSICA L. ORGERON, ESQ.
 5         Rutherford Law, PC
          900 Camp Street
 6         New Orleans, Louisiana  70130

 7

 8    REPRESENTING BARRETT BOEKER:

 9         LEE J. LEDET, ESQ.
          Erlingson Banks, PLLC
10         301 Main Street
          Suite 2110
11         Baton Rouge, Louisiana  70801

12

13    REPRESENTING SHERIFF AUSTIN DANIEL:

14         JASON P. WIXOM, ESQ.
          Frosch, Rodrigue & Arcuri
15         1615 Poydras Street
          Suite 1250
16         New Orleans, Louisiana  70112

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2                                              Page
 3    Appearances ...................................2
 4    Stipulation ...................................4
 5    Examination By Mr. Wixom ......................5
 6    Confidential Portion Begins ..................91
 7    Confidential Portion Ends ....................97
 8    Examination By Mr. Rutherford ...............108
 9    Re-Examination by By Mr. Wixom ..............126
10    Reporter's Page .............................134
11    Reporter's Certificate ......................135
12
13    Exhibits:
14    Exhibit L1      Statement ....................31
15    Exhibit L2      Text Messages ................39
16    Exhibit L3      Driver's License .............50
17    Exhibit L4      Photograph ...................50
18    Exhibit L5      Statement ....................70
19    Exhibit L6      Text Messages ................75
20    Exhibit L7      Handwritten Notes ............79
21    Exhibit L8      Dylan Pizzolato Statement ....83
22    Exhibit P11     Handwritten Notes ...........110
23    Exhibit P12     Handwritten Notes ...........113
24
25
```

```
 1                S T I P U L A T I O N
 2        It is hereby stipulated by and between counsel
 3   for the parties hereto that the deposition of
 4                 PRISCILLA LEFEBURE
 5   be taken before Lindsay I. Gibney, Certified Court
 6   Reporter, for all purposes, pursuant to notice and
 7   to the provisions of the appropriate statutes of the
 8   Federal Rules of Civil Procedure.
 9        The parties hereto waive all formalities in
10   connection with the taking of said deposition,
11   including the reading and signing thereof, except
12   the swearing of the witness, and the reduction of
13   the questions and answers to typewriting.
14        Counsel for all parties reserve all objections
15   except as to the form of the question and
16   responsiveness of the answer at the time of taking
17   said deposition, but they also reserve the right to
18   make objections at the time said deposition or any
19   part thereof may be offered in evidence, with the
20   same rights as if the testimony had been taken and
21   given in Open Court.
22
23
24
25
```

1          PRISCILLA LEFEBURE

2          775 SPANISH TOWN ROAD

3          BATON ROUGE, LOUISIANA  70802

4     having been first duly sworn by the above-named

5     certified court reporter, was examined and testified

6     as follows:

7          E X A M I N A T I O N

8     BY MR. WIXOM:

9          Q    Good afternoon, Ms. Lefebure.  My name is

10    Jason Wixom.  I represent Sheriff Austin Daniel in

11    this matter.  We're here to take your deposition

12    today.  Before we begin, I want to let you know we

13    are going to talk about some uncomfortable things.

14    My purpose is not to embarrass you or make you feel

15    bad or call your experiences invalid.  I believe you

16    were raped.  I'm going to have to ask you about

17    that, not because I'm trying to trip you up, but

18    because this happened quite a while back.  You may

19    remember things now that you didn't remember back

20    then.  I do have your statement, but I can't ask

21    your statement questions, so I'm going to have to

22    ask you.

23          Understanding that, if you need to take a

24    break at any time, at any time, just let me know,

25    and we will take a break.  I imagine that will

1    probably happen.  Again, I'm going to ask you some
2    awkward questions.  The questions are going to be
3    awkward for me, but that doesn't matter.  Like, I
4    get paid to do this, so that doesn't matter.  My
5    concern is that you feel safe and comfortable in his
6    deposition.
7
8         A    Okay.
9         Q    Let me ask you this:  Have you given a
10    deposition previously?
11        A    No.
12        Q    Okay.  I'm going to go over some ground
13    rules just to make it easier on the court reporter
14    and all the attorneys later on.  That court reporter
15    is taking down every word I'm saying, every word you
16    say.  Every fumble of mine is being recorded by that
17    court reporter.  With that in mind, if I ask you a
18    question, if you could not give me nonverbal
19    responses.  Instead of nodding your head or shaking
20    your head, if you could answer verbally, that would
21    be better for all involved here, because the court
22    reporter cannot take down the nod of the head or a
23    shake of the head.  Similarly, if you could avoid
24    using uh-huh or uh-uh, that would also be better.
25    Because as Jessica pointed out to a witness

1    yesterday, uh-huh and uh-uh sound very, very

2    similar.  So yes, no, or whatever the answer is.

3              I'm going to do my absolute best not to

4    talk over you.  Normally, it's not a problem.  I

5    would ask that you do the same for me, because I

6    want to be sure that you fully understand the

7    question I'm asking before you answer, which would

8    require you to wait until after I'm done asking a

9    question so there's no confusion.  If you give me an

10   answer to a question, I'm going to assume that you

11   understood the question I asked; is that fair?

12        A    Yes.

13        Q    If you do not understand the question that

14   I asked because I phrased it poorly, which will

15   undoubtedly happen, please ask me to rephrase the

16   question or tell me you don't understand it.  If

17   your attorneys object to any question I ask, allow

18   them to make the objection, I'm going to wait, and

19   then we'll go on from there.

20              I think that's all I have for now.  Do you

21   have any questions for me before we begin?

22        A    No, sir.  I'm aware of how

23   depositions -- the proceeding, yes.

24        Q    Good.  That makes it easy for everybody.

25   Perfect.  Can you give me your full name?

```
 1      A     Priscilla Noel Lefebure.

 2      Q     How old are you?

 3      A     28 years old.

 4      Q     What is your date of birth?

 5      A     12-9-1993.

 6      Q     What is your social security number?

 7            MR. WIXOM:  And I'm going to ask the court

 8      reporter to redact all but the final four.

 9      A     XXX-XX-1751.

10  BY MR. WIXOM:

11      Q     Prior to today's deposition, have you

12  reviewed any documents?  I'm sorry.  Let me rephrase

13  the question.  See?  That's my first poor one.  In

14  preparation for today's deposition, have you

15  reviewed any documents?

16      A     Yes.

17      Q     Can you tell me what you reviewed?

18      A     I reviewed my notes and a statement I

19  typed.

20      Q     And to your knowledge, have those notes

21  and that statement been -- have they been given to

22  your attorneys?

23      A     Yes.

24      Q     Do you know if those documents have been

25  given to me and Mr. Ledet?
```

```
1          A    Yes, you both have a copy.
2          Q    Have you reviewed any video recordings in
3    preparation for today's deposition?
4          A    No.
5          Q    Have you reviewed any auditory recordings?
6          A    I listened to one to two audio recordings.
7          Q    Okay.  And what recordings were those?
8          A    One recording, it was just of me calling
9    West Feliciana.  I don't recall exactly which
10   recording it was.  I listened to one that was, like,
11   maybe a voicemail I left.  It was like one minute.
12         Q    Who was the voicemail for?
13         A    I don't remember who I was calling.  It
14   just said -- it's saved in my phone as WFS.
15         Q    And you mentioned a second recording?
16         A    Yes.  I -- it played, but I didn't listen
17   to it.  Yeah.
18         Q    Okay.  What was the recording of?
19         A    I don't know.  It was just the recordings
20   from West Feliciana Parish.
21         Q    Do you know -- was the recording a
22   recording of a telephone conversation?
23         A    Yes, the recording was the one with -- I
24   don't know for sure exactly.  It might have
25   been -- I think I listened to that one -- no, I
```

1   don't remember.  Yeah.

2        Q    You don't remember who the call was made

3   to?

4        A    No, I don't remember which two recordings.

5   I wasn't -- I had started to play them, but then I

6   remembered that what my --

7        Q    I don't want to hear anything your lawyers

8   told you.

9        A    Yeah.

10        Q    That's the rule.  Do you remember when I

11   paused earlier?

12        A    Yeah.

13        Q    There's another rule.

14        A    Yeah.

15        Q    I don't want to know what your lawyers

16   told you, and I don't want to know what you told

17   your lawyers.

18        A    Yeah.

19        Q    All right.  So you reviewed your

20   statement, your notes, no video recordings, and two

21   auditory recordings, but you don't recall what they

22   were?

23        A    I can't.

24        Q    Where do you currently live?  What's your

25   address?

```
 1        A     775 Spanish Town Road, Baton Rouge,
 2   Louisiana 70802.
 3        Q     How long have you lived there?
 4        A     Two years.
 5        Q     Do you live with anyone or do you live
 6   alone?
 7        A     I live alone.
 8        Q     Has anyone ever lived with you at that
 9   address?
10        A     No -- yes.
11        Q     Who?
12        A     My daughter.
13        Q     What's your daughter's name?
14        A     Ellie.
15        Q     And how old is she?
16        A     Four years old.
17        Q     What is the name of Ellie's father?
18        A     Dylan.
19        Q     Is that Dylan Pizzolato?
20        A     Yes.
21        Q     When did your daughter stop living with
22   you?
23              MS. ORGERON:  Objection:  Relevance.
24              MR. WIXOM:  Objection noted.
25   BY MR. WIXOM:
```

1    Q    When did your daughter stop living with
2  you?
3    A    Over a year ago.
4    Q    And who does Ellie live with now?
5    A    She resides at her father's and at her
6  grandparents'.
7    Q    Do her father and her grandparents live
8  together, or do they live in separate homes?
9    A    They live in separate homes.
10    Q    Okay.  And is that custody arrangement
11  voluntary or was it ordered by a court?
12         MS. ORGERON:  Objection.
13  BY MR. WIXOM:
14    Q    You can answer.
15    A    I don't --
16         MR. RUTHERFORD:  Do you know how to answer
17     his question?
18         THE WITNESS:  What?
19         MR. RUTHERFORD:  Do you know how to answer
20     his question?
21    A    It's stipulations, I believe.
22  BY MR. WIXOM:
23    Q    Stipulations between who?
24    A    Between me and her father.  Her father and
25  I.

1        Q    Okay.  So a court didn't order that Dylan
2    be given custody of Ellie?
3        A    I don't know how to answer your question.
4        Q    Let me ask you this:  Were there child
5    custody proceedings in any court regarding Ellie and
6    your --
7        A    Yes.
8        Q    What court?
9        A    East Baton Rouge Family Court.
10       Q    Prior to living at 775 Spanish Town Road,
11   where did you live?
12       A    746 Spanish Town Road, Apartment 6, Baton
13   Rouge, Louisiana 70802.
14       Q    How long did you live there?
15       A    A year.
16       Q    And did you live with anyone at that
17   address?
18       A    Yes, with my daughter.
19       Q    Prior to living at 746 Spanish Town Road,
20   where did you live?
21       A    4835 Greenforest Drive, Baton Rouge,
22   Louisiana.
23       Q    And how long did you live there?
24       A    For five years.
25       Q    And prior to living at 4835 Greenforest

1    Drive, where did you live?

2         A     It was four years.

3         Q     Four years.

4         A     I lived in Baton Rouge.

5         Q     Where?

6         A     Off Dalrymple Drive.

7         Q     Did you live with anyone there?

8         A     Yes.

9         Q     Who did you live with?

10        A     Dylan Pizzolato.

11        Q     How many years did you live at Dalrymple

12   Drive with Dylan Pizzolato?

13        A     Less than a year.

14        Q     Do you recall about when you stopped

15   living at that address with Dylan Pizzolato?

16        A     Yes.

17        Q     When was that?

18        A     When I was accepted into college.

19        Q     What year was that?

20        A     2013.

21        Q     So the reason I'm going through all these

22   addresses is in your complaint, as I recall, there's

23   an allegation that at some point in time you were

24   homeless; is that an accurate representation?

25        A     Yes.

1    Q    So when did that period of homelessness

2    occur?

3    A    It began after the flood of 2016.  The

4    flood of greater Baton Rouge.

5    Q    Okay.  So that was prior to the incident

6    involving Barrett Boeker?

7    A    That's a complicated question.  Because

8    there was a flood in 2016, and we were staying

9    with -- I was staying with my family.  And then we

10   had returned back home to Dylan and I's home.  And I

11   had told him I was leaving him and I had signed a

12   lease to move to New Orleans to pursue my career

13   because I had been accepted into LSU Health &

14   Science Center School of Nursing and I no longer

15   wanted to be with him.

16          And I was only temporarily going to be

17   living at -- after the flood, with my cousin,

18   Aurielle Graham Boeker, and Barrett Boeker and their

19   children at Angola State Penitentiary in the

20   neighborhood B-Line until my lease started.  And I

21   signed the lease in November of '16 and the lease

22   was going to start on January 1st of 2017.  So

23   Aurielle offered me to stay with them then until

24   I -- and I was only going to stay until I left.  But

25   she had previously offered in August of 2016

1   for -- that I could come up with her, that my

2   boyfriend at the time could come live with her and

3   my sister and my nephew.  And --

4        Q    Okay.  So immediately prior to living -- I

5   want to make sure I understand.  This is the only

6   opportunity you and I are going to have to talk like

7   this.  Immediately prior to moving in with Barrett

8   and Aurielle, were you living with your boyfriend,

9   Dylan?

10       A    Yes.

11       Q    And then you told Dylan that you did not

12  want to be in a relationship with him anymore?

13       A    Yes.

14       Q    And you moved out and you lived with

15  Barrett and Aurielle?

16       A    Yes.

17       Q    Was that breakup contentious, or was it a

18  simple, you know, look, we've run our course, I

19  think it's time to end this?

20       A    Could you rephrase the question, please?

21       Q    Sure.  So there are hard breakups and

22  there are easy breakups, in my experience.  Did you

23  and Dylan have a mutual understanding when you broke

24  up that simply, you know what, this relationship is

25  not working and it's time to call it off, or was

1  there more involved to it than just we are breaking

2  up?  Basically, I'm --

3       A    We were cohabitating during the time.

4       Q    Okay.

5       A    And we had been together since we were

6  teenagers.  And, yeah, it was difficult for us both.

7       Q    And I'm asking because I know that Dylan

8  gave statements for you later on, so I have to

9  assume that you and him maintained a friendly

10  relationship, but that's not a -- I'm telling you

11  what my assumption is.

12       A    Okay.

13       Q    So at any period of time after the sexual

14  assault occurred, were you homeless?

15       A    After Barrett Boeker sexually assaulted

16  me?

17       Q    Yes.

18       A    Yes.

19       Q    Okay.  So I've gotten addresses and times.

20  During what time period were you homeless?

21       A    From the time after I lived with him for

22  two weeks, I was homeless for about a month and a

23  half, and then I've experienced homelessness since

24  then, yes.  I've had to stay at several different

25  locations since he raped me.

