The Deposition of

# CAPTAIN SHANNON TILLEY

In the Matter of

# PRISCILLA LEFEBURE

## vs

# BARRETT BOEKER, ET AL

Taken On

# NOVEMBER 01, 2022



**Exhibit E**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


PRISCILLA LEFEBURE,
an individual,
    Plaintiff,


VERSUS                CASE NO: 3:17-cv-1791-BAJ-EWD


BARRETT BOEKER, ASSISTANT WARDEN LSP,
individually and in his official capacity,
J. AUSTIN DANIEL, Sheriff, West Feliciana
Parish, individually and in his official
capacity, WEST FELICIANA PARISH, PRINCETON
EXCESS AND SURPLUS LINES INSURANCE COMPANY,
INSURANCE COMPANY DOES 2-5, DOES 6-20,
    Defendants.
************************************************


DEPOSITION OF CAPTAIN SHANNON TILLEY


The oral deposition of CAPTAIN SHANNON TILLEY

was taken at the offices of Erlingson Banks, 301

Main Street, Suite 2110, Baton Rouge, Louisiana,

on November 1, 2022, commencing at 2:00 p.m.,

before Jean M. Breaux, Certified Court Reporter.

1                    A P P E A R A N C E S

2

3    REPRESENTING THE PLAINTIFF, PRISCILLA LEFEBURE:

4    MR. JACK RUTHERFORD
     MS. JESSICA ORGERON
5    RUTHERFORD LAW
     900 CAMP STREET
6    NEW ORLEANS, LA  70130

7

8    REPRESENTING THE DEFENDANT, BARRETT BOEKER IN
     THE 1983/1985 CONSPIRACY CLAIM:
9
     MR. LEE J. LEDET
10   ERLINGSON BANKS, PLLC
     301 MAIN STREET
11   BATON ROUGE, LA  70801

12

13   REPRESENTING THE DEFENDANT, SHERIFF AUSTIN
     DANIEL:
14
     MR. JASON P. WIXOM
15   FROSCH, RODRIGUE & ARCURI, LLC
     1615 POYDRAS STREET, SUITE 1250
16   NEW ORLEANS, LA  70112

17

18   ALSO PRESENT:

19   MS. PRISCILLA LEFEBURE, PLAINTIFF

20

21

22

23

24

25

1                       I N D E X

2

3                                      PAGE NO.

4

5  EXAMINATION BY MS. ORGERON.................5

6  EXAMINATION BY MS. WIXOM..................113

7  EXAMINATION BY MR. LEDET..................117

8  EXAMINATION BY MR. RUTHERFORD............118

9

10

11        EXHIBITS MARKED FOR IDENTIFICATION

12

13  P8 - LEFEBURE(PL)0066-71...................86

14  P9 - LEFEBURE(PL)0101......................99

15

16           EXHIBITS PREVIOUSLY MARKED

17            AND ATTACHED BY REFERENCE

18

19  P2 - LEF0079 - Voluntary Statement.........92

20  P6 - LEF0023-28............................39

21  S1 - LEF0001-19, Incident Report..........72

22  S2 - LEF0020-22, Arrest Warrant...........96

23  S5 - LEF0055-57, Arrest File Checklist.....88

24

25

S T I P U L A T I O N S

1  
2  
3     It is stipulated and agreed by and
4  between counsel for the parties that the
5  deposition of CAPTAIN SHANNON TILLEY is
6  hereby taken by the Plaintiff, pursuant to
7  Rule 30 of the Federal Rules of Civil
8  Procedure.
9  
10    That the witness waives the right to
11  read and sign the deposition;
12  
13    That all objections, save those as to
14  the form of the question and the
15  responsiveness of the answer, are reserved
16  until such time as this deposition or any
17  part thereof may be used or sought to be
18  used in evidence;
19  
20    That JEAN M. BREAUX, Certified Court
21  Reporter, officiated in administering the
22  oath to the above-mentioned witness.
23  
24  
25

1  PROCEEDINGS:

2              CAPTAIN SHANNON TILLEY,

3          who, after having been duly sworn by

4          the above-mentioned Court Reporter, was

5          examined and testified as follows:

6              EXAMINATION BY MS. ORGERON

7          MS. ORGERON:

8          Good afternoon.

9          THE WITNESS:

10         Good afternoon.

11         MS. ORGERON:

12         I'm Jessica Orgeron, and I represent

13             Ms. Priscilla Lefebure, along with

14             Jack Rutherford.

15 BY MS. ORGERON:

16 Q    Could you please state your full name and

17      title, for the record?

18 A    Shannon Tilley.  I'm currently a Captain,

19      Supervisor of Uniformed Patrol, West

20      Feliciana Sheriff's Office.

21 Q    Supervisor of Uniformed Patrol?

22 A    Right, Uniformed Patrol.

23 Q    Have you ever been deposed before?

24 A    Yes.

25 Q    About how many times would you say you've

| | | |
|---|---|---|
| 1 | | been deposed? |
| 2 | A | Half-dozen, maybe. |
| 3 | Q | Okay.  So, you're pretty familiar.  Have |
| 4 | | you ever been deposed in a civil case |
| 5 | | before? |
| 6 | A | Yes.  Every case I've been deposed in is |
| 7 | | civil. |
| 8 | Q | Oh, okay.  What do you remember about the |
| 9 | | rules for deposition testimony? |
| 10 | A | You'll have to refresh me on it. |
| 11 | | MS. ORGERON: |
| 12 | | Okay, happy to.  So, first of all, |
| 13 | | you're under oath, just -- |
| 14 | | THE WITNESS: |
| 15 | | Uh-huh (yes). |
| 16 | | MS. ORGERON: |
| 17 | | -- like, you know, I'm sure you've |
| 18 | | appeared in court.  And, similarly, |
| 19 | | your testimony is just like it would |
| 20 | | be in front of a judge.  Do you |
| 21 | | understand that? |
| 22 | | THE WITNESS: |
| 23 | | Yes. |
| 24 | | MS. ORGERON: |
| 25 | | And the court reporter is recording |

1    everything we say, and this is going

2    to be turned into a transcript.  And

3    it's going to be important that we

4    don't speak over one another.  I'm

5    saying this as much for myself as for

6    you.  I can talk kind of fast.  If I

7    ever need to slow down, let me know.

8    And we can also -- she'll probably let

9    us know if she's not understanding us.

10   So, please wait to respond to my

11   question, you know, until I totally

12   finish it.

13   THE WITNESS:

14   Okay.

15   MS. ORGERON:

16   Does that make sense?

17   THE WITNESS:

18   Yes.

19   MS. ORGERON:

20   And, then, the next is audible

21   responses.  We need to have verbal

22   responses.  So, if you say "uh-huh" or

23   "uh-uh", that may not be clear for the

24   record, or shaking your head or

25   gesturing, so, say "yes", "no", in

1  answers audibly.

2      If you need me to restate

3  anything, please let me know.  If you

4  don't understand, you can just say I

5  don't understand the question.  Does

6  that make sense?

7  THE WITNESS:

8  Yes.

9  MS. ORGERON:

10  Okay.  And, then, from time to time

11  your attorney may object to questions.

12  Please still answer the question

13  unless otherwise instructed.

14  Understood?

15  THE WITNESS:

16  Okay.  Yes.

17  MS. ORGERON:

18  Okay.  And, then, today I'm asking you

19  to just provide me with your best

20  testimony, however, you don't need to

21  guess.  So, estimates are okay, but if

22  you don't know, you can just say I

23  don't recall.

24      And, then, finally, when the

25  deposition is over, they're going to

```
 1          make it into a booklet that you'll be
 2          able to review if you like.  Do you
 3          understand that?
 4          THE WITNESS:
 5          Yes.
 6          MS. ORGERON:
 7          Okay.  So, if you need to -- if
 8          something's incorrect when you look
 9          over that transcript, you'll be able
10          to have an opportunity to correct it
11          at that time.
12          THE WITNESS:
13          Okay.
14          MS. ORGERON:
15          All right.  And, then, finally, if you
16          need to take a break at any time,
17          please let me know.  I don't want to
18          wear you out.
19     BY MS. ORGERON:
20     Q    Are you on any medication or have consumed
21          any alcohol today --
22     A    No.
23     Q    -- that would affect your testimony?
24          Thank you.
25              Is there any other reason, like life
```

```
 1        circumstances, why this deposition
 2        shouldn't go forward today?
 3   A    No.
 4   Q    Okay.  Thank you.  All right.
 5            So, what's your date of birth?
 6   A    March 3, 1980.
 7   Q    Okay.  And what is your work address?
 8   A    P.O. Box 1844, St. Francisville, Louisiana
 9        70775.
10   Q    Thanks.  Do you have a wife?
11   A    Yes.
12   Q    Kids?
13   A    Yes, three.
14   Q    Three?
15   A    Yeah.
16   Q    Nice.  Boy, girl, what --
17   A    Two girls, one boy.
18   Q    Have you spoken with anyone in preparation
19        for today's deposition?
20   A    A little bit, with my attorney.
21   Q    Okay.  When was that?
22   A    Over the last couple of days.
23   Q    Okay.  And did you take any other steps to
24        prepare for this deposition?
25   A    I read over my -- the case file, as
```

1      relative to -- my report.

2    Q    Okay.  Thank you.

3    A    Uh-huh (yes).

4    Q    So, how long have you been in your current

5      position?

6    A    My current position, since July 1, 2020.

7    Q    2020.  What does that job encompass?

8    A    I supervise the Uniformed Patrol Division.

9      The Uniformed Patrol Division are your

10      uniformed deputies that patrol our parish.

11      So, I am the overall supervisor of those

12      guys and girls.

13    Q    Okay.  About how many deputies is that?

14    A    I have currently 20 --

15    Q    Twenty.

16    A    -- that I supervise.

17    Q    And what does that supervision entail?

18    A    It's mostly keeping up with their time,

19      you know, approving time off, approving

20      their timesheets, approving and going over

21      their arrest reports that are submitted to

22      the courthouse, hmm, disciplinary actions

23      that need to be taken against them, making

24      sure that they have the equipment and the

25      training they need to perform their jobs.

```
1           And I also still answer calls from time to
2           time.  And I do a little bit of
3           everything, I guess.  Counseling.
4    Q      So, when you say "answer calls", what do
5           you mean?
6    A      Yeah, that, you know, calls that come in
7           from the public, calls for, whether it
8           would be a crash, or a domestic, or an
9           alarm call.  If I'm close by and they're
10          -- if most of my people are tied up, I'll
11          go handle it.
12   Q      Okay.  Do you ever get involved in
13          investigations?
14   A      Not anymore.
15   Q      Okay.  What is your schedule typically
16          like?
17   A      Usually my schedule, I work a 40-hour
18          week.  My hours typically are 7:30 to --
19          well, they're supposed to be 7:30 to 4:00,
20          but it's usually more like, you know, 6:30
21          to 6:30.  My time usually starts earlier
22          and ends later.
23   Q      Just the volume of work?
24   A      Yeah.  Yeah, because of the -- yeah,
25          because of the work.
```

1    Q    And do you remember how that schedule and

2          kind of volume compares to the time in

3          question here, which would be about late

4          2016 --

5    A    Yes.

6    Q    -- early 2017?

7    A    Yes.

8    Q    So, what was your --

9    A    Well, my schedule then was I worked -- I

10         was still on 40-hour weeks, but I worked

11         10-hour days.  I was off on Fridays.  I

12         worked Monday through Thursday, from, I

13         usually went to work at around 7:30, 7:30

14         or 8:00, and then I'd work till 5:00,

15         between 5:00 and 6:00.

16             And, all my volume, I dealt

17         specifically with investigations at the

18         time, so, you know, I can't really -- it's

19         hard to estimate on how many cases I

20         worked a week because it was different

21         from week to week.  And we worked all the

22         crimes, burglaries, thefts, rapes,

23         homicides, suicides, hit-and-runs.  I

24         mean, we worked a little bit of

25         everything.  So, they were generally

1  assigned to one of us as they came in, and

2  depending on how many calls we had per

3  week, or how our call volume was. For

4  some weeks I was much busier and I worked

5  more than I was for others.

6 Q And was this position the last position

7  that you held before this current one?

8 A Right, before I was promoted. I -- I was

9  a detective from July 1st of 2005, until

10  July 1st of 2020.

11 Q And that was in the Criminal Investigation

12  Division?

13 A That's the Criminal Investigation

14  Division.

15 Q And how many deputies or detectives were

16  there in that division at --

17 A Well, it changed over the years. When I

18  first started there, there were a total of

19  four, five, six, seven, eight, nine.

20  Nine, I think, when I started in 2005. In

21  2020, when I left, there were four. So,

22  it's -- the amount of detectives decreased

23  over that, you know, 15-year period.

24 Q What do you think caused that decrease?

25 A Well, we had a combined division of

```
 1        Narcotics and Criminal Investigations.
 2        Our Criminal Investigations focused on all
 3        criminal complaints that came in, where
 4        Narcotics focused mainly on narcotics
 5        complaints.  The Narcotics Division kind
 6        of, you know, kind of went away.  We did
 7        away with the Narcotics Division and the
 8        Criminal Investigation Division started
 9        handling all of those complaints.
10    Q   So, would you say that it's primarily due
11        to, like, a lower volume of -- of drug --
12    A   No, I think it was a less -- less of a
13        focus on interdiction and more a focus on
14        investigation.
15    Q   Okay.  And when you say "interdiction" --
16    A   That's, so, that's traffic stops, that's,
17        you know, stops on the street to try to
18        locate illicit drugs.
19    Q   Okay.
20    A   And so I think the focus went away from
21        doing that interdiction more to an
22        investigative role --
23    Q   Okay.
24    A   -- and undercover type stuff.  I never
25        dealt with any of that, but that's kind of
```

1              --
2    Q    Okay.  So, your entire time in the
3         criminal investigations division, you just
4         said you didn't really do the under --
5    A    The narcotics, yes.
6    Q    Narcotics.
7    A    I didn't work any narcotics.
8    Q    But you did do investigations --
9    A    Correct.
10   Q    -- of pretty much all types of crime.
11            So, did you do narcotics
12        investigations?
13   A    No, I did not.  I did not do narcotics
14        investigations.
15   Q    So, just really anything --
16   A    I did --
17   Q    -- except for --
18   A    -- like I said, thefts, burglaries,
19        robberies, homicides, suicides, rapes,
20        batteries, hit-and-runs, just, just about
21        anything except narcotics.
22   Q    Okay.  And I'd love to get a, like, kind
23        of an idea of the break-up of that
24        caseload in terms of, you know, the
25        different types of crimes, you know, what

1      volume of it would you say?

2    A   Probably the largest volume that we dealt

3        with were thefts and burglaries.

4    Q   Okay.

5    A   Because the same -- if I had to say,

6        anywhere you'd go, that would be, most of

7        the crime would be thefts and burglaries.

8    Q   Right.

9    A   So, I would think that most -- most of

10       what we dealt with were thefts and

11       burglaries.  And then I would say that sex

12       crimes probably comes in at -- came in at

13       number two, suicides at three,

14       homicides -- well, you know, homicides

15       would have been kind of far on the list

16       because, you know, we may have averaged

17       one every couple of years.

18   Q   Okay.  So, that's a very low number.

19   A   Yeah.

20   Q   How about for suicides, what would the

21       volume be?

22   A   Our suicide volume was a little higher.

23       We probably -- I would be guessing, but I

24       would think that we, we worked at least

25       six a year.

```
 1   Q    Six.  And then for sex crimes, and
 2        thinking specifically now to, you know,
 3        around the time of this incident, so,
 4        2015 --
 5   A    Yeah.
 6   Q    -- to 2017, something around --
 7   A    We worked -- we worked quite a bit of sex
 8        crimes, and we're talking about from
 9        children to the inmates, because we had
10        Angola in our jurisdiction.  And so, PREA
11        investigations were almost a weekly deal
12        up there.
13   Q    You said "PRE"?
14   A    "PREA".  Yeah, the Prison Rape Elimination
15        Act.
16   Q    Okay.
17   A    So, PREA investigations, I mean, they have
18        a PREA -- they have PREA investigators
19        there, but if they were able to find any
20        validity to any of the complaints that
21        they received, they would pass it on to us
22        and we would work it.
23            So, I mean, I would say probably 65 to
24        70 percent of our case load was probably
25        thefts and burglaries, and then after
```

1        that, maybe 20 -- 20 percent or so would

2        be sex investigations, sex crimes

3        investigations.

4  Q   Okay.  And so I do want to ask you about

5        the crimes on Louisiana State Penitentiary

6        grounds in jurisdiction, but is there --

7        would there be any way for you to kind of

8        tease out the volume of sex crimes that

9        were not related to things happening

10      directly, you know --

11  A   I mean, not --

12  Q   -- on the [inaudible]?

13  A   -- not without actually being able to pull

14      the numbers up myself.  Hmm, I can tell

15      you that the majority of our sex crimes

16      probably involve children.  I mean, that

17      was the majority of what we look -- what

18      we dealt with.

19  Q   Okay.  What did you do before joining the

20      sheriff's office?

21  A   I went to high school.

22  Q   You went to high school.  So, did you go

23      to join the sheriff's office straight --

24  A   Three weeks after I graduated high school.

25  Q   Wow.

```
 1          REPORTER:
 2          Excuse me, that's okay, you're just
 3          answering before she finishes.
 4          THE WITNESS:
 5          Oh, I'm sorry.
 6  THE WITNESS:  (CONTINUING)
 7  A    Yes, three weeks after I graduated high
 8       school, I went to work at the sheriff's
 9       office.
10  BY MS. ORGERON:
11  Q    Thank you.  So, what was the training like
12       when you joined the force?
13  A    My first nine months, I guess was probably
14       on-the-job training.  I started in the
15       Corrections aspect, so, I worked in the
16       jail first, then I --
17  Q    When you say, "the jail" --
18  A    Our -- the West Feliciana Parish Jail.
19  Q    Okay.
20  A    So probably the first nine months of --
21       let me think -- it was closer to a year
22       that I worked in the jail and had
23       on-the-job training.  Then I went to the
24       LSU Basic Academy in 1999, in the summer
25       of 1999, one year after I started.
```

```
 1    Q    Okay.  So, you joined the force in 1998?
 2    A    Yes.
 3    Q    And your first year was working at the
 4         jail?
 5    A    Yes.
 6    Q    And you remember that as mainly being
 7         on-the-job training?
 8    A    Correct.
 9    Q    Do you remember if there was any formal
10         training in that initial bout?
11    A    Hmm, there wasn't.
12    Q    Okay.
13    A    It wasn't required by legislature at the
14         time, and, you know, we housed, I think 29
15         inmates, so it wasn't a difficult -- it
16         wasn't a difficult job, it was basically
17         dealing -- learning how to deal with
18         people.
19    Q    Yeah, that makes sense.
20    A    Yeah.
21    Q    And then in 1999 you went to the LSU Basic
22         Academy, can you tell me a little bit
23         about that?
24    A    LSU Basic Training Academy is the POST
25         Academy -- was the POST Academy at the
```

```
 1        time, and so just about every law
 2        enforcement officer that was working
 3        during that time period went to LSU Basic
 4        Training Academy.
 5   Q    And about how long is that training?
 6   A    Then, I think it was eight or nine weeks.
 7   Q    Okay.
 8   A    Now, it's like four months.
 9   Q    Let's see if I have anything else.
10            So, how much experience would you say
11        that you have with -- have had with sexual
12        assault investigations?
13   A    A lot of experience.
14   Q    Okay.  Could you estimate how many
15        you've been involved with?
16   A    I mean, well, I probably wouldn't be
17        close.
18   Q    Dozens?
19   A    No, I -- I really couldn't estimate.
20   Q    Okay.
21   A    I've been here for 24 years, so, I mean,
22        it's -- I've dealt with a lot in 24 years.
23   Q    Yeah, I can imagine.
24            So, now we're going to talk about the
25        current practices for investigation of
```

1        crime, specifically sexual assault, but if

2        there's just a more general practice, you

3        can just tell me and that's just what's

4        happening these days.

5   A   Uh-huh (yes).

6   Q   So, how do cases -- and I understand, by

7        the way, that you're now in a little bit

8        of a different role than you were in 2016.

9        So, if there is anything of relevance to

10       talk about in terms of the differences in

11       your understanding, that would be fine.

12       But I'm just trying to get a general sense

13       of the office's practices.

14         How do cases typically come to the

15       office?

16   A   So, a call is initiated by a complainant

17        who is either a victim or a witness, and

18        they give us the complaint, what they know

19        the facts to be.  If the call -- it's "a

20        call", that's the way we, you know, the

21        verbiage we use is a call comes in, a

22        uniformed patrol deputy is usually sent to

23        that call and works it up to the point

24        where they can't work it anymore.  If they

25        get to that point where they can't work it

1        anymore, we generally assign it or send it

2        to the criminal investigation division,

3        and the supervisor there assigns it to one

4        of the detectives to work.

5  Q   So, when you say, "can't work it anymore",

6        what does that entail?

7  A   Well, just say run out -- either run out

8        of time or run out of resources.  Because,

9        you know, a uniformed deputy doesn't --

10       isn't really -- we don't let them work a

11       lot of overtime.