```
 1        Q    Were you staying with friends or maybe a
 2   woman's shelter?
 3        A    I've stayed where I could.
 4        Q    And where was that?
 5        A    I've stayed with family, I've stayed with
 6   friends, I've stayed at hotel rooms, I've slept in
 7   my car.
 8        Q    What is your educational background?
 9   What's the highest level of education you've
10   achieved?
11        A    I have achieved some college.  I have a
12   certificate.
13        Q    What college did you go to?
14        A    I first went to Baton Rouge Community
15   College.
16        Q    When did you go there?
17        A    When I was a senior in high school.
18        Q    Which was what year?
19        A    2012 to 2013.
20        Q    Did you finish -- did you get a degree
21   from Baton Rouge Community College?
22        A    They offered at my high school to -- you
23   could enroll in courses at the Baton Rouge Community
24   College.  I took sociology and psychology.  Then I
25   was accepted into college at Louisiana State
```

1    University.

2         Q     Did you begin there in 2013?

3         A     Yes, August.

4         Q     What was your major?

5         A     Pre-nursing, and I minored in psychology

6    and social work.

7         Q     Did you get a degree from LSU?

8         A     Yes.

9         Q     And what was your degree?

10         A     I graduated from the Louisiana State

11    University paralegal studies program.

12         Q     Just out of curiosity, what made you

13    decide to go from pre-nursing to paralegal studies?

14         A     Because I'm passionate about legal

15    studies.

16         Q     After LSU, did you go to any other college

17    or university or trade school?

18         A     Yes, I went to -- I was accepted and I

19    went to Louisiana Health Science Center School of

20    Nursing.  The reason I switched from nursing to

21    legal background is because I couldn't sit in class

22    at nursing school, especially whenever they talked

23    about diseases like HIV, for instance, because I was

24    still being tested to see if Barrett Boeker had

25    given me HIV.  And I couldn't sit in class and learn

```
 1   about it while I was still being tested.
 2       Q    And I don't know if we have gotten there
 3   yet, and let me explain why.  What year did you
 4   begin nursing school?
 5       A    You skipped that part.  So I began nursing
 6   school in 2016 and 2017.
 7       Q    Okay.  How many semesters did you complete
 8   of nursing school, if any?
 9       A    None.  I --
10            MR. WIXOM:  Time out.  Would you like to
11       take a break?
12            THE WITNESS:  I'm just trying to think of
13       the right words to say.
14            MR. WIXOM:  Are you okay?
15            THE WITNESS:  Yeah, I'm just trying to
16       think about the time.  I --
17            MR. WIXOM:  Okay.  I'm not going to do
18       that again.
19            THE WITNESS:  Yeah, I left school.  Yeah,
20       I'm okay.  Yeah.
21   BY MR. WIXOM:
22       Q    Are you currently enrolled anywhere?
23       A    No.
24       Q    Okay.  Are you employed?
25       A    Yes.
```

```
 1          Q    Where are you employed?
 2          A    McClenny, Moseley & Associates.
 3          Q    McClenny, Moseley & Associates.
 4          A    McClenny.
 5          Q    And what do they do?
 6          A    It's a law firm.
 7          Q    And what is your position?
 8          A    A legal assistant.
 9          Q    How long have you been there for?
10          A    Since July of 2022.
11          Q    Are you paid hourly or are you paid via
12     salary?
13          A    Hourly.
14          Q    How much do you make per hour?
15          A    $20.
16          Q    Okay.  How many hours a week do you
17     typically work?
18          A    It varies.
19          Q    Do you ever work over 40?
20          A    No.
21          Q    Do you ever work less than 40?
22          A    Yes.
23          Q    Is there an average hourly range that you
24     work in a typical week?
25          A    Between -- around 22.5 hours.
```

1       Q     Why do your hours vary?

2       A     Due to post-traumatic stress disorder.

3       Q     And have the people you work with

4   generally been accommodating?

5       A     Yes.

6       Q     Prior to working at the law firm you're at

7   now, where did you work -- or did you work?

8       A     Yes.

9       Q     Where did you work?

10      A     I was self-employed.

11      Q     Doing what?

12      A     Cleaning services and as a caretaker.

13      Q     Did you have your own business?

14      A     No.

15      Q     So when you say you were self-employed,

16  how do you go about obtaining clients?

17      A      It was people that I met.  I started doing

18  that when I first started at LSU.  I was starting

19  my -- Dylan Pizzolato's mother taught me to clean

20  houses.

21      Q     So from 2013 until what year were you

22  self-employed?

23      A     Well, I did the cleaning and caretaking

24  off and on.

25      Q     Did you do cleaning and caretaking in

1    2022?

2        A    Yes, once.

3        Q    Do you recall about --

4        A    Twice.

5        Q    Twice.  So nothing continuous?

6        A    No.

7        Q    Do you recall about how much you've

8    earned?

9        A    $160 total.

10       Q    So I'm going to make this as easy as

11   possible.  In 2021, do you know about how much you

12   earned?

13       A    No.

14       Q    Was it more than $160?

15       A    Yes.

16       Q    Was it less than 20,000?

17       A    Yes.

18       Q    Okay.  So by your answer, I have to assume

19   it was substantially less than 20,000?

20       A    Yes.

21       Q    Okay.

22       A    It was less than $10,000.

23       Q    Do you have an estimate or can you tell me

24   how much you've earned in income between December

25   2016 and today?

1        A    A few thousand dollars.  That's it.

2        Q    Prior to November 2016 -- or in the year

3   2016 prior to November, were you employed?

4        A    Yes.

5        Q    Where were you employed?

6        A    I was employed as a caretaker with the

7   Starkey family, and I was employed at GoAuto car

8   insurance.

9        Q    How long did you work for GoAuto?

10       A    I worked there from my junior year in high

11  school.

12       Q    Other than being a caretaker and working

13  for GoAuto car insurance, did anyone else employ you

14  between your junior year of high school and November

15  of 2016?

16       A    Oh, I worked at Walk On's Bistreaux and

17  Bar.

18       Q    When did you work there?

19       A    I worked there my freshman year at LSU.

20       Q    For how long?

21       A    Six months.

22       Q    With GoAuto car insurance, how many hours

23  a week did you work?

24       A    30 to 33 hours a week at least.

25       Q    And just so I'm clear, you worked there

**25**

```
 1   from your junior year of high school until 2016?
 2        A    Yes, until the summer of 2016.  And I
 3   worked six days a week.
 4        Q    Who was your supervisor?
 5        A    I was head of the reinstatement
 6   department.
 7        Q    Okay.  Did you report to anyone?
 8        A    No.  Oh, well, at one point, before I was
 9   supervisor -- I had two different job positions
10   there, yeah, and in the beginning, I reported to
11   Brad Scharf.
12        Q    Can you spell the last name?
13        A    Yes, S-C-H-A-R-F.
14        Q    A-R- --
15        A    F.
16        Q    And did you report to anybody else?
17        A    I reported to Kim McCloud.
18        Q    So other than GoAuto and Walk-On's
19   Bistreaux, did you work for any other business or
20   companies?
21        A    I worked for a store that sold chicken
22   briefly.  One time I did events where we served
23   crawfish.  I worked at a snowball stand.  I worked
24   at Spanish Town Market.  I worked at Southeast Legal
25   Services.  I worked at Capitol City Grocery.  I
```

```
 1   worked at Frog's gas station.
 2        Q    And you held all these jobs --
 3        A    I worked at a hair salon -- last one.
 4        Q    Okay.
 5        A    I had that job since -- I started when I
 6   was 15, yeah.
 7        Q    Okay.  So you held all these jobs between
 8   when you were a teenager, basically --
 9        A    Yes.
10        Q    -- until 2016?
11        A    Since I was a freshman in high school,
12   yes.
13        Q    Okay.
14        A    Well, no, since freshman year -- from 2009
15   through 2022, I've had those jobs.
16        Q    Okay.  Prior to the incident we're here
17   for, were you ever diagnosed with a mental illness?
18        A    No.
19        Q    Did you ever experience depression?
20        A    No.
21        Q    Prior to the incident had you ever seen a
22   psychologist or psychiatrist?
23        A    I saw a psychiatrist once.
24        Q    Meaning you saw one psychiatrist or you
25   had one visit with a psychiatrist?
```

```
 1        A     One visit with a psychiatrist.

 2        Q     Who was that?

 3        A     I was a minor child.  I don't remember the

 4   name.  It was court ordered.

 5        Q     Okay.  Sorry, I should've worded my

 6   question better.  As an adult, have you ever sought

 7   mental health treatment?

 8              MR. RUTHERFORD:  What time period?

 9   BY MR. WIXOM:

10        Q     Between the ages of 18 and the date of

11   incident.

12        A     A psychiatrist?

13        Q     Psychologist, counselor, or social worker?

14        A     Yes.

15        Q     With who?

16        A     I -- Baton Rouge Cognitive Behavioral

17   Therapy, Sexual Trauma Awareness and Response.

18        Q     Now --

19              MS. ORGERON:  Wait, to clarify -- go

20        ahead.

21   BY MR. WIXOM:

22        Q     I'm speaking about before the incident.

23   Before you were raped, did you --

24        A     Oh, no.

25        Q     Have you ever been convicted of a crime?
```

```
 1          A     No.
 2          Q     Have you ever been in the military?
 3          A     No.
 4          Q     Have you ever lived in Mississippi?
 5          A     No.
 6          Q     In the past ten years, have you been
 7     arrested?
 8                MR. RUTHERFORD:  Objection.
 9                MS. ORGERON:  Objection.
10     BY MR. WIXOM:
11          Q     Go ahead.
12                MR. RUTHERFORD:  Do you want to handle it,
13          or do you want me to?
14                MS. ORGERON:  Yeah.  Objection.  This
15          isn't a fishing expedition.
16                MR. WIXOM:  No, it's a deposition.
17                MR. RUTHERFORD:  So, Jason, I don't think
18          this is admissible.  This is not relevant.
19          Her -- any charges -- we let you ask about
20          convictions, and she answered that question.
21          We're going to instruct her not to answer with
22          charges, so --
23                MR. WIXOM:  So you're advising your client
24          not to answer?
25                MR. RUTHERFORD:  Yes.
```

BY MR. WIXOM:

    Q    Prior to the rape, have you ever attempted suicide?

    A    No.

    Q    How long have you known Barrett Boeker?

    A    Before he raped me, I knew him for ten years.

    Q    During that ten-year period, had Barrett ever attempted to have a -- I'm reluctant to use the word.  Had he ever tried to kiss you or have a physical relationship?

    A    No.

    Q    What I'd like to do is talk about the incidents that prompted the lawsuit.  And I've reviewed your statements, and you generally refer to three different events.  You refer to the lanyard incident, you refer to the rape, you refer to the sex toy incident.  But in my mind there is a fourth incident, which is the masturbation.  So can we talk about each one of those incidents?  So if you could, could you walk me through the lanyard incident?

    A    Yes.  Barrett Boeker -- I had a -- grabbed me by a lanyard that had my keys on it and tried to pull me towards him to force me to kiss him.  And I did not let him touch me.  And, yeah, that's it.  I

1  just said, what are you doing?  You're my cousin's

2  husband.  Why are you trying to kiss me, you know?

3      Q    How did he react to that?

4      A    I pushed him off me.  He just like

5  shrugged his shoulders and walked off.  He

6  didn't -- yeah.

7      Q    You said you reviewed your statement

8  before you came in here today?

9      A    No, I have not --

10     Q    Oh, you didn't, okay.

11     A    -- read that statement.

12     Q    All right.

13     A    No.

14     Q    Did you tell Aurielle that Barrett

15  attempted to kiss you around the time that he

16  attempted to kiss you?

17     A    I don't recall at this time.  Oh, yes, I

18  did.  Yes, I did tell her.  I remember telling her,

19  and she said that he does that all of the time and

20  acted like it was no big deal.  I remember she was

21  sitting on the couch.  Yeah, I did tell her.  And I

22  thought that I was still safe -- like I was safe

23  there, it was just -- she acted like it was silly.

24     Q    I'm going to change this up a little bit,

25  because I have your -- and Mr. Ledet may feel

1  differently.  I have your written statement.  I have
2  the details of what happened.  When did you write
3  this?
4          MR. WIXOM:  So I'm going to call this
5      Exhibit L1.
6        (Exhibit L1 marked for identification.)
7          MR. RUTHERFORD:  Can we take a break for a
8      second?
9        (Discussion held off the record.)
10 BY MR. WIXOM:
11     Q    I'm going to hand you a document (tenders
12 document).  What did I just hand you?
13     A    Statement.
14     Q    Who drafted it?
15     A    I did.
16     Q    Do you recall when you drafted that
17 statement?
18     A    Yes.
19     Q    And when did you draft it?  And the reason
20 I ask is because it's not dated.
21     A    I drafted this statement after I reported
22 to West Feliciana Sheriff's Department.
23     Q    Okay.  How long after you recorded to West
24 Feliciana Sheriff's Department?
25          MR. RUTHERFORD:  Recorded or reported?

1      Because I heard two different things.

2         MR. WIXOM:  Recorded.

3         MR. RUTHERFORD:  Is that what you said?

4    A   I said after I reported.  I wrote this

5 statement because I was asked to.

6 BY MR. WIXOM:

7    Q   Right, okay.  So when did you write --

8    A   Write the statement, write down and put

9 into words the rape.

10    Q   Okay.  Do you remember when you wrote it?

11    A   After I reported to the West Feliciana

12 Sheriff's Office.

13    Q   Do you remember about how many days after?

14    A   It took me a while to write it.

15    Q   So you reported to West Feliciana Parish

16 Sheriff's Office after you went to Woman's Hospital,

17 correct?

18    A   Yes.

19    Q   Why did you wait between the day of the

20 rape and -- I'm going to represent to you my records

21 show you went to Woman's Hospital on December 8th,

22 2016.  Why did you wait that period of time before

23 getting a rape kit done?

24    A   I didn't want it to be real, what happened

25 to me.  I didn't want to be a victim of rape.

1       Q     And what prompted you to ultimately decide

2  to go to Woman's Hospital?

3       A     He was going to continue to try to rape me

4  and to force himself on me.  And I went to the

5  hospital to get a rape kit because there

6  was -- because of the damage to my vaginal and

7  genitalia area.  My hymen was so swollen that I

8  needed a doctor to be able to look at it.  I was in

9  pain down there.  I needed to be tested for diseases

10  and take medication to prevent getting diseases.  I

11  went because I was raped.

12       Q     Okay.

13       A     Yeah.

14       Q     I understand why you went, because you

15  were raped.  But you were raped approximately seven

16  or eight days prior to that, right?

17       A     I was raped on more than one occasion.  I

18  was sexually assaulted on more than one occasion.

19       Q     Let's talk about this.  Barrett Boeker

20  raped you more than once?

21       A     Yes.

22       Q     Okay.  What is your definition of rape?

23            THE WITNESS:  Can we take a break?

24            MR. WIXOM:  Yeah.

25                  (A brief recess was held.)

1    BY MR. WIXOM:

2        Q    Let me ask you this:  When you went to

3    Woman's Hospital, the records reflect that you

4    indicated you did not want law enforcement

5    involvement; is that correct?

6        A    The way my brain works is -- can we go

7    back to the question you asked me before we took a

8    break?  Is that okay?  Can I answer about what my

9    definition of rape is first?

10       Q    Yes.  I'm so sorry.  I totally forgot

11   about that.

12       A    My definition of rape is someone that uses

13   excessive force to penetrate another individual

14   without their consent.

15       Q    Okay.  How many times did Barrett Boeker

16   penetrate your vagina with his penis?

17       A    Once.

18       Q    How many times did Barrett Boeker

19   penetrate your mouth with his penis?

20       A    Once.

21       Q    Was that at the same time as the vaginal

22   penetration or --

23       A    It first started with him forcing his

24   penis into my mouth.  He sat on my face to

25   where -- and he was so heavy to where I couldn't

1    move.  I remember that I froze.  I couldn't
2    even -- I didn't even move my tongue.
3        Q    Okay.  And the other incident of
4    penetration was the sex toy, correct?
5        A    The next thing he did was he raped me with
6    his penis.
7        Q    Right.
8        A    Then the next assault was with the foreign
9    object, yeah.
10       Q    When you went to Woman's Hospital, the
11   records indicate that you did not want law
12   enforcement involvement; is that correct?
13       A    I'm going to tell you directly like I told
14   the SANE nurse that day was -- I said that I wanted
15   to continue my education and I -- it's known that if
16   you do report a rape and he was convicted, he would
17   probably do three months of time, but it would take
18   away three years of my life and my mind would never
19   be the same again if I did decide to report it to
20   the police.
21            So at the time -- which you have every
22   right to decide whether you want to report
23   the -- whether you want to report it at all or not.
24   You don't have to.  You have two years from the
25   date.  And during that time, I didn't want to lose

1    my mental health and capacity.  I wanted to focus on

2    finishing my education and I didn't want to have to

3    relive the traumatic event over and over and over

4    again.

5        Q    But you did end up going to law

6    enforcement the following day, correct?

7        A    I went home, back to my parents' house,

8    and I decided to tell my stepmother that I had been

9    discharged from the hospital.  I still had the

10   wristband.  And I did decide to report it to law

11   enforcement, yes.

12       Q    What made you -- how did you come to that

13   decision?

14       A    I had slept on it overnight.  And I had

15   thought about it a lot, what my nana, Helena Graham,

16   had said and I thought about my baby cousins and I

17   thought about what he had done to other family

18   members.  I thought about what he had done to his

19   wife, Aurielle Graham.  I had thought about the fact

20   that if I didn't report that this would continue to

21   happen to other people, and I thought I didn't want

22   anyone else to get hurt.  I especially didn't want

23   him to be -- I especially didn't want him to hurt

24   his daughter.

25            I also didn't want -- my stepmom had -- we

1    had talked about the fact that when my dad flew back

2    from New York and she told him, she didn't want to

3    see my father go to jail after he found out

4    and -- which is basically a response a lot of

5    fathers have whenever they're told that one of their

6    children -- one of their daughters have been raped

7    by a man.  I just didn't want my dad to do anything

8    to Boeker for hurting me.

9            And which -- yeah, so and I did it to

10   protect my family.  And I did it because I couldn't

11   let -- I told my stepmom, yeah, point blank what he

12   did to me was not okay and it was wrong.  And I

13   didn't want him to get away with it.  And I decided

14   to report to the police immediately for that, even

15   so far as -- even though it was -- despite the fact

16   that it was my birthday and no one wants to have to

17   go in to a sheriff's department on their birthday

18   and have to tell -- have to relive the event and

19   tell what happened to them.  I drove up there and I

20   did it.

21       Q    When you went to the sheriff's office on

22   December 9th, 2016, who did you first speak with; do

23   you remember?

24       A    I first spoke with David Hidalgo.

25       Q    And was that the recorded interview?  I