12  Q   Right.

13  A   So, they have a 12-hour shift in which to

14       do their work.  If they have an extremely

15       busy shift, they can't put a whole lot of

16       time into one case.  But if they have a

17       little bit of extra time, you know,

18       they'll try to talk to witnesses and try

19       to work it from there.  But if they can't,

20       they don't have the time or, like I said,

21       the resources.  I mean, they can't travel

22       out of the parish to go find someone else

23       because they're on duty in West Feliciana

24       Parish, they really can't -- they can't

25       leave our parish.

```
 1              So, if it gets to that point and it
 2         needs to be investigated further, we'll
 3         send it to Criminal Investigations.
 4    Q    Okay.
 5    A    Generally, with -- obviously, with
 6         homicide, with anything with a crime
 7         scene, we would call the detectives
 8         immediately, because the crime scene needs
 9         to be worked and, you know, they have the
10         training in working with crime scenes.
11    Q    Okay.  In your experience, do you -- does
12         the office investigate the crime scene for
13         sexual assault cases?
14    A    Yes, if there is a crime scene.
15    Q    Okay.  And when would there --
16    A    So, within 72 hours of the crime.
17    Q    Within 72 hours.
18    A    Because anything after 72 hours, the
19         chance of there being DNA is almost zero
20         percent.  So, anything outside of 72
21         hours, we would -- also, you've got to
22         make sure that the crime scene was
23         contained.  If you had a lot of people
24         going in and out of the crime scene,
25         you're going to have contaminants.  And, I
```

1   mean, the chance of you gaining something

2   relevant to a case at that point is pretty

3   much zero, as well.

4   Q   So, you would say it's uncommon to

5   investigate a crime scene after 72 hours?

6   A   Correct.

7   Q   Does it still happen sometimes?

8   A   Sometimes.

9   Q   So, I'd like to talk about the types of

10  evidence and kind of when that evidence is

11  generally collected, who collects it.  And

12  I guess I would invite you to talk

13  generally first, and then if you don't

14  cover everything I can ask you about, you

15  know, how evidence is collected in your

16  office?

17  A   Well, it depends really on what type of

18  crime you're working, and what the scope

19  of the crime is and where the crime

20  happened.

21  Q   Okay.

22  A   I mean, but -- and this is going to be a

23  lot of generalizations, really.  So, if

24  you start out with a crime scene, your

25  crime scene detectives would go to that

1      crime scene, photograph, draw, take all
2      the details needed, and then collect any
3      evidence they see on that crime scene.
4      You know, if it's a traffic stop, the
5      deputy who initiates the stop would take
6      evidence out of that crime scene, you
7      know, that vehicle.  And, you know, I
8      mean, there's not really an opportunity to
9      take evidence off of someone who's giving
10     a complaint, so that rarely happens.
11  Q  Why would -- what -- when you say there's
12     not an opportunity to take evidence off of
13     someone whose giving a complaint --
14  A  Yeah, I mean, if somebody comes in to give
15     me a complaint of an ID theft, then
16     there's no evidence to take off of them
17     unless they actually have, you know, some
18     paperwork documenting where the ID theft
19     occurred or --
20  Q  Right.
21  A  -- you know.
22  Q  Well, I guess we can narrow it down in --
23     for just purposes of our discussion, to a
24     typical sex crime investigation.
25  A  Uh-huh (yes).

1    Q    So, obvious -- there can be differences,

2         right.  So, what about collecting physical

3         evidence from an alleged victim, a

4         complainant, as you say?

5    A    From -- in a rape?

6    Q    Yeah.

7    A    Okay.  So, now, I believe it's the duty of

8         the coroner's office to investigate rapes

9         and to be able -- and to conduct rape

10        kits.  SANE Nurses are assigned to do

11        those.

12   Q    When you say "now", is this a new policy?

13   A    I don't know when it went into effect.  It

14        hasn't always been in effect.  It wasn't

15        always like that.  You know, when I first

16        started, if you had a victim of a rape

17        come to you to make a complaint, you could

18        bring them to the local hospital and have

19        a nurse do the rape kit, and everything

20        was contained in that rape kit, and a

21        nurse could do the rape kit there.

22   Q    Okay.

23   A    At some point it changed, and it's now the

24        coroner's office duty to train people in

25        evidence collection in a rape case.

```
 1   Q    Okay.  So, they collect the evidence.   Who
 2        is responsible for incorporating that
 3        evidence into the case?
 4   A    So, they hold the evidence at the
 5        coroner's office, and then the
 6        investigating agency or prosecuting agency
 7        would be -- would decide when it's
 8        necessary to pick that evidence up.  That
 9        evidence would have to go to a crime lab.
10        We use the state police crime lab for our
11        -- for our crime, our evidence inspection.
12        So, the kit would go there, and then the
13        crime lab would send the results to the
14        investigating and prosecuting agencies.
15   Q    Okay.  So, for West Feliciana, is there a
16        particular party that is expected to pick
17        up the sexual assault kit?
18   A    We have -- we have no policy in place
19        for -- for that particular instance.  It
20        -- you have to look at the overall
21        circumstances of what's going on with the
22        case to decide whether or not it's
23        relevant to pick it up at this point, or
24        later, or, you know, leave it up to the
25        prosecuting agency to do that.
```

```
1    Q    Would it surprise you to know that Sheriff
2         Daniel actually in 2016 made a public
3         statement that they were changing their
4         policy to have rape kits picked up and
5         processed in a timely fashion?
6    A    No, that would not surprise me.
7    Q    Okay.  It just seems that you had just
8         said that there wasn't a particular
9         policy, do --
10   A    Uh-huh (yes), yeah.  There's not.
11   Q    Okay.  So --
12   A    We have no detailed policies on how to
13        investigate a crime, because every crime
14        is different.
15   Q    Right.
16   A    So, you have to go into each crime that
17        you investigate with the mindset that,
18        hey, I'm going to take this clue and it
19        will lead to this one, and then it will
20        lead to this one, and lead to this one.
21        You can't just go in there saying I'm
22        going to do this, this and this, because
23        you're going to skip over something.  So,
24        there is no detailed policy on how to
25        investigate a crime.  We have vague
```

1     policies on criminal procedures, because

2     we have to follow the law.  And, as long

3     as we follow the law and we are able to

4     obtain the most facts that we can and set

5     a case forward and make an arrest, then

6     we've done our job.

7  Q  Okay.  So, you said that you have vague

8     policies on procedures --

9  A  Correct.

10  Q  -- in general?  Where are those policies

11     located?

12  A  Uh, there's a public draft for the West

13     Feliciana Sheriff's Office that has them

14     on there, that --

15  Q  Okay.

16  A  -- all the sheriff's office employees have

17     access to.

18  Q  Okay.  So, to your knowledge, are there

19     policies, like general policies regarding

20     investigation protocols on that drive,

21     or --

22  A  No, I don't think so.

23  Q  What is on that drive?

24  A  I mean, it's mostly, hmm, there's policies

25     for -- for -- there's uniform policies,

1     there's policies for leave, there's

2     policies on vehicle and vehicle usage,

3     there's policies on our -- on how we

4     perform, you know, how we conduct

5     ourselves professionally.  But there are

6     no detailed policies on how to handle

7     situations that arise outside of

8     administrative procedures.

9  Q  Okay.

10 A  So --

11 Q  So, to your knowledge, there was no policy

12    change with respect to the handling of

13    rape kits?

14 A  That is correct.  As far as I know, I have

15    not seen it, and I read over the policies

16    quite often with new hires --

17 Q  Okay.

18 A  -- so that they're -- so that they kind of

19    know what they're supposed to do and

20    what's expected of them, and, that -- we

21    -- that -- those policies have not been

22    set in place.  There's never been --

23    policies have been updated two years ago

24    when the new sheriff took office, but I

25    can't really tell you which policies those

1    were that were updated.

2  Q    Okay.  But as far as you know, none would

3       pertain to sexual assault examination

4       kits?

5  A    That's correct.

6  Q    Okay.  Or sexual assaults or investigation

7       of crimes in general?

8  A    Yes.  And, if I may add, I think one

9       reason for that is because investigative

10      techniques change so often, it would kind

11      of defeat the purpose of having

12      detectives, if you told them every step

13      they're supposed to take along the way of

14      an investigation.  Because, like, as

15      technology changes, as new modes of

16      investigation changes, then, you know,

17      training sets forth what we should do and

18      how we should handle situations, and not

19      a, you know, not words in a policy manual.

20  Q   Right.  Are you in charge of ensuring that

21      new hires in your department --

22  A    "Division".

23  Q    -- division are doing the trainings that

24      they need to do?

25  A    I am not over training, no.  So, I -- when

1    a list of training is emailed to me, I

2    email it out to my people, and if they

3    don't show up for training, I write them

4    up and discipline them for it.  But I'm

5    not the one that -- and if they bring

6    training to me that they're interested in,

7    say, someone's interested in, you know,

8    narcotics interdiction, or someone's

9    interested in fingerprinting, then I'll

10   find some training, I'll help them find

11   training to send them to, but I'm not over

12   the, you know, the train -- the POST

13   training.

14   Q   Right.  Who is over it?

15   A   Vanessa Jones.

16   Q   Vanessa Jones is over --

17   A   Yes.

18   Q   -- your new divisions, as well.

19       So, we talked a little bit about

20   physical evidence.  Again, so, we're

21   talking about current investigative

22   policies, what about -- or practices,

23   let's say it that way.

24   A   Uh-huh (yes).

25   Q   What about collection of witness

1    statements, how does that normally go

2    about?

3  A  If we can gain the names of witnesses, we

4    generally try the best that we can to get

5    them in.  Obviously, we can't force them

6    to come talk to us, we can't force them to

7    give us a statement.  We will name them in

8    our narratives, and if they want -- if the

9    court wants to subpoena them to ask them

10   questions, obviously they can do that.

11   But we try our best to interview and

12   obtain statements from every witness

13   involved in every case that we work.

14  Q  If a witness refuses to talk, what do you

15    do?

16  A  I mean, there's not much we can do.

17  Q  But, do you reflect that in the narrative?

18  A  Yes.

19  Q  Okay.  And, then, how about the collection

20    of electronic evidence?

21  A  If we know that there's electronic

22    evidence that we can gain from a victim or

23    a witness, we'll ask them just to provide

24    it for us, because that's the easiest

25    route.

1        If we have to get a subpoena or a court
2    order for electronic evidence, then, you
3    know, we can do that, as well.
4  Q   And how do you determine whether there is
5    electronic evidence, let's say for a
6    sexual assault case, that you want to get?
7  A   I mean, we have to be told so, we have to
8    have good information.  We have to have
9    probable cause, of course, for a court
10   order or subpoena.  I mean, we can't just,
11   you know, guess that, hey, there might be
12   text messages or there may be some phone
13   calls or emails between them.  Someone has
14   to cooperate enough to provide us with
15   information to give us an inkling that
16   there is some evidence there.
17 Q   So, if someone, for example, if they were
18   suspected of murder, would it be typical
19   for you to look -- to try to get access to
20   their electronic evidence?
21 A   Again, that -- I think that's kind of up
22   to each individual detective.  I would.
23   I've seen some murder cases recently where
24   they didn't, and, I mean, I -- I mean,
25   who's to say who's right and who's wrong

1    right there.  I probably would on a murder

2    investigation, but not everyone would or

3    does.

4  Q  Okay.  How about for sexual assault cases?

5  A  It, that again depends on, you know, the

6    evidence or the -- and the statements that

7    we gather on whether or not we get, you

8    know, a search warrant for that.

9  Q  Okay.

10  A  Because it takes some time to gather

11    everything that we need for a subpoena,

12    and it takes a good amount of time --

13  Q  Right.

14  A  -- to write a subpoena.  And when you have

15    seven or eight cases on your desk, you

16    want to make sure that this is going to

17    lead to information that I need before,

18    you know, before you start on it.

19  Q  Yeah.  When you're investigating a violent

20    crime like a sexual assault, is it common

21    practice to do a criminal background check

22    on a suspect?

23  A  We, at West Feliciana Sheriff's office, it

24    is not mandated, and it's not mandatory we

25    do it, but every arrest that we make, we

1        include a criminal history in the file.

2   Q   You include a criminal history in their

3        file?

4   A   Yes.  As far as I know.  Now, since 2020,

5        since I've been where I'm at, you know, a

6        criminal history is sent to us, to the

7        officer who makes the arrest, to the

8        deputy who makes the arrest, by our

9        dispatchers, and it's run through NCIC.

10  Q   Do you remember if you did that in 2016?

11  A   I don't.  I don't recall.  There was a

12       time when the district attorney had to

13       request the criminal histories before

14       court, because they weren't being included

15       in the file.  And, you know, I can't -- I

16       can't tell you for sure whether or not I

17       included a criminal history.  Usually, I

18       do, but I make mistakes from time to time,

19       so.

20  Q   Okay.  Do you remember around when that

21       was that the district attorney was trying

22       to make -- having to make those requests?

23  A   No.  I mean, it's been throughout my

24       career.  I mean, I've -- it's been -- it's

25       been throughout my career.

```
 1   Q    Okay.  And you would say that as far as
 2        you know, in 2020, the practice of the
 3        department changed?
 4   A    Yes.  Now, there's -- I don't submit an
 5        arrest folder unless a criminal history is
 6        included in the arrest folder.
 7   Q    Okay.
 8            MS. ORGERON:
 9            I would like to -- do we have "P6"?
10            (DISCUSSION OFF THE RECORD)
11   BY MS. ORGERON:
12   Q    Okay, this is "P6".  We looked at it
13        earlier today with Mr. Lee.
14   A    Uh-huh (yes).
15   Q    This was included in the file that was
16        produced to our clients.  Could you tell
17        me what this printout is?
18   A    This is an ICJIS printout.  And, you know,
19        I would be lying if I tried to tell you
20        what "ICJIS" stands for.  But this is not
21        the NCIC printout that dispatch, the
22        dispatchers, give to us for criminal
23        histories.  I can see that this is DMV
24        information and that he has a criminal
25        history, a Louisiana criminal history
```

1       here, because this is basic information

2       gleaned from that.  But this is not the

3       criminal history that is printed out by

4       our dispatchers.

5  Q    Okay.  Thank you.

6         (DISCUSSION OFF THE RECORD)

7  BY MS. ORGERON:

8  Q    Okay.  And when -- how does investigation

9       and reporting and all of that change when

10      a crime is also -- has also taken place on

11      the grounds of the Louisiana State Police

12      [sic] -- Penitentiary?

13  A    The penitentiary?

14  Q    Yeah, excuse me.

15  A    Yeah.  Most of our crimes on the

16      penitentiary property occur between

17      inmates.  So, that's a challenge in

18      itself, because, I mean, you would think

19      that these cells and dorms are contained

20      and that you're not going to lose any

21      evidence, but you do because there's so

22      many people walking in and out and people

23      living in these -- in the dorms and

24      things.  So, most of our investigations

25      involving inmates, inmate deaths, inmate

1    fights or inmate rapes, you know, we have

2    to kind of look at the crime scene

3    differently knowing that we're going to

4    collect, but, you know -- let me back up.

5    When you collect evidence, DNA evidence

6    that's to be sent to the crime -- state

7    police crime lab, they only accept a

8    certain amount of evidence for each case.

9    So, you can't just take everything that

10   you have and send it all there, because

11   they're overwhelmed with DNA evidence.

12   So, that, the last that I was told by our

13   DNA -- hmm, our evidence guy -- not DNA --

14   our evidence guy, is that they'll take

15   three pieces of DNA evidence, and then

16   they'll take -- but they have to have

17   swabs from everyone that had access to

18   that area.  So, you know, if you've got a

19   dorm with 80 inmates living in there, it

20   takes quite some time, right.  So,

21   obviously that changes the dynamics of how

22   you work a case, because you -- most of

23   it's going to be consumed in taking those

24   DNA swabs from those inmates there.

25        Hmm, the crime outside of the prison

1     setting, at what we call "B-Line", the

2     neighborhood that people live in, very

3     little crime is actually reported there.

4     And when it is, there's usually Roving

5     Security, which is called RS, are usually

6     on the scene, and the warden that's over

7     roving security is usually there, and then

8     the whole neighborhood comes out to find

9     out what's going on, and so that also

10    presents, you know, a lot of issues when

11    working crimes there -- crime scenes

12    there.

13  Q   So, Roving Security is a force that is

14       part of the --

15  A   Louisiana State Penitentiary.

16  Q   -- State Penitentiary?

17  A   Yes, ma'am.

18  Q   So, how does it work when you have kind of

19       two different forces --

20  A   Well --

21  Q   -- with the same jurisdiction?

22  A   It's hard, you know, because they --

23       they're not a law enforcement entity, but

24       they have to be there with you to make

25       sure that you don't try to pass something

1        off to an inmate any, you know, they've

2        got to make sure that you don't have your

3        guns on you and that all you have with you

4        is your equipment that you need to work a

5        crime scene.  So, I mean, it's tough, but

6        we deal with it.

7   Q   Do they typically involve themselves in

8        the --

9   A   They have --

10   Q   -- investigation?

11   A   -- in the past.  They have in the past,

12        yes.

13   Q   When you say, "in the past", like, it --

14   A   Since I've been here the last two years in

15        my position as a supervisor, they have

16        interfered with a couple of our

17        investigations, crash investigations

18        there.  And, you know, so we try and deal

19        with it on that end.

20   Q   So, when you say, "interfere", what is --

21        what is "interfere"?

22   A   Hmm, telling -- you know, telling the

23        officers what they should and shouldn't

24        do; "Hey, you shouldn't talk to them

25        without your attorney", or, "Hey, maybe

1    you should go home and think about it

2    before you talk to them", or, you know,

3    things that probably isn't necessary for

4    them to, to get involved in.

5  Q   And were you aware of them doing any

6    activities like this prior to this

7    position?

8  A   No, I -- because -- because I never worked

9    really with any of the Roving Security

10    guys.  Most of the time that we received

11    complaints from Angola, it was from

12    Investigations, Investigation Division,

13    and we would go there to meet with the

14    people we needed to talk to; or, was from

15    the, you know, inmates inside cells; or,

16    people came to us.

17  Q   The Angola Investigations Division?

18  A   Right, the Angola Investigation Division.

19    So, they would call us if, you know, an

20    inmate threw urine on someone, or they hit

21    someone, or if someone showed up there

22    with a warrant, or if there were issues

23    with officers bickering and they got into

24    a fight or something of that nature, we

25    would go to investigations division there

1    to deal with that.  I never worked much on

2    the actual B-Line because there was never

3    any crime scene for me to go work on

4    B-Line.  Most of the crimes were domestic,

5    Uniformed Patrol would handle that, and I

6    wasn't in Uniformed Patrol at the time.

7  Q  Crimes occurring on the B-Line were

8    domestic?

9  A  Most of them were domestic in nature.

10 Q  Okay.  So, did you ever investigate

11   crimes -- were you ever called by Angola

12   to investigate crimes that allegedly were

13   perpetrated by penitentiary personnel

14   against inmates?

15 A  Oh, yes, all the time.

16 Q  Okay.  So, Angola would call you?

17 A  Yes.

18 Q  And what part -- was that the

19   investigation division at Angola?

20 A  Yes, that was the investigation division.

21 Q  Okay.

22 A  So, the investigation division would call

23   us and allow us to conduct a proper

24   investigation.

25 Q  Okay.

1   A   We never had any problems with them

2        interfering with anything.

3   Q   Okay.  All right.  So, we kind of went on

4        a tangent with LSP.  Generally, you've

5        collected the evidence, how does the

6        office make a decision to make an arrest?

7   A   If we have probable cause, generally you

8        submit a warrant to a judge, if the judge

9        signs the warrant you make an arrest.

10  Q   Okay.  So, the investigating deputy

11       determines --

12  A   That's correct.

13  Q   -- if there's probable cause?

14       And does the deputy need any approval

15       to do that, is there -- or is it a

16       unilateral decision?

17  A   No.  I mean, we swore an oath to protect

18       the laws of the State of Louisiana, and

19       that's what we're allowed to do.

20  Q   Okay.  So, it's the practice that an

21       individual deputy will make that call, on

22       --

23  A   Yes.

24  Q   Okay.  And, then, finally, you know,

25       you've issued an arrest, how --

1       can you tell me a little bit about what

2       happens after you've issued the arrest

3       warrant?

4   A   Again, it's really depending upon the case

5       you're working.  If it's an investigative

6       case where you have, you know, different

7       elements of a crime and different bits of

8       evidence and different witnesses and

9       things that you have to get, you try to

10      get as much of that as you can before

11      making an arrest.  Now, you don't want to

12      wait too long, because if it's a violent

13      offender, you don't want them walking the

14      street and doing something to someone

15      else.  So, you want to try to get as much

16      information as you can right off the bat,

17      and then when you get what you need to

18      make an arrest, you submit your warrant,

19      the judge signs the warrant, we effect the

20      arrest.  If there's any loose ends that we

21      need to tie up after the arrest, we try to

22      do it at that point.  But for the most

23      part, you try to get everything in as

24      quickly as possible so that everything can

25      be turned over to the prosecution and the

1       next step in the criminal process can take

2       place.

3    Q   Okay.  And, so, that next step involves

4       the district attorney?