```
 1   have a recorded interview which is about an hour and
 2   a half long where you were in a room with David
 3   Hidalgo and he asked you questions about the rape.
 4   Was that --
 5        A    It's not just me and David Hidalgo in the
 6   room.
 7        Q    In the first interview.
 8        A    My sister's not present in the room with
 9   me?
10        Q    I'm sorry.  I'm referring to law
11   enforcement.  Yes, your sister was there as well.
12        A    Yeah.
13        Q    So --
14        A    And I have not seen this tape.
15        Q    What was your impression of David Hidalgo?
16        A    My impression of David Hidalgo?
17        Q    Yes.
18        A    I didn't have an impression.  I was there
19   to report a rape to a police officer.
20        Q    Did you think that he took your claim
21   seriously?
22        A    Yes.
23             MR. RUTHERFORD:  At what point in time?
24   BY MR. WIXOM:
25        Q    During the interview.
```

1    A    During interview?  I couldn't say how he

2  was feeling or whether he took me seriously.  He's

3  just a police officer that was there to -- someone

4  was reporting a crime to him as a witness.  He was

5  interviewing me to get the facts of the case.  Yeah.

6    Q    At any point in time during that interview

7  with David Hidalgo, did you get the impression he

8  didn't believe you?

9    A    No.

10    Q    I'm going to give you what I've marked as

11  Exhibit L2 (tenders documents).

12     (Exhibit L2 marked for identification.)

13  BY MR. WIXOM:

14    Q    And can you identify what I've given you,

15  please?

16    A    Screenshots.

17    Q    Of what?

18    A    Text messages.

19    Q    Between?

20    A    Myself and Dylan Pizzolato.

21    Q    Okay.  Who did you give those screenshots

22  to from the West Feliciana Parish Sheriff's Office?

23    A    Either David or Shannon.

24    Q    When were those text messages between you

25  and Dylan exchanged?

1      A    On the night that Boeker was assaulting me

2   with a foreign -- with a sex toy -- with him and his

3   wife's sex toy.

4      Q    I have to ask, is there a reason during

5   that exchange with Dylan that you did not tell him

6   that Barrett Boeker had sexually assaulted you?  And

7   if you need to review the text messages --

8            MR. RUTHERFORD:  I'm just going to object

9        to the form of the question.  The document

10        speaks for itself.

11      A    Yeah, I don't understand what you mean,  I

12   didn't tell him.  I think that --

13            MR. RUTHERFORD:  Take a minute.

14            THE WITNESS:  Okay.

15      A    No one wants to tell their boyfriend

16   they've been raped by another man.  You feel like

17   people don't look at you the same way afterwards.

18   BY MR. WIXOM:

19      Q    Do you recall either Hidalgo or Shannon

20   Tilley asking you to give them screenshots of text

21   messages you exchanged with Barrett Boeker?

22      A    No.

23      Q    You don't recall them asking you to

24   forward them copies of screenshots of text messages

25   that -- where Barrett Boeker told you to come in my

1    room, I'm cold, or anything to that effect?

2         A    No.  The first I remember -- I heard of

3    them asking for screenshots was yesterday when I was

4    present.  And the first I'm being told or reminded

5    of the texts where Boeker asking me to be

6    cold -- because he was cold to come in his room is

7    today.  They never asked me that -- about the cold,

8    I don't think.  I mean, I don't know.  I haven't

9    watched the tape.

10        Q    Okay.  In your phone right now, do you

11   have any text messages between you and Barrett

12   Boeker which were exchanged during the period the

13   assaults were happening?

14        A    No.

15        Q    Do you remember -- after the initial

16   interview with David Hidalgo, do you remember the

17   next time you went to the West Feliciana Parish

18   Sheriff's Office, what that date was?

19        A    What the date was?

20        Q    Yes.

21        A    I don't know the dates.  I just know I was

22   asked to come back three or four times.

23        Q    You were asked by who to come back three

24   or four times?

25        A    By the deputies.

1    Q    Okay.  Were you reluctant to return to the

2  sheriff's office?

3    A    Uh-uh.  I cooperated.

4    Q    You said they asked you three or four

5  times.  Do you know why they asked you three or four

6  times?

7    A    At first, they wanted -- okay.  The first

8  time -- the first interview was to discuss the

9  crime -- the rape.  Then the second time they had me

10  come back because we were going to discuss -- we

11  discussed whether they were going to charge him with

12  first-degree rape or second-degree rape.  I remember

13  them bringing me into the kitchen and then showing

14  me the law book and reading me the difference

15  between the two and they had further questions.

16        Another time, I remember they asked me to

17  come back at midnight to do coached phone calls, as

18  they called it.

19        And then another time, I went back and I

20  remember meeting with just Shannon Tilley only, and

21  that is where we discussed -- where we discussed

22  that he was trying to tell me that I should ask

23  another office or another department to investigate

24  the rape -- the crime, because his office or the

25  district attorney's office was going to be

1    compromised, it was going to be a compromised

2    investigation.

3              And he told me that he thought that if I

4    went to the attorney general with -- and asked him

5    to investigate -- or maybe that was after he

6    might've said that -- at some point, he just told me

7    to contact the attorney general.  And then I

8    remember him asking after -- yeah, that was then.

9    And then afterwards, this was his words:  Well, did

10   you try to contact the attorney general?  Because if

11   you do, and he -- there's nothing I can do about it

12   here, because the sheriff's department wouldn't

13   basically allow him to.  And they had even

14   threatened to remove him from the case.

15             They said that -- so he had said, have you

16   tried to contact the attorney general?  Because if

17   you can get the attorney general to come up here,

18   then I will -- West Feliciana Sheriff's Department,

19   then I will be able to lay out all of the evidence

20   on the table, and I can show the attorney general

21   exactly what the district attorney -- what evidence

22   the district -- I can show him all of the evidence

23   and exactly what the district attorney

24   showed -- provided to the grand jury hearing, and

25   then I can show him all the evidence that he chose

1    not to provide.

2    Q    Okay.  Let's talk about -- did you say

3    Tilley told you this?

4    A    Yes.

5    Q    Did he tell you this before the grand jury

6    hearing or after the grand jury hearing?

7    A    About the table part?  After.  But before

8    the grand jury hearing, he told me that I needed to

9    contact an outside source to investigate my claims.

10          And at the time, I didn't -- I was young

11   and naïve and I had no idea what he was saying.  I

12   was so confused that I had e-mailed S. D'Aquilla.  I

13   thought he was saying to contact the district

14   attorney.  I didn't realize he was saying the

15   attorney general, because at the time, I didn't know

16   what was going on and I didn't know that he meant

17   that their office wasn't going to follow the law and

18   policies and procedures they were trained and what

19   their job is in this instance, because it was a

20   high-profile case and he was an Angola assistant

21   warden.  I didn't understand what he was saying to

22   me.  I didn't understand the context, like, of what

23   his sentence was.  And obviously, you know, that's

24   his job and he only said that one sentence, you

25   know, to me.  And I had no idea what that sentence

 1   entailed at the time.

 2        Q    To be clear, Barrett Boeker was arrested

 3   pursuant to a warrant generated by either Hidalgo or

 4   Tilley, correct?  Barrett Boeker was arrested,

 5   correct?

 6             THE WITNESS:  I'm sorry.  Can I have some

 7        water?  And then can you repeat the question,

 8        please?

 9             MR. WIXOM:  I'll wait.

10             (A brief recess was held.)

11   BY MR. WIXOM:

12        Q    So Barrett Boeker was arrested as a result

13   of Tilley and Hidalgo's involvement in the case,

14   correct?

15             MR. RUTHERFORD:  Object to the form.

16             You can answer.

17        A    Can you rephrase the question?

18   BY MR. WIXOM:

19        Q    Was Barrett Boeker arrested to your

20   knowledge?

21        A    Yes, at a later date than initially he was

22   going to be arrested.

23        Q    What date do you believe he was arrested?

24        A    He was arrested on December 14th, I

25   believe.

1    Q    When you say he was arrested at a later

2    date than he was going to be arrested, what do you

3    mean by that?

4    A    That the deputies planned to arrest him

5    before then, and that was run by their supervisors.

6    They were planning on arresting him before then, and

7    they told me how they were going to do it, where,

8    and everything like that.  But for some reason, they

9    waited a few days, and they did not --

10   they -- arrest him as they originally told me.

11   Q    So where did you get that information

12   that -- where did you get that information that they

13   intended to arrest him earlier than the day he was

14   actually arrested him?

15   A    The detectives or deputies or police

16   officers that were assigned to the case.  They told

17   me that Barrett Boeker was going to be -- like, a

18   warrant for his arrest would be issued.  And this

19   was before the 14th.  It might've been the 12th or

20   earlier, but I think it was possibly the 12th.

21        But for certain, I know that they said

22   they were not going to arrest him at -- because I

23   asked.  I said, will you be arresting him at the

24   home on the grounds of Angola State Penitentiary in

25   B-Line on Falcon Road?  And they said no, because

1   that would jeopardize the safety of Aurielle and the

2   children, that they were going to arrest him while

3   he was at work at Angola State Penitentiary, at the

4   prison.  That he would be arrested at work while he

5   was away from home, and that then he would be

6   detained and brought into one of the rooms

7   where -- a room in question, like where attorneys

8   meet with their clients, one of those rooms, except

9   it would be the police that would arrest him there

10  and detain him there and question him there.  And

11  that's not how it took place.

12      Q    Do you remember if Hidalgo or Tilley told

13  you that?

14      A    I don't remember which officer told me

15  that.

16      Q    And did I hear right they told you that

17  their supervisors instructed them to not arrest

18  Barrett Boeker earlier than they did?

19      A    They didn't give me those details.

20      Q    Barrett Boeker was ultimately arrested,

21  correct?

22      A    I thought he turned himself in.

23      Q    He was arrested pursuant to a warrant.

24  So --

25      A    Wasn't he allowed to turn himself in?

```
1              MR. RUTHERFORD:  You're asking her
2         questions --
3              MR. WIXOM:  Right.
4              MR. RUTHERFORD:  -- about things she has
5         no idea about, so --
6              MR. WIXOM:  Okay.  I don't know what you
7         and her spoke about, so --
8         A    What does this have to do with anything?
9    Maybe you should ask David or Shannon.
10             MR. RUTHERFORD:  She's told you how she
11        prepared for this deposition.  And I don't
12        appreciate that comment.
13             MR. WIXOM:  Which comment?
14             MR. RUTHERFORD:  That you don't know what
15        her and I talked about, as if it could somehow
16        involve all of this.
17   BY MR. WIXOM:
18        Q    So I'm going to represent that Barrett
19   Boeker was arrested by the deputies involved in this
20   case.  Do you have any issue with the fact that he
21   was arrested pursuant to their investigation?  Do
22   you believe they did anything wrong in their
23   investigation?
24             MS. ORGERON:  Compound question.
25        Objection.
```

1          A      Yes.

2    BY MR. WIXOM:

3          Q      What did they do wrong?

4          A      I was told that they were -- that Barrett

5    was in East Feliciana Parish and there was a

6    polygraph test going on, and after that, he turned

7    himself in instead of arresting him.  Someone that

8    is being arrested for a crime on second-degree

9    rape -- I believe, for instance, if I was being

10   accused of second-degree rape in West Felicia Parish

11   that they would have arrested me on scene or within

12   a few days and they would've put me in handcuffs and

13   they would have not nicely let me turn myself in or

14   offered me a polygraph test.

15         Q      Who gave Barrett Boeker a polygraph test?

16              MS. ORGERON:  Objection.  She doesn't have

17         personal knowledge.

18         A      I don't have that document.  I did ask the

19   district attorney for that document.  And it was

20   provided, but it wasn't with all of the questions

21   and answers.  And every time I went to ask the

22   sheriff's department about the investigation, I

23   would have to refer to the district attorney.  You'd

24   have to get that from the district attorney's

25   office.  Every time I'd ask the district attorney's