5    A   That's correct.

6    Q   And how does that work from y'alls end?

7    A   When we finish a case, the entire file is

8       approved by Administration, and

9       Administration turns everything over to

10      the district attorney.  If a new witness

11      comes in later, we'll take a statement

12      from that new witness, or if new evidence

13      comes in later, we'll take that new

14      evidence, we'll let Administration know,

15      and then they'll turn that over to the

16      district attorney.  But we, as deputies,

17      don't have, you know -- there's not a lot

18      of communication between the district

19      attorney's office and the individual

20      deputies.

21   Q   Okay.

22   A   Not until it's time to go to trial, and

23      then they may call and say, "Hey, this is

24      going to trial.  This is what you need to

25      know" --

1   Q   Okay.

2   A   -- that type of deal, for lack of a better

3       word, preparation for a trial, you know.

4   Q   Yeah.  What about grand jury proceedings?

5   A   So, grand jury proceedings, for those

6       crimes that are -- that have to go in

7       front of the grand jury, we're usually

8       told beforehand that a grand jury will be

9       picked on this date, this case is going

10      there, I'll need you there for it.

11          So, when we go to the grand jury

12      hearing, we're usually called to testify

13      and we give our testimony on how we worked

14      the case, explain what evidence is there,

15      what witnesses said, answer questions to

16      the grand jury, and then we're released.

17  Q   Have you testified in a lot of grand jury

18      proceedings?

19  A   Yes.

20  Q   Is it common for there to be a grand jury

21      proceeding where the officers or the

22      deputies are not called to testify?

23  A   Not in my experience.

24  Q   Okay.  I'm going to ask about a few

25      specific areas of trainings.  You said

1      that, to your knowledge, you know, there

2      are no written policies pertaining to

3      sexual assaults or investigations.  Do you

4      recall if there are POST trainings for

5      evidence collection?

6  A   I'm not sure if there are POST trainings

7      for it.  I mean, over the 15 years I was a

8      detective, I probably went to evidence

9      collection or crime scene investigation at

10     least once a year.  It was, again, methods

11     and modes of those type of investigations

12     change.  We went away from 20 years ago

13     using exclusively fingerprints, and now

14     exclusively using DNA.  So, yeah, I don't

15     know if there's any POST courses for

16     evidence collection, but I do know that, I

17     mean, we've had a lot of evidence

18     collection training.

19 Q   So, these are other trainings --

20 A   Yes.  This is --

21 Q   -- outside of POST?

22 A   Yes, these are trainings hosted by

23     different jurisdictions, different

24     agencies, state police, FBI.  State police

25     crime lab has put on crime scene

1      investigation classes, evidence collection

2      classes.  Hmm, Public Agency Training

3      Council, "PATC", is another agency that

4      offers quite a bit of specific training

5      for investigators.  So, yeah, we've -- I

6      mean, we've done quite a bit of that.

7    Q  Yeah.  Do they provide you with written

8      materials from those trainings?

9    A  Most of the time, yes.

10   Q  Do you retain those?

11   A  I have some of it, you know.  I've moved

12     so many times between offices that I think

13     I've lost quite a bit of training

14     materials, but I do have -- I do have some

15     left, yes.

16   Q  Do you know if there's any kind of library

17     for those training materials?

18   A  Not to my knowledge.

19   Q  Okay.  How about trainings for handling

20     sexual assault investigations in

21     particular?

22   A  I've been -- yeah, there are several --

23     this is just like with the crime scene

24     schools or classes or training, there are

25     several sexual assault or rape

1    investigation training.  Specifically for

2    me, I, you know, I'm not sure exactly how

3    many of those trainings I went to, but I

4    do recall going to four or five Crimes

5    Against Women conferences in Dallas,

6    Texas, over the years, and they run from

7    -- they move from, you know, serial

8    killers, to sexual harassment, you know.

9  Q  And do you recall when you went to those

10    trainings?

11  A  Hmm, you know, 2006 was the first year

12    they had it, I do remember going that

13    year, and  I've probably been four or five

14    years since.

15  Q  Okay.  And, so, there are other -- so,

16    there's this conference, are there other

17    sources outside of POST that you know of

18    for sexual assault trainings?

19  A  Yeah, again, PATC offers some courses.

20  Q  Could you refresh me on PATC?

21  A  PATC, Public Agency Training Counsel, is a

22    law enforcement first responder training

23    organization that is nationwide, and

24    different agencies can host classes

25    through them.  And they'll send the

1    instructor, you know, you pay the fee,

2    they send the instructor.  And, then, you

3    know, you get the class ready and they'll

4    come to each.  And, I mean, they pretty

5    much offer everything that would involve a

6    first responder.

7  Q  So, do you know that -- so, how are

8    trainings assigned, or, do you -- did you

9    get to pick?

10 A  Yeah, usually you kind of pick what

11   interests you, what, hmm -- you know,

12   because nothing is actually required

13   except for homicide training.  Homicides

14   training is required for a detective, but

15   nothing else is actually required by

16   legislature.

17 Q  Okay.

18 A  So, we have to have a certain amount of

19   hours of POST training, and that could be

20   anything, though.  It's an elective,

21   basically, what the -- you know, you have

22   firearms training, you have defensive

23   tactics that you have to do, and then you

24   have electives.  And some of those

25   electives -- of course, we have ethics and

1        sexual harassment and things like that,

2        and you have some electives that you have

3        to do that are signed by Vanessa, or

4        someone in the office.  But, more

5        personalized training is usually kind of

6        sought out and found by the deputy or the

7        detective, or whoever wants to go to the

8        training, they apply for it, and, you

9        know, their supervisor either sends them

10       or they don't.

11   Q   Okay.  So, you signed up for these --

12   A   Yes.

13   Q   -- trainings?

14   A   Yes.

15   Q   Do you remember if you were ever required

16       to take sexual assault training?

17   A   Hmm, I don't remember.

18   Q   Okay.  How about trainings dealing with

19       victims of trauma?

20   A   Yes, we do have -- we do have that

21       required training by our office, and it's

22       through POST.

23   Q   Okay.  So, when you say it's a required

24       training by your office, it's one of the

25       ones that your office --

| | | |
|---|---|---|
| 1 | A | That our office requires us to go through. |
| 2 | Q | Is there a list of trainings that the |
| 3 | | office requires? |
| 4 | A | Uh, I'm sure there is.  Vanessa would |
| 5 | | probably have those. |
| 6 | Q | Vanessa, okay.  And, then, do you remember |
| 7 | | the last time you took training on dealing |
| 8 | | with victims of trauma? |
| 9 | A | I think it was earlier this year. |
| 10 | Q | Okay. |
| 11 | A | But I don't know what month it was. |
| 12 | Q | Do you know if you had taken one prior to |
| 13 | | the incident in question, 2016? |
| 14 | A | I don't recall. |
| 15 | Q | Okay.  And, then, have you -- are there |
| 16 | | any trainings for mitigating the effects |
| 17 | | of gender bias in policing, that you know |
| 18 | | of? |
| 19 | A | Yes. |
| 20 | Q | Okay. |
| 21 | A | We've been through -- yeah, we've been |
| 22 | | through several of those trainings, as |
| 23 | | well. |
| 24 | Q | Okay.  And do you know when you went |
| 25 | | through those trainings? |

1    A    Uh, it's pretty recently.

2    Q    Pretty --

3    A    Within the last year-and-a-half or two

4         years, I guess.

5    Q    Okay.  So, this is a kind of a new

6         development?

7    A    No, I'm talking about the last one we went

8         through was fairly recently, but I don't

9         remember the first time we ever went

10        through it.

11   Q    All right.  Okay.  So, those are kind of

12        the background questions, and now we'll

13        talk about, you know, the investigation in

14        this case.

15             Do you remember how you found out about

16        the allegations that Priscilla brought?

17   A    Yes.

18   Q    When?

19   A    So, my supervisor was Archer Lee.  He

20        called me one afternoon, I had -- I was on

21        call.  So, each detective has call a

22        certain night during the week and then,

23        you know, every few weekends, and it was

24        my evening of call.  It was close to the

25        end of the workday.  And he said he

1    received a call from the state police that

2    there was a rape victim at Woman's

3    Hospital and he wanted me to go down there

4    and see if I could make contact with them.

5        So, usually, usually we don't get a

6    call until the coroner's office has

7    actually finished their investigation and

8    they'll call us afterwards -- unless the

9    victim wants to speak with us that

10   evening.  In this case, the victim didn't

11   want to speak with me, she was gone by the

12   time I got there.  But I did speak with

13   her aunt, I believe it was, who was

14   Barrett Boeker's mother-in-law, and she

15   kind of filled me in on what the

16   allegations were and what happened.

17       Hmm, the SANE Nurse, I did speak with

18   her.  She said that she conducted a rape

19   kit, and I asked her if I could have it.

20   She said, "No, it would be at the Baton

21   Rouge coroner's officer".  And I said

22   okay, I'll follow-up with that later.

23       After I finished talking to the aunt, I

24   went back -- I came back -- went back to

25   West Feliciana Parish because there was

1    nothing else for me to do at that point.

2  Q   Okay.  What was your first impression of

3       the case, based on that?

4       MR. WIXOM:

5       Object to the form of the question.

6  THE WITNESS:  (CONTINUING)

7  A   Hmm, it's hard to make an impression on

8      that because I -- I mean, I talked to

9      someone who wasn't a witness, who just had

10     hearsay, you know, second-hand information

11     to give me.  And, so, I wasn't able to

12     really base any opinion on the case at

13     that point.

14  BY MS. ORGERON:

15  Q   What was your impression of Ms. Helena?

16  A   You know, I don't really remember.  I

17     don't remember having anything negative to

18     think about, you know, about her.

19  Q   So, you went back, and then what happened

20     next?

21  A   So, as I told you earlier, I was off on

22     Fridays, at that point, I worked Monday

23     through Thursday.  So, on a Friday, I

24     received a call from David Hidalgo, who

25     was a detective that worked along with me.

1        And he was going to interview the victim

2        in the case when she came in to give her

3        statement.  Hmm, I don't remember if it

4        was the next day or a couple of days

5        later, but, he came -- she came in to give

6        her statement.  He called me when it was

7        over with, and kind of filled me in on

8        what she said.  And, hmm, and I told him,

9        all right, well, I'll be back in on

10       Monday, we'll get to work on that, you

11       know, as soon as I do.  And -- and that's

12       what we did.

13   Q   All right.  So, do you remember what your

14       next steps were?

15   A   Yeah.  So, obviously, the first thing I

16       did was watch the interview, because I

17       wasn't present for it.  There was a lot of

18       information given on the case.  What we

19       did next, I really don't remember.  I

20       remember -- I know we got a warrant for

21       Barrett Boeker fairly early on.  We had

22       enough probable cause to get that warrant.

23       We tried to reach out to other possible

24       witnesses and victims of Mr. Boeker's, and

25       no one wanted to talk to us, for various

1    reasons.

2  Q    Do you recall who you reached out to?

3  A    Hmm, we reached out to Ms. Lefebure's

4       boyfriend at the time, Dylan, first, or

5       fairly early on.  And, uh, he came in

6       later, two months later, and gave a

7       statement, but he wouldn't talk -- he

8       wouldn't -- he didn't feel comfortable

9       talking to us at first.  Another victim of

10      Barrett's, Stephanie was her name.  And we

11      made contact with Barrett Boeker's sister,

12      Virginia, who Ms. Lefebure had also spoken

13      with about the incident, she wouldn't talk

14      to us.  And I think those were the only --

15      only actual, you know, folks that we had

16      to talk to at that point about it.

17          It's a rape -- it's a rape case, and,

18      like most of them, there are no witnesses.

19      So, you've kind of got to try to develop,

20      you know, other victims like we were

21      trying to do, because we were given the

22      name of another possible victim, and then

23      also, the, you know, the only witnesses

24      were people that were spoken to before us,

25      so, you know, we wanted to try to kind of

1       talk to them and find out what was, you

2       know, what was told to them about it.

3  Q   Do you recall who contacted Dylan

4       initially?

5  A   No.

6  Q   How about Stephanie?

7  A   We were never able to make contact with

8       her.  She wouldn't answer her phone, as

9       far as I know.  And Helena told me that

10      Stephanie wasn't going to talk to us, so.

11  Q   Okay.

12  A   We weren't able to actually make contact

13      with her.

14  Q   And, then, how about Virginia?

15  A   And Virginia, I talk -- I spoke with her

16      briefly, and she hung up on me.

17  Q   What did she say before she hung up?

18  A   She said, "I'm not talking to you".

19  Q   Wow.  Okay.

20  A   Yeah.

21  Q   Do you recall speaking with any other

22      relatives of Barrett?

23  A   Hmm, no, I don't recall.  And, now -- you

24      know, we did a controlled phone call with

25      Barrett's wife and Ms. Lefebure.  The idea

1    behind that, because she, Barrett Boeker's

2    wife, Aurielle, kind of knew what was

3    going on, we were told.  She -- she knew

4    what was happening.  And so we wanted her

5    to tell Ms. Lefebure on the phone what she

6    knew and what happened.

7        So, we made the phone -- we made the

8    controlled phone call.  She did not admit

9    that Barrett did it, but she also didn't

10   deny it.  And we felt like she knew a lot

11   more than what she was saying, and -- but

12   we knew too that we would never get her to

13   talk to us.

14 Q  Did you attempt to call her?

15 A  Yes, after that incident we did, and we --

16   neither -- neither David nor I tried to

17   get her to -- on the phone.  We tried to

18   -- we had one of our female detectives,

19   Michaela McNeal would try to get -- she

20   tried to make contact with her, and was

21   unsuccessful.

22       REPORTER:

23       What was her name?

24       THE WITNESS:

25       Michaela, M-I-C-H-A-E-L-A, McNeal.

1        REPORTER:

2        McNeal.

3        THE WITNESS:

4        -- M-C-N-E-A-L.

5        MS. ORGERON:

6        Yeah, I think this is a pretty good

7        time for -- to take a little break.

8        REPORTER:

9        I'm off the record at 3:03.

10            (OFF THE RECORD)

11       REPORTER:

12       Back on the record at 3:22.

13   BY MS. ORGERON:

14   Q    Okay.  I just have a couple of questions

15        that relate to things we talked about

16        previously to wrap up.

17            Earlier, you mentioned that you

18        wouldn't be able to tease out the sexual

19        assault crimes occurring at LSP from the

20        ones that occurred in the rest of the

21        parish without pulling up -- without

22        looking at the numbers.  Would you be able

23        to pull up those numbers?

24   A    Yes, we could pull those numbers up.

25   Q    How would you do that?

1    A    The reporting system that we have, ADSI,

2          it's called, is able to document those

3          numbers and those patterns.  So, yeah,

4          that could be pulled up.

5    Q    Okay.  So, is there like a particular

6          field that would -- do you know what that

7          would be that would allow you to --

8    A    Yes.

9    Q    -- separate those?

10   A    There's a -- a -- you know, the -- a crime

11         field, or the -- I don't think it's called

12         crime, but it's the field that documents

13         each call and activity the sheriff's

14         office goes on, so, there would be a field

15         for a sex crime.

16   Q    Okay.  And then what about being able to

17         tell which ones happened on the -- at the

18         penitentiary?

19   A    So, that was -- that's easy.  So, you pull

20         up all the sex crimes, and then you just

21         look at the addresses of where they

22         occurred.

23   Q    Okay.  So, you would basically have to

24         crunch those numbers yourself?

25   A    Yes, or somebody probably more tech savvy

1      than me, but, yeah, it can be done.

2   Q   Okay.  And then the other question was

3      just a little follow-up on the gender bias

4      trainings.  I know that you took them.

5      Who all in the office is required to take

6      those trainings?

7   A   You know, I think that was a mandatory

8      departmental-wide training that everyone

9      had to have, just -- just as you would

10      have to have ethics or sexual harassment

11      or, you know, training on race, yeah, and

12      it was -- I think it was

13      departmental-wide.

14   Q   And do you know when that requirement came

15      into place?

16   A   No, I don't.

17   Q   Okay.  And you said similarly there's a

18      racial bias training that's required?

19   A   That's correct.

20   Q   Okay.  And what about those conferences

21      about crime against women, did any other

22      employees of the department attend with

23      you?

24   A   Yes, a guy that is -- hasn't been employed

25      by the sheriff's office for quite some

1          time went to the first couple with me, and

2          then Michaela McNeal went to the others

3          that I went to.  She went to some more,

4          along with an ADA, Assistant District

5          Attorney.  And I believe that Hidalgo went

6          to at least one of them, maybe two of

7          them.

8     Q    How did the office determine who would go

9          to those?

10    A    It was whoever could.  So, it's held in

11         the spring.  And so, we generally -- like

12         I said, we would send two people usually,

13         that's what we've been doing in the past.

14         So, it was whoever could go, you know.  If

15         I had -- the last few years I was a

16         detective, it happened to fall on my

17         birthday, and I wasn't able to make it,

18         so.  But, whoever could go and wanted to

19         go, was willing to go, the office, the

20         sheriff's office would pay for them to go.

21    Q    For two people?

22    A    For two people, yes.

23    Q    Okay.  So, we were talking about the

24         investigation in this case.  I guess I

25         would like to know the individuals to your

1       recollection in the sheriff's office that

2       were involved in the investigation?

3  A   It was -- I was lead investigator, since

4       the call came in whenever I had call.

5       Detective Hidalgo assisted because he took

6       the first interview, he was able to do the

7       first interview.  And then we had Michaela

8       McNeal follow-up on a few things for us,

9       because we all worked together on cases.

10      So, she would -- she followed-up on a few

11      things, and I'm not sure what the

12      specifics would be.  And, then, David

13      Ellis is our evidence custodian, or

14      evidence, uh, thing.  And he would have

15      had a part in it, as well.

16  Q   Michaela McNeal, was she also a deputy

17      with the --

18  A   She was a captain.

19  Q   A captain?

20  A   Yeah.

21  Q   With what, with the criminal investigation

22      division?

23  A   Yes, Criminal Investigation Division, West

24      Feliciana Sheriff's Office.

25  Q   Okay.  Was there anyone else involved in

1          the investigation?

2     A    Not to my knowledge.

3     Q    What was Randy Metz's involvement, if any?

4     A    I don't think he was involved.

5     Q    Okay.  And how about Archer Lee?

6     A    I don't think Archer was involved neither.

7          He was my supervisor, but he wasn't

8          involved in working the case.

9     Q    Okay.  So, it was primarily you, Captain

10         McNeal, and David Ellis, and David

11         Hidalgo?

12    A    It was primarily me and David Hidalgo,

13         with Captain McNeal and David Ellis

14         assisting.

15    Q    Okay.  So, when Priscilla came in for her

16         initial interview, that was with David,

17         and you were not present.  On follow-up,

18         you and Hidalgo brought Priscilla in to

19         make a couple of controlled calls, do you

20         recall that?

21    A    Yes.

22    Q    Why did you ask Priscilla to call Barrett

23         Boeker?

24    A    For the same reason that we had her call

25         Barrett's wife, to see if he would talk

1        about the incident, about what happened,

2        what he did.

3   Q   Do you remember whose idea it was to make

4        the call to Barrett?

5   A   No, I don't recall.

6   Q   Is this a common practice to ask sexual

7        assault victims to make these calls to

8        alleged perpetrators?

9   A   I don't know.  I don't know if it's a

10       common practice.  I can't say what's

11       common outside of our sheriff's office

12       anyway.  But, I mean, we've made

13       controlled calls before, maybe not

14       particularly on rape cases, but we, I

15       mean, we do controlled calls quite often.

16   Q   Do you recall making another controlled

17       call in a sexual assault case?

18   A   Not that I can recall off the top of my

19       head.

20   Q   Okay.  So, I just want to review again the

21       individuals that were spoken to, to make

22       sure I have everyone.  It's Stephanie, you

23       did not reach Stephanie, attempted to.

24       Sorry, it's a different page.  Dylan

25       initially declined, and Virginia wouldn't

1        talk.  Did you take any notes when you

2        reached out to these folks?

3  A   Probably not.  I don't -- I don't remember

4        taking any notes.

5  Q   Okay.  So, you basically just reached out

6        to them and it didn't work, and you moved

7        on?

8  A   Yes.

9  Q   Okay.  Do you know if anyone else in your

10       office spoke with any -- in the sheriff's

11       office, spoke with relatives of Barrett

12       Boeker regarding this matter?

13  A   I don't know, but I don't think so.  I

14       mean, not to my knowledge.

15  Q   Okay.  So, let's see.  Well, I'll go

16       through the rest of these folks.  How

17       about any employees at the Louisiana State

18       Penitentiary?

19  A   That we interviewed?

20  Q   Did you speak with any employees of the

21       Louisiana State Penitentiary regarding

22       this incident?

23  A   Regarding the incident, I don't think so.

24  Q   Do you know if anyone in the sheriff's

25       office was contacted by individuals from

1    the Louisiana State Penitentiary regarding

2    this incident?

3  A  I don't know.

4  Q  You don't know?

5  A  I was not.

6  Q  What about coordination with any victim

7    support, like, STAR or the Victim's

8    Coordinator at the district attorney's

9    office?

10  A  That would be a good question for the SANE

11    Nurse or the district attorney's office.

12  Q  Okay.  Did you speak with any of the

13    neighbors on the B-Line regarding this

14    incident?

15  A  No.

16  Q  Okay.  Do you know if any of the other

17    investigators attempted to do so?