```
1   office about the investigation, oh, you'd have to
2   refer to the West Feliciana Sheriff's Department.
3   Like, so we're all doing everything to the best of
4   our ability, but every time it came to, like,
5   something, it was, you have to go -- no, that's
6   their job.  No, no, that's at that office.  No,
7   that's that office.  And -- yeah.
8              MR. WIXOM:  I want to mark this Exhibit L3
9        (tenders document).
10        (Exhibit L3 marked for identification.)
11   BY MR. WIXOM:
12        Q    In the investigative file, I have what I
13   believe is a photo of you.  When was that photo
14   taken?
15              MR. RUTHERFORD:  Object to the form.
16              If you know.
17   BY MR. WIXOM:
18        Q    Yeah, if you know.
19        A    It's my driver's license from high school.
20        Q    In the same file --
21        A    It was taken when I was 17 years old.
22        Q    In the same file --
23              MR. WIXOM:  I'm going to mark this L4
24        (tenders document.)
25        (Exhibit L4 marked for identification.)
```

1  BY MR. WIXOM:

2      Q    -- there's another photo of you.  When was

3  that photo taken?

4           MR. RUTHERFORD:  Object to the form.

5           If you know.

6      A    It was taken in 2016.  It was taken the

7  weekend after I told Dylan Pizzolato I was leaving

8  him and I was going to be moving -- or, no, let me

9  rephrase.  Can I edit that?  Or, I guess, I have to

10 wait until the end.  How do I edit my testimony,

11 because -- the photo was taken the weekend after I

12 told him that -- yeah, that I was leaving him and I

13 was taking my personal property and my animals and I

14 had signed a lease.  It was taken the weekend after

15 I told him I was signing a lease for January 1st of

16 2017.

17 BY MR. WIXOM:

18     Q    Where was that photo taken?

19     A    At the prison.

20     Q    What prison?

21     A    EBR.

22     Q    I think the easiest way to go through this

23 would be for me to go through your lawsuit and ask

24 you questions based upon what's contained in your

25 lawsuit.

1        MR. RUTHERFORD:  Are you going to give her

2     a copy of that?

3        MR. WIXOM:  Yeah.

4        Actually, I haven't taken a recess yet.

5     Can we take a brief break?

6        MR. RUTHERFORD: Yeah.

7           (A brief recess was held.)

8   BY MR. WIXOM:

9     Q    So right now, we're looking at Document

10  No. 37, which is your first amended complaint.  I'd

11  like to ask you about Paragraph 5 of your complaint,

12  which is on Page 2.  In that paragraph, you allege

13  that you were treated as the accused from the

14  beginning.  By "the beginning," do you mean the day

15  you walked into the West Feliciana Parish Sheriff's

16  Office in 2016?

17    A    Can you please give me a moment to read --

18    Q    Uh-huh.  Go ahead.

19    A    -- and then ask your questions?

20    Q    Sure.

21    A    Thank you.  Sadly, Ms. Lefebure's

22  nightmare did not end once she was physically safe

23  and given medical treatment.  While Mr. Boeker was

24  arrested for second-degree rape on December 20th,

25  2016, he was never indicted or convicted.  Instead

1   Ms. Lefebure was treated as the accused from the

2   beginning, and Mr. Boeker was able to use his

3   official position and connections to law enforcement

4   and parish officials to ensure he would not be held

5   accountable for his actions.

6       Q    So I'm referring specifically to the

7   portion where it states you were treated as the

8   accused from the beginning.  When you say "from the

9   beginning," do you mean from that point of

10  December 9th, 2016, when you went to the West

11  Feliciana Parish Sheriff's Office, or is that

12  another time period you're referring to?

13          MR. RUTHERFORD:  I'm just going to put,

14      like, a running objection to the form --

15          MR. WIXOM:  Of course.

16          MR. RUTHERFORD:  -- of these questions.

17      I've never seen anybody take a complaint

18      drafted by an attorney and ask --

19          MR. LEDET:  Standard operating --

20          MR. WIXOM:  Standard operating procedures.

21          MR. RUTHERFORD:  Perhaps in Louisiana.

22          MR. WIXOM:  Well, guess where we are?

23          MR. RUTHERFORD:  I do have a law license

24      here.  I've been here, okay?  So I'm only

25      saying this once, because I don't want to

1          interrupt what you're doing.  It's just a

2          standing objection to the form of the questions

3          asked about the first amended complaint, which

4          speaks for itself and she didn't draft.

5               MR. WIXOM:  Okay.  But it's her lawsuit,

6          and these are her allegations.  So the only

7          person I can ask is her.

8    BY MR. WIXOM:

9          Q    So I'm going to repeat my question.  When

10   you state in your complaint that you were treated as

11   the accused from the beginning, what time frame are

12   we talking about when you say "from the beginning"?

13        A    From the beginning would be the instance

14   right after I told the brutal details of my sexual

15   assault to West Feliciana Sheriff's Department after

16   I was asked to tell what happened, how I was

17   sexually assaulted and raped by Barrett Boeker to

18   the two detectives.  After I told my story and I

19   left, that is when it began.

20        Q    How did Tilley and Hidalgo treat you as

21   though you were the, quote, accused?

22        A    You're putting words in my mouth.

23        Q    No, ma'am.  I'm reading from your

24   complaint.

25             MR. RUTHERFORD:  Objection:

1          Argumentative.

2    BY MR. WIXOM:

3          Q     No, I'm --

4          A     It says.  I read the complaint.  I didn't

5    mean to talk over anyone.

6          Q     So when I asked you --

7                MR. RUTHERFORD:  This document doesn't say

8          Tilley and Hidalgo.  The objection --

9                MR. WIXOM:  No, but she just stated from

10         the moment she walked into the West Feliciana

11         Parish Sheriff's Department and she spoke to

12         the detectives --

13         A     Did I say names?  No.

14               MR. RUTHERFORD:  She said after that

15         point.

16   BY MR. WIXOM:

17         Q     Okay.  So who --

18         A     You tell me.

19         Q     Who from West Feliciana Parish Sheriff's

20   Office treated you like you were the accused?

21         A     That is a question to ask the West

22   Feliciana Sheriff's Office.

23         Q     No, ma'am.  This is your lawsuit.  This is

24   a question I ask you.

25         A     How would I know that?

1    Q    You alleged it.

2         MR. RUTHERFORD:  Just tell him if you can

3    answer his question.

4    A    I can't answer your question.

5 BY MR. WIXOM:

6    Q    Okay.  In Paragraph 6, you allege that

7 Barrett Boeker was not treated as a suspect of a

8 crime and was given preferential treatment by

9 Sheriff Austin Daniel and his office.  How did

10 Sheriff Austin Daniel give Barrett Boeker

11 preferential treatment?

12   A    By instructing his office to not

13 investigate the rape and by telling them that it

14 was -- to not worry about it, because it was going

15 to be swept under the rug.

16   Q    Okay.  So you met with Detectives Hidalgo

17 and Tilley, correct?

18   A    Yes.

19   Q    And you told them about what Barrett

20 Boeker did to you, correct?

21   A    Yes.

22   Q    Okay.  And based upon your allegations,

23 they got a warrant for Barrett Boeker's arrest,

24 correct?

25        MR. RUTHERFORD:  Objection.

```
 1        A     That was --
 2   BY MR. WIXOM:
 3        Q     And Barrett Boeker was arrested --
 4              MR. RUTHERFORD:  Objection:  Asked and
 5        answered.
 6   BY MR. WIXOM:
 7        Q     -- pursuant to your complaint, correct?
 8              MR. RUTHERFORD:  Asked and answered three
 9        times.
10        A     Yes.
11   BY MR. WIXOM:
12        Q     So how did his office -- how did Sheriff
13   Daniel's office fail to treat Barrett Boeker like a
14   suspect?
15        A     They allowed him to turn himself in.  He
16   was given -- a polygraph was administered.  The
17   person giving the polygraph -- only the few
18   questions that were -- it was like it was stipped.
19   It was like you can have -- the polygraph paper that
20   was given was like this question -- I don't know.
21   For example -- this isn't exact because I don't have
22   the document in front of me.  But, like, Question
23   No. 2, Question No. 8, Question No. 9, but the
24   questions were worded -- for the polygraph, they
25   were not questions that -- they didn't include all
```

1    the questions.  They didn't question him on

2    everything that I had reported to the West Feliciana

3    sheriff and his office.

4           And they did not pick up my rape kit

5    from -- neither -- no one from his office -- no one

6    from Sheriff J. Austin Daniel's office picked up my

7    rape kit and brought it to the state crime lab to be

8    tested.  They didn't look at any of the pictures of

9    the bruising over my body -- over my whole body,

10   inside and out.

11          So when people are sexually assaulted and

12   go to the hospital and they have this rape kit done,

13   it's not for -- it is very traumatic.  Very

14   traumatic.  It re-traumatizes you after being

15   assaulted that way.  And it is something very hard

16   to go through.  And then the fact that you do all

17   that and it's almost like it's all for nothing

18   because this office didn't even look at it.

19          They just decided -- well, they were

20   instructed by Sheriff J. Austin Daniel to no longer

21   investigate Barrett Boeker for the crime,

22   to -- basically, they were investigating

23   me -- exactly why -- to investigate me.  Because he

24   was a well-known -- he's well known because he was

25   grandfathered in generations down into his job

1    position.  And they had spoken with his family.  His

2    family -- and they were going to let this man get

3    away with it.  Exactly why they didn't even pick up

4    the rape -- they didn't pick up the rape kit.

5        Q    Let me ask you is:  Do you believe Sheriff

6    Austin Daniel instructed any member of his staff to

7    not pick up the rape kit?

8        A    Sheriff Austin Daniel instructed his

9    office to not pursue criminal charges against

10   Barrett Boeker.  Because there was a meeting that

11   took place between Sheriff J. Austin Daniel, Warden

12   Burl Cain, and the district attorney Sam

13   D'Aquilla --

14       Q    So --

15       A    -- where it was decided in that meeting

16   that they were going to let this man get away with

17   it -- with rape -- with raping me.

18       Q    Let me ask you my original question.  We

19   will get to that, I promise.  Are you alleging that

20   Sheriff Daniel instructed any member of his staff to

21   not pick up your rape kit?

22       A    Isn't Sheriff J. Austin Daniel's job

23   to -- wouldn't he instruct his office to pick up

24   rape kits?

25       Q    I'm going off your allegations.

1      A    I'm sorry.  What is the question?  Can you

2  repeat it?  Because I'm just a little confused.

3      Q    Do you believe Sheriff Austin Daniel

4  instructed any member of his staff to not pick up

5  your rape kit?

6      A    Absolutely.

7      Q    Okay.  Why do you believe that?

8      A    Because of all the reasons I just told

9  you.

10     Q    Okay.  That's --

11     A    Because he had a meeting, and he told the

12  detectives assigned to the case -- he told them not

13  to pick it up or they would lose their job.

14     Q    Were you --

15     A    Or they would be taken off the case.

16  There'd be taken off the case.

17     Q    Were you at that meeting?

18     A    Which meeting?

19     Q    The one where Sheriff Daniel allegedly

20  told the people who ended up arresting Barrett

21  Boeker to not pick up your rape kit?  You just

22  referenced the meeting.

23     A    Would he say that in front of the victim?

24  And would I be at that meeting?  Would I have been

25  at either meeting?  I don't understand --

```
 1              MR. RUTHERFORD:  I understand you're
 2        frustrated.
 3              THE WITNESS:  I know.  I'm just --
 4   BY MR. WIXOM:
 5        Q    You just alleged that there was a
 6   meeting --
 7              THE WITNESS:  He's trying to trip me up
 8        even though he began it by saying he wasn't
 9        going to.
10        A    So what's the question?  I know I have to
11   answer it.  I'm under oath.
12   BY MR. WIXOM:
13        Q    You just alleged there was a meeting
14   between Sheriff Daniel and the detectives involved
15   in this case regarding not investigating your
16   claims.  Were you at that meeting?
17        A    No.
18        Q    When did that meeting occur?
19        A    I don't know.
20        Q    How do you know about this meeting?
21        A    I was told.
22        Q    By who?
23        A    By employees of West Feliciana Sheriff's
24   Department.
25        Q    And who are those employees?
```

1        A      I can't say names for certain.

2        Q      Okay.  You can't say for certain.

3        A      It had to have been one of the two,

4    between Shannon Tilley and David Hidalgo.

5        Q      So it was either Shannon Tilley or David

6    Hidalgo who told you that?

7        A      Yes, or Randy Metz or someone at that

8    office.  I spoke to several different employees

9    there at the sheriff's department.

10       Q      Okay.  When did they tell you this?

11       A      I cannot give you exact dates.

12       Q      Okay.  Did they tell you this in person or

13   did they tell you over the phone?

14       A      As I stated previously before, I was told

15   in person and over the phone that this investigation

16   was not going to follow protocol.

17              It wasn't following protocol.  They were

18   instructed not to.  It was -- they're the ones -- I

19   was told by employees -- by them that it was corrupt

20   and that they got mad and frustrated and they had

21   even -- yeah, they were in a conference with -- I

22   don't know.  They didn't tell me exactly who was in

23   the conference, but, yeah, they said that there was

24   a conference and they, you know, tried -- were told

25   that no, they were not allowed to continue to do

1  their jobs or to investigate the allegations of rape

2  on the prison grounds.  And if they spoke up about

3  it or got mad about it, that they were basically

4  shut down.  They were -- there was nothing they

5  could do about it.  They tried to speak up and say,

6  like, you know, this wasn't right, that Priscilla

7  was raped and our office is just going to -- we're

8  not going to -- we're going to allow this man to get

9  away with raping her even though we believe that she

10  was raped.

11          But you're saying that we -- so the police

12  are basically saying -- they're police officers.

13  Their job is to investigate me being raped.  And

14  they said their bosses -- or whoever was in that

15  conference at the West Feliciana Sheriff's

16  Department of Sheriff J. Austin Daniel and his

17  office, they told the two officers and whoever else

18  was there that I was raped and that they weren't

19  going to do anything about it because of his title

20  and the fact that he was an Angola assistant warden.

21  Because he was an Angola assistant warden, he got to

22  get away with it, and they were not allowed to

23  continue to investigate the claim.

24          But what I was told multiple different

25  times though was that it's pending investigation.