18  A  Not to my knowledge.

19  Q  Okay.  And, I'm sorry, you-all had Captain

20    Michaela McNeal attempt to call Aurielle,

21    and she refused to talk?

22  A  (Witness nods head affirmatively.)

23  Q  Do you know if she would have documented

24    that in her notes anywhere?

25  A  No, probably not.  She has a report, but

1        it was from the -- several months later

2        where she I think took a DNA swab.  So, if

3        it's not in her report, then she probably

4        didn't.

5    Q   Okay.  Is there anyone else that you can

6        think of that you or the other

7        investigator spoke with regarding Ms.

8        Lefebure's allegations?

9    A   There's no one else I spoke to.

10   Q   Okay.  I'd like to look at the Incident

11       Reports.  I believe that is "S1".

12           MR. RUTHERFORD:

13           Yeah.

14           MS. ORGERON:

15           I have my own, but if you've got a

16           copy for him.

17           MR. RUTHERFORD:

18           (Produces document to witness.)

19   BY MS. ORGERON:

20   Q   Okay.  So, we're looking at the first

21       seven pages.  If you look at the bottom,

22       it says LEF01 through 07.  Do you

23       recognize this report?

24           REPORTER:

25           Would you repeat that number?

```
 1            MS. ORGERON:
 2            LEF0001 through 0007.  So, it's pages
 3            1 through 7.
 4    THE WITNESS:  (CONTINUING)
 5    A    Yes, that is my report.
 6    BY MS. ORGERON:
 7    Q    And it states at the bottom that the
 8         report was approved on July 11, 2011
 9         [sic].  What date would you have initially
10         generated this report?
11            MR. WIXOM:
12            I'm sorry?
13    THE WITNESS:  (CONTINUING)
14    A    It should be 2017.
15    BY MS. ORGERON:
16    Q    Excuse me, I just misread it.  2017, yes.
17    A    And the report was generated, at the top,
18         on December 8, 2016.
19    Q    So, if we look at the Narrative on page --
20         starting on page 5, this Narrative is the
21         Narrative that you wrote regarding this
22         incident?
23    A    Yes.
24    Q    And the information in this Narrative goes
25         past, you know, that initial report
```

1       date -- hmm, I believe December 8th was

2       the date that this incident was reported,

3       is that correct, to your recollection?

4  A   Yes, December 8th.

5  Q   So, can you -- is there any way for you to

6       know when you wrote this narrative?

7  A   No, I don't think so.  I'm not sure that

8       the exact date of the narrative would be

9       logged in our system by ADSI.  I'm not

10      sure that capability is there.  Hmm,

11      but -- yeah, I'm not sure.  I'm not sure

12      what date the narrative would have been

13      written.

14 Q   Okay.  How do these narratives typically

15      get inputed?

16 A   The narratives are typically typed by the

17      deputy that -- that's writing the report.

18 Q   Do you tend to do them all in one sitting?

19 A   Usually, you do.  Or, you'll go from, you

20      know, Point A to Point B, stop, and then

21      you may pick up from Point B to C after

22      you go through your next leg of

23      investigation.

24 Q   Okay.  So, it's possible, for example,

25      that you could have written the first

1     three paragraphs one day, saved it, and
2     then kept adding?
3   A  Could have, I mean --
4   Q  Would that be something that you have done
5     in the past?
6   A  Yes.
7   Q  Okay.  And this report does not reflect
8     the individuals that you reached out to
9     and were unable to contact, is that
10    correct -- or unable to communicate with?
11  A  Hmm, not in my -- I don't think so,
12    according to the report, uh, it doesn't
13    appear that it does.
14  Q  Okay.  Did you know Barrett before this
15    incident?
16  A  Yes.
17  Q  Had you had any encounters with him in
18    your job previously?
19  A  I arrested him previously, yes, before
20    this incident.
21  Q  Okay.  What did you arrest him for?
22  A  A DWI.
23  Q  DWI.  And are you aware of any other
24    arrests that he had previous to this
25    incident?

1   A    Nah.

2   Q    You're not aware?

3   A    None that I -- none that I was involved

4        in.

5        MR. RUTHERFORD:

6        [Inaudible].

7        MS. ORGERON:

8        What's that?

9        MR. RUTHERFORD:

10       When?

11  BY MR. RUTHERFORD:

12  Q    Oh, yeah.  When -- when was the arrest?

13  A    So, it was prior to 2005.  I don't know

14       the exact year.  I moved to Criminal

15       Investigations in 2005, and I began in

16       Uniformed Patrol in 1999.  So, it would

17       have been in that six-year span.

18  Q    Okay.

19  A    Somewhere in that six-year span, because I

20       was still in Uniformed Patrol.

21  Q    Did you conduct a criminal background

22       check on Barrett as a part of this

23       investigation?

24  A    I can't recall.  I assume that I probably

25       did check the CH to make sure there were

1         no outstanding warrants.  As part of a

2         rape investigation, though, I'm not sure

3         that the prior criminal history would have

4         changed much in our investigation.  Hmm,

5         we knew he wasn't a sex offender because

6         we deal with all the sex offenders, too,

7         and we know -- I know -- we visited every

8         sex offender once a month.  So, we knew he

9         wasn't a sex offender.  So, I'm not sure

10        that his past criminal history would have

11        made a huge impact on the way that we

12        handled this investigation.  But, as part

13        of records, we -- I probably did check it

14        at some point to make sure that he was not

15        wanted.  But, I -- because I usually do

16        that on every case I work.

17  Q    Okay.  If you checked it, would you expect

18        that to be part of your file?

19  A    Yes, I would.

20  Q    Okay.

21         MS. ORGERON:

22         Do you have the file?

23         MR. RUTHERFORD:

24         (Counsel produces document.)

25  BY MS. ORGERON:

```
1    Q    If you wouldn't mind, this is a copy of
2         the production given to our office.  If
3         you could --
4    A    Uh-huh (yes).
5    Q    -- flip through it and see if you
6         recognize a criminal background check?
7    A    (Witness reviews document.)  No, I do not
8         see one.
9    Q    Thank you.
10            Do you remember what you did to collect
11        electronic evidence in this case?
12   A    Hmm, I think the only electronic evidence
13        we have are some text messages that
14        Ms. Lefebure sent to her then boyfriend.
15        Now, there were some other text messages
16        that she talked about, we never did
17        receive those.  I believe they were asked
18        for in the interview, but we didn't
19        receive them.  And we did not look at any
20        other electronic evidence in the case.
21   Q    Do you recall why the decision was made
22        not to try to look at Barrett Boeker's
23        phone?
24   A    For any texts that were sent between he
25        and Ms. Lefebure, she told us about them,
```

1    and she said she had screenshots of them

2    but she never sent them.  So, we tried in

3    that respect.  It's a little bit more

4    difficult to, hmm, obtain text messages

5    from a phone if they've been deleted.

6    We've actually had to seize the phone, and

7    then we would have to find someone who was

8    capable of dumping that phone and then

9    going through that data to pull those

10   messages out.  We had no one capable of

11   doing that at our department.  We've used,

12   in the past, the attorney general's office

13   on homicide cases.  But, like I said, it's

14   a little bit more difficult.  It's much

15   easier to have a cooperative victim or

16   witness that provides us with that stuff,

17   since they already have it.

18   Q   Do you think it's possible that other

19       communications that Barrett had could have

20       corroborated or could have gone to the

21       allegations in any fashion?

22           MR. WIXOM:

23           Object to the form of the question.

24   THE WITNESS:  (CONTINUING)

25   A   And that would be very presumptuous for me

1       to say either way.  I -- I don't know.

2  BY MS. ORGERON:

3  Q    Okay.  Did Boeker, to your knowledge,

4       delete any messages?

5  A    I can't say.  We don't know.

6  Q    Okay.  What was done in this case to

7       collect physical evidence?

8  A    The -- we didn't have physical evidence

9       because the crime occurred eight days

10      before it was reported.  So, there was no

11      evidence, no -- there was no physical

12      evidence for us to collect.

13  Q    Okay.  So, this is because, according to

14      your testimony, just to make sure I'm not

15      misstating it, after 72 hours, DNA

16      evidence is no longer recoverable?

17  A    It is a very, very slim chance that it is

18      recoverable.  I believe that the lab

19      technician at state police told us that it

20      was -- he's never heard of evidence being

21      recovered eight days after a crime, DNA

22      evidence, we're talking about, being able

23      to be recovered eight days after a crime,

24      in a rape kit.

25  Q    Are there other kinds of evidence that can

1        be collected from a sexual assault crime

2        scene?

3  A   Yes.  From a crime scene, within a certain

4        span of time.  We're talking about here,

5        in this case, this was a residence where

6        two children and two adults were living

7        and visitors were in and out of there all

8        the time.  If we could have got to that

9        crime scene the day of, maybe the day

10       after, we would have taken bed sheets and

11       comforters and pillows and everything that

12       we could have taken, because we've done

13       that in the past, I've done that in the

14       past.  But, eight days after a reportable

15       offense it's a little bit -- it's -- it's

16       -- I'm not going to do that.  I'm not

17       going to go into an area to invade

18       someone's privacy to take everything that

19       they have, when I was -- when I know from

20       my training that it's almost impossible to

21       find DNA evidence from that.  If I could,

22       I would.  I mean, that's -- it just builds

23       a better case.  But, and this is why rape

24       cases are so hard to work.

25  Q   Is it, in your opinion, is the layout of

1    the space ever relevant to the

2    corroboration of a victim's story or a

3    witness' story?

4  A  In what -- what do you mean by the layout

5    of the space being relevant?

6  Q  So, you know, where things are located and

7    where, you know, a victim says a person

8    stood and did certain things being

9    consistent, you know, verifying that they

10   were there?

11 A  Uh, I'm not -- I'm not sure.  I mean, I --

12   you know, there's a bed, every bedroom has

13   a bed.  There's a door, and every room has

14   a door.  I mean, I'm not sure that the

15   descriptions were specific enough to

16   dictate serving a search warrant on a home

17   to see if there was a bed and a door in

18   the bedroom.

19 Q  Okay.  And what about -- or, Priscilla's

20   narrative included the use of a particular

21   sex toy, what about -- what about that

22   item?

23 A  Hmm, yes, that could have been relevant

24   possibly.

25 Q  And she also said in her initial laundry

1    [sic] that -- in her initial interview

2    that her laundry had remained there.  Of

3    course, that, you've said that DNA

4    evidence would be gone.  And assuming

5    that's true, what about hairs or the

6    existence of other physical items, you

7    know, uh, discharge?

8  A  Again, I mean, if -- DNA evidence has a

9    short lifespan, especially when there's

10   traffic and washing and cleaning and

11   things being done.  So, hairs, I mean, Ms.

12   Lefebure's hair would be at the residence

13   already because she lived there for a

14   time.  So, being able to recover a strand

15   of hair in this case would not have made a

16   difference in our investigation.

17  Q  Even if that strand of hair was on a

18   different person's underclothing, for

19   example?

20  A  That's a lot of speculation that it would

21   have been there.  But, could it have made

22   a difference, possibly so.  It would have

23   strengthened the case, certainly.

24  Q  We talked a little bit about, earlier,

25   about policies around the sexual assault

```
 1        examination kit, the rape kit, I'll call
 2        it.
 3   A    Uh-huh (yes).
 4   Q    In this case, the rape kit went to the
 5        coroner's office, and the documents we
 6        have reflects that it wasn't picked up
 7        until after the grand jury investigation.
 8        Who would have been in charge of picking
 9        up the rape kit at that time?
10   A    David Ellis --
11   Q    David Ellis.
12   A    -- the evidence custodian, yes.
13   Q    And how would David -- what would have
14        triggered David Ellis to go pick up that
15        rape kit?
16   A    I believe he was instructed to by his
17        supervisor.
18   Q    Who was his supervisor?
19   A    Archer Lee.
20   Q    Archer Lee?
21   A    Yes.
22   Q    So, why -- do you know why he was not
23        instructed previously to pick up the rape
24        kit?
25   A    No.
```

1   Q    As the lead investigator in the case,

2        would you take any steps to make sure that

3        the rape kit gets picked up?

4   A    If I was going to use the rape kit as part

5        of my investigation, I would, yes.  But, I

6        did not, in this case.

7   Q    Why?

8   A    Because it had been eight days since the

9        incident that the rape kit was --

10   Q    Have you --

11   A    -- conducted.

12   Q    Have you looked at rape kits in connection

13        with sexual assault cases before?

14   A    Yes.

15   Q    So, are you aware that rape kits contain

16        more than just DNA evidence?

17   A    Yes.

18          MS. ORGERON:

19          Would you like me to introduce this as

20          an exhibit?

21          MR. RUTHERFORD:

22          Yes.

23  BY MS. ORGERON:

24   Q    Okay.  So, this is going to be "P" --

25          REPORTER:

1                The next exhibit will be "P8".

2          MS. ORGERON:

3          "P8", okay.

4     (EXHIBIT NO. P8 MARKED FOR IDENTIFICATION)

5 BY MS. ORGERON:

6 Q   So, this is actually part of our

7      production.

8          MS. ORGERON:

9          Oh, yeah, it's multiple copies.  Thank

10      you.

11 BY MS. ORGERON:

12 Q   This was not included in the sheriff's

13      office production, and we are not sure if

14      the sheriff has it.  Are you familiar with

15      this document?

16 A   No.  This particular doc -- this specific

17      document (indicating), I've not seen this

18      one before, no.

19 Q   Have you seen a similar document when

20      looking at other rape kits?

21 A   Yes.

22 Q   If you want to just take a minute to look

23      at it.  Do you see that on page, what's

24      marked as "68", at the bottom, that there

25      is a narrative account of the assault?

1   A   Yes.

2   Q   Would you agree that this statement is a

3       corroborating statement of our vicitim's

4       account?

5   A   Yes.

6   Q   And, then, if you look at the following

7       page, you can see documentation of

8       contusions and irritation on her cervix.

9       Would you agree that this information

10      could also be relevant evidence in a

11      sexual assault case?

12  A   Yes.

13  Q   Okay.  And then finally, on the final

14      page, the form reflects that there are

15      photo cards along with the kit.  These

16      photos were also not part of the sheriff's

17      production in this case, however, they

18      show the bruising on Priscilla's body.

19      Would you agree that these photos could be

20      relevant evidence in a sexual assault

21      case?

22  A   They could be.

23  Q   Okay.  Thank you.

24          All right.  So, next, I would like to

25      show you the Arrest File Checklist, which

```
 1        is "S5", I believe.
 2             MR. WIXOM:
 3             I have two copies.
 4             MS. ORGERON:
 5             Fantastic.
 6             MR. RUTHERFORD:
 7             We have an extra copy for the witness.
 8             MR. WIXOM:
 9             I just gave him one.
10             MR. RUTHERFORD:
11             Okay.
12             MS. ORGERON:
13             Do you have a copy of this one,
14             because I'm not sure where mine is.  I
15             thought I had them all in order, but I
16             believe I'm missing one.
17             MR. RUTHERFORD:
18             (Producing document.)
19             MS. ORGERON:
20             Thank you.
21   BY MS. ORGERON:
22   Q    Okay.  Can you tell me what this document
23        is (indicating)?
24   A    It's a WFPSO form, Arrest File Checklist.
25        So, this checklist is included in the
```

1       folders that we turn in to our supervisors

2       to let them know what should be included

3       in the case file.

4  Q   Okay.  And did you fill out this

5       checklist?

6  A   That is my handwriting, yes.

7  Q   That's what I thought.  So, could you just

8       briefly describe these different screens?

9  A   Yes.  So, we can go back to "S1" and I can

10      show you what each one are.

11        The ADMIN Screen is going to be the

12      first page, this says "Administration

13      Information" at the top, "Primary Offense"

14      at the bottom, is the Offense Screen.  So,

15      on the computer it's going to be two

16      different screens, but they print out as

17      one sheet.

18  Q   Okay.

19  A   The third screen is the PERSON Screen.

20      So, that's where you put all person

21      information for everyone involved in the

22      case that you're working.

23       The RELATIONSHIP Screen is where their

24      relationships are defined, and they have

25      to be defined for LIBRS and LIBRS errors.

1     I'm not sure if you're familiar with those

2     or not, but that's the way the FBI tracks

3     data.

4         The VEHICLE Screen is a screen that we

5     enter vehicles in.

6         The PROPERTY Screen is the screen that

7     we enter property in evidence.

8         And, then, the NARRATIVE Screen is the

9     screen that we use to type our reports.

10  Q   So, what, what is the Property Screen

11     here?

12  A   It should be probably the DVDs that were

13     entered into evidence for the, uh -- from

14     the interviews.

15  Q   So, "Property" refers to just any physical

16     evidence?

17  A   Any -- yeah, any physical evidence that we

18     turn over for storage, so that the

19     district attorney knows, or whoever needs

20     it, knows what property is in there, you

21     know, what evidence that -- that they were

22     able to obtain.

23  Q   Okay.  And, then, here it says

24     "Statements, How many?  Three".  What does

25     that mean?

1   A   So, those are written statements, written

2       voluntary statements --

3   Q   Okay.

4   A   -- that we take.  And so there were three

5       statements that were submitted at the time

6       of the arrest -- or statement forms that

7       were submitted at the time of the arrest.

8   Q   So, I have Priscilla's, and I have

9       Dylan's.  I can't think of a third written

10      statement.

11   A   So, it's a statement form with Barrett

12      Boeker.

13   Q   Okay.

14   A   And he didn't -- of course, he didn't give

15      a statement, because he asked for his

16      attorney, and, but the form is actually in

17      there.

18   Q   Okay.

19         MS. ORGERON:

20         I'm not sure, I may want to take a

21         break for just a second to see what's

22         going on with Jack, if that's okay.

23         Thank you.

24         REPORTER:

25         Okay, I'm off the record at 4:01.

```
1                        (RECESS)
2              REPORTER:
3              I'm back on the record at 4:03.
4    BY MS. ORGERON:
5    Q    Okay.  So, we were just talking about
6         "S5", and we were looking through, and you
7         stated that there are three voluntary
8         statements, and you said Priscilla's was
9         one, Dylan's was another, and then Barrett
10        Boeker had an unsigned statement.  I
11        noticed that Helena Graham also had an
12        unsigned statement there.
13   A    Shew, I guess, maybe so, she had a
14        statement in there.
15             MR. RUTHERFORD:
16             Here you go.
17   BY MS. ORGERON:
18   Q    Yeah, I just want to show you "P2".  These
19        are all the different copies --
20   A    Okay.
21   Q    -- of everyone's.
22   A    Okay.
23   Q    I don't have a lot to say about this one.
24   A    So, the three would be Helena Graham,
25        Barrett Boeker and Priscilla, and then --
```

1    because I recall that Dylan didn't come in
2    for another two months.
3  Q  Okay.
4  A  So, his would not have been submitted with
5    this Arrest File Checklist, his would have
6    been submitted later on.
7  Q  Okay.  So, what is the trigger that, you
8    know, makes somebody different between
9    having an unsigned statement and then just
10   having nothing at all?
11 A  So, we can't force anybody to write a
12   statement, but we can write a statement
13   for them.  If they want to give us a
14   ver... -- a statement, a -- it's a
15   voluntary written statement, it's not a
16   forcible written statement.  So, if they
17   voluntarily write us a statement, we will
18   accept it.  We ask them to, but they can
19   refuse to write a statement if they want
20   to.
21 Q  Okay.  And what about, for example, when
22   you spoke with Aurielle, there aren't
23   notes reflecting that conversation when, I
24   think it was Captain McNeal spoke --
25     REPORTER:

1          There are or there aren't?

2          MS. ORGERON:

3          There are not.

4          REPORTER:

5          Thank you.

6    BY MS. ORGERON:

7    Q    I also didn't see a statement, an unfilled

8          statement like this (indicating).  Why is

9          there that difference?

10   A    Because they never came in and afforded us

11         an opportunity for it.  You see the

12         "Location" is at CID.  We pre-fill these

13         out whenever they come in for an

14         interview, and we ask them if they'd like

15         to make a written statement, you know.

16         This, we're able to gain all their

17         information so that we can add it to our

18         report so that we can subpoena them, or

19         call them, or whatever we need to do.  So,

20         we at least get that much.  Then we ask

21         them if they want to give us a written

22         statement, and sometimes they're just too

23         upset to write anything, sometimes they

24         can't write.  So, you know, it's either

25         yes or no, and, at the very least we'll

1     get a verbal statement from them that we

2     can record so that we can use their

3     statement in our investigation.

4  Q  Okay.  And you were -- do you recall when

5     Barrett came to your office?

6  A  It would have been on December 20, 2016,

7     at 12 o'clock p.m.

8  Q  Do you remember anything about that

9     encounter?

10 A  Hmm, I do remember -- I do remember him

11    coming.  I remember telling him what we

12    were investigating him for.  And he stated

13    that, "That's pretty serious, I think I

14    need to talk to my attorney".  I mean,

15    that was before, obviously, I read him his

16    rights, because he didn't sign any of the

17    lines on his -- on the "Rights" form.  So,

18    he asked for his attorney pretty quick.

19 Q  Okay.

20 A  I informed him at that point that I did

21    have a warrant for him, and that he was

22    going to jail.  So, he was arrested and

23    booked later that day.