```
1     And that was also publicly told to news media
2     outlets even after the grand jury.  Even the
3     sheriff, they said that, you know, it's pending
4     investigation.  I mean, to this day, I believe if I
5     called, they would say it's still pending
6     investigation.  Because they said it's not enough
7     that one victim came forward.  You need other
8     rapists to come forward, but that's not -- whenever
9     I originally was there --
10          Q    Who told you that --
11          A    Whenever I gave my statement when I was
12    originally there -- I wasn't finished.
13          Q    I know, but --
14          A    When I was originally there -- and it was
15    said that a warrant was going to be issued for his
16    arrest that -- when his picture -- his mug shot
17    was -- you know, when the crime was reported on the
18    news that other -- that the other victims that were
19    sexually assaulted -- that maybe they would come
20    forward too after I had.  But that was not the case,
21    because what happened with the fact that it was
22    broadcasted -- that was broadcasted, but then once
23    it was broadcasted that he was able to rape me and
24    get away with it, no other victims were willing to
25    come forward.
```

1    Q    Who told you that multiple witnesses
2    needed to come forward?

3    A    Needed to come forward?

4    Q    Yes, ma'am.  Earlier in that long bit of
5    testimony, you said that they told you that multiple
6    victims need to come forward in order for him to be
7    prosecuted, which is why I tried to stop you at that
8    point.  Do you recall --

9    A    They said that this would give the
10   opportunity for them to come forward or that -- you
11   know, that -- yeah.

12   Q    Do you believe that Sheriff Daniel is
13   doing anything today to prevent Mr. Boeker from
14   being prosecuted?

15           MR. RUTHERFORD:  Objection.  He's not the
16       current sheriff.

17           MR. WIXOM:  Exactly.

18           MR. RUTHERFORD:  Answer the question.

19   A    I believe he retired right before
20   something was coming up in this lawsuit.  He
21   retired.  Yeah, something was going to proceed
22   forward in this lawsuit, and he decided to up and
23   retire.

24   BY MR. WIXOM:

25   Q    So the reason why I ask that question is

1  because Mr. Barrett Boeker can still be prosecuted

2  today by the district attorney if the district

3  attorney made that decision.  Do you believe that

4  Sheriff Daniel today is doing anything to stand in

5  the way of that prosecution?

6          MS. ORGERON:  Objection:  Asked and

7      answered.

8      A    Yes, I was told that they were -- I was

9  told about -- yes.

10 BY MR. WIXOM:

11     Q    How?  Why do you believe that?

12     A    You might want to check their bank

13 accounts.

14     Q    What are you saying?

15     A    I'm just being honest.  I don't know.  I'm

16 giving an honest answer.

17     Q    You're giving a half answer.  What do you

18 mean by that?

19     A    (No response.)

20     Q    Okay.  Are you alleging --

21     A    There was a meeting that took place that

22 they decided that Barrett was not guilty from the

23 beginning, despite me reporting the crime to the

24 sheriff's office.

25     Q    How many meetings were there?

1        A      More than one, to my knowledge.

2        Q      Okay.  More than two?

3        A      I don't know the number.  I was not at the

4    meeting.

5        Q      But you realize that you're making the

6    accusation that there was more than one meeting,

7    right?

8        A      Not necessarily.  Let me rephrase it.  Not

9    necessarily a meeting.  There was more than one

10   conversation between officials that -- it was

11   corrupt.  That they were going to commit the crime

12   of corruption, basically.  Or I don't know the right

13   words, yeah.

14       Q      Okay.  So you allege that there was more

15   than one meeting --

16       A      More than one -- they talked about doing

17   this and letting him get away with it more than

18   once.

19       Q      Okay.

20       A      Whether that was in person, over the

21   phone, at what location, all the dates and times, I

22   don't know.

23       Q      And who were the officials involved in

24   these conversations?

25       A      West Feliciana Parish District Attorney

1    Sam D -- D'Aquilla and his office, West Feliciana

2    Parish Sheriff J. Austin Daniel and his office.

3         Q    What do you mean when you say "his

4    office"?  So --

5         A    The sheriff's department of West

6    Feliciana.

7         Q    Who else from the sheriff's department

8    from West Feliciana?

9         A    I can't answer your question.

10        Q    Okay.  Anybody else?

11        A    Someone from inside Boeker's family was at

12   these meetings and along with the warden, Burl Cain,

13   was at the first meeting.  The only time -- I know

14   of a meeting and then I know of conversations and

15   then I know of them being paid lump sums of money.

16        Q    Let me explain the difficulty we're

17   having --

18             THE WITNESS:  He's not even listening.

19             MR. RUTHERFORD:  Before you start that, I

20        need a quick break.  Is that okay?  Are you

21        done?

22             MR. WIXOM:  Can we talk?

23             MR. RUTHERFORD:  Sure.

24             (A brief recess was held.)

25   BY MR. WIXOM:

1     Q   So to pick up where we left off, you said

2  earlier that you knew of one meeting between Sheriff

3  Daniel and other officials where they had agreed to

4  not fully investigate Barrett Boeker; is that

5  correct?

6     A   Yes.

7     Q   Okay.  And then you mentioned other

8  conversations between Sheriff Austin Daniel and

9  other officials where Barrett Boeker's investigation

10  was discussed, and they also agreed not to fully

11  investigate, correct?

12     A   Yes, it was discussed with Sheriff Austin

13  Daniel and his employees.

14     Q   How many conversations occurred?

15     A   I couldn't say for certain.

16     Q   Okay.  Did you hear any of those

17  conversations?

18     A   No.

19     Q   Who told you about those conversations?

20     A   Employees of the West Feliciana Sheriff's

21  Department.

22     Q   Which employees?

23     A   I don't recall.

24     Q   Okay.  Have you ever recorded any

25  telephone conversations with David Hidalgo?

1      A    Not that I know of at this time.

2      Q    Have you ever recorded any phone

3  conversations with Shannon Tilley?

4      A    Not that I know of.

5      Q    Have you ever attempted to record any

6  telephone conversations with David Hidalgo?

7      A    No.

8      Q    Have you ever attempted to record any

9  telephone conversations with Shannon Tilley?

10     A    No.

11     Q    Have you ever recorded any telephone

12  conversations with Sheriff Austin Daniel?

13     A    Yes.

14     Q    How many?

15     A    One.

16     Q    And is that the telephone conversation

17  where you were asking him why your rape kit was not

18  picked up?

19     A    Yes.

20     Q    I'm going to hand you a document I'm going

21  to mark as L5 (tenders document).

22       (Exhibit L5 marked for identification.)

23  BY MR. WIXOM:

24     Q    This is a document that your attorneys

25  produced.  Can you please identify that document?

```
 1        A     Yes.  How do I identify it?
 2        Q     What is it?
 3        A     It's a statement I typed up.
 4        Q     When did you type that statement up?
 5        A     I cannot give you the exact dates.
 6        Q     Can you give me a time frame?
 7        A     Yes.  It was at different periods
 8   throughout this process.
 9        Q     So it's an ongoing statement?
10        A     If you read the paragraphs, it was -- I
11   added to it.
12        Q     So can you tell me in that statement what
13   the original set of paragraphs was -- or the
14   original statement?  What was the first beginning
15   and end statement, for lack of a better phrase, in
16   that document?
17        A     I don't understand the question you're
18   asking me.
19        Q     You said it was an ongoing document,
20   correct?  You added to it?
21        A     I took a lot of notes.
22        Q     Right.
23        A     I took notes every time I spoke with
24   someone almost.  Not every time, but --
25        Q     So --
```

1    A    -- I didn't want to go off just memory, so

2    I would write down what was happening as it was

3    happening.

4    Q    So in that document, what was the original

5    set of words that you typed?

6    A    It's on the paper.

7    Q    Was that document drafted in one sitting?

8    A    No.

9    Q    Okay.  You said that you added to that

10   document over a period of time, correct?

11   A    Can I read the document?

12   Q    Absolutely.

13   A    Detective Shannon Tilley called me and

14   told Barrett Boeker was in the other parish for some

15   type of evaluations for work, I believe.  I was told

16   he was called and asked to come into the station for

17   questioning.  Barrett Boeker was asked by law

18   enforcement if he knew why he was there and told

19   them he had a pretty good idea and then said he

20   wanted a lawyer.  And then he was arrested for

21   second-degree rape which did occur at his home.  It

22   was considered three different incidents/assaults

23   during the few weeks I lived with my cousin and her

24   family.  I can't reread all of this right now --

25   Q    I don't need you --

```
 1        A    -- and answer your questions.

 2        Q    Okay.  I'm trying to get a time frame over

 3   which you drafted this document.

 4        A    I drafted the document because -- for the

 5   exact reason that I wouldn't be able to give a time

 6   frame with details and off of memory.  Because when

 7   you go through a trauma like this, you do have

 8   memory loss issues and you cannot recall all of the

 9   chain of events in one sitting -- and here today --

10             MR. RUTHERFORD:  Can I help?

11        I think he's asking you when each

12        paragraph was drafted.  Which one -- was the

13        top one the first?  What kind of chronology --

14        A    Okay.  The first paragraph was first.  The

15   last one is last.

16   BY MR. WIXOM:

17        Q    Okay.  Was Paragraph 2 drafted in

18   conjunction with Paragraph 1 or Paragraph 3, or are

19   they each individual entries?

20        A    They're each individual entries.

21        Q    Let me ask you this:  When did you first

22   start feeling like the sheriff's office was not

23   properly investigating Barrett Boeker?

24        A    That's hard to say for certain.  I'd like

25   to say it was whenever my sister and I left the
```

1   sheriff's department after the first interview when
2   we had both discussed some things.  But --
3       Q    So --
4       A    I don't feel like -- but the sheriff's
5   department, when I felt like they first weren't
6   investigating was -- a date or are you asking or --
7       Q    Generally.  You just said when you first
8   left the sheriff's office --
9       A    It's all about dates?
10      Q    No.  Just the general time frame would be
11  good.
12      A    Okay.  A general time frame would be after
13  reporting to the West Feliciana Sheriff's Department
14  and from the moment I -- from the moment -- this is
15  where it is, okay?  From the moment that Ricky
16  Collins, the victim coordinator, wasn't given the
17  file and I wasn't informed.  And when he would
18  get -- when he was arrested -- I don't know what I'm
19  saying.
20      Q    Do you need to take a break?
21      A    I don't know like -- no, let's just keep
22  going.
23      Q    So earlier in the deposition -- so you
24  were -- you felt like the sheriff's office was not
25  taking your complaints seriously after you left that

1  first interview on December 9th?

2      A    I felt like the sheriff's office wasn't

3  investigating from the moment I was told.  That's

4  the honest truth, from the moment I was told.

5      Q    From the moment you were told what?

6      A    That they weren't going to investigate

7  because they couldn't because their supervisor or

8  their boss or the sheriff or whoever it was told

9  them someone at West Feliciana Sheriff's

10  Department -- whenever Sheriff Austin J. Daniel

11  was -- he did hold that job title.  He was the

12  current sheriff.  Whenever he was in charge there --

13      Q    I know you can't give me an exact date,

14  but can you give me a time frame that that happened?

15      A    The time frame is December to January.

16      Q    Okay.

17      A    December of 2016 to January of 2017.

18      Q    I'm going to hand you a document entitled

19  L6, which was turned over by your attorneys (tenders

20  document).

21        (Exhibit L6 marked for identification.)

22  BY MR. WIXOM:

23      Q    Can you look at that, please?

24      A    Yes.

25      Q    Can you identify the document?

```
 1        A    It looks like it's text messages between
 2   me and Detective Shannon Tilley.
 3        Q    Is there a date on those text messages?
 4        A    January 9th, 2017.
 5        Q    So at the bottom of that page, is there a
 6   different date?
 7        A    I'm trying to read it.  Is there a bottom?
 8        Q    So I'm seeing a date of March 14th 2017?
 9        A    Oh, at the bottom there's a date
10   from -- yeah, okay.  That's not the bottom.  It's
11   March 14th of 2017.
12        Q    And it looks like you sent David Hidalgo a
13   Facebook post in that text exchange, correct, at the
14   very bottom?  Did you type out:  I have this on
15   Facebook, but I guess no one important sees this.  I
16   sent it to David -- I'm sorry, I got the name
17   wrong -- but I never got to send it to you.  It's
18   the only comment I ever made.  One night I couldn't
19   take what they were saying LOL.  So this was Shannon
20   Tilley.  Is that your text message --
21        A    Yes.
22        Q    -- I have?  Okay.  Are you able to read
23   that Facebook post?
24        A    Yes.
25        Q    Okay.  What does that say?  What was the
```

1    original comment on that Facebook post?

2         A    From who?

3         Q    Randy Jackson.

4         A    Okay.  It says:  Who is covering for this

5    guy?  The detectives or the DA?

6         Q    And what is your response?

7         A    The detectives did their duty to help

8    protect and serve their community.  They

9    investigated the case and had -- something -- enough

10   evidence to indict this man.  But remember, anything

11   they were not able to pursue further in this case is

12   out of their hands.  People --

13             Can I keep reading it?

14        Q    Please.

15        A    Okay.  Obviously, I'm supposed to keep

16   reading, okay -- higher up above their heads.  Men

17   like that deserve an honor award for also trying to

18   make a difference in their community and not being

19   okay with the corrupt and unjust ways.  Brave,

20   righteous men is what I would call them.

21        Q    What men were you referring to in that

22   comment?  When you said men like that deserve an

23   honor award, who were referring to?

24        A    The detectives.

25        Q    Which detectives?

1        A    The detectives that originally told me

2    that they had enough evidence to indict the man and

3    that it did not have to go before a grand jury

4    hearing.

5        Q    And who are those people?

6        A    But afterwards, it was decided that it

7    would go before a grand jury hearing to make sure

8    the appropriate charges were pressed on the man.

9    But as I was told that --

10        Q    Who were those detectives?

11        A    Detective David and Shannon.

12        Q    And you felt that way on January 17th,

13    2017?

14        A    It does not say that.

15        Q    I'm sorry.  March 14, 2017.

16        A    It says March 14th.

17        Q    2017, right.

18        A    Yes.

19        Q    Okay.  And you felt that way enough to

20    share that post with Shannon Tilley, correct?

21        A    Yes.  I was feeling all kinds of different

22    emotions at the time as a sexual assault victim.

23        Q    Okay.

24        A    And at the time, I did feel like they were

25    doing what they could, but then their bosses, as

1    they told me themselves, that their bosses told them

2    that they weren't allowed to do anything further or

3    they would be removed from the case in this

4    instance.

5        Q    I'll hand you a document I've marked as

6    L7, which was also turned over by your counsel

7    (tenders document).

8        (Exhibit L7 marked for identification.)

9    BY MR. WIXOM:

10       Q    What is that document?

11       A    That is, again, notes that I had taken.

12           MR. RUTHERFORD:  Jason, the stuff we were

13           brought in the original, would you like to look

14           at that?  Because I think the copy cuts it off

15           a little.

16           MR. WIXOM:  Yes, thank you.

17           MR. RUTHERFORD:  (Tenders document.)

18   BY MR. WIXOM:

19       Q    So one of my questions was what was the

20   date.  And I can see now that is March 9th, 2017.  I

21   couldn't read that before.  What is this document

22   that you're looking at?  You said it was notes.

23   Were these notes taken -- I'll have you explain that

24   document to me.  What does this represent?

25       A    The document was in my handwriting.  The