24 Q  Did you record him when he told you that

25    he didn't -- when he -- this encounter,

1        did you record this encounter?

2   A   I don't know.  I'm not sure if I did.  If

3        it's in the -- if it's in evidence, I did.

4        If it's not in evidence, then I didn't.

5   Q   Okay.  Next, I'd like to look at your

6        Arrest Warrant.  And I believe the Arrest

7        Warrant, I have it written, up in front,

8        it's "S2".

9   A   (Witness reviews document.)

10  Q   How did you come to the decision to issue

11       this arrest warrant?

12  A   Hmm, by the statements -- obviously, by

13       the statements that I received, I was able

14       to have probable cause to sign it, because

15       the judge signed it.  So, and, you know,

16       many times when we work cases, many times

17       that's all we do have.  And, like I said

18       earlier, you want to try to gain as much

19       information as possible, but you don't

20       want to wait too long to make the arrest.

21       Because, you know, a guy that raped

22       someone, that's out there, you don't want

23       them to commit this crime on anyone else.

24  Q   Okay.

25  A   So, the investigation wasn't complete, but

```
 1        we had enough probable cause to have a

 2        warrant signed.

 3   Q    So, when Barrett entered your office, had

 4        you already completed this affidavit?

 5   A    Yes.

 6   Q    Did you have any supervisors or anyone

 7        else who had input into the content of

 8        this affidavit?

 9   A    No.  I always do my own work.

10   Q    Okay.  So, was it your decision alone to

11        arrest Barrett?

12   A    That is correct.

13   Q    Okay.  There is a line in particular, it

14        actually spans the first and second page,

15        and, "Priscilla said that she was shocked

16        and did not move, while Barrett said that

17        he has, quote, 'trouble getting hard

18        outside of marriage'", quote.  Who said

19        that second part in quotes, like, who told

20        you that?

21   A    That, I believe that was on the interview

22        that she gave Hidalgo.

23   Q    Okay.  Do you recall Mr. Boeker saying

24        anything else regarding Ms. Lefebure's

25        allegations?
```

```
1   A   No, I don't recall.  I mean, I'm sure he
2       had a lot to say, I mean, the guy -- he's
3       going to let you know what he's thinking,
4       but he didn't incriminate himself in any
5       way, and, uh, but -- and I don't recall
6       exactly what he said, if anything.
7   Q   And when he spoke to you, was it just you
8       and he in the room?
9   A   Probably.
10  Q   Do you recall warning Priscilla that the
11      district attorney would try to sweep this
12      matter under the rug?
13  A   No.
14  Q   Do you recall Priscilla warning you that
15      -- warning Priscilla that the DA may try
16      to bully her out of pressing charges?
17  A   No.
18  Q   Okay.  Do you recall telling Priscilla
19      that your boss threatened to take you off
20      the case?
21  A   No.
22  Q   Do you recall recommending to Priscilla
23      that she consider taking her matter to the
24      attorney general's office?
25  A   No.
```

1  Q    Okay.  I'm going to introduce a new

2       exhibit.  This is, I guess, "P9" at this

3       point.

4     (EXHIBIT NO. P9 MARKED FOR IDENTIFICATION)

5            MS. ORGERON:

6            I don't have the clean copies.

7            MR. RUTHERFORD:

8            (Counsel producing document.)

9            MS. ORGERON:

10           Great.

11  BY MS. ORGERON:

12  Q    These are some notes that we produced from

13       our client's files.

14  A    (Witness reviews document.)

15           (DISCUSSION OFF THE RECORD)

16  BY MS. ORGERON:

17  Q    And you can go ahead and let me know when

18       you're finished looking at it.

19  A    (Witness reviews document.)  Okay.

20  Q    So, having looked at these notes, do you

21       recall anything differently in terms of

22       how you may have spoken with Priscilla?

23  A    No.

24  Q    So, you do not recall being very upset

25       around the time of Barrett Boeker's

1       securing bond and release?

2  A   No, I -- I don't recall being very upset.

3       I have worked a lot of cases in my career,

4       and have lost many of them, and, I mean,

5       it's just -- it's a part of -- part of the

6       job.  And, you know, early on, you get

7       really frustrated, early on in your

8       career, but you learn that, hey, you know,

9       it's part of it.  And you can't let it --

10      you can't let it get to you, because then

11      when the next victim comes along and they

12      have a crime that needs to be

13      investigated, you've got -- you know,

14      you've got to be able to be there for

15      them.  And I've never, ever been

16      threatened with my job in 24 years of law

17      enforcement.  No one has ever threatened

18      my job.  So, no, I -- I don't -- I'm not

19      sure where this came from, but I don't --

20      this is not true.

21  Q   Do you recall any incidents where the

22      district attorney -- any other incidents

23      where the district attorney, in your

24      opinion, did sweep sexual assault

25      allegations under the rug?

1    A    None that I can recall.

2    Q    Do you recall any other incidences where

3         the district attorney, in your opinion,

4         bullied, or, you know, strongly encouraged

5         sexual assault victims to -- to not press

6         charges?

7              MR. LEDET:

8              I'm sorry, I'm going to have to

9              object.  I don't -- I'm just going to

10             object to the form of the question.

11   THE WITNESS:  (CONTINUING)

12   A    No, I don't -- I don't know anything about

13        any of that.

14   BY MS. ORGERON:

15   Q    Okay.  Would you ever ask -- would it be

16        something that you have ever done, to, you

17        could see yourself, if you don't recall in

18        this instance, recommending that a victim

19        bring a case to the attorney general?

20             MR. WIXOM:

21             Now I'm going to object to the form of

22             the question.

23   THE WITNESS:  (CONTINUING)

24   A    The only people that I have ever referred

25        to the attorney general were elderly

```
 1          people who were victims of identity theft
 2          and fraud, because they have a special
 3          unit that investigates it, especially
 4          whenever it's multi-jurisdictional.
 5     BY MS. ORGERON:
 6     Q    Okay.  She also mentions in this --
 7               MR. RUTHERFORD:
 8               [Inaudible].
 9               MS. ORGERON:
10               Oh, I will, but I have one more.
11     BY MS. ORGERON:
12     Q    -- that Barrett Boeker was -- is alleged
13          to have multiple victims.  We've talked
14          about Stephanie.
15     A    Uh-huh (yes).
16     Q    Are there any other -- did you get any
17          other information about possible victims?
18     A    I've arrested Barrett three times.  This
19          is the only sexual assault case against
20          Barrett that I ever worked.  As far as I
21          can recall, I don't remember any other
22          complainants ever coming in to file -- to
23          file complaints on him.  Ms. Lefebure told
24          us about Stephanie, she told us about one
25          other incident that happened in Livingston
```

1      Parish at a party.  So, those two

2      instances I am aware of because she told

3      us about those, but I am not aware of any

4      other investigations or complaints against

5      Mr. Boeker.

6  Q   Okay.  In her initial interview with

7      Deputy Hidalgo, near the end, he mentions

8      having information that Barrett

9      potentially raped one of Barrett's

10     sister's friends, do you recall anything

11     about that?

12  A   I do not recall.  No, I do not recall

13     that.

14  Q   Okay.

15      MR. RUTHERFORD:

16      [Inaudible].

17 BY MS. ORGERON:

18  Q   Oh, what were the other two arrests for?

19     You said you've arrested him three times.

20  A   The DWI that we talked about earlier, and

21     a battery, a simple battery, at Angola

22     Prison where he sprayed an inmate with a

23     fire extinguisher, and, that, I made that

24     arrest in 2020.

25  Q   Okay.  So, is the third time Priscilla?

```
1   A   Yes, those are the three, the three
2       arrests that I made of Barrett.
3   Q   Yeah, all right.  So, I'd like to ask you
4       a little bit about the grand jury
5       proceeding.  Were you instructed by anyone
6       to prepare to testify before the grand
7       jury in this case?
8   A   I'm not sure if I was specifically
9       instructed, but I expected to because I
10      was told that there was going to be a
11      grand jury hearing.  And, as I said
12      earlier, I've -- I've never been to a
13      grand jury hearing that I did not testify
14      in.
15  Q   You've never been to one.
16  A   No.
17  Q   So, how many grand jury hearings have you
18      been involved in, approximately?
19  A   Maybe a dozen, 15, somewhere in that area.
20  Q   And do you know if there were any grand
21      jury hearings where you just weren't
22      called at all to testify, that you were
23      involved in the case?
24  A   None that I know of.
25  Q   And you mentioned that grand juries are
```

1        required for some crimes, what crimes are

2        those?

3   A    A homicide, first degree rape, some, uh --

4        off the top of my head, those are the ones

5        that are, some homicides and first degree

6        rape.

7   Q    When you arrested Barrett did you -- and

8        wrote that affidavit, did you anticipate

9        that a grand jury would be necessary in

10       that case?

11   A    No.

12   Q    Why didn't you think it would be

13       necessary?

14   A    Because it wasn't first degree rape.

15   Q    Do you know of other instances where -- do

16       you recall other instances where the DA

17       has pursued a grand jury in instances of

18       sexual assault that were not first degree

19       rape?

20   A    I went to a grand jury a couple of times

21       on molestations, molestation cases.

22   Q    And those are -- a grand jury is not

23       required for those?

24   A    You know, I don't -- I'd have to look at

25       the -- to see, but I don't think so.

```
 1            MS. ORGERON:
 2            All right.  I think I only have a few
 3            more questions.  I think I'm going to
 4            take a short break, and then just a
 5            few more questions and I will finish
 6            up.
 7            THE WITNESS:
 8            All right.
 9            MS. ORGERON:
10            Thanks for everyone's patience.
11            REPORTER:
12            I'm off the record at 4:21.
13                 (RECESS)
14            (BACK ON THE RECORD AT 4:29)
15   BY MS. ORGERON:
16   Q    So, were you subpoenaed to appear before
17        the grand injury in this case?
18   A    I don't think so.
19   Q    So, when the grand jury hearing called --
20        grand jury came around, you weren't geared
21        up to testify?
22   A    Well, I knew about it because I was told,
23        "Hey, we're picking a new grand jury.  The
24        Boeker case is going in front of them, we
25        need you there".
```

1          I very rarely got subpoenas, as a
2     forty-hour employee, because my office was
3     a block from the courthouse.  So, I mean,
4     there were many times when they would call
5     me at 9:40 and say, "Hey, I need you here
6     at 9:45 to testify on this case that we
7     have in court".  So, I can't say for sure
8     that I did get a grand jury subpoena, but
9     if I didn't, I was definitely told when to
10    be there, and I was there.
11  Q   Who told you when to be there?
12  A   It probably would have been either Sam
13    D'Aquilla or the ADA at the time, Haley
14    Greene.
15  Q   Okay.  Were you surprised when you weren't
16    called?
17  A   Yes.
18  Q   When did you find out that you weren't
19    going to be testifying?
20  A   Hmm, after it was over.  Sam came out, and
21    he asked me -- I remember him asking me
22    where the rape kit was at.  I told him it
23    was at the Baton Rouge coroner's office.
24    He said okay.  He went back in.  Then they
25    came out a few minutes later and said,

```
 1          okay, we're done, you can go.  And, it was
 2          me, David Hidalgo, uh, Priscilla's mother
 3          was in there, and there was one other
 4          person, but I can't remember who it was.
 5     Q    Did he give any indication as to why you
 6          didn't testify?
 7     A    No.
 8     Q    What was your involvement in this case
 9          after the grand jury?
10     A    Nothing.
11     Q    Nothing?
12     A    You know, Dylan came in and gave a
13          statement that was added to this.  Hmm,
14          we --
15     Q    Was that prior to or after the grand jury?
16     A    You know, I'm not sure.  It may have been
17          before the grand jury.  I don't know, I'd
18          have to look at the dates.
19     Q    I think it was February, which would be
20          before.
21     A    Okay.
22     Q    Do you remember why he came in to give
23          that statement?
24     A    No, I don't know why.
25     Q    So, you didn't do anything with this case
```

1       after the grand injury?

2   A   No.  So, the hope was that one of these

3       other victims would step forward still and

4       kind of give us something else to -- you

5       know, to go on, and, but at that point, I

6       mean, I guess there really wasn't a reason

7       to, right.  I mean, the case was over as

8       far as prosecuting went, unless, if I can

9       remember correctly, more evidence was --

10      you know, was found, well, you know, we

11      were kind of stuck there.  So, no, I

12      didn't do anything else.  I had other

13      cases to work, I worked on them.  I don't

14      know if anybody else had anything else to

15      do with the case, but --

16   Q   When did --

17   A   -- I know I didn't.

18   Q   When did your investigation conclude?

19   A   I mean, I guess you can't really say that

20      it ever -- an investigation never really

21      concludes, because 30 years from now some

22      evidence in some obscure case that you

23      work may pop up.  Hmm, but I would say

24      probably at the time of the grand jury

25      hearing.  Because, up to that point, like

1    I said, we were hopeful that maybe another
2    victim would come forward, because we knew
3    names of a couple of victims and, uh, like
4    I said, after that point there was no
5    reason for them to.
6  Q   Do you recall ever being asked to stop
7      investigating?
8  A   No.  I've never been asked to stop
9      investigating on any case that I've ever
10     worked, that I can recall.
11 Q   Okay.  Just a few more questions.  In your
12     experience, how do victims usually behave
13     after they've had a sexual assault
14     committed against them?
15         MR. WIXOM:
16         Objection to the form of the question.
17 THE WITNESS:  (CONTINUING)
18 A   I think it probably depends on that
19     person's personality.  I mean, I've seen
20     people come in just calm, collected, cool,
21     and knew every detail about every time and
22     date when anything took place.  And, then,
23     I've seen victims come in and have -- and
24     they don't have a clue about anything.
25     So, you know, I think it -- it never --

1       there's never anything -- there's no such

2       thing as normal, or, and I think it

3       depends on the personality and the person

4       you're dealing with, the victim.

5   Q   So, from what you're saying, different

6       people can react very differently to the

7       same trauma?

8   A   That's correct.

9   Q   And, also, from what you're saying,

10      different people can have very different

11      levels of detail in their memory of an

12      assault?

13         MR. WIXOM:

14         Object to the form of the question.

15  THE WITNESS: (CONTINUING)

16  A   In my experience, yes.

17  BY MS. ORGERON:

18  Q   Have you ever had a sexual assault victim

19      give you inconsistent stories?

20  A   Yes.

21  Q   And, does the -- do the inconsistent

22      stories necessarily indicate to you that

23      they are not being truthful?

24         MR. WIXOM:

25         Object to the form of the question.

1    THE WITNESS: (CONTINUING)

2    A    No.

3    BY MS. ORGERON:

4    Q    In your trauma training, in your trainings

5         on trauma and sexual assault, have you

6         ever learned that memory and recall can be

7         affected by a trauma?

8    A    I have heard that, yes.

9    Q    Okay.  Finally, are you aware of any

10        complaints or reviews of the sheriff's

11        office with respect to alleged mishandling

12        of sexual assault allegations?

13   A    Hmm, not specifically.  Of course, people

14        complain about the sheriff's office

15        dealing with anything, so, I would not be

16        shocked or surprised at all to see that

17        there are complaints, but I don't know of

18        any specifically.

19   Q    Okay.  Are you aware of any other

20        complaints or reviews of the district

21        attorney's office with respect to the

22        alleged mishandling of sexual assault

23        allegations?

24   A    Again, not specifically.  I mean, I can't

25        say that I have heard anything about

1      sexual assault allegations.

2   Q   Okay.

3           MS. ORGERON:

4           Do you have anything else?

5           MR. RUTHERFORD:

6           No.

7           MS. ORGERON:

8           No further questions.  Thank you very

9           much for your time.

10          THE WITNESS:

11          Yeah.  Thank you.

12          MR. RUTHERFORD:

13          Yes, thank you.

14          MR. WIXOM:

15          I have a few.

16          (DISCUSSION OFF THE RECORD)

17            EXAMINATION BY MR. WIXOM

18  BY MR. WIXOM:

19  Q   What was the reason that you decided to

20      have Priscilla make a controlled call in

21      this case?

22  A   Again, trying to gain evidence and

23      establish exactly what happened.  We knew

24      that Barrett was not going to come in and

25      talk to us, we know that he wasn't going

1        to give us a statement.  We knew that

2        probably Aurielle wasn't either, because,

3        I mean, this is her husband, and who is

4        going to come in and, you know, give a

5        statement and testify against your

6        husband.  So, we wanted -- Priscilla had

7        been telling us that she knew everything

8        that was going on, that she was still in

9        contact with her, she was still talking to

10       her.  So, we said okay, let's call her

11       from a controlled environment, video it,

12       and if she gives us any information, well,

13       then we have a stronger case.

14  Q   Do you know if the DA's office conducts a

15       criminal investigation check into

16       individuals that are being prosecuted?

17  A   I do not know if they do.  I do know that

18       they have an investigator, I do not know

19       exactly what his role is and what he does.

20       I've never worked with the guy.

21  Q   Okay.  As far as you're concerned -- let

22       me back up.  The rape occurred in Barrett

23       Boeker's house, per your investigation,

24       correct?

25  A   Yes.

```
 1   Q    Was there any doubt that you would find
 2        Barrett Boeker's hairs in his own home?
 3   A    No.
 4   Q    Was there any doubt to you that you would
 5        have found Priscilla Lefebure's hairs in
 6        Barrett Boeker's home?
 7   A    No.
 8   Q    Why is that?
 9   A    Because they were both living there at the
10        time of the rape.
11   Q    During the investigation into Barrett
12        Boeker's actions, was Ms. Lefebure asked
13        if she had had sex with anyone between the
14        date of the rape and the date her rape kit
15        was performed?
16   A    She was not asked, but she did volunteer
17        that information.
18   Q    And what did she say?
19   A    She said that she was unable to have sex
20        with her boyfriend, it made her sick to
21        her stomach to think about it.
22   Q    Okay.  Do you know if Ms. Lefebure had sex
23        with anyone between the period of the rape
24        and the date the rape kit was taken?
25   A    Hmm, I -- we were told that -- by her,
```

1    that she didn't, but the rape kit shows

2    that she did.

3  Q    In terms of a criminal investigation, was

4    that inconsistency problematic for you?

5  A    Yeah, that would be hugely problematic.

6  Q    Why is it problematic?

7  A    Hmm, the fact that she wasn't truthful

8    about whether or not she had sex after the

9    rape would cause problems with the facts

10    that she gave us prior to the rape kit,

11    the facts of allegations of the rape.

12  Q    Did anyone ask you whether or not you

13    thought a grand jury should have been

14    convened relative to Barrett Boeker's

15    crime?

16  A    No, that's not my decision.

17  Q    To your knowledge, did anyone ask Sheriff

18    Daniel if a grand jury should have been

19    convened relative to Barrett Boeker's

20    crime?

21        MR. RUTHERFORD:

22        Object to the form, and foundation.

23  BY MR. WIXOM:

24  Q    To your knowledge?

25  A    Not to my knowledge.

1          MR. WIXOM:

2          That's all I have.

3          MR. LEDET:

4          I have a couple of questions,

5          Mr. Tilley.

6                    EXAMINATION BY MR. LEDET

7     BY MR. LEDET:

8     Q    During the course of your investigation,

9          did Mr. Boeker ever ask you to treat him

10         differently because he was a warden at

11         Angola?

12    A    No.

13    Q    During the course of your investigation,

14         did District Attorney Sam D'Aquilla ever

15         ask you to treat Mr. Boeker differently

16         because Mr. Boeker was a warden at Angola?

17    A    No.

18    Q    During the course of your investigation,

19         did Sheriff Austin Daniel ever ask you to

20         treat Mr. Boeker differently because Mr.

21         Boeker was a warden at Angola?

22    A    No.

23    Q    During your investigation, did you speak

24         with any wardens at Angola about your

25         investigation into Mr. Boeker?

1    A    No.

2    Q    During your investigation, did you treat

3         Mr. Boeker differently from other members

4         of the public during -- at any point?

5    A    No.

6              MR. LEDET:

7              That's all I have.

8              MR. RUTHERFORD:

9              I have some questions.

10             EXAMINATION BY MR. RUTHERFORD

11   BY MR. RUTHERFORD:

12   Q    Earlier, you said you knew Barrett wasn't

13        going to come in, how did you know that?

14   A    That I knew he wasn't going to come in?

15        Well, he came in, but I -- I mean, I

16        didn't think he was going to talk and give

17        me an admission.  Because, like I said,

18        I've dealt with him before on a DWI arrest

19        that I made, he didn't really think highly

20        of me.  So, I didn't think I was going to

21        have a whole lot of success talking to

22        him.

23   Q    So, when you say you knew Barrett wasn't

24        going to come in, that was your estimation

25        of the situation?

1   A   Yes.

2   Q   You said Priscilla told you she was unable

3       to have sex with her boyfriend, where is

4       that reflected in your report?

5   A   It's not in my report.  Hmm, and she

6       didn't actually tell me, she told Hidalgo

7       on one of the phone conversations.  They

8       talked quite a bit, quite a bit more than

9       I talked to her.  And so she told him

10      this, and the information was passed on to

11      me.  It had no bearing in my case, so

12      there's no reason to list it in my report.

13      Had the rape kit -- had the rape kit gone

14      to the crime lab, it would have been in my

15      report because it would have been

16      relative, relevant to my case at that

17      point.