```
 1    date is March 9th, 2017, if I'm correct.  Does the
 2    original say March 9th?
 3         Q    (Indicating.)
 4         A    Okay.  I put at the top who I'm speaking
 5    with, Sergeant David Hidalgo.  I put in the phone
 6    number, which is (225)721-0321.  I put what day of
 7    the week it is and around what time I speak to him.
 8         Q    In Paragraph 1, can you read out what you
 9    wrote?
10         A    When rape was reported, warden of Angola
11    went to meet with sheriff and DA, Sam D'A.  Warden
12    told them the charges were BS and everyone on Angola
13    property knew they had a relationship and were
14    sleeping together.
15         Q    Is this the meeting you were referring to
16    earlier?
17         A    Yes.
18         Q    Can you read Paragraph 2?
19         A    Right off the bat, Sam was told that side
20    and made up his mind on what happened.
21         Q    Can you read Paragraph 3?
22         A    His goal in there was to prove I was a
23    liar.
24         Q    And when you say "his goal," were you
25    referring to the district attorney?
```

1        A    I don't know who "his" is.  That was five
2    years ago.
3        Q    Can you read the final paragraph?
4        A    He never played the tapes of the phone
5    call between myself, Priscilla Lefebure, and
6    Aurielle Graham Boeker where she did not deny him --
7        Q    When you took these notes, were you on the
8    phone --
9        A    -- raping me or her sister, Stephanie
10   Graham.  And that's not the final paragraph.
11       Q    Can you read the final paragraph?
12       A    Yes.  Aurielle got on the stand and said
13   that her husband cheated on her with me.
14       Q    When you took these notes, do you recall
15   if you took them while you were on the phone with
16   David Hidalgo?
17       A    Yes.
18       Q    So as he was speaking, you were writing
19   these notes down?
20       A    Yes.
21       Q    Do you see anything in this document that
22   pertains to what Sheriff Daniel did or did not do
23   during that meeting?
24       A    When rape was -- I don't understand the
25   question the way you're wording it.

1      Q      During the conversation with David

2  Hidalgo, did he tell you that the sheriff was

3  conspiring with the district attorney to not

4  properly investigate or persecute Barrett Boeker

5  during this conversation?

6      A      It says:  When the rape was reported, the

7  warden of Angola went to meet with the sheriff

8  who -- the sheriff, Officer J. Daniel, and the

9  district attorney, Sam D'Aquilla, and they agreed to

10  not pursue the charges.  They were all in agreement

11  that they would not pursue the charges and they all

12  had a meeting and said -- they all met together and

13  said that it was consensual.  They decided for

14  themselves it was consensual.

15      Q      Do you believe the sheriff controls the

16  prosecution?

17      A      I believed that they work together, the

18  sheriff and the district attorney.

19      Q      Do you believe the sheriff has the ability

20  to determine whether or not a person is brought

21  before a grand jury?

22      A      I don't --

23          MS. ORGERON:  Objection:  That's a legal

24      conclusion.

25          MR. WIXOM:  Okay.

1          THE COURT REPORTER:  I didn't hear the

2     answer.

3     A     Oh, I don't work in law enforcement.

4  BY MR. WIXOM:

5     Q     I'm going to give you a document I'm going

6  to mark L8 (tenders document).

7        (Exhibit L8 marked for identification.)

8  BY MR. WIXOM:

9     Q     Do you recognize this document?

10    A     Yes.

11    Q     What is that?

12    A     It's a statement.

13    Q     From whom?

14    A     From Dylan Pizzolato.

15    Q     Did Dylan give you that statement?

16          THE WITNESS:  I need to use the restroom,

17    if that's okay.

18          MR. RUTHERFORD:  Can you answer his

19    question first and then we will use the

20    restroom?

21          THE WITNESS:  Yeah.

22    A     I don't know if it was given to me or if

23  it was given to the sheriff's department.  I

24  don't -- yeah, I don't recall.

25          MR. WIXOM:  Okay.

```
 1              (A brief recess was held.)
 2    BY MR. WIXOM:
 3         Q    I gave you two documents that you
 4    prepared.  The first was -- or one of them was the
 5    notes you took during your conversation with David
 6    Hidalgo.
 7         A    Yes.
 8         Q    During that conversation, did David
 9    Hidalgo tell you he was involved in that meeting or
10    he was present for that meeting?
11         A    He informed me of the meeting.
12         Q    Did he tell you that he was present during
13    that meeting?
14         A    He informed me of the meeting.  How he
15    knew about the meeting or whether he was -- if there
16    were other people present, I don't know.
17         Q    Okay.  So he didn't tell you how he
18    learned of the meeting?
19         A    No.
20              MR. WIXOM:  Do you have the Tilley
21         statement?
22              MR. RUTHERFORD:  Uh-huh.
23              MR. WIXOM:  Oh, here we go.  I have it.
24    BY MR. WIXOM:
25         Q    And earlier, I gave you the statement that
```

1  you typed out that was typed over time regarding

2  conversations that you had with Shannon Tilley.

3        A    Okay.  So --

4             MR. RUTHERFORD:  Let him ask the

5        questions.

6             THE WITNESS:  Okay.  Because I'm like, we

7        jump from this document to that document to

8        this document and --

9             MR. RUTHERFORD:  Wait for the question.

10            THE WITNESS:  Okay.

11  BY MR. WIXOM:

12       Q    Did Detective Tilley tell you who

13  threatened his job?  And let me lay a foundation.

14  Here, you say that he told you that his job was

15  threatened in Paragraph 3.

16            MR. RUTHERFORD:  Can you point us to that,

17       please?

18            MR. WIXOM:  Sure thing.

19  BY MR. WIXOM:

20       Q    Detective apologized to me.  He was scared

21  for his job, I assumed, as he nervously told me he

22  had basically gotten in trouble for speaking up for

23  multiple victims by the same perpetrator, as any

24  righteous man would if they felt they were doing --

25       A    Okay.  I assumed this incorrectly.  That's

1    just whenever --

2         Q    Okay.

3         A    I don't know why I threw that in there,

4    but he told me that his job had been threatened.

5         Q    By whom?  Who threatened his job?

6         A    I don't know.  I wasn't the one that had

7    my job threatened.

8         Q    Okay.  So I don't know what Tilley told

9    you and what he didn't tell you, so I have to ask

10   you these questions.

11        A    I understand.

12        Q    So I understand that you're not the one

13   with the job threatened, but I don't know.

14             Since the rape happened, what medical

15   providers have you seen?

16        A    I've seen multiple different medical

17   providers.

18        Q    Okay.  Who have you seen?

19        A    I couldn't tell you all of the doctors'

20   names.  I don't have my medical history in front of

21   me.

22        Q    Okay.  I know you've gone to the Woman's

23   Hospital, and I believe you went to St.

24   Francisville, or am I mistaken about that?  You're

25   the only person I can ask.

```
 1        A     Can you repeat the question?
 2        Q     What medical providers have you seen since
 3    the rape?
 4        A     Like medical facilities --
 5        Q     Yes.
 6        A     -- or the actual doctors?
 7        Q     Let's start with the doctors' names.
 8        A     I don't know the doctors' names since the
 9    rape.
10        Q     How about the --
11        A     Of every doctor I've seen since, was the
12    question?
13        Q     What facilities have you gone to?
14        A     Okay, facilities.  I've gone to Our Lady
15    of the Lake.
16        Q     Okay.
17        A     I've gone to St. Clare, the Tau Center.
18    I've gone to my primary care physician.  I've gone
19    to Central STAT Care.  I've gone to Woman's
20    Hospital.  I've gone to a place in Hammond -- brain
21    rewiring -- yeah, rewiring your brain.
22        Q     That's the name of the facility?
23        A     Not the exact name, obviously.
24        Q     I mean, but roughly --
25        A     Yeah, it's -- yeah, rewiring your brain,
```

1   and it's in Hammond.  The doctor's name is Emily.

2   I'm not sure of the last name.  I'm trying to think.

3   I've probably gone to an urgent care facility.  I've

4   had a cold before.

5        Q    Out of these facilities that you've

6   listed, which ones have you gone to as a result of

7   the rape incident?

8        A    I've gone to Dr. Karen Dantin my primary

9   care physician.  I've gone to Our Lady of the Lake.

10  I've gone to St. Clare, the Tau Center.  I've gone

11  to Baton Rouge Cognitive Behavioral Therapy.  And

12  I've gone to Sexual Trauma Awareness and Response.

13       Q    The reason that I'm asking is to get a

14  history of your treatment, but also, we're trying to

15  figure out how much money you've spent on medical

16  bills related to the treatment arising out of the

17  rape.  I have some medical records I've been

18  provided from the Woman's Hospital in Baton Rouge.

19  I don't have medical bills pertaining to these other

20  facilities.  Do you have them?

21       A    Yes.

22       Q    Where are they?

23       A    They're at my home.

24       Q    Can your attorneys get me those bills?

25            MR. RUTHERFORD:  We will find out if they

```
 1        are different than the ones we've already
 2        collected --
 3              MS. ORGERON:  Yeah, we've
 4        requested -- absolutely.
 5              MR. RUTHERFORD:  Yeah, absolutely.  We'll
 6        find out.
 7   BY MR. WIXOM:
 8        Q    Do you have copies of your medical records
 9   from these facilities?
10        A    No, not every copy.
11              MR. RUTHERFORD:  We provided you with some
12        medical records.
13              MR. WIXOM:  Some, yeah.  I got Woman's
14        Hospital and a 2017 incident out of, I believe
15        it was, St. Francisville.  Those are the only
16        ones I have.
17              MR. RUTHERFORD:  Okay.
18        A    St. Francisville --
19   BY MR. WIXOM:
20        Q    I'm probably saying it bad.  I'm just
21   jumping in --
22        A    All the treatment has been -- I came back
23   to my home -- to my hometown, Baton Rouge.
24        Q    Probably Our Lady of the Lake then.
25              Do you know if Sheriff Daniel has ever
```

1    failed to investigate other claims of sexual

2    assault, other than yours?

3        A    Do I know?

4        Q    Yes.

5        A    Yes.

6        Q    Okay.  Whose?

7        A    I cannot give you names, but I have had

8    multiple sexual assault victims tell me their

9    stories.

10        Q    Okay.  But you can't give me their names?

11        A    That is their story to tell.

12        Q    So here's the problem:  You've made an

13    equal protection claim, and you said that the

14    sheriff has a history of discriminating against

15    women and/or individuals who identify as female and

16    that he has failed to investigate or take seriously

17    reports of sexual assault against women and has

18    treated those allegations with less priority than

19    other crimes not involving sexual assault.  So I

20    need to know who those people are.

21            MR. RUTHERFORD:  Can we take a second off

22        the record?

23                (A brief recess was held.)

24    //

25    //

1  BY MR. WIXOM:

2      Q    So you said between one and three -- let

3  me take a breath.  You stated that you attempted

4  suicide between one and three times before we took a

5  break.  Can you give me rough dates on which those

6  attempts occurred?

7      A    Between October of 2021 and October of

8  2022.

9      Q    So you attempted suicide last month?

10     A    No, just somewhere between that time.

11     Q    Okay.

12     A    Or I've been smoking cigarettes to hurt

13 myself ever since.

14     Q    Okay.  So what I'm focusing on at the

15 moment is strictly any attempts you may have made to

16 immediately end your own life.  So have you made any

17 such attempts?

18     A    January of 2021.

19     Q    Okay.  After you made that attempt -- let

20 me back up.  Can you please tell me about that

21 attempt?

22     A    That's not the first time that I -- it was

23 another in October too.  I ate a bunch of pills the

24 first time in October.  And then in January, I ate a

25 bunch of pills.

1      Q    So in October of 2021, you ate a lot of

2 pills?

3      A    Yes.

4      Q    What did you take?

5           MR. LEDET:  Hold on.  She said it

6      predated --

7           MR. RUTHERFORD:  Yeah, I think she said

8      October 2020.

9           MR. WIXOM:  Oh, 2020, okay.

10 BY MR. WIXOM:

11     Q    So what pills did you take?

12     A    October of 2020, I ate a whole bottle of

13 Xanax.

14     Q    After you took the bottle of Xanax, did

15 you call any medical professionals to tell them that

16 you had taken a bottle of Xanax?

17     A    No.

18     Q    What happened after you took the bottle of

19 Xanax?

20     A    I woke up.

21     Q    How many pills do you estimate you took?

22     A    At least 14.

23     Q    And your next attempt was in January of

24 2021?

25     A    Yes.

```
1        Q     Can you please tell me about that attempt?
2        A     I took pills.
3        Q     Okay.  Also Xanax, or something else?
4        A     It was Xanax or Klonopin.
5        Q     How many do you think you took?
6        A     A handful, ten.
7        Q     And what happened after you took the ten?
8  Meaning, did you wake up as you did the first
9  attempt?
10       A     Yes.
11       Q     So with either of these attempts, did you
12 inform any medical professional that you had
13 attempted suicide?
14       A     No.
15       Q     Was there a third attempt?
16       A     Yes, I did inform a medical professional.
17       Q     For which one?
18       A     The attempts.
19       Q     Both of them?
20       A     No, the one in January.
21       Q     Who did you tell?
22       A     I told my doctor.
23       Q     Who's your doctor?
24       A     Dr. Karen Dantin.
25       Q     I'm sorry.  Can you repeat that?
```

```
 1        A    Dr. Karen Dantin.
 2        Q    What steps did Dr. Karen Dantin take after
 3   you told her?  Did she have you put under supervised
 4   care?  Did she let you go home?
 5        A    I was no longer suicidal.  And we
 6   discussed my medications and we discussed the
 7   caseload of what I was -- we discussed the civil
 8   case involving -- from what happened to me in West
 9   Feliciana Parish.  And we just discussed that it was
10   too much for any one person to handle, and we
11   changed the dosages on my medications.  And I
12   recently started a new medication.
13        Q    And I promise we're going to talk about
14   your medications in a little bit.  I just want to
15   make sure the record is clear.  Was there a third
16   suicide attempt?
17        A    I've just been habitually smoking
18   cigarettes.
19        Q    Okay.
20        A    Hoping it would --
21        Q    To be clear, in a self-destructive way,
22   correct?
23        A    Yes.
24        Q    To the best of your recollection, since
25   you were raped, what medications have you been
```

```
 1   prescribed?

 2       A     Where's the paper?  Or do I -- I don't how

 3   to say it.

 4             MR. LEDET:  Prednisone?  I'm sorry.

 5       A     Yeah, thank you.

 6   BY MR. WIXOM:

 7       Q     Prednisone?

 8             MS. ORGERON:  That's a steroid.

 9       A     No, okay.  No.  It starts with a P.  No,

10   not that.

11             MR. LEDET:  I'm not going to guess.  I was

12       just trying to help with the pronunciation.

13       A     It's a PTSD drug.

14   BY MR. WIXOM:

15       Q     Are you taking -- well, go on.

16       A     I started taking the anxiety medicine

17   recently after I was traumatized and all this

18   happened.