18  Q   So, did it have no bearing in your case?

19  A   At the time, no.

20  Q   Is it possible that you misheard Hidalgo

21      when he passed this statement along to

22      you?

23  A   I don't think so.

24  Q   If Mr. Hidalgo says something differently

25      would he be correct, since he's the one

```
 1        that spoke to her, or would you be
 2        correct?
 3             MR. WIXOM:
 4             Object to the form of the question.
 5   THE WITNESS:  (CONTINUING)
 6   A    He spoke to her, I didn't.
 7             (DISCUSSION OFF THE RECORD)
 8             MR. RUTHERFORD:
 9             I think that's all we have.
10             THE WITNESS:
11             Okay.
12             MS. ORGERON:
13             Thank you.
14             MR. WIXOM:
15             You're free to go.
16             (DISCUSSION OFF THE RECORD)
17             REPORTER:
18             Reading and signing?
19             MR. WIXOM:
20             We'll waive it.  Let me back up.  You
21        have the right to read the deposition
22        to make sure that what this lady put
23        in the transcript accurately reflects
24        what was asked today.  Most people
25        waive it.  It's up to you.
```

1          THE WITNESS:

2          I'll waive.

3          MR. WIXOM:

4          All right.

5          REPORTER:

6          Thank you.

7          (DISCUSSION OFF THE RECORD)

8          REPORTER:

9          Jason, do you want a copy of this,

10         also?

11         MR. WIXOM:

12         Electronic, please.

13         (DISCUSSION OFF THE RECORD)

14         REPORTER:

15         Do you want a copy?  I just have to

16         put it on the record.

17         MR. LEDET:

18         Yes, electronic.

19      (DEPOSITION CONCLUDED AT 4:50 P.M.)

20                 * * * * *

21

22

23

24

25

CERTIFICATE

2    This certification is valid only for a
3 transcript accompanied by my original signature
4 and original required seal on this page.
5    I, Jean M. Breaux, Certified Court
6 Reporter, in and for the State of Louisiana, as
7 the officer before whom this testimony was
8 taken, do hereby certify that
9          CAPTAIN SHANNON TILLEY,
10 after having been duly sworn by me upon
11 authority of R.S. 37:2554, did testify as
12 hereinbefore set forth in the foregoing
13 one-hundred-twenty-one (121) pages; that this
14 testimony was reported by me in the stenotype
15 reporting method, was prepared and transcribed
16 by me or under my personal supervision, and is a
17 true and correct transcript to the best of my
18 ability and understanding; that the transcript
19 has been prepared in compliance with transcript
20 format guidelines required by statute or by
21 rules of the Board, as described on the website
22 of the Board; that I have acted in compliance
23 with the prohibition on contractual
24 relationships, as defined by Louisiana Code of
25 Civil Procedure Article 1434 and in rules and

1  advisory opinions of the Board; that I am not

2  related to counsel or the parties herein, nor am

3  I otherwise interested in the outcome of this

4  matter.

5

6  This, the _____ day of _____,

7  2022, at LAFAYETTE, LOUISIANA.

8

9

10

11                    JEAN M. BREAUX, CCR
          LOUISIANA CERTIFICATION NO. 91148
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**0**

**0007** 73:2
**07** 72:22

**1**

**1** 11:6 73:3
**10-hour** 13:11
**11** 73:8
**12** 95:7
**12-hour** 24:13
**15** 50:7 104:19
**15-year** 14:23
**1844** 10:8
**1980** 10:6
**1998** 21:1
**1999** 20:24,25 21:21
76:16
**1st** 14:9,10

**2**

**20** 11:14 19:1 50:12 95:6
**2005** 14:9,20 76:13,15
**2006** 52:11
**2011** 73:8
**2015** 18:4
**2016** 13:4 23:8 30:2
38:10 55:13 73:18 95:6
**2017** 13:6 18:6 73:14,16
**2020** 11:6,7 14:10,21
38:4 39:2 103:24
**24** 22:21,22 100:16
**29** 21:14

**3**

**3** 10:6
**30** 109:21
**3:03** 63:9
**3:22** 63:12

**4**

**40-hour** 12:17 13:10
**4:00** 12:19
**4:01** 91:25
**4:03** 92:3
**4:21** 106:12
**4:29** 106:14
**4:50** 121:19

**5**

**5** 73:20

**5:00** 13:14,15

**6**

**65** 18:23
**68** 86:24
**6:00** 13:15
**6:30** 12:20,21

**7**

**7** 73:3
**70** 18:24
**70775** 10:9
**72** 25:16,17,18,20 26:5
80:15
**7:30** 12:18,19 13:13

**8**

**8** 73:18
**80** 41:19
**8:00** 13:14
**8th** 74:1,4

**9**

**9:40** 107:5
**9:45** 107:6

**A**

**above-mentioned** 5:4
**Academy** 20:24 21:22,
24,25 22:4
**accept** 41:7 93:18
**access** 31:17 36:19
41:17
**account** 86:25 87:4
**accurately** 120:23
**Act** 18:15
**actions** 11:22 115:12
**activities** 44:6
**activity** 64:13
**actual** 45:2 60:15
**ADA** 66:4 107:13
**add** 33:8 94:17
**added** 108:13
**adding** 75:2
**address** 10:7
**addresses** 64:21
**ADMIN** 89:11
**Administration** 48:8,9,
14 89:12
**administrative** 32:8
**admission** 118:17

**admit** 62:8
**ADSI** 64:1 74:9
**adults** 81:6
**affect** 9:23
**affected** 112:7
**affidavit** 97:4,8 105:8
**affirmatively** 71:22
**afforded** 94:10
**afternoon** 5:8,10 56:20
**agencies** 29:14 50:24
52:24
**agency** 29:6,25 51:2,3
52:21
**agree** 87:2,9,19
**ahead** 99:17
**alarm** 12:9
**alcohol** 9:21
**allegations** 56:16 57:16
72:8 79:21 97:25
100:25 112:12,23 113:1
116:11
**alleged** 28:3 69:8 102:12
112:11,22
**allegedly** 45:12
**allowed** 46:19
**amount** 14:22 37:12
41:8 53:18
**Angola** 18:10 44:11,17,
18 45:11,16,19 103:21
117:11,16,21,24
**answering** 20:3
**answers** 8:1
**anticipate** 105:8
**anymore** 12:14 23:24
24:1,5
**appeared** 6:18
**apply** 54:8
**approval** 46:14
**approved** 48:8 73:8
**approving** 11:19,20
**approximately** 104:18
**Archer** 56:19 68:5,6
84:19,20
**area** 41:18 81:17 104:19
**areas** 49:25
**arise** 32:7
**arrest** 11:21 31:5 37:25
38:7,8 39:5,6 46:6,9,25
47:2,11,18,20,21 75:21
76:12 87:25 88:24 91:6,
7 93:5 96:6,11,20 97:11
103:24 118:18
**arrested** 75:19 95:22
102:18 103:19 105:7
**arrests** 75:24 103:18
104:2

**aspect** 20:15
**assault** 22:12 23:1 25:13
29:17 33:3 36:6 37:4,20
51:20,25 52:18 54:16
63:19 69:7,17 81:1
83:25 85:13 86:25
87:11,20 100:24 101:5
102:19 105:18 110:13
111:12,18 112:5,12,22
113:1
**assaults** 33:6 50:3
**assign** 24:1
**assigned** 14:1 28:10
53:8
**assigns** 24:3
**Assistant** 66:4
**assisted** 67:5
**assisting** 68:14
**assume** 76:24
**assuming** 83:4
**attempt** 62:14 71:20
**attempted** 69:23 71:17
**attend** 65:22
**attorney** 8:11 10:20
38:12,21 43:25 48:4,10,
16 66:5 79:12 90:19
91:16 95:14,18 98:11,
24 100:22,23 101:3,19,
25 117:14
**attorney's** 48:19 71:8,11
112:21
**audible** 7:20
**audibly** 8:1
**aunt** 57:13,23
**Aurielle** 62:2 71:20
93:22 114:2
**Austin** 117:19
**averaged** 17:16

**B**

**B-LINE** 42:1 45:2,4,7
71:13
**back** 41:4 57:24 58:19
59:9 63:12 89:9 92:3
106:14 107:24 114:22
120:20
**background** 37:21
56:12 76:21 78:6
**Barrett** 57:14 59:21
60:11 61:22 62:1,9
68:22 69:4 70:11 75:14
76:22 78:22 79:19
91:11 92:9,25 95:5
97:3,11,16 99:25
102:12,18,20 103:8

104:2 105:7 113:24
114:22 115:2,6,11
116:14,19 118:12,23
**Barrett's** 60:10 61:25
68:25 103:9
**base** 58:12
**based** 58:3
**basic** 20:24 21:21,24
22:3 40:1
**basically** 21:16 53:21
64:23 70:5
**bat** 47:16
**Baton** 57:20 107:23
**batteries** 16:20
**battery** 103:21
**bearing** 119:11,18
**bed** 81:10 82:12,13,17
**bedroom** 82:12,18
**began** 76:15
**behave** 110:12
**bias** 55:17 65:3,18
**bickering** 44:23
**birth** 10:5
**birthday** 66:17
**bit** 10:20 12:2 13:24 18:7
21:22 23:7 24:17 34:19
47:1 51:4,6,13 79:3,14
81:15 83:24 104:4
119:8
**bits** 47:7
**block** 107:3
**body** 87:18
**Boeker** 59:21 68:23
70:12 80:3 91:12 92:10,
25 97:23 102:12 103:5
106:24 117:9,15,16,20,
21,25 118:3
**Boeker's** 57:14 59:24
60:11 62:1 78:22 99:25
114:23 115:2,6,12
116:14,19
**bond** 100:1
**booked** 95:23
**booklet** 9:1
**boss** 98:19
**bottom** 72:21 73:7 86:24
89:14
**bout** 21:10
**Box** 10:8
**boy** 10:16,17
**boyfriend** 60:4 78:14
115:20 119:3
**break** 9:16 63:7 91:21
106:4
**break-up** 16:23
**briefly** 61:16 89:8

**bring** 28:18 34:5 101:19
**brought** 56:16 68:18
**bruising** 87:18
**builds** 81:22
**bullied** 101:4
**bully** 98:16
**burglaries** 13:22 16:18 17:3,7,11 18:25
**busier** 14:4
**busy** 24:15

**C**

**call** 12:9 14:3 23:16,19, 20,21,23 25:7 42:1 44:19 45:16,22 46:21 48:23 56:21,24 57:1,6,8 58:24 61:24 62:8,14 64:13 67:4 68:22,24 69:4,17 71:20 84:1 94:19 107:4 113:20 114:10
**called** 42:5 45:11 49:12, 22 56:20 59:6 64:2,11 104:22 106:19 107:16
**calls** 12:1,4,6,7 14:2 36:13 68:19 69:7,13,15
**calm** 110:20
**capability** 74:10
**capable** 79:8,10
**captain** 5:2,18 67:18,19 68:9,13 71:19 93:24
**cards** 87:15
**career** 38:24,25 100:3,8
**case** 6:4,6 10:25 18:24 24:16 26:2 28:25 29:3, 22 31:5 35:13 36:6 41:8,22 47:4,6 48:7 49:9,14 56:14 57:10 58:3,12 59:2,18 60:17 66:24 68:8 69:17 77:16 78:11,20 80:6 81:5,23 83:15,23 84:4 85:1,6 87:11,17,21 89:3,22 98:20 101:19 102:19 104:7,23 105:10 106:17,24 107:6 108:8, 25 109:7,15,22 110:9 113:21 114:13 119:11, 16,18
**caseload** 16:24
**cases** 13:19 23:6,14 25:13 36:23 37:4,15 67:9 69:14 79:13 81:24 85:13 96:16 100:3 105:21 109:13
**caused** 14:24
**cells** 40:19 44:15

**cervix** 87:8
**CH** 76:25
**challenge** 40:17
**chance** 25:19 26:1 80:17
**change** 32:12 33:10 40:9 50:12
**changed** 14:17 28:23 39:3 77:4
**changing** 30:3
**charge** 33:20 84:8
**charges** 98:16 101:6
**check** 37:21 76:22,25 77:13 78:6 114:15
**checked** 77:17
**checklist** 87:25 88:24,25 89:5 93:5
**children** 18:9 19:16 81:6
**CID** 94:12
**circumstances** 10:1 29:21
**civil** 6:4,7
**class** 53:3
**classes** 51:1,2,24 52:24
**clean** 99:6
**cleaning** 83:10
**clear** 7:23
**client's** 99:13
**clients** 39:16
**close** 12:9 22:17 56:24
**closer** 20:21
**clue** 30:18 110:24
**collect** 27:2 29:1 41:4,5 78:10 80:7,12
**collected** 26:11,15 46:5 81:1 110:20
**collecting** 28:2
**collection** 28:25 34:25 35:19 50:5,9,16,18 51:1
**collects** 26:11
**combined** 14:25
**comfortable** 60:8
**comforters** 81:11
**commit** 96:23
**committed** 110:14
**common** 37:20 49:20 69:6,10,11
**communicate** 75:10
**communication** 48:18
**communications** 79:19
**compares** 13:2
**complain** 112:14
**complainant** 23:16 28:4
**complainants** 102:22
**complaint** 23:18 27:10, 13,15 28:17
**complaints** 15:3,5,9

18:20 44:11 102:23 103:4 112:10,17,20
**complete** 96:25
**completed** 97:4
**computer** 89:15
**concerned** 114:21
**conclude** 109:18
**CONCLUDED** 121:19
**concludes** 109:21
**conduct** 28:9 32:4 45:23 76:21
**conducted** 57:18 85:11
**conducts** 114:14
**conference** 52:16
**conferences** 52:5 65:20
**connection** 85:12
**consistent** 82:9
**consumed** 9:20 41:23
**contact** 57:4 60:11 61:7, 12 62:20 75:9 114:9
**contacted** 61:3 70:25
**contained** 25:23 28:20 40:19
**contaminants** 25:25
**content** 97:7
**CONTINUING** 20:6 58:6 73:4,13 79:24 101:11, 23 110:17 111:15 112:1 120:5
**controlled** 61:24 62:8 68:19 69:13,15,16 113:20 114:11
**contusions** 87:8
**convened** 116:14,19
**conversation** 93:23
**conversations** 119:7
**cool** 110:20
**cooperate** 36:14
**cooperative** 79:15
**coordination** 71:6
**Coordinator** 71:8
**copies** 86:9 88:3 92:19 99:6
**copy** 72:16 78:1 88:7,13 121:9,15
**coroner's** 28:8,24 29:5 57:6,21 84:5 107:23
**correct** 9:10 16:9 21:8 26:6 31:9 32:14 33:5 46:12 48:5 65:19 74:3 75:10 97:12 111:8 114:24 119:25 120:2
**Corrections** 20:15
**correctly** 109:9
**corroborated** 79:20
**corroborating** 87:3

**corroboration** 82:2
**Council** 51:3
**counsel** 52:21 77:24 99:8
**Counseling** 12:3
**couple** 10:22 17:17 43:16 59:4 63:14 66:1 68:19 105:20 110:3 117:4
**courses** 50:15 52:19
**court** 5:4 6:18,25 35:9 36:1,9 38:14 107:7
**courthouse** 11:22 107:3
**cover** 26:14
**crash** 12:8 43:17
**crime** 16:10 17:7 23:1 25:6,8,10,12,14,16,22, 24 26:5,18,19,24,25 27:1,3,6,24 29:9,10,11, 13 30:13,16,25 37:20 40:10 41:2,6,7,25 42:3, 11 43:5 45:3 47:7 50:9, 25 51:23 64:10,12,15 65:21 80:9,21,23 81:1, 3,9 96:23 100:12 116:15,20 119:14
**crimes** 13:22 16:25 17:12 18:1,8 19:2,5,8, 15 33:7 40:15 42:11 45:4,7,11,12 49:6 52:4 63:19 64:20 105:1
**criminal** 14:11,13 15:1, 2,3,8 16:3 24:2 25:3 31:1 37:21 38:1,2,6,13, 17 39:5,22,24,25 40:3 48:1 67:21,23 76:14,21 77:3,10 78:6 114:15 116:3
**crunch** 64:24
**current** 11:4,6 14:7 22:25 34:21
**custodian** 67:13 84:12

**D**

**D'AQUILLA** 107:13 117:14
**DA** 98:15 105:16
**DA's** 114:14
**Dallas** 52:5
**Daniel** 30:2 116:18 117:19
**data** 79:9 90:3
**date** 10:5 49:9 73:9 74:1, 2,8,12 110:22 115:14, 24
**dates** 108:18

**corroboration** 82:2

**David** 58:24 62:16 67:12 68:10,12,13,16 84:10, 11,13,14 108:2
**day** 59:4 75:1 81:9 95:23
**days** 10:22 13:11 23:4 59:4 80:9,21,23 81:14 85:8
**deal** 18:11 21:17 43:6,18 45:1 49:2 77:6
**dealing** 21:17 54:18 55:7 111:4 112:15
**dealt** 13:16 15:25 17:2, 10 19:18 22:22 118:18
**deaths** 40:25
**December** 73:18 74:1,4 95:6
**decide** 29:7,22
**decided** 113:19
**decision** 46:6,16 78:21 96:10 97:10 116:16
**declined** 69:25
**decrease** 14:24
**decreased** 14:22
**defeat** 33:11
**defensive** 53:22
**defined** 89:24,25
**degree** 105:3,5,14,18
**delete** 80:4
**deleted** 79:5
**deny** 62:10
**department** 33:21 39:3 65:22 79:11
**departmental-wide** 65:8,13
**depending** 14:2 47:4
**depends** 26:17 37:5 110:18 111:3
**deposed** 5:23 6:1,4,6
**deposition** 6:9 8:25 10:1,19,24 120:21 121:19
**deputies** 11:10,13 14:15 48:16,20 49:22
**deputy** 23:22 24:9 27:5 38:8 46:10,14,21 54:6 67:16 74:17 103:7
**describe** 89:8
**descriptions** 82:15
**desk** 37:15
**detail** 110:21 111:11
**detailed** 30:12,24 32:6
**details** 27:2
**detective** 14:9 36:22 50:8 53:14 54:7 56:21 58:25 66:16 67:5
**detectives** 14:15,22 24:4 25:7 26:25 33:12

62:18
**determine** 36:4 66:8
**determines** 46:11
**develop** 60:19
**development** 56:6
**dictate** 82:16
**difference** 83:16,22 94:9
**differences** 23:10 28:1
**differently** 41:3 99:21
111:6 117:10,15,20
118:3 119:24
**difficult** 21:15,16 79:4,
14
**directly** 19:10
**discharge** 83:7
**disciplinary** 11:22
**discipline** 34:4
**discussion** 27:23 39:10
40:6 99:15 113:16
120:7,16 121:7,13
**dispatch** 39:21
**dispatchers** 38:9 39:22
40:4
**district** 38:12,21 48:4,
10,16,18 66:4 71:8,11
90:19 98:11 100:22,23
101:3 112:20 117:14
**division** 11:8,9 14:12,
14,16,25 15:5,7,8 16:3
24:2 33:22,23 44:12,17,
18,25 45:19,20,22
67:22,23
**divisions** 34:18
**DMV** 39:23
**DNA** 25:19 41:5,11,13,
15,24 50:14 72:2 80:15,
21 81:21 83:3,8 85:16
**doc** 86:16
**document** 64:2 72:18
77:24 78:7 86:15,17,19
88:18,22 96:9 99:8,14,
19
**documentation** 87:7
**documented** 71:23
**documenting** 27:18
**documents** 64:12 84:5
**domestic** 12:8 45:4,8,9
**door** 82:13,14,17
**dorm** 41:19
**dorms** 40:19,23
**doubt** 115:1,4
**dozen** 104:19
**Dozens** 22:18
**draft** 31:12
**draw** 27:1
**drive** 31:20,23

**drug** 15:11
**drugs** 15:18
**due** 15:10
**duly** 5:3
**dumping** 79:8
**duty** 24:23 28:7,24
**DVDS** 90:12
**DWI** 75:22,23 103:20
118:18
**Dylan** 60:4 61:3 69:24
93:1 108:12
**Dylan's** 91:9 92:9
**dynamics** 41:21

E

**earlier** 12:21 39:13 55:9
58:21 63:17 83:24
96:18 103:20 104:12
118:12
**early** 13:6 59:21 60:5
100:6,7
**easier** 79:15
**easiest** 35:24
**easy** 64:19
**effect** 28:13,14 47:19
**effects** 55:16
**elderly** 101:25
**elective** 53:20
**electives** 53:24,25 54:2
**electronic** 35:20,21
36:2,5,20 78:11,12,20
121:12,18
**elements** 47:7
**Elimination** 18:14
**Ellis** 67:13 68:10,13
84:10,11,14
**email** 34:2
**emailed** 34:1
**emails** 36:13
**employed** 65:24
**employee** 107:2
**employees** 31:16 65:22
70:17,20
**encompass** 11:7
**encounter** 95:9,25 96:1
**encounters** 75:17
**encouraged** 101:4
**end** 43:19 48:6 56:25
103:7
**ends** 12:22 47:20
**enforcement** 22:2 42:23
52:22 100:17
**ensuring** 33:20
**entail** 11:17 24:6
**enter** 90:5,7