19       Q     Do you know the name of that medication?

20       A     Yes, it's Xanax.

21       Q     So are you still taking Xanax?

22       A     It is temporary, yes.

23       Q     How often do you take Xanax?

24       A     Daily.

25       Q     Have any of your doctors expressed any
```

1   concern with your taking Xanax, given your prior

2   suicide attempts?

3        A    Regarding the prior suicide attempts?

4        Q    Yes.

5        A    No.

6        Q    How often do you take the PTSD medication?

7        A    I no longer take that PTSD medication.

8        Q    You no longer take it.  When did you stop

9   taking it?

10       A    I stopped taking it in January or February

11  of 2018.

12       Q    And why did you stop taking it?

13       A    Because of the side effects.

14       Q    What other medications have you taken

15  since the incident?

16       A    That's what I've been prescribed since the

17  incident.

18       Q    Okay.  Have you been prescribed any

19  antidepressants?

20       A    Oh, it starts with a B, the new medication

21  I'm on now.

22       Q    Is that an anti-anxiety medication?

23       A    Anti-anxiety, yes.

24       Q    Is it called Buspar?

25       A    I can't say for certain it's -- because I

```
1    tried to say it was Buspar, but then I'm corrected
2    again on the name, so --
3         Q    How often do you take that medication?
4         A    Twice a day.  Same dose, twice a day.
5         Q    What is your dosage?
6         A    Well, I started off with 10 and gradually
7    have gotten up to 60 milligrams.
8         Q    Are you taking any antidepressants?
9         A    Yes.
10        Q    Okay.  What are you taking?
11        A    Lexapro.
12        Q    When were you first prescribed Lexapro?
13        A    I don't know.
14        Q    Was it after the incident?
15        A    I don't know.  I don't know if it was
16   before or after.
17        Q    Prior to the incident, do you recall if
18   you took any psychotropic medications?  And by that,
19   I mean antianxiety medication, antidepressants?
20        A    The only one I might've taken was Lexapro.
21        Q    Did you suffer from anxiety before the
22   incident?
23        A    I had generalized anxiety.
24        Q    You were diagnosed with generalized
25   anxiety, or do you believe that you had generalized
```

```
1   anxiety?
2        A     I was diagnosed.
3        Q     Do you remember about when you were
4   diagnosed?  A year would be fine.
5        A     I just know I was going to Louisiana State
6   University.
7        Q     Did you have depression or were you
8   diagnosed with depression prior to the incident?
9        A     No.
10       Q     So no history of taking antidepressants?
11       A     No.
12       Q     Are there any other medications that
13  you're taking that you haven't listed or told me
14  about?
15       A     Yes.
16       Q     Okay.  What are they?
17       A     Lisinopril.
18       Q     What's that for?
19       A     High blood pressure.
20       Q     Anything else?
21       A     Yes.
22       Q     What is that?
23       A     ADHD medication.
24       Q     What are you taking?
25       A     I'm taking Adderall.
```

1      Q      Anything else?

2      A      No, that's it.  Oh, and I was taking

3   something to prevent HIV.  PrEP.

4      Q      Are you still taking that?

5      A      Not currently.

6      Q      Are you and Dylan still in a romantic

7   relationship?

8      A      No.

9      Q      When did you and Dylan break up?

10     A      Two years ago.

11     Q      Are you currently in a romantic

12   relationship?

13     A      No.

14     Q      When was the last time you were in one?

15     A      December of 2021.

16     Q      And who was that with?

17     A      Brett Harding.

18     Q      Harding?

19     A      Uh-huh, H-A-R-D-I-N-G.

20     Q      Did you and Brett break up due to -- I'll

21   just ask -- due to the incident?  Why did y'all

22   break up?

23     A      He was moving.  And I had troubles.  Yeah,

24   I carry emotional baggage.

25     Q      In 2017 -- to speed this up, I'm leading a

1  little bit.  But in 2017, you applied for victim's

2  reparations, correct?

3      A    Yes.

4      Q    Was your claim approved or denied?

5      A    Denied.

6      Q    Do you know why it was denied?

7      A    No.

8      Q    Do you think Sheriff Daniel had anything

9  to do with that claim being denied?

10     A    It's a possibility.

11     Q    Okay.  Why is it a possibility?

12     A    Because it was decided that charges would

13 not be -- that he would not be -- like, the charges

14 would not be pursued by his office.

15     Q    Let me try again.  Let me try this way:

16 As you sit here right now, do you have any

17 information to suggest Sheriff Daniel stopped you

18 from getting victim's compensation or attempted to?

19     A    Yes, by the fact that he -- that they

20 just -- they decided that they weren't going to help

21 me as a victim of sexual assault.

22     Q    All right.

23          MR. WIXOM:  Can I take five minutes?

24          MR. RUTHERFORD:  Uh-huh.

25              (A brief recess was held.)

1          MR. WIXOM:  I don't have any further

2     questions.

3          MR. LEDET:  None for me.

4          MR. RUTHERFORD:  None for you?  That was

5     unexpected.  Now we're going to need five

6     minutes.  Well, actually, I have some

7     questions.

8                E X A M I N A T I O N

9     BY MR. RUTHERFORD:

10         Q    So, Ms. Lefebure, I want to show you

11    what's been marked L5, which are the notes you took

12    of your calls with Detective Shannon Tilley.  Do you

13    see that document?

14         A    Yes.

15         Q    And here at the bottom, it says:  When I

16    told Detective Shannon Tilley that West Feliciana

17    Parish Sheriff's Office of the conversation I had

18    with DA Sam D'Aquilla and how he treated me and

19    talked to me, Shannon made a statement saying he

20    felt like I should take my case to the attorney

21    general's office and have them prosecute the case.

22    At the time, I did not know the extent of what he

23    was trying to tell me.

24         My question is:  What did Sam D'Aquilla

25    say to you and how did he speak to you -- how did he

1    treat you as you said in this first conversation?

2         A    He treated me as if I was the

3    criminal -- as the rapist, and not the victim or

4    witness that had been sexually assaulted.  He yelled

5    at me.  He may have even cussed.  It's the tone of

6    voice he had spoken to me in and he was questioning

7    whether the act took place.

8         Q    Were you surprised by that?

9         A    Yes.  I did not -- I did not know that he

10   was going to use that tone of voice and speak to me

11   that way as a victim of sexual assault.

12        Q    And did Shannon Tilley seem surprised by

13   that, when you relayed that information to him?

14        A    Not at all.

15        Q    Did he have anything to say about the way

16   you were treated by the DA?

17        A    That it was expected and that that was

18   what he was trying to tell me from the beginning,

19   was that Sam D'Aquilla was going to try to scare me

20   into not proceeding forward with the charges against

21   Barrett Boeker.

22        Q    Do you know, did Deputy Tilley tell you

23   why he wasn't surprised at the district attorney's

24   behavior towards you?

25        A    No, he just told me to be prepared.

1       Q    I'm going to show you what has previously
2  been marked and shown to you today L7, and I'm going
3  to put your original handwritten paper next to it.
4  Was it your common practice to put the date at the
5  tops of notes?
6       A    Yes, I always put the dates at the top of
7  the notes.
8       Q    What would you put underneath that?
9       A    I would put who I'm speaking with and
10 their phone number and the time.
11      Q    When did you develop that practice of note
12 taking?
13      A    I've done that throughout the years.  I
14 was possibly taught it at school.  But in this case,
15 I started this after speaking with the officials at
16 West Feliciana -- in West Feliciana Parish.
17      Q    Okay.
18           MR. RUTHERFORD:  I'm showing you what's
19      been marked P11 (tenders document).
20        (Exhibit P11 marked for identification.)
21 BY MR. RUTHERFORD:
22      Q    Do you recognize this piece of paper?
23      A    Yes.
24      Q    Is that your handwriting?
25      A    Yes.

1      Q    And what does it say at the top?

2      A    Victim's notification.

3      Q    What's that next bullet point?

4      A    Call January 2, 2017, 3:44 p.m.

5      Q    And does it say after that who you spoke

6    with?

7      A    Yes.

8      Q    Who did you speak with?

9      A    Seva and Sarah.  Supervisor -- her

10   supervisor.

11     Q    And then you've got sort of three hash

12   marks of information underneath that.  And on one,

13   it looks like you put an asterisk that says "was

14   told this at the end," and you've got an arrow

15   moving it down.  Why did you make that notation?

16     A    Because I wanted to make sure that my

17   notes were exactly written as I was told and that

18   they were precise.

19     Q    So if we read them in the order that your

20   notes say we should go, the first one is in the

21   middle.  And what does it say there?

22     A    This one (indicating)?

23     Q    Uh-huh.

24     A    Couldn't see exact charges.  Only

25   aggressive sexual assault.

1    Q    And the next one?

2    A    No case info available.

3    Q    And then what you've now moved down is the

4  last one.

5    A    Which --

6    Q    (Indicating.)

7    A    Oh, okay.  It says West Feliciana was

8  offline since September.

9    Q    Do you remember having this conversation

10  with Seva and Sarah?

11    A    Yes.

12    Q    Do you remember what it was about?

13    A    Yes.

14    Q    What was it about?

15    A    It was about LAVNS, L-A-V-N-S, the victim

16  notification.

17    Q    What were you calling to ask them about

18  from victim notification?

19    A    I was calling to see if they could pull it

20  up.

21    Q    And could they?

22    A    Yes, but it was not like they -- something

23  that she had ever seen before.

24    Q    In what way?

25    A    She said that Barrett Boeker's name had a

1    red flag next to it.  And she had to call to speak

2    to her supervisor because she had never seen this

3    before and didn't understand why it was there or why

4    she couldn't see everything that she normally sees.

5         Q    Do you recall anything else from that

6    conversation?  If not --

7         A    No.  I can recall the next time I spoke to

8    them the next day.

9         Q    Do you remember what you talked about the

10   next day?

11        A    Yes.

12        Q    What was that?

13        A    They tried to pull it up again and they

14   were unable to do so --

15        Q    Do you remember anything else --

16        A    -- which was strange to them and their

17   office too.

18        Q    Do you remember anything else from that

19   conversation?

20        A    No.

21             MR. RUTHERFORD:  I'm going to mark this

22        next exhibit P12 (tenders document).

23          (Exhibit P12 marked for identification.)

24   BY MR. RUTHERFORD:

25        Q    Again, I'm going to show you --

```
 1              MR. RUTHERFORD:   And you can look at this
 2         if you want.
 3    BY MR. RUTHERFORD:
 4         Q     This is your original, and then here is a
 5    copy.   What's the date on top of those notes?
 6         A     December 4th, 2016.
 7         Q     And so, again, does that mean you took
 8    those notes that day?
 9         A     Yes.
10         Q     And just look at it briefly.   Can you tell
11    me what these notifications are about?
12         A     It is about Barrett Boeker raping me.
13         Q     And if we keep flipping, there's another
14    page with the date December 9th, 2016.   Who have you
15    called on December 9th, 2016?
16         A     The East Baton Rouge Coroner's Office.
17         Q     Do you remember what that was about?
18         A     Yes, regarding the rape kit, now known as
19    a sexual assault forensic exam.
20         Q     And if we go to the next page, what does
21    it say at the top there, that first hash mark?
22         A     So because I had last talked to the DA's
23    office on February 22nd, 2017, no -- over the
24    phone -- and over the phone, no e-mail, seven was
25    sent to me -- or no e-mail was sent to me.
```

1    Q    Sitting here today, do you recall what you
2  were trying to say in that paragraph?
3    A    No.
4    Q    Do you remember a time when the district
5  attorney's office sent you an e-mail asking them to
6  contact you?
7    A    Yes.
8    Q    And did you ever delay in getting back to
9  the district attorney's office?
10    A    After the first time speaking to him, I
11  felt uncomfortable speaking with him -- with the
12  DA's office.  I was terrified.  But I did still get
13  back in touch.  But it's just that as a victim
14  of -- or survivor of sexual assault, it takes -- I
15  couldn't just -- I needed breaks in between speaking
16  to all of these different parties.  I had no
17  representation.  I knew what I was told, and I know
18  that I did not -- yeah, I knew what I was told, and
19  I -- which I had to do something that no person
20  should ever have to do in their life, which is prove
21  that what was happening was really happening.  And
22  that is why I had to be very careful with -- I
23  needed breaks.  I just needed breaks.
24    Q    So sometimes after you would interact with
25  this case and anybody from the case, you needed a

1  few days to have the interaction again?

2          MR. WIXOM:  I'm going to object to the

3     testimony.

4     A    Yes.

5          MR. RUTHERFORD:  Hers?

6          MR. WIXOM:  Yes.

7     A    Sometimes --

8          MR. RUTHERFORD:  You recapitulated most of

9     the questions that she -- after she answered,

10    you would rephrase it, but sure.

11         MR. WIXOM:  Out of necessity.

12         THE WITNESS:  Can I say something?

13         MR. RUTHERFORD:  There's no question

14    pending.

15         THE WITNESS:  Okay.

16         MR. RUTHERFORD:  Sorry.

17  BY MR. RUTHERFORD:

18    Q    Could -- and I'm going to go kind of

19  pretty quickly here, so -- just two different

20  things, okay?

21    A    Okay.

22    Q    The bruises that Woman's Hospital took

23  pictures of when you went in for the SANE

24  examination, do you remember those bruises?

25    A    Yes.

```
 1        Q    Were those bruises caused by a consensual
 2   interaction?
 3        A    No.
 4        Q    Were they caused by your ex-boyfriend
 5   Dylan Pizzolato?
 6        A    No.
 7        Q    Your ability to seek medical care for the
 8   injuries that you told us about today, has that been
 9   impacted in any way?
10        A    Yes.
11        Q    Have you been able to seek access to
12   medical care every time you've wanted it in this
13   case?
14        A    No.
15        Q    What has prevented you from doing that?
16        A    Because the kind of treatment that I would
17   need from an expert or a psychiatrist or a
18   psychologist costs anywhere between $150 to $350 an
19   hour.  And the type of trauma I've endured, I can't
20   afford to seek the treatment that I desperately need
21   to recover from what happened.
22        Q    About how tall are you?
23        A    5'3".
24        Q    Have you grown since 2016 in height?
25        A    No.
```

1       Q    So you were 5'3" in 2016?

2       A    Yes.

3       Q    Do you remember how much you weighed back

4    then?

5       A    Around 115.

6       Q    And do you recall how tall Barrett Boeker

7    is?

8       A    No.

9       Q    Taller than you?

10      A    Yes.  I believe he might be -- from

11   looking at that document -- is he -- he's 6'1" or

12   6'3", 6'4" -- or taller than me.  He's over 6-foot.

13      Q    And do you know about how much he weighs?

14   Is he bigger than you?

15      A    He weighs anywhere from 180 to over

16   200 pounds, possibly 205 pounds.  I don't know

17   exactly what the document says -- or what his

18   driver's license says.

19      Q    Earlier, you were asked about the issues

20   you had with the sheriff's office's investigation.

21   And I may have heard your answer incorrectly.  But

22   was the fact that Barrett wasn't arrested at the

23   prison the only issue you had with the sheriff's

24   office's investigation?

25      A    No.

1      Q     Without mentioning the names or the facts,

2   because it's a confidential portion of the

3   transcript, why do you think the women who reached

4   out to you reached out to you about their

5   experiences?

6      A     Because after what happened, I chose to

7   speak up about -- and speak out about the truth of

8   what happened despite how scary it was or the fact

9   that it was -- because I spoke out and I attached my

10  face to rape publicly, people over the years have

11  contacted me in many different ways and forms and

12  have shared their story with me.

13     Q     Did Deputy Hidalgo ever express to you on

14  the phone frustration with the way the case was

15  going?

16     A     Yes.

17     Q     Do you remember what he said?

18     A     He said that there was a meeting that took

19  place between the warden of Angola State

20  Penitentiary, the sheriff of West Feliciana Parish

21  department, and the West Feliciana sheriff's

22  district attorney, and someone from Boeker's family.

23     Q     And did he express frustration with that,

24  or could you tell?

25     A     Yes, you could tell that they didn't feel

1    comfortable that they could do their job and

2    investigate the claims.

3        Q    You said you could tell.  Did he ever say

4    anything to you about how he would be perceived by

5    the department if he continued to advocate for you

6    in this case?

7        A    He would be perceived -- he would be

8    accused of being a captain-save-a-ho.

9        Q    And was this something that he told you

10   over the phone or in person; do you remember?

11       A    It was over the phone.  I remember I was

12   in my apartment.

13       Q    Do you remember if you took notes about

14   that conversation?

15       A    No, I did not.

16       Q    Did you ask him to explain what he meant

17   by that?

18       A    Yes.

19       Q    Did he explain it?

20       A    Yes.

21       Q    What did he say?

22       A    He explained to me how Sam D'Aquilla did

23   not play the first interview tape where I

24   explained -- which is the initial -- it was the

25   first time I had to talk -- tell about Barrett

1    raping me and everything he did to me at Angola.  He

2    said that Sam D'Aquilla, the district attorney, used

3    that as an excuse to not play that first interview

4    tape in front of the grand jury, to say that -- he

5    used it as an excuse to say that I was flirting

6    during the interview with the officer, and he didn't

7    want to be accused of that.  And I was very upset by

8    that piece of information.

9        Q    Just a few more.  Did you ever tell Deputy

10   Hidalgo that the thought of having sex with Dylan

11   after the assault disgusted you?

12       A    I don't remember exactly telling him that,

13   but I do -- it's been very hard for me to have

14   sexual intercourse with anyone.  I've suffered for

15   years.  I have --

16       Q    And we can talk about that in a second.

17   Specifically about Dylan back around at the time,

18   you disclosed to the SANE nurse -- because they ask

19   you at the beginning of that exam if you've had

20   consensual sex in the past -- in the immediate

21   past -- and you had noted December 8th; is that

22   correct, what you told the SANE nurse?  Did you try

23   to have sex with Dylan at some point on the 8th?

24       A    I remember having sex with Dylan after the

25   first incident, not the second one.  I physically

1    couldn't have sex with him after the second rape.

2        Q    How has the handling of your case impacted

3    your feeling of safety, if at all?

4        A    It has drastically changed my life.  I

5    haven't felt safe even -- I've been afraid to return

6    to courthouses.  I have not been able to sleep at

7    night.  I have felt like they would -- my life has

8    been threatened ever since, and all for speaking

9    out, because it's a high-profile case.  And I've

10   even had, you know, their friends and family from

11   West Feliciana travel to Baton Rouge to -- they've

12   followed me, they've taken pictures of me, they've

13   known where I live, they have contact -- I just

14   haven't felt safe ever since.

15       Q    And how has the investigation

16   impacted -- I'm sorry.  How has the rape and the

17   handling of the investigation impacted your mental

18   health?

19       A    I have never suffered from post-traumatic

20   stress disorder before.  I have never had a problem

21   with depression.  I never had any problem, for

22   instance, going outside or socializing.  I never had

23   the family issues that I have today.  I never had an

24   issue walking down the sidewalk without looking over

25   my shoulder.