**entered** 90:13 97:3
**entire** 16:2 48:7
**entity** 42:23
**environment** 114:11
**equipment** 11:24 43:4
**errors** 89:25
**establish** 113:23
**estimate** 13:19 22:14,19
**estimates** 8:21
**estimation** 118:24
**ethics** 53:25 65:10
**evening** 56:24 57:10
**everyone's** 92:21
106:10
**evidence** 26:10,15 27:3,
6,9,12,16 28:3,25 29:1,
3,4,8,9,11 34:20 35:20,
22 36:2,5,16,20 37:6
40:21 41:5,8,11,13,14,
15 46:5 47:8 48:12,14
49:14 50:5,8,16,17 51:1
67:13,14 78:11,12,20
80:7,8,11,12,16,20,22,
25 81:21 83:4,8 84:12
85:16 87:10,20 90:7,13,
16,17,21 96:3,4 109:9,
22 113:22
**exact** 74:8 76:14
**examination** 5:6 33:3
84:1 113:17 117:6
118:10
**examined** 5:5
**exclusively** 50:13,14
**excuse** 20:2 40:14 73:16
**exhibit** 85:20 86:1,4
99:2,4
**existence** 83:6
**expect** 77:17
**expected** 29:16 32:20
104:9
**experience** 22:10,13
25:11 49:23 110:12
111:16
**explain** 49:14
**extinguisher** 103:23
**extra** 24:17 88:7
**extremely** 24:14

F

**fact** 116:7
**facts** 23:19 31:4 116:9,
11
**fairly** 56:8 59:21 60:5
**fall** 66:16
**familiar** 6:3 86:14 90:1
**Fantastic** 88:5

**fashion** 30:5 79:21
**fast** 7:6
**FBI** 50:24 90:2
**February** 108:19
**fee** 53:1
**feel** 60:8
**Feliciana** 5:20 20:18
24:23 29:15 31:13
37:23 57:25 67:24
**felt** 62:10
**female** 62:18
**field** 64:6,11,12,14
**fight** 44:24
**fights** 41:1
**file** 10:25 38:1,3,15
39:15 48:7 77:18,22
87:25 88:24 89:3 93:5
102:22,23
**files** 99:13
**fill** 89:4
**filled** 57:15 59:7
**final** 87:13
**finally** 8:24 9:15 46:24
87:13 112:9
**find** 18:19 24:22 34:10
42:8 61:1 79:7 81:21
107:18 115:1
**fine** 23:11
**fingerprinting** 34:9
**fingerprints** 50:13
**finish** 7:12 48:7 106:5
**finished** 57:7,23 99:18
**finishes** 20:3
**fire** 103:23
**firearms** 53:22
**flip** 78:5
**focus** 15:13,20
**focused** 15:2,4
**folder** 39:5,6
**folders** 89:1
**folks** 60:15 70:2,16
**follow** 31:2,3
**follow-up** 57:22 65:3
67:8 68:17
**followed-up** 67:10
**force** 20:12 21:1 35:5,6
42:13 93:11
**forces** 42:19
**forcible** 93:16
**form** 58:5 79:23 87:14
88:24 91:11,16 95:17
101:10,21 110:16
111:14,25 116:22 120:4
**formal** 21:9
**forms** 91:6
**forty-hour** 107:2

**forward** 10:2 31:5 109:3
110:2
**found** 54:6 56:15 109:10
115:5
**foundation** 116:22
**Francisville** 10:8
**fraud** 102:2
**free** 120:15
**Friday** 58:23
**Fridays** 13:11 58:22
**friends** 103:10
**front** 6:20 49:7 96:7
106:24
**frustrated** 100:7
**full** 5:16

G

**gain** 35:3,22 94:16 96:18
113:22
**gaining** 26:1
**gather** 37:7,10
**gave** 60:6 88:9 97:22
108:12 116:10
**geared** 106:20
**gender** 55:17 65:3
**general** 23:2,12 31:10,
19 33:7 101:19,25
**general's** 79:12 98:24
**generalizations** 26:23
**generally** 13:25 24:1
25:5 26:11,13 35:4
46:4,7 66:11
**generated** 73:10,17
**gesturing** 7:25
**girl** 10:16
**girls** 10:17 11:12
**give** 23:18 27:14 35:7
36:15 39:22 49:13
58:11 59:2,5 91:14
93:13 94:21 108:5,22
109:4 111:19 114:1,4
118:16
**giving** 27:9,13
**gleaned** 40:2
**good** 5:8,10 36:8 37:12
63:6 71:10
**graduated** 19:24 20:7
**Graham** 92:11,24
**grand** 49:4,5,7,8,11,16,
17,20 84:7 104:4,6,11,
13,17,20,25 105:9,17,
20,22 106:17,19,20,23
107:8 108:9,15,17
109:1,24 116:13,18
**Great** 99:10

**Greene** 107:14
**grounds** 19:6 40:11
**guess** 8:21 12:3 20:13 26:12 27:22 36:11 56:4 66:24 92:13 99:2 109:6, 19
**guessing** 17:23
**guns** 43:3
**guy** 41:13,14 65:24 96:21 98:2 114:20
**guys** 11:12 44:10

**H**

**hair** 83:12,15,17
**hairs** 83:5,11 115:2,5
**Haley** 107:13
**Half-dozen** 6:2
**handle** 12:11 32:6 33:18 45:5
**handled** 77:12
**handling** 15:9 32:12 51:19
**handwriting** 89:6
**happen** 26:7
**happened** 26:20 57:16 58:19 62:6 64:17 66:16 69:1 102:25 113:23
**happening** 19:9 23:4 62:4
**happy** 6:12
**harassment** 52:8 54:1 65:10
**hard** 13:19 42:22 58:7 81:24 97:17
**head** 7:24 69:19 71:22 105:4
**heard** 80:20 112:8,25
**hearing** 49:12 104:11,13 106:19 109:25
**hearings** 104:17,21
**hearsay** 58:10
**held** 14:7 66:10
**Helena** 58:15 61:9 92:11,24
**hey** 30:18 36:11 43:24, 25 48:23 100:8 106:23 107:5
**Hidalgo** 58:24 66:5 67:5 68:11,12,18 97:22 103:7 108:2 119:6,20, 24
**high** 19:21,22,24 20:7
**higher** 17:22
**highly** 118:19
**hires** 32:16 33:21

**histories** 38:13 39:23
**history** 38:1,2,6,17 39:5, 25 40:3 77:3,10
**hit** 44:20
**hit-and-runs** 13:23 16:20
**hmm** 11:22 19:14 21:11 31:24 41:13,25 43:22 51:2 52:11 53:11 54:17 57:17 58:7 59:3,8 60:3 61:23 74:1,10 75:11 77:4 78:12 79:4 82:23 95:10 96:12 107:20 108:13 109:23 112:13 115:25 116:7 119:5
**hold** 29:4
**home** 44:1 82:16 115:2, 6
**homicide** 25:6 53:13 79:13 105:3
**homicides** 13:23 16:19 17:14 53:13 105:5
**hope** 109:2
**hopeful** 110:1
**hospital** 28:18 57:3
**host** 52:24
**hosted** 50:22
**hours** 12:18 25:16,17, 18,21 26:5 53:19 80:15
**house** 114:23
**housed** 21:14
**huge** 77:11
**hugely** 116:5
**hung** 61:16,17
**husband** 114:3,6

**I**

**ICJIS** 39:18,20
**ID** 27:15,18
**idea** 16:23 61:25 69:3
**IDENTIFICATION** 86:4 99:4
**identity** 102:1
**illicit** 15:18
**imagine** 22:23
**immediately** 25:8
**impact** 77:11
**important** 7:3
**impossible** 81:20
**impression** 58:2,7,15
**inaudible** 19:12 76:6 102:8 103:16
**incidences** 101:2
**incident** 18:3 55:13 60:13 62:15 69:1 70:22, 23 71:2,14 72:10 73:22

**74:2 75:15,20,25 85:9 102:25**
**incidents** 100:21,22
**include** 38:1,2
**included** 38:14,17 39:6, 15 82:20 86:12 88:25 89:2
**inconsistency** 116:4
**inconsistent** 111:19,21
**incorporating** 29:2
**incorrect** 9:8
**incriminate** 98:4
**indicating** 86:17 88:23 94:8
**indication** 108:5
**individual** 36:22 46:21 48:19
**individuals** 66:25 69:21 70:25 75:8 114:16
**information** 36:8,15 37:17 39:24 40:1 47:16 58:10 59:18 73:24 87:9 89:13,21 94:17 96:19 102:17 103:8 114:12 115:17 119:10
**informed** 95:20
**initial** 21:10 68:16 73:25 82:25 83:1 103:6
**initially** 61:4 69:25 73:9
**initiated** 23:16
**initiates** 27:5
**injury** 106:17 109:1
**inkling** 36:15
**inmate** 40:25 41:1 43:1 44:20 103:22
**inmates** 18:9 21:15 40:17,25 41:19,24 44:15 45:14
**input** 97:7
**inputted** 74:15
**inside** 44:15
**inspection** 29:11
**instance** 29:19 101:18
**instances** 103:2 105:15, 16,17
**instructed** 8:13 84:16,23 104:5,9
**instructor** 53:1,2
**interdiction** 15:13,15,21 34:8
**interested** 34:6,7,9
**interests** 53:11
**interfere** 43:20,21
**interfered** 43:16
**interfering** 46:2
**interview** 35:11 59:1,16 67:6,7 68:16 78:18 83:1

**94:14 97:21 103:6**
**interviewed** 70:19
**interviews** 90:14
**introduce** 85:19 99:1
**invade** 81:17
**investigate** 25:12 26:5 28:8 30:13,17,25 45:10, 12
**investigated** 25:2 100:13
**investigates** 102:3
**investigating** 29:6,14 37:19 46:10 95:12 110:7,9
**investigation** 14:11,13 15:8,14 22:25 24:2 27:24 31:20 33:6,14,16 37:2 40:8 43:10 44:12, 18 45:19,20,22,24 50:9 51:1 52:1 56:13 57:7 66:24 67:2,21,23 68:1 74:23 76:23 77:2,4,12 83:16 84:7 85:5 95:3 96:25 109:18,20 114:15,23 115:11 116:3 117:8,13,18,23,25 118:2
**investigations** 12:13 13:17 15:1,2 16:3,8,12, 14 18:11,17 19:2,3 22:12 25:3 40:24 43:17 44:12,17,25 50:3,11 51:20 76:15 103:4
**investigative** 15:22 33:9 34:21 47:5
**investigator** 67:3 72:7 85:1 114:18
**investigators** 18:18 51:5 71:17
**invite** 26:12
**involve** 19:16 43:7 53:5
**involved** 12:12 22:15 35:13 44:4 67:2,25 68:4,6,8 76:3 89:21 104:18,23
**involvement** 68:3 108:8
**involves** 48:3
**involving** 40:25
**irritation** 87:8
**issue** 96:10
**issued** 46:25 47:2
**issues** 42:10 44:22
**item** 82:22
**items** 83:6

**J**

**Jack** 5:14 91:22

**jail** 20:16,17,18,22 21:4 95:22
**Jason** 121:9
**Jessica** 5:12
**job** 11:7 21:16 31:6 75:18 100:6,16,18
**jobs** 11:25
**join** 19:23
**joined** 20:12 21:1
**joining** 19:19
**Jones** 34:15,16
**judge** 6:20 46:8 47:19 96:15
**July** 11:6 14:9,10 73:8
**juries** 104:25
**jurisdiction** 18:10 19:6 42:21
**jurisdictions** 50:23
**jury** 49:4,5,7,8,11,16,17, 20 84:7 104:4,7,11,13, 17,21 105:9,11,22,22 106:19,20,23 107:8 108:9,15,17 109:24 116:13,18

**K**

**keeping** 11:18
**Kids** 10:12
**killers** 52:8
**kind** 7:6 13:2 15:5,6,25 16:22 17:15 19:7 26:10 32:18 33:10 36:21 41:2 42:18 46:3 51:16 53:10 54:5 56:5,11 57:15 59:7 60:19,25 62:2 109:4,11
**kinds** 80:25
**kit** 28:19,20,21 29:12,17 57:19 80:24 84:1,4,9, 15,24 85:3,4,9 87:15 107:22 115:14,24 116:1,10 119:13
**kits** 28:10 30:4 32:13 33:4 85:12,15 86:20
**knew** 62:2,3,6,10,12 77:5,8 106:22 110:2,21 113:23 114:1,7 118:12, 14,23
**knowing** 41:3
**knowledge** 31:18 32:11 50:1 51:18 68:2 70:14 71:18 80:3 116:17,24, 25

**L**

**lab** 29:9,10,13 41:7 50:25 80:18 119:14

**lack** 49:2
**lady** 120:22
**largest** 17:2
**late** 13:3
**laundry** 82:25 83:2
**law** 22:1 31:2,3 42:23 52:22 100:16
**laws** 46:18
**layout** 81:25 82:4
**lead** 30:19,20 37:17 67:3 85:1
**learn** 100:8
**learned** 112:6
**learning** 21:17
**leave** 24:25 29:24 32:1
**LEDET** 101:7 117:3,6,7 118:6 121:17
**Lee** 39:13 56:19 68:5 84:19,20
**LEF0001** 73:2
**LEF01** 72:22
**Lefebure** 5:13 60:12 61:25 62:5 78:14,25 102:23 115:12,22
**Lefebure's** 60:3 72:8 83:12 97:24 115:5
**left** 14:21 51:15
**leg** 74:22
**legislature** 21:13 53:16
**levels** 111:11
**library** 51:16
**LIBRS** 89:25
**life** 9:25
**lifespan** 83:9
**lines** 95:17
**list** 17:15 34:1 55:2 119:12
**live** 42:2
**lived** 83:13
**living** 40:23 41:19 81:6 115:9
**Livingston** 102:25
**load** 18:24
**local** 28:18
**locate** 15:18
**located** 31:11 82:6
**Location** 94:12
**logged** 74:9
**long** 11:4 22:5 31:2 47:12 96:20
**longer** 80:16
**looked** 39:12 85:12 99:20
**loose** 47:20
**lose** 40:20
**lost** 51:13 100:4

**lot** 22:13,22 24:11,15 25:23 26:23 42:10 48:17 49:17 50:17 59:17 62:10 83:20 92:23 98:2 100:3 118:21
**Louisiana** 10:8 19:5 39:25 40:11 42:15 46:18 70:17,21 71:1
**love** 16:22
**low** 17:18
**lower** 15:11
**LSP** 46:4 63:19
**LSU** 20:24 21:21,24 22:3
**lying** 39:19

**M**

**M-C-N-E-A-L** 63:4
**M-I-C-H-A-E-L-A** 62:25
**made** 30:2 60:11 62:7 69:12 77:11 78:21 83:15,21 103:23 104:2 115:20 118:19
**majority** 19:15,17
**make** 7:16 8:6 9:1 25:22 28:17 31:5 37:16,25 38:18,22 42:24 43:2 46:6,9,21 47:18 57:4 58:7 61:7,12 62:20 66:17 68:19 69:3,7,21 76:25 77:14 80:14 85:2 94:15 96:20 113:20 120:22
**makes** 21:19 38:7,8 93:8
**making** 11:23 47:11 69:16
**mandated** 37:24
**mandatory** 37:24 65:7
**manual** 33:19
**March** 10:6
**marked** 86:4,24 99:4
**marriage'** 97:18
**materials** 51:8,14,17
**matter** 70:12 98:12,23
**Mcneal** 62:19,25 63:2 66:2 67:8,16 68:10,13 71:20 93:24
**medication** 9:20
**meet** 44:13
**members** 118:3
**memory** 111:11 112:6
**mentioned** 63:17 104:25
**mentions** 102:6 103:7
**messages** 36:12 78:13, 15 79:4,10 80:4
**methods** 50:10

**Metz's** 68:3
**Michaela** 62:19,25 66:2 67:7,16 71:20
**mind** 78:1
**mindset** 30:17
**mine** 88:14
**minute** 86:22
**minutes** 107:25
**mishandling** 112:11,22
**misheard** 119:20
**misread** 73:16
**missing** 88:16
**misstating** 80:15
**mistakes** 38:18
**mitigating** 55:16
**modes** 33:15 50:11
**molestation** 105:21
**molestations** 105:21
**Monday** 13:12 58:22 59:10
**month** 55:11 77:8
**months** 20:13,20 22:8 60:6 72:1 93:2
**mother** 108:2
**mother-in-law** 57:14
**move** 52:7 97:16
**moved** 51:11 70:6 76:14
**multi-jurisdictional** 102:4
**multiple** 86:9 102:13
**murder** 36:18,23 37:1

**N**

**Nah** 76:1
**names** 35:3 110:3
**narcotics** 15:1,4,5,7 16:5,6,7,11,13,21 34:8
**narrative** 35:17 73:19, 20,21,24 74:6,8,12 82:20 86:25 90:8
**narratives** 35:8 74:14,16
**narrow** 27:22
**nationwide** 52:23
**nature** 44:24 45:9
**NCIC** 38:9 39:21
**necessarily** 111:22
**needed** 27:2 44:14
**negative** 58:17
**neighborhood** 42:2,8
**neighbors** 71:13
**Nice** 10:16
**night** 56:22
**nods** 71:22
**normal** 111:2

**notes** 70:1,4 71:24 93:23 99:12,20
**noticed** 92:11
**number** 17:13,18 72:25
**numbers** 19:14 63:22, 23,24 64:3,24
**nurse** 28:19,21 57:17 71:11
**Nurses** 28:10

**O**

**oath** 6:13 46:17
**object** 8:11 58:5 79:23 101:9,10,21 111:14,25 116:22 120:4
**Objection** 110:16
**obscure** 109:22
**obtain** 31:4 35:12 79:4 90:22
**obvious** 28:1
**occur** 40:16
**occurred** 27:19 63:20 64:22 80:9 114:22
**occurring** 45:7 63:19
**offender** 47:13 77:5,8,9
**offenders** 77:6
**offense** 81:15 89:13,14
**offer** 53:5
**offers** 51:4 52:19
**office** 5:20 19:20,23 20:9 23:15 25:12 26:16 28:8,24 29:5 31:13,16 32:24 37:23 46:6 48:19 54:4,21,24,25 55:1,3 57:6 64:14 65:5,25 66:8,19,20 67:1,24 69:11 70:10,11,25 71:9, 11 78:2 79:12 84:5 86:13 95:5 97:3 98:24 107:2,23 112:11,14,21 114:14
**office's** 23:13
**officer** 22:2 38:7 57:21
**officers** 43:23 44:23 49:21
**offices** 51:12
**on-the-job** 20:14,23 21:7
**opinion** 58:12 81:25 100:24 101:3
**opportunity** 9:10 27:8, 12 94:11
**order** 36:2,10 88:15
**organization** 52:23
**Orgeron** 5:6,7,11,12,15 6:11,16,24 7:15,19 8:9, 17 9:6,14,19 20:10

39:8,11 40:7 58:14 63:5,13 72:14,19 73:1, 6,15 76:7 77:21,25 80:2 85:18,23 86:2,5,8,11 88:4,12,19,21 91:19 92:4,17 94:2,6 99:5,9, 11,16 101:14 102:5,9, 11 103:17 106:1,9,15 111:17 112:3 113:3,7 120:12
**outstanding** 77:1
**overtime** 24:11
**overwhelmed** 41:11

**P**

**p.m.** 95:7 121:19
**P.O.** 10:8
**P2** 92:18
**P6** 39:9,12
**P8** 86:1,3,4
**P9** 99:2,4
**pages** 72:21 73:2
**paperwork** 27:18
**paragraphs** 75:1
**parish** 11:10 20:18 24:22,24,25 57:25 63:21 103:1
**part** 42:14 45:18 47:23 67:15 76:22 77:1,12,18 85:4 86:6 87:16 97:19 100:5,9
**party** 29:16 103:1
**pass** 18:21 42:25
**passed** 119:10,21
**past** 43:11,13 66:13 73:25 75:5 77:10 79:12 81:13,14
**PATC** 51:3 52:19,20,21
**patience** 106:10
**patrol** 5:19,21,22 11:8,9, 10 23:22 45:5,6 76:16, 20
**patterns** 64:3
**pay** 53:1 66:20
**penitentiary** 19:5 40:12, 13,16 42:15,16 45:13 64:18 70:18,21 71:1
**people** 12:10 21:18 25:23 28:24 34:2 40:22 42:2 44:14,16 60:24 66:12,21,22 101:24 102:1 110:20 111:6,10 112:13 120:24
**percent** 18:24 19:1 25:20
**perform** 11:25 32:4