```
 1          Q    And if you can, some of -- you were
 2    assaulted and raped by Barrett Boeker, and some of
 3    that's going to cause trauma, right?  And you've
 4    alleged that the handling of the situation by both
 5    the district attorney's office and the sheriff's
 6    office has caused you injury, correct?
 7          A    Yes.
 8          Q    Can you -- and if you can, let us know.
 9    Tell us the difference between the impact of those
10    two events, right, the rape versus the handling of
11    the investigation into the rape.  Do those, in your
12    mind, have different impacts on your mental health?
13          A    Yes.
14          Q    What are the differences?
15          A    Okay.  So anyone that has been -- an
16    individual that has been sexually assaulted would be
17    traumatized from the rape instance itself.  But then
18    to -- you have a choice.  It is the victim's choice
19    whether or not you want to come forward.  And if one
20    does choose to come forward, you never imagine in a
21    million years that the sheriff's department would
22    not go and pick up the rape kit -- the evidence.
23    They pick up the evidence for other criminal acts.
24    They did -- not only did they not pick up the rape
25    kit, but they did not pick up the sex toy that he
```

1    used to assault me with; instead, it was left in his

2    possession to continue to use.

3              And on top of that, I -- it's just made it

4    very hard to believe that there is justice in our

5    system and that -- it's hard to report things to the

6    police and to trust them.  I feared -- even before

7    when I was driving down the road, I've been deathly

8    afraid of even just being pulled over ever since,

9    because the badge -- because he raped me in his

10   jacket or had me wear his wife's jacket with the

11   symbol on the side, I just have never been able to

12   look at that symbol, a sheriff or any state official

13   symbol, like, with -- on the shoulder or right here

14   the same again.

15        Q    And the impact of the trauma, both the

16   rape and the handling of the investigation

17   afterwards, sometimes does that feel like it

18   overlaps for you?  Do you feel like those things are

19   impacting you at the same time?

20        A    Can you repeat the question?

21        Q    Yeah.  We were just talking about how the

22   impacts of the different experiences could have

23   different affects, right?  On one hand the rape, on

24   one hand the handling of the case.  And you were

25   telling me about some of the differences, and I

1    guess I'm kind of asking if there are similarities.

2    Sometimes, is the trauma that you're

3    experiencing -- or the impact that you're

4    experiencing from both of those?

5         A    Yes.  It's mainly from the way they

6    handled it.  That is what affects my daily

7    day-to-day life, is how it has caused me to distrust

8    the system and -- because that incident has changed

9    my entire world and life.  I will never be the same

10   after what happened there.  Not just from the rape,

11   but the more catastrophic damage to my life and

12   especially to my mental health has been from the way

13   it was handled.  Not to mention -- the rape

14   obviously impacts my mental health, but to the point

15   that my mental health has been deteriorated to today

16   is from how it was handled.

17        Q    One quick fact question I want to make

18   sure I heard the answer to earlier or not.  I can't

19   remember.  So you were enrolled at LSU nursing

20   school.  Remind me when you were supposed to start

21   at LSU nursing school.

22        A    I was going to start in January of 2017.

23        Q    And you did not start those nursing

24   classes, right, or did you start them?

25        A    I did start them.

1      Q    Did you have to drop out that semester?

2      A    Yes.

3      Q    Why did you have to drop out?

4      A    I dropped out for -- because I could not

5    focus on school and because -- I left school to

6    focus on the trial -- or the charges that were going

7    to be pressed or because -- yeah, to focus on having

8    my rapist held accountable for his actions.

9            MR. RUTHERFORD:  I'm done.

10           MR. WIXOM:  I have a few.

11           MR. RUTHERFORD:  I figured you might.

12             R E - E X A M I N A T I O N

13   BY MR. WIXOM:

14      Q    How many times did you speak with Sheriff

15   Daniels about your case?

16      A    Once.

17      Q    And is that the recorded call that your

18   attorneys provided me where you asked him why the

19   rape kit wasn't picked up?

20           THE WITNESS:  I've already testified to

21       this earlier today.

22           MR. RUTHERFORD:  Well, answer --

23           THE WITNESS:  So he gets to ask again?

24       Okay.

25      A    But, yes.

1   BY MR. WIXOM:

2        Q    Okay.  How did you get his phone number?

3        A    I believe it was given to me.

4        Q    By whom?

5        A    Either Sam D'Aquilla or Randy Metz.

6        Q    How many times did you speak to Shannon

7   Tilley on the telephone during the course of the

8   investigation and prosecution?

9        A    Could you give me a time frame?

10       Q    Sure.  From December 9th, 2016, until the

11   end of 2017.

12       A    So only that time frame?

13       Q    So only that time frame.

14       A    We talked multiple different times

15   throughout the years.

16       Q    So did you talk to him in 2018?

17       A    I couldn't tell you the exact date I last

18   talked to him.

19            MR. RUTHERFORD:  He want to know how many

20       times you spoke to him.

21       A    I spoke to him over a dozen times.

22   BY MR. WIXOM:

23       Q    Okay.  Have you had a conversation with

24   Shannon Tilley in 2018 -- or did you have a

25   conversation with him in 2018?  Let me ask this:

1    When is the last time you spoke to Shannon Tilley?

2        A    I was living at Dylan and I's home on

3    Greenforest.

4        Q    What year was that?

5        A    It was a few years after.

6        Q    When was the last time you spoke to David

7    Hidalgo?

8        A    I haven't spoken to him since the

9    conversation we discussed earlier.

10        Q    Okay.  Your attorney asked you if Barrett

11    Boeker not being arrested sooner comprised all of

12    the issues you had with the sheriff's office's

13    investigation, and you said no.  Can you identify

14    all of the issues that you have with the sheriff's

15    office's investigation of Barrett Boeker?

16        A    Okay.  My first issue would be having to

17    be told that I needed to seek outside help, that

18    they wouldn't be able -- that that would be -- that

19    another office -- that the attorney general's office

20    would be able to, like, basically truthfully

21    investigate.  That was my first issue.

22            My second issue is that they did not pick

23    up my sexual assault forensic exam.

24            My third issue is that I was told and

25    assured that it would be picked up and processed in

```
 1   a timely member before a grand jury hearing would
 2   have operated.
 3            And -- what's the question again?
 4            MR. RUTHERFORD:  Do you have another
 5        question, Jason?
 6            MR. WIXOM:  Yeah.
 7   BY MR. WIXOM:
 8        Q    Are you finished?  Are those all the
 9   issues?
10        A    No.  Just -- no.
11        Q    Could you please provide me with all of
12   the issues you have with the sheriff's office's
13   investigation?
14            MS. ORGERON:  I'm going to object to the
15        extent that it's asking for kind of legal
16        theory of the case kind of wrapped up.
17            MR. WIXOM:  I'm asking for the factual
18        issues that she has.  So she was able to
19        identify not picking up the rape kit, not
20        processing the rape kit, not arresting Barrett
21        Boeker sooner.
22            MS. ORGERON:  So you're talking about her
23        personal issues?
24            MR. WIXOM:  Correct.
25            MS. ORGERON:  But, you know, if you're
```

1        asking in the sense of her complaint, as you

2        were earlier, you know, there could be more

3        than that that her attorneys identify.

4            MR. WIXOM:  I'm asking her specifically.

5            MS. ORGERON:  So I'm just objecting to the

6        extent that it's --

7            MR. WIXOM:  That's fine.

8            MS. ORGERON:  -- asking -- okay.

9            MR. WIXOM:  Sure.

10   BY MR. WIXOM:

11       Q    So are there any other issues that you

12   personally have with the investigation conducted by

13   the West Feliciana Parish Sheriff's Office?

14       A    Yes.  How sometimes they could speak to

15   me -- like, well, okay.  My issue is that they would

16   defer and deflect to the district attorney's office

17   any time that it was something that it was supposed

18   to be their responsibility, they would blame it on

19   the district attorney.

20            The fact that the sheriff said that it was

21   a moot issue because it was a not true bill after

22   the grand jury hearing was put on after not even

23   showing them the evidence, that was another issue.

24            Another issue is the fact that they were

25   possibly -- or possibly did not have pictures of my

1   entire body naked and bruised up and that they had

2   all possibly -- or they looked at it and the fact

3   that they had heard all the crimes that had happened

4   to me and they believed me, but yet -- and they

5   collected -- they had me, you know, do these

6   interviews, do these phone calls, tape things, and I

7   had to travel at my expense and all of that

8   for -- to gather all this information but not to

9   investigate and -- the crime to the best of their

10  ability.

11          And the fact that they were telling me

12  that they couldn't, that's one of that main huge

13  issues I have with it, is the fact that they were

14  sitting there telling me that it was out of their

15  hands.  Like, anything that happens on the prison

16  grounds basically there's nothing that their

17  office -- the West Feliciana Sheriff's

18  Department -- it was well known.  Even the officers

19  told me this, that it was well known that there was

20  nothing they could do about it -- with what happened

21  there.  Like, that there have been previous

22  instances before me where crimes have been committed

23  there where they have tried to hold the criminal

24  accountable, but they were unable to do so due to

25  whatever ties in the community.

1          And another issue is the fact that
2    one -- being raped and sexually assaulted on
3    multiple different occasions, just one person,
4    should have been enough.  The fact that they said
5    that I would -- in order to pursue just what
6    happened to me, I would need other victims to come
7    forward and they would have to speak out.  That was
8    a major -- it should have been enough that I came
9    forward.  No victim should have to then decide to
10   come forward and sit there and go through all of
11   this and explain all of this and all of the details
12   of being brutally raped and -- especially by a
13   perpetrator that is part of their family, no matter
14   what their job title is, that they should be allowed
15   to get away with it, and due to the fact that I
16   can't get other victims to come forward -- it should
17   have been enough that one person was raped.  It
18   should never -- even if he just raped me, that
19   should've been enough to investigate and not -- they
20   shouldn't have told -- why did they tell the
21   detectives not to continue to investigate, that it
22   would be swept under the rug?  Why did they have
23   this meeting?  Why did they allow that to happen?
24        Q     Earlier, you were asked about Exhibit P11
25   where you called -- or spoke to Seva -- am I

1    pronouncing that right?  S-E-V-A -- and Sarah?

2        A    Yes.

3        Q    Who are they employed by?

4        A    LAVNS, L-A-V-N-S, the victim notification.

5        Q    Were they able to tell you who placed the

6    red flag next to Barrett Boeker's name?

7        A    No.

8             MR. WIXOM:  That's all I have.

9             MR. RUTHERFORD:  I don't have anything

10   further.

11            MR. LEDET:  I don't have anything.

12            THE COURT REPORTER:  Do you need a copy of

13   this transcript?

14            MR. RUTHERFORD:  Electronically would be

15   great.

16            THE COURT REPORTER:  And do you need a

17   copy of this one as well, sir?

18            MR. LEDET:  Yes.

19          (Deposition concluded at 5:10 p.m.)

20

21

22

23

24

25

1              REPORTER'S PAGE

2

3        I, Lindsay I. Gibney, Certified Court Reporter,

4    in and for the State of Louisiana, the officer, as

5    defined in Rule 28 of the Federal Rules of Civil

6    Procedure and/or Article 1434(b) of the Louisiana

7    Code of Civil Procedure, before whom this sworn

8    testimony was taken, do hereby state on the record:

9        That due to the interaction in the spontaneous

10   discourse of this proceeding, dashes (--) have been

11   used to indicate pauses, changes in thought, and/or

12   talkovers; that same is the proper method for a

13   court reporter's transcription of proceeding; that

14   the dashes (--) do not indicate that words or

15   phrases have been left out of this transcript; and

16   that any words and/or names which could not be

17   verified through reference material have been

18   denoted with the phrase "(phonetic)."

19

20            LINDSAY I. GIBNEY, CCR #2018008

21

22

23

24

25

CERTIFICATE

1

2     This certification is valid only for a
transcript accompanied by my original signature and
3   original required seal or my certified digital
signature on this page.

4

     I, Lindsay I. Gibney, Certified Court Reporter
5   in and for the State of Louisiana, as the officer
before whom this testimony was taken, do hereby
6   certify that, PRISCILLA LEFEBURE, after having been
duly sworn by me upon authority of R.S. 37:2554, did
7   testify as hereinbefore set forth in the foregoing
134 pages;

8     That this testimony was reported by me in the
stenomask method, was prepared and transcribed by me
9   or under my personal direction and supervision, and
is a true and correct transcript to the best of my

10  ability and understanding;
     That the transcript has been prepared in
11  compliance with transcript format guidelines
required by statute or by rules of the board and

12  that I am informed about the complete arrangement,
financial or otherwise, with the person or entity
13  making arrangements for deposition services;
     That I have acted in compliance with the
14  prohibition on contractual relationships as defined
by La. C.C.P. art. 1434 and in rules and advisory
15  opinions of the board;
     That I have no actual knowledge of any
16  prohibited employment or contractual relationship,
direct or indirect, between a court reporting firm
17  and any party litigant in this matter nor is there
any such relationship between myself and a party
18  litigant in this matter;
     That I am not related to counsel or to the
19  parties herein, nor am I otherwise interested in the
outcome of this matter.

20     SUBSCRIBED AND SWORN on the 15th day of

21  November, 2022.

22                   _____

23             LINDSAY I. GIBNEY, CCR #2018008

24

25