**performed** 115:15
**period** 14:23 22:3 115:23
**perpetrated** 45:13
**perpetrators** 69:8
**person** 82:7 89:19,20 108:4 111:3
**person's** 83:18 110:19
**personality** 110:19 111:3
**personalized** 54:5
**personnel** 45:13
**pertain** 33:3
**pertaining** 50:2
**phone** 36:12 61:8,24 62:5,7,8,17 78:23 79:5, 6,8 119:7
**photo** 87:15
**photograph** 27:1
**photos** 87:16,19
**physical** 28:2 34:20 80:7,8,11 83:6 90:15,17
**pick** 29:8,16,23 53:9,10 74:21 84:14,23
**picked** 30:4 49:9 84:6 85:3
**picking** 84:8 106:23
**pieces** 41:15
**pillows** 81:11
**place** 29:18 32:22 40:10 48:2 65:15 110:22
**point** 23:23,25 25:1 26:2 28:23 29:23 47:22 58:1, 13,22 60:16 74:20,21 77:14 95:20 99:3 109:5, 25 110:4 118:4 119:17
**police** 29:10 40:11 41:7 50:24 57:1 80:19
**policies** 30:12 31:1,8,10, 19,24,25 32:1,2,3,6,15, 21,23,25 34:22 50:2 83:25
**policing** 55:17
**policy** 28:12 29:18 30:4, 9,24 32:11 33:19
**pop** 109:23
**position** 11:5,6 14:6 43:15 44:7
**possibly** 82:24 83:22
**POST** 21:24,25 34:12 50:4,6,15,21 52:17 53:19 54:22
**potentially** 103:9
**practice** 23:2 37:21 39:2 46:20 69:6,10
**practices** 22:25 23:13 34:22

**PRE** 18:13
**pre-fill** 94:12
**PREA** 18:10,14,17,18
**preparation** 10:18 49:3
**prepare** 10:24 104:6
**present** 59:17 68:17
**presents** 42:10
**press** 101:5
**pressing** 98:16
**presumptuous** 79:25
**pretty** 6:3 16:10 26:2 53:4 56:1,2 63:6 95:13, 18
**previous** 75:24
**previously** 63:16 75:18, 19 84:23
**primarily** 15:10 68:9,12
**Primary** 89:13
**print** 89:16
**printed** 40:3
**printout** 39:17,18,21
**prior** 44:6 55:12 76:13 77:3 108:15 116:10
**Priscilla** 5:13 56:16 68:15,18,22 92:25 97:15 98:10,14,15,18, 22 99:22 103:25 113:20 114:6 115:5 119:2
**Priscilla's** 82:19 87:18 91:8 92:8 108:2
**prison** 18:14 41:25 103:22
**privacy** 81:18
**probable** 36:9 46:7,13 59:22 96:14 97:1
**problematic** 116:4,5,6
**problems** 46:1 116:9
**procedures** 31:1,8 32:8
**proceeding** 49:21 104:5
**proceedings** 5:1 49:4,5, 18
**process** 48:1
**processed** 30:5
**produced** 39:16 99:12
**produces** 72:18 77:24
**producing** 88:18 99:8
**production** 78:2 86:7,13 87:17
**professionally** 32:5
**promoted** 14:8
**proper** 45:23
**property** 40:16 90:6,7, 10,15,20
**prosecuted** 114:16
**prosecuting** 29:6,14,25 109:8

**prosecution** 47:25
**protect** 46:17
**protocols** 31:20
**provide** 8:19 35:23 36:14 51:7
**public** 12:7 30:2 31:12 51:2 52:21 118:4
**pull** 19:13 63:23,24 64:19 79:9
**pulled** 64:4
**pulling** 63:21
**purpose** 33:11
**purposes** 27:23
**pursued** 105:17
**put** 24:15 50:25 89:20 120:22 121:16

---

**Q**

**question** 7:11 8:5,12 13:3 55:13 58:5 65:2 71:10 79:23 101:10,22 110:16 111:14,25 120:4
**questions** 8:11 35:10 49:15 56:12 63:14 106:3,5 110:11 113:8 117:4 118:9
**quick** 95:18
**quickly** 47:24
**quote** 97:17,18
**quotes** 97:19

---

**R**

**race** 65:11
**racial** 65:18
**Randy** 68:3
**rape** 18:14 28:5,9,16,19, 20,21,25 30:4 32:13 51:25 57:2,18 60:17 69:14 77:2 80:24 81:23 84:1,4,9,15,23 85:3,4,9, 12,15 86:20 105:3,6,14, 19 107:22 114:22 115:10,14,23,24 116:1, 9,10,11 119:13
**raped** 96:21 103:9
**rapes** 13:22 16:19 28:8 41:1
**rarely** 27:10 107:1
**reach** 59:23 69:23
**reached** 60:2,3 70:2,5 75:8
**react** 111:6
**read** 10:25 32:15 95:15 120:21
**Reading** 120:18

**ready** 53:3
**reason** 9:25 33:9 68:24 109:6 110:5 113:19 119:12
**reasons** 60:1
**recall** 8:23 38:11 50:4 52:4,9 55:14 60:2 61:3, 21,23 68:20 69:5,16,18 76:24 78:21 93:1 95:4 97:23 98:1,5,10,14,18, 22 99:21,24 100:2,21 101:1,2,17 102:21 103:10,12 105:16 110:6,10 112:6
**receive** 78:17,19
**received** 18:21 44:10 57:1 58:24 96:13
**recently** 36:23 56:1,8
**RECESS** 92:1 106:13
**recognize** 72:23 78:6
**recollection** 67:1 74:3
**recommending** 98:22 101:18
**record** 5:17 7:24 39:10 40:6 63:9,10,12 91:25 92:3 95:2,24 96:1 99:15 106:12,14 113:16 120:7,16 121:7,13,16
**recording** 6:25
**records** 77:13
**recover** 83:14
**recoverable** 80:16,18
**recovered** 80:21,23
**referred** 101:24
**refers** 90:15
**reflect** 35:17 75:7
**reflected** 119:4
**reflecting** 93:23
**reflects** 84:6 87:14 120:23
**refresh** 6:10 52:20
**refuse** 93:19
**refused** 71:21
**refuses** 35:14
**relate** 63:15
**related** 19:9
**RELATIONSHIP** 89:23
**relationships** 89:24
**relative** 11:1 116:14,19 119:16
**relatives** 61:22 70:11
**release** 100:1
**released** 49:16
**relevance** 23:9
**relevant** 26:2 29:23 82:1,5,23 87:10,20 119:16

**remained** 83:2
**remember** 6:8 13:1 21:6, 9 38:10,20 52:12 54:15, 17 55:6 56:9,15 58:16, 17 59:3,13,19,20 69:3 70:3 78:10 95:8,10,11 102:21 107:21 108:4,22 109:9
**repeat** 72:25
**report** 11:1 71:25 72:3, 23 73:5,8,10,17,25 74:17 75:7,12 94:18 119:4,5,12,15
**reportable** 81:14
**reported** 42:3 74:2 80:10
**reporter** 5:4 6:25 20:1 62:22 63:1,8,11 72:24 85:25 91:24 92:2 93:25 94:4 106:11 120:17 121:5,8,14
**reporting** 40:9 64:1
**reports** 11:21 72:11 90:9
**represent** 5:12
**request** 38:13
**requests** 38:22
**required** 21:13 53:12,14, 15 54:15,21,23 65:5,18 105:1,23
**requirement** 65:14
**requires** 55:1,3
**residence** 81:5 83:12
**resources** 24:8,21
**respect** 32:12 79:3 112:11,21
**respond** 7:10
**responder** 52:22 53:6
**responses** 7:21,22
**responsible** 29:2
**rest** 63:20 70:16
**restate** 8:2
**results** 29:13
**retain** 51:10
**review** 9:2 69:20
**reviews** 78:7 96:9 99:14, 19 112:10,20
**rights** 95:16,17
**robberies** 16:19
**role** 15:22 23:8 114:19
**room** 82:13 98:8
**Rouge** 57:21 107:23
**route** 35:25
**roving** 42:4,7,13 44:9
**RS** 42:5
**rug** 98:12 100:25
**rules** 6:9

**run** 24:7,8 38:9 52:6
**Rutherford** 5:14 72:12, 17 76:5,9,11 77:23 85:21 88:6,10,17 92:15 99:7 102:7 103:15 113:5,12 116:21 118:8, 10,11 120:8

**S**

**S1** 72:11 89:9
**S2** 96:8
**S5** 88:1 92:6
**Sam** 107:12,20 117:14
**SANE** 28:10 57:17 71:10
**saved** 75:1
**savvy** 64:25
**scene** 25:7,8,12,14,22, 24 26:5,24,25 27:1,3,6 41:2 42:6 43:5 45:3 50:9,25 51:23 81:2,3,9
**scenes** 25:10 42:11
**schedule** 12:15,17 13:1, 9
**school** 19:21,22,24 20:8
**schools** 51:24
**scope** 26:18
**screen** 89:11,14,19,23 90:4,6,8,9,10
**screens** 89:8,16
**screenshots** 79:1
**search** 37:8 82:16
**second-hand** 58:10
**securing** 100:1
**security** 42:5,7,13 44:9
**seize** 79:6
**send** 24:1 25:3 29:13 34:11 41:10 52:25 53:2 66:12
**sends** 54:9
**sense** 7:16 8:6 21:19 23:12
**separate** 64:9
**serial** 52:7
**serving** 82:16
**set** 31:4 32:22
**sets** 33:17
**setting** 42:1
**sex** 17:11 18:1,7 19:2,8, 15 27:24 64:15,20 77:5, 6,8,9 82:21 115:13,19, 22 116:8 119:3
**sexual** 22:11 23:1 25:13 29:17 33:3,6 36:6 37:4, 20 50:3 51:20,25 52:8, 18 54:1,16 63:18 65:10 69:6,17 81:1 83:25

**85**:13 87:11,20 100:24 101:5 102:19 105:18 110:13 111:18 112:5, 12,22 113:1
**shaking** 7:24
**Shannon** 5:2,18
**she'll** 7:8
**sheet** 89:17
**sheets** 81:10
**sheriff** 30:1 32:24 86:14 116:17 117:19
**sheriff's** 5:20 19:20,23 20:8 31:13,16 37:23 64:13 65:25 66:20 67:1, 24 69:11 70:10,24 86:12 87:16 112:10,14
**Shew** 92:13
**shift** 24:13,15
**shocked** 97:15 112:16
**short** 83:9 106:4
**show** 34:3 87:18,25 89:10 92:18
**showed** 44:21
**shows** 116:1
**sic** 40:12 73:9 83:1
**sick** 115:20
**sign** 95:16 96:14
**signed** 54:3,11 96:15 97:2
**signing** 120:18
**signs** 46:9 47:19
**similar** 86:19
**similarly** 6:18 65:17
**simple** 103:21
**sister** 60:11
**sister's** 103:10
**sitting** 74:18
**situation** 118:25
**situations** 32:7 33:18
**six-year** 76:17,19
**skip** 30:23
**slim** 80:17
**slow** 7:7
**someone's** 34:7,8 81:18
**something's** 9:8
**sought** 54:6
**sources** 52:17
**space** 82:1,5
**span** 76:17,19 81:4
**spans** 97:14
**speak** 7:4 57:9,11,12,17 70:20 71:12 117:23
**speaking** 61:21
**special** 102:2
**specific** 49:25 51:4 82:15 86:16

**specifically** 13:17 18:2 23:1 52:1 104:8 112:13, 18,24
**specifics** 67:12
**speculation** 83:20
**spoke** 61:15 70:10,11 72:7,9 93:22,24 98:7 120:1,6
**spoken** 10:18 60:12,24 69:21 99:22
**sprayed** 103:22
**spring** 66:11
**St** 10:8
**stands** 39:20
**STAR** 71:7
**start** 26:24 37:18
**started** 14:18,20 15:8 20:14,25 28:16
**starting** 73:20
**starts** 12:21
**state** 5:16 19:5 29:10 40:11 41:6 42:15,16 46:18 50:24 57:1 70:17, 21 71:1 80:19
**stated** 92:7 95:12
**statement** 30:3 35:7 48:11 59:3,6 60:7 87:2, 3 91:6,10,11,15 92:10, 12,14 93:9,12,14,15,16, 17,19 94:7,8,15,22 95:1,3 108:13,23 114:1, 5 119:21
**statements** 35:1,12 37:6 90:24 91:1,2,5 92:8 96:12,13
**states** 73:7
**step** 33:12 48:1,3 109:3
**Stephanie** 60:10 61:6,10 69:22,23 102:14,24
**steps** 10:23 59:14 85:2
**stomach** 115:21
**stood** 82:8
**stop** 27:4,5 74:20 110:6, 8
**stops** 15:16,17
**storage** 90:18
**stories** 111:19,22
**story** 82:2,3
**straight** 19:23
**strand** 83:14,17
**street** 15:17 47:14
**strengthened** 83:23
**stronger** 114:13
**strongly** 101:4
**stuck** 109:11
**stuff** 15:24 79:16

**submit** 39:4 46:8 47:18
**submitted** 11:21 91:5,7 93:4,6
**subpoena** 35:9 36:1,10 37:11,14 94:18 107:8
**subpoenaed** 106:16
**subpoenas** 107:1
**success** 118:21
**suicide** 17:22
**suicides** 13:23 16:19 17:13,20
**summer** 20:24
**supervise** 11:8,16
**supervision** 11:17
**supervisor** 5:19,21 11:11 24:3 43:15 54:9 56:19 68:7 84:17,18
**supervisors** 89:1 97:6
**support** 71:7
**supposed** 12:19 32:19 33:13
**surprise** 30:1,6
**surprised** 107:15 112:16
**suspect** 37:22
**suspected** 36:18
**swab** 72:2
**swabs** 41:17,24
**sweep** 98:11 100:24
**swore** 46:17
**sworn** 5:3
**system** 64:1 74:9

**T**

**tactics** 53:23
**takes** 37:10,12 41:20
**taking** 41:23 70:4 98:23
**talk** 7:6 22:24 23:10 24:18 26:9,12 35:6,14 43:24 44:2,14 56:13 59:25 60:7,13,16 61:1, 10,15 62:13 68:25 70:1 71:21 95:14 113:25 118:16
**talked** 34:19 58:8 63:15 78:16 83:24 102:13 103:20 119:8,9
**talking** 18:8 34:21 56:7 57:23 60:9 61:18 66:23 80:22 81:4 92:5 114:9 118:21
**tangent** 46:4
**tease** 19:8 63:18
**tech** 64:25
**technician** 80:19
**techniques** 33:10

**technology** 33:15
**telling** 43:22 95:11 98:18 114:7
**tend** 74:18
**terms** 16:24 23:10 99:21 116:3
**testified** 5:5 49:17
**testify** 49:12,22 104:6, 13,22 106:21 107:6 108:6 114:5
**testifying** 107:19
**testimony** 6:9,19 8:20 9:23 49:13 80:14
**Texas** 52:6
**text** 36:12 78:13,15 79:4
**texts** 78:24
**theft** 27:15,18 102:1
**thefts** 13:22 16:18 17:3, 7,10 18:25
**thing** 59:15 67:14 111:2
**things** 19:9 40:24 44:3 47:9 54:1 63:15 67:8,11 82:6,8 83:11
**thinking** 18:2 98:3
**thought** 88:15 89:7 116:13
**threatened** 98:19 100:16,17
**threw** 44:20
**Thursday** 13:12 58:23
**tie** 11:23
**tied** 12:10
**till** 13:14
**Tilley** 5:2,18 117:5
**time** 8:10 9:11,16 11:18, 19 12:1,2,21 13:2,18 16:2 18:3 21:14 22:1,3 24:8,16,17,20 37:10,12 38:12,18 41:20 44:10 45:6,15 48:22 51:9 55:7 56:9 57:12 60:4 63:7 66:1 81:4,8 83:14 84:9 91:5,7 99:25 103:25 107:13 109:24 110:21 113:9 115:10 119:19
**timely** 30:5
**times** 5:25 51:12 96:16 102:18 103:19 105:20 107:4
**timesheets** 11:20
**title** 5:17
**today** 8:18 9:21 10:2 39:13 120:24
**today's** 10:19
**told** 33:12 36:7 41:12 49:8 58:21 59:8 61:2,9 62:3 78:25 80:19 95:24 97:19 102:23,24 103:2

104:10 106:22 107:9,
11,22 115:25 119:2,6,9
**top** 69:18 73:17 89:13
105:4
**total** 14:18
**totally** 7:11
**tough** 43:5
**toy** 82:21
**tracks** 90:2
**traffic** 15:16 27:4 83:10
**train** 28:24 34:12
**training** 11:25 20:11,14,
23 21:7,10,24 22:4,5
25:10 33:17,25 34:1,3,
6,10,11,13 50:18 51:2,
4,13,17,24 52:1,21,22
53:13,14,19,22 54:5,8,
16,21,24 55:7 65:8,11,
18 81:20 112:4
**trainings** 33:23 49:25
50:4,6,19,22 51:8,19
52:3,10,18 53:8 54:13,
18 55:2,16,22,25 65:4,6
112:4
**transcript** 7:2 9:9
120:23
**trauma** 54:19 55:8 111:7
112:4,5,7
**travel** 24:21
**treat** 117:9,15,20 118:2
**trial** 48:22,24 49:3
**trigger** 93:7
**triggered** 84:14
**trouble** 97:17
**true** 83:5 100:20
**truthful** 111:23 116:7
**turn** 48:15 89:1 90:18
**turned** 7:2 47:25
**turns** 48:9
**Twenty** 11:15
**type** 15:24 26:17 49:2
50:11 90:9
**typed** 74:16
**types** 16:10,25 26:9
**typical** 27:24 36:18
**typically** 12:15,18 23:14
43:7 74:14,16

**U**

**uh-huh** 6:15 7:22 11:3
23:5 27:25 30:10 34:24
39:14 78:4 84:3 102:15
**uh-uh** 7:23
**unable** 75:9,10 115:19
119:2
**uncommon** 26:4

**underclothing** 83:18
**undercover** 15:24
**understand** 6:21 8:4,5
9:3 23:6
**understanding** 7:9
23:11
**Understood** 8:14
**unfilled** 94:7
**uniform** 31:25
**uniformed** 5:19,21,22
11:8,9,10 23:22 24:9
45:5,6 76:16,20
**unilateral** 46:16
**unit** 102:3
**unsigned** 92:10,12 93:9
**unsuccessful** 62:21
**updated** 32:23 33:1
**upset** 94:23 99:24 100:2
**urine** 44:20
**usage** 32:2

**V**

**vague** 30:25 31:7
**validity** 18:20
**Vanessa** 34:15,16 54:3
55:4,6
**vehicle** 27:7 32:2 90:4
**vehicles** 90:5
**ver** 93:14
**verbal** 7:21 95:1
**verbiage** 23:21
**verifying** 82:9
**victim's** 87:3
**victim** 23:17 28:3,16
35:22 57:2,9,10 59:1
60:9,22 71:6 79:15 82:7
100:11 101:18 110:2
111:4,18
**victim's** 71:7 82:2
**victims** 54:19 55:8 59:24
60:20 69:7 101:5 102:1,
13,17 109:3 110:3,12,
23
**video** 114:11
**violent** 37:19 47:12
**Virginia** 60:12 61:14,15
69:25
**visited** 77:7
**visitors** 81:7
**volume** 12:23 13:2,16
14:3 15:11 17:1,2,21,22
19:8
**voluntarily** 93:17
**voluntary** 91:2 92:7
93:15

**volunteer** 115:16

**W**

**wait** 7:10 47:12 96:20
**waive** 120:20,25 121:2
**walking** 40:22 47:13
**wanted** 57:3 59:25 60:25
62:4 66:18 77:15 114:6
**warden** 42:6 117:10,16,
21
**wardens** 117:24
**warning** 98:10,14,15
**warrant** 37:8 44:22 46:8,
9 47:3,18,19 59:20,22
82:16 95:21 96:6,7,11
97:2
**warrants** 77:1
**washing** 83:10
**watch** 59:16
**wear** 9:18
**week** 12:18 13:20,21
14:3 56:22
**weekends** 56:23
**weekly** 18:11
**weeks** 13:10 14:4 19:24
20:7 22:6
**West** 5:19 20:18 24:23
29:15 31:12 37:23
57:25 67:23
**WFPSO** 88:24
**wife** 10:10 61:25 62:2
68:25
**witness'** 82:3
**witnesses** 24:18 35:3
47:8 49:15 59:24 60:18,
23
**WIXOM** 58:4 73:11
79:22 88:2,8 101:20
110:15 111:13,24
113:14,17,18 116:23
117:1 120:3,14,19
121:3,11
**Woman's** 57:2
**women** 52:5 65:21
**word** 49:3
**words** 33:19
**work** 10:7 12:17,23,25
13:13,14 16:7 18:22
20:8 23:24,25 24:4,5,
10,14,19 35:13 41:22
42:18 43:4 45:3 48:6
59:10 70:6 77:16 81:24
96:16 97:9 109:13,23
**workday** 56:25
**worked** 13:9,10,12,20,
21,24 14:4 17:24 18:7
20:15,22 25:9 44:8 45:1

49:13 58:22,25 67:9
100:3 102:20 109:13
110:10 114:20
**working** 21:3 22:2 25:10
26:18 42:11 47:5 68:8
89:22
**works** 23:23
**Wow** 19:25 61:19
**wrap** 63:16
**write** 34:3 37:14 93:11,
12,17,19 94:23,24
**writing** 74:17
**written** 50:2 51:7 74:13,
25 91:1,9 93:15,16
94:15,21 96:7
**wrong** 36:25
**wrote** 73:21 74:6 105:8

**Y**

**y'alls** 48:6
**year** 17:25 20:21,25 21:3
50:10 52:11,13 55:9
76:14
**year-and-a-half** 56:3
**years** 14:17 17:17 22:21,
22 32:23 43:14 50:7,12
52:6,14 56:4 66:15
100:16 109:21
**you-all** 71:19