The Deposition of

# LIEUTENANT DAVID HIDALGO

In the Matter of

## PRISCILLA LEFEBURE

vs

## BARRET BOEKER, ET AL

Taken On

## NOVEMBER 02, 2022



**Exhibit F**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

```
* * * * * * * * * * * * * * *
PRISCILLA LEFEBURE,           *
AN INDIVIDUAL                 *    CASE NO.:
                              *    3:17-CV-1791-BAJ-EWD
VS.                           *
                              *
BARRET BOEKER, ASSISTANT      *
WARDEN LSP, INDIV. AND IN     *
HIS OFFICIAL CAPACITY, J.     *
AUSTIN DANIEL, SHERIFF,       *
WEST FELICIANA PARISH,        *
INDIVIDUALLY AND IN HIS       *
OFFICIAL CAPACITY, WEST       *
FELICIANA PARISH, PRINCETON   *
EXCESS AND SURPLUS LINES      *
INS. COMPANY, INSURANCE CO.   *
DOES 2-5, DOES 6-20           *
* * * * * * * * * * * * * * *
```

DEPOSITION OF

LIEUTENANT DAVID HIDALGO


TAKEN AT THE OFFICES OF ERLINGSON BANKS, PLLC,

301 MAIN STREET, SUITE 2110, BATON ROUGE LOUISIANA

70801, ON WEDNESDAY, THE 2ND DAY OF NOVEMBER, 2022,

BEGINNING AT 10:08 A.M.




REPORTED BY:

    LINDSAY I. GIBNEY
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 2018008

<pre>
1                    A P P E A R A N C E S

2


3   REPRESENTING THE PLAINTIFF:

4         JACK G. RUTHERFORD, ESQ.
          JESSICA L. ORGERON, ESQ.
5         Rutherford Law, PC
          900 Camp Street
6         New Orleans, Louisiana  70130


7


8   REPRESENTING BARRETT BOEKER:

9         LEE J. LEDET, ESQ.
          Erlingson Banks, PLLC
10        301 Main Street
          Suite 2110
11        Baton Rouge, Louisiana  70801


12


13  REPRESENTING SHERIFF AUSTIN DANIEL:

14        JASON P. WIXOM, ESQ.
          Frosch, Rodrigue & Arcuri
15        1615 Poydras Street
          Suite 1250
16        New Orleans, Louisiana  70112

17

18

19

20

21

22

23

24

25
</pre>

1                    I N D E X

2                                              Page

3   Appearances ................................2

4   Stipulation ................................4

5   Examination By Mr. Rutherford ..............5

6   Examination By Mr. Ledet ..................57

7   Reporter's Page ...........................59

8   Reporter's Certificate ....................60

9

10  Exhibits:

11  Exhibit P10   Photographs ..................41

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    S T I P U L A T I O N

        It is hereby stipulated by and between counsel

for the parties hereto that the deposition of

                 LIEUTENANT DAVID HIDALGO

be taken before Lindsay I. Gibney, Certified Court

Reporter, for all purposes, pursuant to notice and

to the provisions of the appropriate statutes of the

Federal Rules of Civil Procedure.

        The parties hereto waive all formalities in

connection with the taking of said deposition,

including the reading and signing thereof, except

the swearing of the witness, and the reduction of

the questions and answers to typewriting.

        Counsel for all parties reserve all objections

except as to the form of the question and

responsiveness of the answer at the time of taking

said deposition, but they also reserve the right to

make objections at the time said deposition or any

part thereof may be offered in evidence, with the

same rights as if the testimony had been taken and

given in Open Court.

```
 1                   LIEUTENANT DAVID HIDALGO
 2   who resides at 4785 Prosperity Street,
 3   St. Francisville, Louisiana 70775, after
 4   having been duly sworn, was examined and did
 5   testify as follows:
 6                   E X A M I N A T I O N
 7   BY MR. RUTHERFORD:
 8        Q.   Good morning.  Could you please state your
 9   name and age for the record?
10        A    Lieutenant David Hidalgo, 41.
11        Q    Lieutenant Hidalgo, I represent the
12   Plaintiff in this matter, Priscilla Lefebure.  This
13   is my co-counsel, Jessica Orgeron.
14             Where are you currently employed?
15        A    West Feliciana Sheriff's Office.
16        Q    Okay.  How long have you worked there?
17        A    20 years.
18        Q    You were 21 when you started?
19        A    Yes.
20        Q    Was that your first job out of college?
21   Out of high school?
22        A    No.  My first job in law enforcement was
23   with St. Francisville Police Department in 2001.
24        Q    At what point did you switch over to West
25   Feliciana Parish Sheriff's Office?
```

1    A    I worked part-time for the sheriff's

2  office in 2002 -- well, I was commissioned with them

3  in 2002 and worked part time; then in 2005, I was

4  hired full-time.

5    Q    Officer Tilley, I think, did the same

6  thing.  Were y'all working around the same time at

7  the St. Francisville Police Department?

8    A    No, he had already moved over to the

9  sheriff's office before.

10    Q    Is that a common path?  People go from the

11  St. Francisville police to the --

12    A    Yes, it's kind of a graduation, a step up.

13    Q    Have you ever had your deposition taken

14  before?

15    A    Yes.

16    Q    How many times?

17    A    Once.

18    Q    What was that -- what kind of case was

19  that?

20    A    That was a traffic accident.

21    Q    Did you have to go testify in court for

22  that one?

23    A    No, I did not.

24    Q    Have you testified in court before?

25    A    Yes, I have.

1     Q    About how many times?

2     A    40.

3     Q    Okay.  I don't know -- is it, I mean, what

4 kind of cases was it?  Was it trials, grand jury, a

5 mixture?

6     A    Everything.  Any kind of court proceeding.

7     Q    Okay.  See you've been sworn in before,

8 and you were just sworn in here.  So any testimony

9 you give today is like we're in court, there is just

10 not a judge.  But the same rules apply, requests for

11 truthfulness and all of the above, as if we were in

12 court.  The only question I really ask people is,

13 have you taken any medication or anything else today

14 that would impact your ability to give your full,

15 truthful, and honest testimony today?

16     A    No, I have not.

17     Q    I'm going to try real hard not to speak

18 over you, I do it sometimes and I apologize in

19 advance.  I ask the same of you, and we'll try to

20 make it as nice and easy for the court reporter as

21 we can.  If you could give audible responses.  If

22 you nod your head I'm going to have to say, you

23 know, will you state it out loud so she can get it

24 down?

25     A    Okay.

1      Q    If you don't understand any of my

2 questions, feel free to let me now and I could try

3 to ask a better one.  I don't ask the best questions

4 all the time.  If your attorney objects, certainly

5 wait and let him do that, and we will figure it out.

6         Right now, what is your title currently

7 with the West Feliciana Sheriff's Office?

8      A    Uniformed patrol lieutenant.

9      Q    Does that mean you are in charge of the

10 uniformed patrol deputies?

11     A    Yes, I am in charge of C and D shifts.

12     Q    How many shifts are there, total?

13     A    Four.

14     Q    Are the other ones A and B?

15     A    Yes.

16     Q    Who's in charge of A and B shifts?

17     A    There's another lieutenant that's over

18 them.

19     Q    What's that lieutenant's name?

20     A    Lieutenant Mark Daigle.

21     Q    And you work as a uniform patrol

22 lieutenant?

23     A    Yes.

24     Q    Do you wear a uniform to work?

25     A    Yes, I do.

1     Q    Thank you for coming to this today, sir,

2  we certainly appreciate that.

3         Approximately how many people on C and D

4  shift do you supervise?

5     A    There are three per shift, so it's six

6  total.

7     Q    And those are all uniformed deputies?

8     A    Yes.

9     Q    What is your supervisory role, currently?

10     A    To oversee the shifts.  There is a shift

11  sergeant on each shift, and that is who I deal with.

12  And they supervise two people.  So that's who they

13  supervise, so I only supervise two sergeants.  And

14  they come to me with any issues on their shift.

15     Q    How long have you been in this current

16  role?

17     A    Since July 1st of this year.

18     Q    What was your title before that?

19     A    I was a uniform patrol sergeant.

20     Q    So you got a promotion?

21     A    Yes.

22     Q    Congratulations.

23     A    Thank you.

24     Q    How long were you a uniform patrol

25  sergeant?

1    A    Since July 1st, 2020, so about two years.

2    Q    When did Sheriff Spillman come in?

3    A    July 1st, 2020.

4    Q    You were there before Sheriff Spillman?

5    A    Yes, that's correct.

6    Q    Who was the sheriff then?

7    A    Officer Daniel.

8    Q    Before July 1st, 2020, what was your

9    title?

10    A    I was a sergeant in the criminal

11    investigations division.

12    Q    How long were you a sergeant in the

13    criminal investigation division?

14    A    Since August of 2009.

15    Q    If you can remember before that, from '05

16    to '09, what was your title and role at the

17    sheriff's department?

18    A    I started off in 2005 as a uniform patrol

19    deputy.  I think in 2007, I was promoted to a

20    corporal in uniform patrol, and from there I moved,

21    in 2009, to criminal investigations.

22    Q    When you moved over to investigations in

23    2009, did you get any departmental training in how

24    to conduct investigations?

25    A    Yes, I did.

1      Q    What kind of training did you get?

2      A    The first training I went to was a basic

3 investigator's training.

4      Q    Who put on the basic investigator's

5 training?

6      A    One of them was the Public Agency Training

7 Council, the PATC.

8      Q    It sounds like there was another one,

9 maybe?

10     A    Louisiana State Police put on a crime

11 scene.

12     Q    And you attended that one as well?

13     A    Yes.

14     Q    Is it normal for a deputy, when he goes

15 into investigations, to do those types of trainings?

16     A    Yes.

17     Q    And had you already done POST training at

18 that point?  In August of 2009?

19     A    Yes.

20     Q    What kind of continuing education credits

21 do you guys -- are you guys required to do that

22 training every year?

23     A    Yes.

24     Q    So there is a requirement?

25     A    Yes.

1     Q    And do you know what the hourly

2  requirement is?

3     A    No, I do not.

4     Q    But you do go to trainings every year?

5     A    Yes.

6     Q    Do you remember which ones you went to

7  last year?

8     A    No, I do not.

9     Q    Do you get to pick those or are they sort

10  of assigned?

11     A    They are assigned.

12     Q    Do you ever get to pick additional ones or

13  different ones from what is assigned?

14     A    We can submit requests to go to trainings,

15  but they are not always approved.

16     Q    Have you ever submitted a request to go to

17  trainings?

18     A    Yes.

19     Q    What kind of trainings have you asked to

20  go to?

21     A    A blood-splatter analysis.

22     Q    Any others?

23     A    Not that I can recall.

24     Q    Okay.  Did you ever go to any conferences

25  in Dallas on -- like, women as victims types of

1  conferences?

2      A    Yes.

3      Q    Did you attend that with Deputy Tilley?

4      A    No.

5      Q    Do you remember what year you attended

6  that?

7      A    No, I do not.

8      Q    Do you think it was more than five years

9  ago?

10     A    I can't recall.

11     Q    Fair enough.  Who is currently your direct

12 supervisor?

13     A    Captain Tilley.

14     Q    Who is Captain Tilley's direct supervisor?

15     A    That would be Lieutenant Colonel Archer

16 Lee.

17     Q    Is Captain Tilley your only supervisor,

18 currently?

19     A    Yes.

20     Q    You told me about the two sergeants from C

21 shift and D shift that you supervise.  Are those

22 your only two?

23     A    Yes.

24     Q    In 2016, I think, you were in the criminal

25 investigations division at that point; is that

1  correct?

2      A     That's correct.

3      Q     Do you recall who your supervisor was in

4  2016?

5      A     It was Captain Makayla McNeal.

6      Q     Did you have any other supervisors back

7  then?

8      A     Yes, I did.

9      Q     Okay.  Who else was your supervisor?

10      A     At the time it was Major Archer Lee.

11      Q     Any other supervisors in 2016?

12      A     No.

13      Q     And do you know who Major Archer Lee's

14  supervisor was in 2016?

15      A     The sheriff.

16      Q     Who all directly reported to the sheriff

17  in 2016?

18      A     The entire department.

19      Q     Is that everybody?

20      A     Well, he's the sheriff.

21      Q     Right.  Do you know if he had any

22  responsibilities -- were there any people who were

23  directly under Sheriff Daniel at the time?

24      A     The number two under him would have been

25  Lieutenant Colonel Randy Metz.

1      Q    Was there a number three?

2      A    Archer Lee.

3      Q    Do you know if Archer Lee is still at the

4 sheriff's office?

5      A    Yes, he is.

6      Q    What about Randy Metz?

7      A    No, he's not.

8      Q    When did Randy Metz leave?

9      A    Prior to July 1st, 2020.

10     Q    Much prior to?  Or a few months before?

11     A    A few months.

12     Q    Do you know where he is working now?

13     A    He is the chief of police with the

14 St. Francisville Police Department.

15     Q    Do you know if he has ever been employed

16 by Angola?

17     A    Yes, he has.

18     Q    Is he currently employed by Angola?  Do

19 you know?

20     A    No, he's not.

21     Q    Do you know when he was?

22     A    Yesterday.

23     Q    So as of today, he is the chief of police

24 of Saint Francisville?

25     A    He was sworn in yesterday as chief of

1   police.

2        Q    So was he at Angola from when he left the

3   sheriff's department until today?

4        A    I don't know.

5        Q    When did you know him to be working at

6   Angola?  Recently?

7        A    Yes.

8        Q    In the past two years?

9        A    Yes.

10       Q    Do you know what his role was over there?

11       A    Chief of Investigations.

12       Q    So do they have a police department at

13  Angola or -- what is the chief of investigations at

14  the prison, do you know?

15       A    Angola has their own investigations

16  division that investigates in-house administrative

17  stuff.  Not legal things, but they handle that.

18       Q    Do they have a division that investigates

19  legal things?

20       A    No.

21       Q    Where did you graduate from high school?

22       A    West Feliciana High School.

23       Q    Did you get any more education after that

24  or did you stop there?

25       A    Stopped there.

1     Q    And what was the first job you had right

2 out of high school, before you went into law

3 enforcement?

4     A    I worked at a place called Pierce Sales in

5 Henrietta, Texas.

6     Q    Didn't love Texas too much?

7     A    Well, I loved it, but I had to come home.

8     Q    I'm from Texas, so -- what kind of

9 trainings have you received, both recently and maybe

10 throughout your time at the sheriff's office, on

11 sexual assault investigations?

12     A    Every year we are required to have our

13 continuing education.  A lot of that is maintained

14 through POST, so there are those trainings that we

15 have yearly.  There's also investigation trainings

16 that cover sexual assaults.

17     Q    So a subsection of a larger --

18     A    Yes.

19     Q    Do you know if POST has a sexual assault

20 training that you go to every year, or are you

21 telling me that POST happens every year?

22     A    I'm not sure I could tell you for sure how

23 often they have that.

24     Q    When was the last time you attended a

25 sexual assault investigation training?

1      A    Last year.

2      Q    Do you remember who put that one on?

3      A    POST.

4      Q    What about training -- I know you

5 mentioned blood splatter was one that you went to,

6 but basic evidence collection?

7      A    Yes.

8      Q    You've attended trainings on that?

9      A    Yes.

10     Q    What kind of trainings on that?

11     A    From the time of that initial POST

12 academy, almost every training that I've attended

13 included some type of evidence collection.

14     Q    Ever any training on collecting -- do you

15 know what a SANE exam is?  S-A-N-E?

16     A    Yes.

17     Q    And do you know what it stands for?

18     A    I don't know the acronym.

19     Q    I'm not sure either.  I think the first

20 part is sexual assault, and then it is exam at the

21 end.  But you know what a SANE exam is, right?

22     A    I know what a SANE nurse is.

23     Q    What is a SANE nurse?

24     A    Those are the nurses that handle sexual

25 assault victims in a hospital.

1       Q       And do you know what they do when a victim

2  comes in?

3       A       No, I do not.

4       Q       Ever receive any training on interacting

5  with SANE nurses, what to expect from SANE nurses,

6  or that aspect of the process?

7       A       Yes.

8       Q       When did you get training on that?

9       A       I can't recall the exact date.

10      Q       Do you know if it was more than five years

11 ago?

12      A       I can't recall that.

13      Q       What about collecting DNA evidence in a

14 sexual assault case?

15      A       I remember going to training on that, yes.

16      Q       Do you remember when the last time was?

17      A       No, I do not.

18      Q       Do you know if it was more than five years

19 ago?

20      A       No, I do not.

21      Q       Ever received any training on interpreting

22 the results on a DNA lab analysis?

23      A       No, I did not.

24      Q       Do you guys have somebody in the

25 department that is responsible for analyzing the DNA

1  tests that come back in rape kits?

2      A    No.

3      Q    So if you are working a sexual assault

4  case and a rape kit was done, and let's say it is

5  done timely, it was done the same day, who

6  interprets the results on that lab analysis?

7      A    So when the results come back from the

8  crime lab, I would review it.

9      Q    So y'all review the lab sheet and make

10 decisions?  You don't consult anybody back at the

11 crime lab to see if you are right about what it

12 says?

13     A    If there's a question I have about it, I

14 will call the crime lab.

15     Q    I'm sorry, I think I may have asked this,

16 but just so I recall.  No specific trainings on

17 interpreting DNA analysis on a rape kit?

18     A    On how to read the paper?

19     Q    Yes.

20     A    I don't remember formal training on how to

21 read the paper.

22     Q    Did anybody ever teach you how to read

23 them?

24     A    Myself.

25     Q    Okay.  So in December 2016 -- I know that

1   was a while back, but did you become involved in the

2   allegations made against Barrett Boeker?

3        A    Yes, I did.

4        Q    How did you initially become involved in

5   that investigation?

6        A    I was contacted by Sergeant Tilley, and I

7   was asked to conduct an interview on that Friday

8   while he was off.

9        Q    Did you conduct an interview?

10       A    I did.

11       Q    Who did you conduct the interview with?

12       A    Priscilla Lefebure.

13       Q    And had you known Ms. Lefebure before

14  that?

15       A    No, I did not.

16       Q    That was the first time you met her?

17       A    Yes.

18       Q    Had you met Barrett Boeker before you

19  conducted that interview?

20       A    Yes.

21       Q    In what capacity had you met him before?

22       A    We went to the same high school.

23       Q    Did you graduate the same year?

24       A    No.

25       Q    Is he older than you or younger?

1  A I don't know.

2  Q Do you remember him being there at the

3 same time?

4  A Yeah.

5  Q Any other occasions you had to interact

6 with Mr. Boeker, not in high school?

7  A When conducting investigations at Angola.

8  Q So was that in his capacity as an

9 assistant warden?

10  A He would be on scene at some of the

11 investigations I was conducting.

12  Q Did you talk to him those times?

13  A I don't recall the conversations with him.

14  Q Did you ever arrest Mr. Boeker?

15  A No.

16  Q You never arrested Barrett Boeker?

17  A No.

18  Q Not for hitting his wife, Aurielle?

19  A I don't recall arresting him for that.

20  Q If you are on a tape telling Priscilla

21 Lefebure that you arrested Barret Boeker for hitting

22 his wife, Aurielle --

23    MR. LEDET:  Objection:  Assumes facts not

24   in evidence.  Foundation.

25 BY MR. RUTHERFORD:

1     Q    I will play it for you later.  We will get

2 there.  I'm going to show you what we marked

3 previously as S1 (tenders documents).  Do you

4 recognize this document?

5     A    Yes, I do.

6     Q    What is it?

7     A    This is our ASI report that we do for

8 investigations of cases we work.

9     Q    Do you know what ASI stands for?

10     A    I do not.

11     Q    Sorry, nobody does.  If you look for me,

12 there's tiny words in the bottom right-hand corner.

13 If you'll look at what's labeled LEF0009 -- so feel

14 free to read the whole page if you would like.

15 Well, I guess the page before, if I am doing this

16 right.  Sorry.  This would be the page before the

17 narrative.  It has your name on there, right?  As

18 report officer?

19         MR. WIXOM:  Is that 008?

20         MR. RUTHERFORD:  Yes, 008, right in the

21     middle.

22     A    Yes.

23 BY MR. RUTHERFORD:

24     Q    Does that mean you are the officer that's

25 writing this narrative?

1     A    That's correct.

2     Q    So in that narrative, on the 009 Page,

3  there's a note that says:  On 12-09-2016, I,

4  Sergeant Hidalgo, was contacted by Sergeant Tilley,

5  who was not at work that day.  He said that

6  Priscilla was wanting to speak with an investigator

7  and asked if I would assist in taking her statement.

8  On this day, Priscilla came to the West Feliciana

9  criminal investigations office.  Upon meeting with

10  her, I informed her that I would be taking her

11  statement during a recorded interview.  So is what

12  you were just talking about how you became involved

13  with the investigation?

14     A    That's correct.

15     Q    Your next note is that Priscilla was

16  obviously in a distressed state and seemed upset.  I

17  began the interview with her, and she gave the

18  following information about what took place.  Your

19  note there, about her being stressed and upset, did

20  that cause you to doubt her credibility at the time?

21     A    No, it did not.

22     Q    Are victims of sexual assaults -- have you

23  seen other victims who are stressed and upset when

24  they come into their interview?

25     A    Yes.

1      Q    If you flip to Page 0011 -- it should just

2   be the next one.  So your narrative continues, and I

3   think it's your description of the interview with

4   Priscilla.  Please, correct me if I'm wrong.  At the

5   bottom -- I'm sorry, at the top of that page, sort

6   of the last half of that paragraph, it says:  While

7   at the hospital she was seen by medical staff and

8   she said photographs were taken of obvious handprint

9   bruises she had on her thighs from where Barrett had

10  held her legs down.  After being treated, she was

11  taken from the hospital.  I did not see her again

12  and did not talk to any family members until the

13  next day when she was told she needed to file a

14  police report.  Do you remember Priscilla telling

15  you that she been seen by medical staff and they

16  took pictures of her bruises?

17      A    Yes, I do.

18      Q    And did anyone from the sheriff's office

19  go collect those photographs?

20      A    I did not.

21      Q    Did you take photographs at the time that

22  Priscilla was giving this interview?

23      A    I did not.

24      Q    Do you recall when she went to the

25  hospital and reported the crime?

1     A    No.  According to what she told me, it

2  would have been on the previous day, which would

3  have been on the 8th -- December 8th.

4     Q    So if the hospital had taken pictures of

5  bruises on the 8th and she was there with you on the

6  9th, is there any reason why you didn't take

7  pictures of those bruises?

8     A    No.

9     Q    Do hand-print bruises on her thighs

10  corroborate what Ms. Lefebure was telling you about

11  what happened?  If you need to read the narrative

12  over again, you can.

13       MR. WIXOM:  I'm just going to object to

14      the form of the question.

15     A    I mean, she stated there were bruises.  So

16  if there were bruises, then it would've corroborated

17  what she said.

18  BY MR. RUTHERFORD:

19     Q    The next paragraph says:  Many times

20  during the interview, Priscilla became very upset

21  and would start crying.  She had difficulty telling

22  events in chronological order, but would fill in the

23  gaps as she remembered certain events or details.

24  At this point, Priscilla gave no indication to me

25  that she was not being truthful or fabricating any

part of the story.  I concluded the interview, and a
DVD of the recording was given to Sergeant Shannon
Tilley.

　　　　　Is your report accurate, as I just read
it?

A    Yes.

Q    So at that time, even though she was upset
and had difficulty telling a direct chronology, it
didn't cause you to doubt her credibility?

A    No.

Q    Have other victims of sexual assaults and
rapes had difficulty telling events in chronological
order, in your experience?

A    Yes.

Q    And you have worked rape investigation
reports before; is that correct?

A    That is correct.

Q    Do you know about how many, in your
career?

A    I can't speculate to that.

Q    Do you know about how many in the last
10 years?

A    One.  I know of one.

Q    Is it this one?

A    Yes.

1      Q     Prior to this, do you know if it was more

2   than five or more than ten?

3      A     I can't say for sure.

4      Q     Do you have records you can go figure

5   out -- like, is there a database at the office you

6   can go back and pull up how many rape investigations

7   you have worked on?

8      A     I don't have access to that.

9      Q     Do you know who does have access?

10     A     No.

11     Q     The next paragraph on that same page -- we

12  will stay there -- it says:  On 12-14-2016, as the

13  investigation continued, Sergeant Tilley and myself

14  had Priscilla come to the criminal investigation

15  office where she agreed to do a recorded phone call.

16  So I think Sergeant Tilley referred to these as

17  controlled calls?

18     A     Yes.

19     Q     And these are things you'll commonly do in

20  an investigation; is that right?

21     A     That's right.

22     Q     What's the purpose of a controlled call?

23     A     To help corroborate the complaintant's

24  story and to document the interaction.

25     Q     And I think y'all first tried a controlled

1  call to Barrett; is that correct?

2      A    That's correct.

3      Q    And he did not answer his phone?

4      A    That's correct.

5      Q    And it looks like Aurielle, who at the

6  time was Barrett Boeker's wife, who lived on the

7  property where the rape occurred, was the next

8  person y'all tried to call?

9      A    That's correct.

10      Q    And it looks like she was able to get

11  Aurielle on the phone?

12      A    Yes, she was.

13      Q    Are you listening to these, or are they

14  recorded, or both?

15      A    I guess, technically, both.

16      Q    So then at the bottom it says:  Priscilla

17  asked very specific questions about Barrett raping

18  her, and Aurielle never disputed the statement; is

19  that accurate?

20      A    Yes.

21      Q    And in your mind, as an investigator, was

22  that important?

23      A    Yes.

24      Q    Why?

25      A    Because had it occurred any other way, I

1    felt that she would have corrected Priscilla.

2         Q    And at the bottom it says the recording of

3    the phone call was also entered in as evidence?

4         A    That's correct.

5         Q    Does that recording have attached to it a

6    witness statement?

7         A    I don't know.

8         Q    I guess I am trying to think of where it

9    would be in the file.  Because we've got recordings

10   of Priscilla's statements, but it looks like you

11   have recordings of other things.  Was this on a

12   disk; do you remember?

13        A    I don't remember.

14        Q    Do you know if y'all still have the

15   evidence from this case?

16        A    I don't know.

17        Q    Is there a person at the department who is

18   in charge of keeping evidence?

19        A    Yes.

20        Q    Who is that?

21        A    David Ellis.

22        Q    You can put that one aside.  We may come

23   back to it, so hold on to your copy.

24             I'm handing you what has been marked P8,

25   and it's Bates Nos. LEFEBUREPL 0066 to 0071 (tenders

1    documents).

2         A    Mine goes to 0072.

3         Q    May I see what your last page is?

4              MS. ORGERON:  Here, you can have this one.

5         This is just a separate one.

6              MR. RUTHERFORD:  Thank you.

7    BY MR. RUTHERFORD:

8         Q    Do you recognize the document I just

9    handed you?

10        A    No, I do not.

11        Q    If you would turn to that next page.  At

12   the top, do you see where it says sexual assault

13   examination form?

14        A    Yes.

15        Q    Have you ever seen this type of a sexual

16   assault examination form before?

17        A    Yes.

18        Q    And in what capacity have you seen them?

19        A    As an investigator.

20        Q    And where do you see them?

21        A    It is part of the sexual assault interview

22   that is done whenever a victim goes to a hospital.

23        Q    Is that the interview that is done by the

24   SANE nurse?

25        A    I believe so, yes.

1      Q    And so these examinations are done at the

2    time that a victim presents to the hospital and

3    reports the assault, right?

4      A    I don't know the process.

5      Q    Okay.  Well, let's look at this one.  If

6    you would turn back the first page.  At the bottom,

7    there is a signature that says Priscilla Lefebure,

8    and the date is 12-8-16; did I get that right?

9      A    That's right.

10     Q    When we look at the top, does it say what

11   date Priscilla's birthday is?

12     A    Yes.

13     Q    What is it?

14     A    12-9 of '93.

15     Q    And I think you said it was the 9th that

16   you did the interview with her?

17     A    That's correct.

18     Q    Did you know it was her birthday on that

19   day?

20     A    She did mention it in the interview.

21     Q    Okay.  We will go back to that second

22   page.  So the form has the patient's name at the

23   top.  And it looks like she was 22 at the time in

24   the age portion; did I get the right?

25     A    Yes.

1     Q    And one of the questions she is asked at

2    the very beginning of this interview is:  Did the

3    patient have consensual sex within the last five

4    days?  And there, it is checked:  Yes, vaginal.  And

5    the narrative answer to "if yes, when?" is:  12-8

6    with boyfriend, Dylan Pizzolato.  So it looks like

7    here that Priscilla discloses to the SANE nurse that

8    day she had had sex with her boyfriend, Dylan

9    Pizzolato.  Consensual sex; is that correct?

10          MR. WIXOM:  Object to the form.

11          MR. RUTHERFORD:  Sorry.

12    BY MR. RUTHERFORD:

13     Q    Did she disclose that fact to you; do you

14    recall?

15     A    Not in that way.

16     Q    How do you recall her disclosing that

17    fact?

18     A    That Dylan had attempted to have sex with

19    her and that she was too traumatized to go through

20    with it.

21     Q    When somebody attempts to have sex with

22    somebody in this regard, is it possible for them to

23    still leave DNA?

24          MR. WIXOM:  Object to the form of the

25     question.

1     A    Can you ask the question again?

2  BY MR. RUTHERFORD:

3     Q    Sure.  When a man attempts to have sex

4  with a woman but doesn't complete it, there are many

5  ways to interpret that, right?

6     A    Yes.

7     Q    Is it possible if a man doesn't ejaculate

8  that there is still DNA evidence to be collected?

9     A    It is possible.

10        MR. WIXOM:  Object to the form of the

11       question.  He is not an expert in the field of

12       male-female relations.  But to that extent, you

13       can answer if you know.

14     A    Yes, it's possible.

15        MR. WIXOM:  Male-female relations is the

16       best I could come up with.

17  BY MR. RUTHERFORD:

18     Q    You have done crime scene investigations,

19  correct?

20     A    Yes.

21     Q    And you've received training on sexual

22  assault investigations?

23     A    Yes.

24     Q    And you have been taught -- I mean, have

25  you received training on when DNA can be left on a

1  rape victim and how?

2        A    Yes.

3        Q    As we sit here right now, can you recall

4  different ways that that can occur?

5        A    Not accurately all of them.

6        Q    Can you name some of them?

7        A    Fluid transfer.

8        Q    Can you describe that for me a little bit?

9        A    Saliva, semen, any bodily excrement,

10  sweat.

11        Q    So other than fluid transfer, any other

12  ways that you can recall today that DNA could end up

13  on a victim?

14        A    No.

15        Q    Okay.  If you'll look at that form, it

16  says the exam date and time was 12-8-16 at 8:00 a.m.

17  And the assault occurred on December 1st and

18  December 3rd.  Does that track with what

19  Ms. Lefebure told you about the assaults, that they

20  occurred on the 1st and the 3rd?

21        A    Yes.

22        Q    In the middle of the page, it says:

23  Summary of facts described by the patient.  And

24  there is a checklist of the different genitalia and

25  different parts of the body that could have been

1  assaulted.  Under where it says "penetration of

2  female genitalia by penis, finger, and other

3  object," all are checked yes.  And at the comment

4  section, it says:  12-1 assault and 12-3 assault

5  with a Jack Rabbit vibrator.  Does that track with

6  what Ms. Lefebure told you during her first

7  interview?

8       A    Yes.

9       Q    Down at the bottom, there's another sort

10 of checklist question.  It says:  Did ejaculation

11 occur?  And there is an option for inside and

12 outside body orifice.  Inside is checked yes,

13 outside is checked no.  And the comments say:  12-1

14 assault, vagina.  Does that also track with what

15 Ms. Lefebure told you during her first interview?

16      A    Yes.

17      Q    If you will look at the next page, at the

18 top, it says the patient's description of the

19 assault.  Would you read that paragraph to yourself?

20 Did you read the whole paragraph?

21      A    Yes.

22      Q    Thank you.  Does that narrative

23 description of the assault track with what

24 Ms. Lefebure told you during her interview?

25      A    Yes.

1    Q    And if you will go to that next page, at
2  the top, it says physical examination.  And the
3  first place you could write says psychological state
4  and Ms. Lefebure's is listed as calm, conflicted,
5  and anxious.  Did you find her to be in a similar
6  state when you talked to her the next day?
7    A    I don't think I could put calm and anxious
8  in the same category.
9    Q    So you didn't find her to be both of those
10 things?
11         MR. WIXOM:  I'm going to object to the
12     form of the question.
13     A    Not at the same time.
14 BY MR. RUTHERFORD:
15     Q    Was she anxious when you interviewed her?
16     A    At times.
17     Q    Was she conflicted?
18     A    At times.
19     Q    Was she calm at times?
20     A    At times.
21     Q    And so underneath that descriptions we
22 have -- on the form, is says genital map, and it's
23 an outline of the female body.  And there is a
24 narrative on the bottom right for body surface
25 trauma present, and a listing -- in fact, an

1    enumeration of bruises and their locations are

2    mapped on this document.  Does this bruising pattern

3    conform with what Ms. Lefebure told you about what

4    Mr. Boeker did to her?

5        A    I feel like that would be speculating.

6        Q    So Ms. Lefebure told you in that first

7    interview that he left a handprint-like bruise.  If

8    I could call your attention to the description here:

9    Contusions 4, 5, 6, 7, 8, on the right leg.  Do you

10    see those on this document?

11        A    I do.

12        Q    And you have experience as an

13    investigator, correct?

14        A    Yes.

15        Q    Does that look like it could be the

16    handprint bruise that Ms. Lefebure described?

17        A    I'm not an expert.  I couldn't say whether

18    or not.

19        Q    Who would be an expert on that?

20        A    I don't know.

21        Q    Have you ever been called to answer

22    similar questions in court?

23        A    On --

24        Q    In criminal cases.

25        A    On bruising?

1     Q    (Indicating.)

2     A    No.

3     Q    Who do you call to testify on that?

4     A    Usually a doctor.

5     Q    We noted that this indicated that

6 Ms. Lefebure had -- the form says consensual sex

7 with her boyfriend, Dylan Pizzolato, and it looks

8 like she told you she attempted to have sex with him

9 and she wasn't able to do it.  Have other victims of

10 sexual assault reported the same?  That a week after

11 the assault they maybe tried to have sex with

12 somebody that they consent to and they can't do it?

13     A    I don't recall that anybody has ever told

14 me that.

15     Q    Do you ever recall anybody telling you

16 that they engaged in consensual sex in the weeks

17 following an assault?

18     A    No, not specifically.

19     Q    In your training, would you consider it

20 abnormal or out of the ordinary if a victim engaged

21 in consensual sex in the weeks following an assault?

22     MR. WIXOM:  Object to the form.

23     A    I don't feel that I could talk about the

24 psychological mindset of someone that has been in

25 that situation.

BY MR. RUTHERFORD:

Q    As an investigator, if you are
interviewing a victim who said she had consensual
sex two weeks after she was raped, how would that
impact you regarding her credibility?

A    It would just be another part of the case,
the information that I have.

Q    Would you regard it as diminishing her
credibility?

A    No.

Q    So a woman can be raped and then two weeks
later engaged in consensual sex?  Those two things
can happen?

A    Yeah.

MR. RUTHERFORD:  I just want to give you
guys a warning -- and I only have two color
copies.

MR. WIXOM:  Can we go off the record?

MR. RUTHERFORD:  Yeah.

(Discussion held off the record.)

MR. RUTHERFORD:  Lieutenant Hidalgo, I
just handed you what we have marked as P10
(tenders documents).  It is Bates labeled
LEFEBUREPL0156 to 0176 in the bottom right.
And a confidential designation is on the bottom

1      left, and we just had a fruitful off the record

2      conversation about that.

3          (Exhibit P10 marked for identification.)

4   BY MR. RUTHERFORD:

5      Q    If you would, take a look at those

6   pictures for me, sir.

7      A    All of them?

8      Q    Yes, if you would, just flip through.

9   Thank you, sir.  If I could turn your attention to

10  the one that is marked 0166.  Can you tell where on

11  Ms. Lefebure's body that bruise is located?

12     A    That appears to be the inside of her right

13  thigh.

14     Q    And does that photograph look to you that

15  it is consistent with Ms. Lefebure's recall of the

16  events of being held down by Mr. Boeker?

17     A    I don't recall her saying she was held in

18  any specific spot.

19     Q    Do you recall her saying that Barrett

20  forced her to have sex, and at times put his whole

21  body weight on her and held her down?

22     A    Yes.

23     Q    And is this bruising pattern on the inner

24  thigh, in your mind, consistent with that

25  description of events?

1        A     It would corroborate it.

2        Q     You can put those together and set them

3   aside.  These photos weren't in y'all's -- we got a

4   copy of the investigative file, and these photos

5   were not in there.  Do you recall ever seen these

6   photos during the investigation?

7        A     These photos were never part of my part of

8   the investigation.

9        Q     Ms. Lefebure had told you -- and I think

10  it is reflected in the report -- that the hospital

11  had taken photos, right?

12       A     That's correct.

13       Q     And I think, at some point in this case,

14  somebody did to go to the coroner's office and

15  collect the DNA analysis of the rape kit; is that

16  right?

17       A     I believe so.

18       Q     If you would, look back at that

19  investigative report, S1.  I think it is on the last

20  page.  It starts at the top:  On 3-13-2017, I,

21  Corporal David Ellis, was contacted by Colonel

22  Archer Lee and asked to pick up a sexual assault kit

23  from the East Baton Rouge Parish coroner's office.

24  Did I read that right?

25       A     That's correct.

1       Q    So I know you didn't write this narrative,

2  but you are familiar with these files.  Is this an

3  indication that somebody went to go pick up the

4  sexual assault kit?

5       A    Yes.

6       Q    And then it says later -- I'm sorry -- the

7  sexual assault kit, along with photos of the victim

8  made during the processing of the kit, were released

9  into my custody.  Upon returning to my office, I

10  logged the kit and the CD into the WFPSO evidence

11  database under this report number and assigned them

12  the evidence tag numbers of 16691 and 16692

13  respectively.  The sexual assault kit was secured in

14  the evidence refrigerator under lock and key, and

15  the CD was secured under the WFPSO evidence vault in

16  the courthouse.  Did I read that right?

17       A    Yes.

18       Q    Were you aware that the CD was contained

19  in an evidence vault in the courthouse?

20       A    No.

21       Q    What is the evidence vault in the

22  courthouse?

23       A    I don't know.

24       Q    Who would know?

25       A    Our evidence custodian.

1      Q    So in this case, they logged in evidence,

2   but did not make the investigating officers aware of

3   it; is that accurate?

4      A    This wasn't my case, so I don't know why I

5   would have been contacted about this.

6      Q    You weren't working on this case?

7      A    I was assisting Sergeant Tilley at the

8   time on this, but things of that matter would not

9   have come to me.

10     Q    So how long did you work on this case?  Do

11  you remember when you stopped working this case?

12     A    No.

13     Q    Do you remember testifying in front of a

14  grand jury for this case?

15     A    No.

16     Q    You were not called to testify; is that

17  correct?

18     A    I was subpoenaed, but I was not called to

19  testify.

20     Q    So you remember getting a subpoena in this

21  case?

22     A    Yes.

23     Q    Who issues those subpoenas?

24     A    The DA's office.

25     Q    And this is a very basic question, but how

1  do you get those at the office?  Does someone drop

2  them off every day or --

3      A    Yes.

4      Q    Do you remember when you got the subpoena

5  to testify in front of the grand jury in

6  Ms. Lefebure's case?

7      A    No, I do not.

8      Q    Did you end up testifying at the grand

9  jury in this case?

10      A    No, I did not.

11      Q    Are you aware if a grand jury was held?

12      A    Yes, it was.

13      Q    Were you at that courthouse at the time,

14  even if you were not testifying?

15      A    Yes, I was.

16      Q    What were you doing up at the courthouse?

17      A    I was there in case I was called to

18  testify.

19      Q    And when did you learn that you were not

20  going to be called to testify?

21      A    That day.

22      Q    How did you learn that?

23      A    I was told by the district attorney.

24      Q    Is that Sam D'Aquilla?

25      A    Yes.

1        Q    And when did he tell you that?

2        A    Sometime that day.

3        Q    Do you know if it was before or after the

4 grand jury?

5        A    I can tell you it was not before.

6        Q    It was not, okay.  How do you know that it

7 was after?

8        A    I don't know that it was after, but it was

9 not before.  I was there for a long time that day,

10 but I don't know at what point I was released.

11        Q    When you are there, is there a place where

12 y'all hang out?

13        A    No, not really.

14        Q    Do you remember what the district attorney

15 said to you, the actual words he used when he told

16 you, you are not going to be called?

17        A    No, I do not.

18        Q    Did he say why you weren't going to be

19 called?

20        A    I don't recall.

21        Q    Did he tell you that the grand jury had

22 returned a not true bill and you can go home?

23        A    I don't recall that.

24        Q    Was it just you and him talking?  Or was

25 there anybody else there?

1     A     I don't remember the conversation, so I
2  can't say one way or another.
3     Q     How did you feel when you learned you were
4  not going to be testifying at the grand jury?
5     A     It was abnormal.
6     Q     Have you ever been subpoenaed to a grand
7  jury you didn't testify in?
8     A     No.
9     Q     Do you know about how many times you have
10  been subpoenaed to a grand jury?
11     A     I can't say, accurately.
12     Q     Do you know if it is more than 50?
13     A     No.
14     Q     More than 20?
15     A     No.
16     Q     More than 10?
17     A     Close to 10.
18     Q     Okay.
19          MR. RUTHERFORD:  I need about 10 minutes
20          to get reorganized.  We can go off the record.
21               (A brief recess was held.)
22  BY MR. RUTHERFORD:
23     Q     Mr. Hidalgo, I previously asked you if you
24  had ever arrested Boeker before.
25     A     That's correct.

1       Q    Have you arrested or even booked

2    Mr. Boeker prior to this occasion?

3       A    When you previously asked me, I couldn't

4    recall a time.  But it triggered a memory of a

5    domestic that I did work at Angola where I arrested

6    the husband -- or the male suspect.  As I thought

7    about it, going through my mind's eye, I do believe

8    it was Barrett Boeker.  That would have been when I

9    worked in uniform patrol prior to when I went into

10   investigations, so that would've been over 10 years

11   ago.  So that's why that memory is fuzzy to me.  But

12   you did trigger a memory on that, so that would be

13   correct -- or possibly correct that I did.

14      Q    So in 2016, which -- seven years ago?

15      A    Yes.

16      Q    Seven years ago.  So my memory does the

17   same thing.  I'm 44, I get it.  In 2016, on the

18   interview tape, if you told Priscilla that you

19   recalled charging Barrett with a domestic out at

20   Angola, you would've been telling her the truth?

21      A    That's correct.

22      Q    And were you telling her the truth

23   throughout that phone call -- I'm sorry, throughout

24   the interview with Priscilla?

25      A    In the recorded interviews we have?

1    Q    Yes, sir.

2    A    Yes.

3    Q    Do you ever have a reason to lie to the

4  victims that you are interviewing?

5    A    No.

6    Q    Let's talk about Boeker's arrest in this

7  case.

8    A    Okay.

9    Q    When did you become aware that he had been

10  arrested?

11    A    I can't give a specific time that I --

12    Q    Do you remember who told you or where you

13  were or how you found out?  That kind of thing?

14    A    No.

15    Q    Do you know if he came up to the station

16  or if somebody had to go get him off of Angola?  Do

17  you know how he came to be booked?

18    A    I would be speculating.

19    Q    And this might be speculation too, but I

20  will have you look.  If you look at Page 006 in that

21  report, it is the paragraph that starts "on December

22  2016, a warrant was issued."

23    A    Okay.

24    Q    Yeah, and it says --

25    A    What narrative is this that I'm looking

1   at?

2       Q    Why don't you check for me?

3           MR. WIXOM:  It would probably be Tilley,

4       correct?

5   BY MR. RUTHERFORD:

6       Q    Officer Tilley is on that page?

7       A    Officer Tilley --

8       Q    So Officer Tilley is writing this.  What

9   Officer Tilley writes is:  Boeker came to my office

10  on his own free will and was read his Miranda

11  rights.  He said he was dealing with a pretty

12  serious charge and would not speak to me without an

13  attorney.  And I advised Mr. Boeker that a warrant

14  was issued for his arrest.

15          Have you seen another suspect in a rape

16  case show up at the office of their own free will?

17      A    Yes.

18      Q    Do you know how Mr. Boeker came to learn

19  that an arrest warrant had been issued for him?

20      A    Not specifically, no.

21      Q    Any of these other suspects that came of

22  their own free will, do you know how they learned?

23      A    They are usually contacted and told that

24  they have a warrant.

25      Q    I don't see it in officer Tilley's

narrative.  Is it possible somebody contacted

Barrett Boeker and let him know there was warrant

out for his arrest?

    A    It is possible.

    Q    But you did not make that contact?

    A    No, I did not.

    Q    So did you ever have any occasion to talk

with Barrett Boeker in the course of this

investigation?

    A    No.

    Q    And other than the controlled call with

his then-wife Aurielle, did you ever have an

occasion to interview her?

    A    No, I did not.

    Q    Did you ever learn of any other potential

victims that have been assaulted by Barrett Boeker?

    A    Unofficially.

    Q    Can I ask how?

    A    An anonymous source told me that there

could be others that may come forward.

    Q    And did they name those possible other

victims?

    A    No, they did not.

    Q    After Barrett was arrested, did your

investigation end there, or did y'all keep working

1  on the case?

2       A    We kept working on it.

3       Q    And at what point in time -- I may have

4  already asked you this, but do you remember at what

5  point in time your work on the case stopped?

6       A    No, I do not.

7       Q    During the course of your investigation,

8  did you ever have occasion to talk with Ms. Lefebure

9  of the phone?

10      A    Yes.

11      Q    Do you know how many times during the

12 course of the investigation?

13      A    I don't recall.

14      Q    Do you know if it was more than a dozen?

15      A    Probably.

16      Q    Did she call you a lot?

17      A    Yes.

18      Q    And did you talk with her -- you talked

19 with her during the investigation, prior to the

20 grand jury, on the phone?

21      A    Yes.

22      Q    Did you ever speak with her again on the

23 phone after the grand jury came back with a not true

24 bill?

25      A    My timeline isn't accurate on when the

1   phone calls stopped.

2      Q    Could you have spoken with her on the

3   phone after the grand jury?

4      A    It's a possibility, yes.

5      Q    Do you remember at what point in time the

6   phone calls with Ms. Lefebure stopped?

7      A    No, I do not.

8      Q    Do you know if she was still calling you a

9   year after the incident?

10     A    No.

11     Q    Do you have a departmental phone number?

12     A    Yes.

13     Q    What is the phone number that she was

14  calling you on?  Do you remember?

15     A    (225)721-0321.

16     Q    And I think -- did you ever come to find

17  out that Ms. Lefebure had recorded a conversation

18  that she had with Sheriff Daniel?

19     A    No, I don't recall that.

20     Q    Do you know if Ms. Lefebure ever recorded

21  any phone calls she was having with you?

22     A    Yes.

23     Q    Did she tell you that?

24     A    No.

25     Q    How did you come to learn that?

1    A    I heard a tape recorder click when I

2    answered the phone, and I asked her if she was

3    recording me.

4    Q    What did she say?

5    A    She said yes.

6    Q    Do you have any of those recordings?

7    A    No.

8         MR. RUTHERFORD:  Give me one second to

9         confer with my co-counsel.  That may be all we

10        have left.

11             (A brief recess was held.)

12   BY MR. RUTHERFORD:

13   Q    Other than the anonymous source, did you

14   learn about other possible victims in this case?

15   A    Yes.

16   Q    Did you guys ever attempt to contact them?

17   A    Yes.

18   Q    What happened?

19   A    I spoke with the possible victim's

20   husband, and they told me that they were not

21   interested in filing a complaint.

22   Q    If you commit a sexual offense in the

23   parish, you have to register as a sex offender,

24   right?

25   A    That's right.

1      Q    Do you know offhand, sitting here,

2  everybody in West Feliciana that is a registered sex

3  offender?

4      A    Right now?

5      Q    Uh-huh.

6      A    No.

7      Q    If somebody commits a sexual offense in,

8  say, Mississippi, for example, but lives in West

9  Feliciana, are they necessarily going to be on

10  y'all's registry?

11      A    Yes.

12      Q    Do the systems talk to each other?  Do you

13  know?

14      A    Yes.  When they move, they have to

15  register where they're living.

16      Q    So it's not that it would transfer over

17  from the Mississippi registration.  It is on them to

18  register when they get into the parish?

19      A    That's correct.

20      Q    During the course of your investigation,

21  did you ever learn -- did you ever come to find out

22  that a warden or any assistant warden or anyone at

23  Angola had met with the sheriff or Randy Metz?

24      A    No.

25      Q    Ever find out that the DA learned or heard

1  from Angola that Ms. Lefebure was having a

2  consensual relationship with Mr. Boeker and

3  therefore this would get swept under the rug?

4      A    No.

5      Q    Since this accident, how many sexual

6  assaults have been reported in West Feliciana

7  Parish?

8      A    I have no idea.

9      Q    Have you worked any since this has been

10  reported?

11      A    I can't recall.

12      Q    Have you been asked to testify or been

13  subpoenaed to a grand jury in any sexual assault

14  cases since then?

15      A    No.

16      Q    Do you know who would have a better

17  recollection of the number of sexual assaults that

18  have been reported since 2016?

19      A    I cannot tell you a specific name of who

20  keeps up with our records.

21          MR. RUTHERFORD:  I believe those are all

22      the questions I have.  These guys might have

23      some for you.

24          MR. WIXOM:  I don't have any.

25          MR. LEDET:  Just a couple, just to

 1      clarify.

 2                 E X A M I N A T I O N

 3    BY MR. LEDET:

 4      Q      I think you've previously testified you

 5    did not speak with Mr. Boeker during this

 6    investigation?

 7      A      That's correct.

 8      Q      Did you have any conversation with the

 9    District Attorney, Sam D'Aquilla, during this

10    investigation?

11      A      No, I did not.

12      Q      Did you ever speak to Sheriff Daniel about

13    the scope of the investigation that we are here for

14    today?

15      A      No, I did not.

16      Q      In your portion of the investigation, did

17    you treat Mr. Boeker differently from other members

18    of the public?

19           MR. RUTHERFORD:  Object to the form.  He

20        did not interact with him.

21      A      I did not have interaction with

22    Mr. Boeker.

23    BY MR. LEDET:

24      Q      Did you ever speak to anybody from Angola

25    about the charges against Mr. Boeker?

1      A      No, I did not.

2      Q      That's all I have.

3             THE COURT REPORTER:  Mr. Ledet, do you

4      need a copy of this?

5             MR. LEDET:  Yes.

6             THE COURT REPORTER:  Mr. Wixom, do you

7      need a copy of this?

8             MR. WIXOM:  Yes.

9          (Deposition concluded at 11:31 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S PAGE

1

2

3    I, Lindsay I. Gibney, Certified Court Reporter,

4    in and for the State of Louisiana, the officer, as

5    defined in Rule 28 of the Federal Rules of Civil

6    Procedure and/or Article 1434(b) of the Louisiana

7    Code of Civil Procedure, before whom this sworn

8    testimony was taken, do hereby state on the record:

9    That due to the interaction in the spontaneous

10   discourse of this proceeding, dashes (--) have been

11   used to indicate pauses, changes in thought, and/or

12   talkovers; that same is the proper method for a

13   court reporter's transcription of proceeding; that

14   the dashes (--) do not indicate that words or

15   phrases have been left out of this transcript; and

16   that any words and/or names which could not be

17   verified through reference material have been

18   denoted with the phrase "(phonetic)."

19

20        LINDSAY I. GIBNEY, CCR #2018008

21

22

23

24

25

1                      CERTIFICATE

2          This certification is valid only for a
   transcript accompanied by my original signature and
3   original required seal or my certified digital
   signature on this page.

4
           I, Lindsay I. Gibney, Certified Court Reporter
5   in and for the State of Louisiana, as the officer
   before whom this testimony was taken, do hereby
6   certify that, LIEUTENANT DAVID HIDALGO, after having
   been duly sworn by me upon authority of
7   R.S. 37:2554, did testify as hereinbefore set forth
   in the foregoing 59 pages;

8          That this testimony was reported by me in the
   stenomask method, was prepared and transcribed by me
9   or under my personal direction and supervision, and
   is a true and correct transcript to the best of my
10  ability and understanding;

           That the transcript has been prepared in
11  compliance with transcript format guidelines
   required by statute or by rules of the board and
12  that I am informed about the complete arrangement,
   financial or otherwise, with the person or entity
13  making arrangements for deposition services;

           That I have acted in compliance with the
14  prohibition on contractual relationships as defined
   by La. C.C.P. art. 1434 and in rules and advisory
15  opinions of the board;

           That I have no actual knowledge of any
16  prohibited employment or contractual relationship,
   direct or indirect, between a court reporting firm
17  and any party litigant in this matter nor is there
   any such relationship between myself and a party
18  litigant in this matter;

           That I am not related to counsel or to the
19  parties herein, nor am I otherwise interested in the
   outcome of this matter.

20         SUBSCRIBED AND SWORN on the 15th day of
   November, 2022.

21

22         _____

23         LINDSAY I. GIBNEY, CCR #2018008

24

25

**Exhibits**

**HidD Exhibit 10** 3:11

**0**

**0011** 25:1
**006** 49:20
**0066** 30:25
**0071** 30:25
**0072** 31:2
**008** 23:19,20
**009** 24:2
**0166** 41:10
**0176** 40:24
**05** 10:15
**09** 10:16

**1**

**10** 27:22 47:16,17,19
  48:10
**11:31** 58:9
**12-09-2016** 24:3
**12-1** 36:4,13
**12-14-2016** 28:12
**12-3** 36:4
**12-8** 33:5
**12-8-16** 32:8 35:16
**12-9** 32:14
**16691** 43:12
**16692** 43:12
**1st** 9:17 10:1,3,8 15:9
  35:17,20

**2**

**20** 5:17 47:14
**2001** 5:23
**2002** 6:2,3
**2005** 6:3 10:18
**2007** 10:19
**2009** 10:14,21,23 11:18
**2016** 13:24 14:4,11,14,
  17 20:25 48:14,17
  49:22 56:18
**2020** 10:1,3,8 15:9
**21** 5:18
**22** 32:23
**225 721-0321** 53:15

**3**

**3-13-2017** 42:20
**3rd** 35:18,20

**4**

**4** 38:9
**40** 7:2
**41** 5:10
**44** 48:17
**4785** 5:2

**5**

**5** 38:9
**50** 47:12

**6**

**6** 38:9

**7**

**7** 38:9
**70775** 5:3

**8**

**8** 38:9
**8:00** 35:16
**8th** 26:3,5

**9**

**93** 32:14
**9th** 26:6 32:15

**A**

**a.m.** 35:16 58:9
**ability** 7:14
**abnormal** 39:20 47:5
**academy** 18:12
**access** 28:8,9
**accident** 6:20 56:5
**accurate** 27:4 29:19
  44:3 52:25
**accurately** 35:5 47:11
**acronym** 18:18
**actual** 46:15
**additional** 12:12
**administrative** 16:16
**advance** 7:19
**advised** 50:13
**age** 5:9 32:24
**Agency** 11:6
**agreed** 28:15
**allegations** 21:2
**analysis** 12:21 19:22
  20:6,17 42:15

**analyzing** 19:25
**Angola** 15:16,18 16:2,6,
  13,15 22:7 48:5,20
  49:16 55:23 56:1 57:24
**anonymous** 51:19 54:13
**anxious** 37:5,7,15
**apologize** 7:18
**appears** 41:12
**apply** 7:10
**approved** 12:15
**Approximately** 9:3
**Archer** 13:15 14:10,13
  15:2,3 42:22
**arrest** 22:14 49:6 50:14,
  19 51:3
**arrested** 22:16,21 47:24
  48:1,5 49:10 51:24
**arresting** 22:19
**ASI** 23:7,9
**aspect** 19:6
**assault** 17:11,19,25
  18:20,25 19:14 20:3
  31:12,16,21 32:3 34:22
  35:17 36:4,14,19,23
  39:10,11,17,21 42:22
  43:4,7,13 56:13
**assaulted** 36:1 51:16
**assaults** 17:16 24:22
  27:11 35:19 56:6,17
**assigned** 12:10,11,13
  43:11
**assist** 24:7
**assistant** 22:9 55:22
**assisting** 44:7
**Assumes** 22:23
**attached** 30:5
**attempt** 54:16
**attempted** 33:18 39:8
**attempts** 33:21 34:3
**attend** 13:3
**attended** 11:12 13:5
  17:24 18:8,12
**attention** 38:8 41:9
**attorney** 8:4 45:23 46:14
  50:13 57:9
**audible** 7:21
**August** 10:14 11:18
**Aurielle** 22:18,22 29:5,
  11,18 51:12
**aware** 43:18 44:2 45:11
  49:9

**B**

**back** 14:6 20:1,7,10 21:1
  28:6 30:23 32:6,21
  42:18 52:23

**Barret** 22:21
**Barrett** 21:2,18 22:16
  25:9 29:1,6,17 41:19
  48:8,19 51:2,8,16,24
**basic** 11:2,4 18:6 44:25
**Bates** 30:25 40:23
**Baton** 42:23
**began** 24:17
**beginning** 33:2
**bill** 46:22 52:24
**birthday** 32:11,18
**bit** 35:8
**blood** 18:5
**blood-splatter** 12:21
**bodily** 35:9
**body** 35:25 36:12 37:23,
  24 41:11,21
**Boeker** 21:2,18 22:6,14,
  16,21 38:4 41:16 47:24
  48:2,8 50:9,13,18 51:2,
  8,16 56:2 57:5,17,22,25
**Boeker's** 29:6 49:6
**booked** 48:1 49:17
**bottom** 23:12 25:5 29:16
  30:2 32:6 36:9 37:24
  40:24,25
**boyfriend** 33:6,8 39:7
**bruise** 38:7,16 41:11
**bruises** 25:9,16 26:5,7,
  9,15,16 38:1
**bruising** 38:2,25 41:23

**C**

**call** 20:14 28:15,22 29:1,
  8 30:3 38:8 39:3 48:23
  51:11 52:16
**called** 17:4 38:21 44:16,
  18 45:17,20 46:16,19
**calling** 53:8,14
**calls** 28:17 53:1,6,21
**calm** 37:4,7,19
**capacity** 21:21 22:8
  31:18
**Captain** 13:13,14,17
  14:5
**career** 27:19
**case** 6:18 19:14 20:4
  30:15 40:6 42:13 44:1,
  4,6,10,11,14,21 45:6,9,
  17 49:7 50:16 52:1,5
  54:14
**cases** 7:4 23:8 38:24
  56:14
**category** 37:8
**CD** 43:10,15,18

**charge** 8:9,11,16 30:18
  50:12
**charges** 57:25
**charging** 48:19
**check** 50:2
**checked** 33:4 36:3,12,13
**checklist** 35:24 36:10
**chief** 15:13,23,25 16:11,
  13
**chronological** 26:22
  27:12
**chronology** 27:8
**clarify** 57:1
**click** 54:1
**Close** 47:17
**co-counsel** 5:13 54:9
**collect** 25:19 42:15
**collected** 34:8
**collecting** 18:14 19:13
**collection** 18:6,13
**college** 5:20
**Colonel** 13:15 14:25
  42:21
**color** 40:16
**comment** 36:3
**comments** 36:13
**commissioned** 6:2
**commit** 54:22
**commits** 55:7
**common** 6:10
**commonly** 28:19
**complaint** 54:21
**complaintant's** 28:23
**complete** 34:4
**concluded** 27:1 58:9
**conduct** 10:24 21:7,9,11
**conducted** 21:19
**conducting** 22:7,11
**confer** 54:9
**conferences** 12:24 13:1
**confidential** 40:25
**conflicted** 37:4,17
**conform** 38:3
**Congratulations** 9:22
**consensual** 33:3,9 39:6,
  16,21 40:3,12 56:2
**consent** 39:12
**consistent** 41:15,24
**consult** 20:10
**contact** 51:5 54:16
**contacted** 21:6 24:4
  42:21 44:5 50:23 51:1
**contained** 43:18
**continued** 28:13
**continues** 25:2

**continuing** 11:20 17:13
**controlled** 28:17,22,25 51:11
**Contusions** 38:9
**conversation** 41:2 47:1 53:17 57:8
**conversations** 22:13
**copies** 40:17
**copy** 30:23 42:4 58:4,7
**corner** 23:12
**coroner's** 42:14,23
**corporal** 10:20 42:21
**correct** 10:5 14:1,2 24:1, 14 25:4 27:16,17 29:1, 2,4,9 30:4 32:17 33:9 34:19 38:13 42:12,15, 44:17 47:25 48:13,21 50:4 55:19 57:7
**corrected** 30:1
**corroborate** 26:10 28:23 42:1
**corroborated** 26:16
**Council** 11:7
**couple** 56:25
**court** 6:21,24 7:6,9,12, 20 38:22 58:3,6
**courthouse** 43:16,19,22 45:13,16
**cover** 17:16
**credibility** 24:20 27:9 40:5,9
**credits** 11:20
**crime** 11:10 20:8,11,14 25:25 34:18
**criminal** 10:10,13,21 13:24 24:9 28:14 38:24
**crying** 26:21
**current** 9:15
**custodian** 43:25
**custody** 43:9

**D**

**D'AQUILLA** 45:24 57:9
**DA** 55:25
**DA's** 44:24
**Daigle** 8:20
**Dallas** 12:25
**Daniel** 10:7 14:23 53:18 57:12
**database** 28:5 43:11
**date** 19:9 32:8,11 35:16
**David** 5:1,10 30:21 42:21
**day** 20:5 24:5,8 25:13 26:2 32:19 33:8 37:6 45:2,21 46:2,9

**days** 33:4
**deal** 9:11
**dealing** 50:11
**December** 20:25 26:3 35:17,18 49:21
**decisions** 20:10
**department** 5:23 6:7 10:17 14:18 15:14 16:3, 12 19:25 30:17
**departmental** 10:23 53:11
**deposition** 6:13 58:9
**deputies** 8:10 9:7
**deputy** 10:19 11:14 13:3
**describe** 35:8
**description** 25:3 36:18, 23 38:8 41:25
**descriptions** 37:21
**designation** 40:25
**details** 26:23
**differently** 57:17
**difficulty** 26:21 27:8,12
**diminishing** 40:8
**direct** 13:11,14 27:8
**directly** 14:16,23
**disclose** 33:13
**discloses** 33:7
**disclosing** 33:16
**discussion** 40:20
**disk** 30:12
**disputed** 29:18
**distressed** 24:16
**district** 45:23 46:14 57:9
**division** 10:11,13 13:25 16:16,18
**DNA** 19:13,22,25 20:17 33:23 34:8,25 35:12 42:15
**doctor** 39:4
**document** 23:4 28:24 31:8 38:2,10
**documents** 23:3 31:1 40:23
**domestic** 48:5,19
**doubt** 24:20 27:9
**dozen** 52:14
**drop** 45:1
**duly** 5:4
**DVD** 27:2
**Dylan** 33:6,8,18 39:7

**E**

**East** 42:23
**easy** 7:20
**education** 11:20 16:23

17:13
**ejaculate** 34:7
**ejaculation** 36:10
**Ellis** 30:21 42:21
**employed** 5:14 15:15,18
**end** 18:21 35:12 45:8 51:25
**enforcement** 5:22 17:3
**engaged** 39:16,20 40:12
**entered** 30:3
**entire** 14:18
**enumeration** 38:1
**events** 26:22,23 27:12 41:16,25
**evidence** 18:6,13 19:13 22:24 30:3,15,18 34:8 43:10,12,14,15,19,21, 25 44:1
**exact** 19:9
**exam** 18:15,20,21 35:16 37:2
**examination** 31:13,16 37:2
**examinations** 32:1
**examined** 5:4
**excrement** 35:9
**exhibit** 41:3
**expect** 19:5
**experience** 27:13 38:12
**expert** 34:11 38:17,19
**extent** 34:12
**eye** 48:7

**F**

**fabricating** 26:25
**fact** 33:13,17 37:25
**facts** 22:23 35:23
**Fair** 13:11
**familiar** 43:2
**family** 25:12
**feel** 8:2 23:13 38:5 39:23 47:3
**Feliciana** 5:15,25 8:7 16:22 24:8 55:2,9 56:6
**felt** 30:1
**female** 36:2 37:23
**field** 34:11
**figure** 8:5 28:4
**file** 25:13 30:9 42:4
**files** 43:2
**filing** 54:21
**fill** 26:22
**find** 37:5,9 53:16 55:21, 25
**finger** 36:2
**flip** 25:1 41:8

**fluid** 35:7,11
**forced** 41:20
**form** 26:14 31:13,16 32:22 33:10,24 34:10 35:15 37:12,22 39:6,22 57:19
**formal** 20:20
**forward** 51:20
**found** 49:13
**Foundation** 22:24
**Francisville** 5:3,23 6:7, 11 15:14,24
**free** 8:2 23:14 50:10,16, 22
**Friday** 21:7
**front** 44:13 45:5
**fruitful** 41:1
**full** 7:14
**full-time** 6:4
**fuzzy** 48:11

**G**

**gaps** 26:23
**gave** 24:17 26:24
**genital** 37:22
**genitalia** 35:24 36:2
**give** 7:9,14,21 40:15 49:11 54:8
**giving** 25:22
**Good** 5:8
**graduate** 16:21 21:23
**graduation** 6:12
**grand** 7:4 44:14 45:5,8, 11 46:4,21 47:4,6,10 52:20,23 53:3 56:13
**guess** 23:15 29:15 30:8
**guys** 11:21 19:24 40:16 54:16 56:22

**H**

**half** 25:6
**hand-print** 26:9
**handed** 31:9 40:22
**handing** 30:24
**handle** 16:17 18:24
**handprint** 25:8 38:16
**handprint-like** 38:7
**hang** 46:12
**happen** 40:13
**happened** 26:11 54:18
**hard** 7:17
**head** 7:22
**heard** 54:1 55:25
**held** 25:10 40:20 41:16, 17,21 45:11 47:21

54:11
**Henrietta** 17:5
**Hidalgo** 5:1,10,11 24:4 40:21 47:23
**high** 5:21 16:21,22 17:2 21:22 22:6
**hired** 6:4
**hitting** 22:18,21
**hold** 30:23
**home** 17:7 46:22
**honest** 7:15
**hospital** 18:25 25:7,11, 25 26:4 31:22 32:2 42:10
**hourly** 12:1
**husband** 48:6 54:20

**I**

**idea** 56:8
**identification** 41:3
**impact** 7:14 40:5
**important** 29:22
**in-house** 16:16
**incident** 53:9
**included** 18:13
**Indicating** 39:1
**indication** 26:24 43:3
**information** 24:18 40:7
**informed** 24:10
**initial** 18:11
**initially** 21:4
**inside** 36:11,12 41:12
**interact** 22:5 57:20
**interacting** 19:4
**interaction** 28:24 57:21
**interested** 54:21
**interpret** 34:5
**interpreting** 19:21 20:17
**interprets** 20:9
**interview** 21:7,9,11,19 24:11,17,24 25:3,22 26:20 27:1 31:21,23 32:16,20 33:2 36:7,15, 24 38:7 48:18,24 51:13
**interviewed** 37:15
**interviewing** 40:3 49:4
**interviews** 48:25
**investigates** 16:16,18
**investigating** 44:2
**investigation** 10:13 17:15,25 21:5 24:13 27:15 28:13,14,20 42:6, 8 51:9,25 52:7,12,19 55:20 57:6,10,13,16
**investigations** 10:11,21, 22,24 11:15 13:25

16:11,13,15 17:11 22:7,
11 23:8 24:9 28:6
34:18,22 48:10
**investigative** 42:4,19
**investigator** 24:6 29:21
31:19 38:13 40:2
**investigator's** 11:3,4
**involved** 1:1,4 24:12
**issued** 49:22 50:14,19
**issues** 9:14 44:23

**J**

**Jack** 36:5
**Jessica** 5:13
**job** 5:20,22 17:1
**judge** 7:10
**July** 9:17 10:1,3,8 15:9
**jury** 7:4 44:14 45:5,9,11
46:4,21 47:4,7,10
52:20,23 53:3 56:13

**K**

**keeping** 30:18
**key** 43:14
**kind** 6:12,18 7:4,6 11:1,
20 12:19 17:8 18:10
49:13
**kit** 20:4,17 42:15,22
43:4,7,8,10,13
**kits** 20:1

**L**

**lab** 19:22 20:6,8,9,11,14
**labeled** 23:13 40:23
**larger** 17:17
**law** 5:22 17:2
**learn** 45:19,22 50:18
51:15 53:25 54:14
55:21
**learned** 47:3 50:22
55:25
**leave** 15:8 33:23
**Ledet** 22:23 56:25 57:3,
23 58:3,5
**Lee** 13:16 14:10 15:2,3
42:22
**Lee's** 14:13
**LEF0009** 23:13
**Lefebure** 5:12 21:12,13
22:21 26:10 32:7 35:19
36:6,15,24 38:3,6,16
39:6 42:9 52:8 53:6,17,
20 56:1
**Lefebure's** 37:4 41:11,

15 45:6
**LEFEBUREPL** 30:25
**LEFEBUREPL0156**
40:24
**left** 16:2 34:25 38:7 41:1
54:10
**leg** 38:9
**legal** 16:17,19
**legs** 25:10
**lie** 49:3
**lieutenant** 5:1,10,11 8:8,
17,20,22 13:15 14:25
40:21
**lieutenant's** 8:19
**listed** 37:4
**listening** 29:13
**listing** 37:25
**lived** 29:6
**lives** 55:8
**living** 55:15
**located** 41:11
**locations** 38:1
**lock** 43:14
**logged** 43:10 44:1
**long** 5:16 9:15,24 10:12
44:10 46:9
**lot** 17:13 52:16
**loud** 7:23
**Louisiana** 5:3 11:10
**love** 17:6
**loved** 17:7

**M**

**made** 21:2 43:8
**maintained** 17:13
**Major** 14:10,13
**Makayla** 14:5
**make** 7:20 20:9 44:2
51:5
**male** 48:6
**male-female** 34:12,15
**man** 34:3,7
**map** 37:22
**mapped** 38:2
**Mark** 8:20
**marked** 23:2 30:24
40:22 41:3,10
**matter** 5:12 44:8
**Mcneal** 14:5
**medical** 25:7,15
**medication** 7:13
**meeting** 24:9
**members** 25:12 57:17
**memory** 48:4,11,12,16

**mention** 32:20
**mentioned** 18:5
**met** 21:16,18,21 55:23
**Metz** 14:25 15:6,8 55:23
**middle** 23:21 35:22
**mind** 29:21 41:24
**mind's** 48:7
**mindset** 39:24
**Mine** 31:2
**minutes** 47:19
**Miranda** 50:10
**Mississippi** 55:8,17
**mixture** 7:5
**months** 15:10,11
**morning** 5:8
**move** 55:14
**moved** 6:8 10:20,22

**N**

**narrative** 23:17,25 24:2
25:2 26:11 33:5 36:22
37:24 43:1 49:25 51:1
**necessarily** 55:9
**needed** 25:13
**nice** 7:20
**nod** 7:22
**normal** 11:14
**Nos** 30:25
**note** 24:3,15,19
**noted** 39:5
**number** 14:24 15:1
43:11 53:11,13 56:17
**numbers** 43:12
**nurse** 18:22,23 31:24
33:7
**nurses** 18:24 19:5

**O**

**object** 26:13 33:10,24
34:10 36:3 37:11 39:22
57:19
**Objection** 22:23
**objects** 8:4
**obvious** 25:8
**occasion** 48:2 51:7,13
52:8
**occasions** 22:5
**occur** 35:4 36:11
**occurred** 29:7,25 35:17,
20
**offender** 54:23 55:3
**offense** 54:22 55:7
**offhand** 51:1
**office** 5:15,25 6:2,9 8:7
15:4 17:10 24:9 25:18

28:5,15 42:14,23 43:9
44:24 45:1 50:9,16
**officer** 6:5 10:7 23:18,24
50:6,7,8,9,25
**officers** 44:2
**older** 21:25
**option** 36:11
**order** 26:22 27:13
**ordinary** 39:20
**Orgeron** 5:13 31:4
**orifice** 36:12
**outline** 37:23
**oversee** 9:10

**P**

**P10** 40:22 41:3
**P8** 30:24
**paper** 20:18,21
**paragraph** 25:6 26:19
28:11 36:19,20 49:21
**parish** 5:25 42:23 54:23
55:18 56:7
**part** 6:3 18:20 27:1
31:21 40:6 42:7
**part-time** 6:1
**parts** 35:25
**past** 16:8
**PATC** 11:7
**path** 6:10
**patient** 33:3 35:23
**patient's** 32:22 36:18
**patrol** 8:8,10,21 9:19,24
10:18,20 48:9
**pattern** 38:2 41:23
**penetration** 36:1
**penis** 36:2
**people** 6:10 7:12 9:3,12
14:22
**person** 29:8 30:17
**phone** 28:15 29:3,11
30:3 48:23 52:9,20,23
53:1,3,6,11,13,21 54:2
**photograph** 41:14
**photographs** 25:8,19,21
**photos** 42:3,4,6,7,11
43:7
**physical** 37:2
**pick** 12:9,12 42:22 43:3
**pictures** 25:16 26:4,7
41:6
**Pierce** 17:4
**Pizzolato** 33:6,9 39:7
**place** 17:4 24:18 37:3
46:11
**Plaintiff** 5:12

**play** 23:1
**point** 5:24 11:18 13:25
26:24 42:13 46:10 52:3,
5 53:5
**police** 5:23 6:7,11 11:10
15:13,14,23 16:1,12
25:14
**portion** 32:24 57:16
**possibility** 53:4
**possibly** 48:13
**POST** 11:17 17:14,19,21
18:3,11
**potential** 51:15
**present** 37:25
**presents** 32:2
**pretty** 50:11
**previous** 26:2
**previously** 23:3 47:23
48:3 57:4
**prior** 15:9,10 28:1 48:2,9
52:19
**Priscilla** 5:12 21:12
22:20 24:6,8,15 25:4,
14,22 26:20,24 28:14
29:16 30:1 32:7 33:7
48:18,24
**Priscilla's** 30:10 32:11
**prison** 16:14
**proceeding** 7:6
**process** 19:6 32:4
**processing** 43:8
**promoted** 10:19
**promotion** 9:20
**property** 29:7
**Prosperity** 5:2
**psychological** 37:3
39:24
**public** 11:6 57:18
**pull** 28:6
**purpose** 28:22
**put** 11:4,10 18:2 30:22
37:7 41:20 42:2

**Q**

**question** 7:12 20:13
26:14 33:25 34:1,11
36:10 37:12 44:25
**questions** 8:2,3 29:17
33:1 38:22 56:22

**R**

**Rabbit** 36:5
**Randy** 14:25 15:6,8
55:23
**rape** 20:1,4,17 27:15

28:6 29:7 35:1 42:15
50:15
**raped** 40:4,11
**rapes** 27:12
**raping** 29:17
**read** 20:18,21,22 23:14
26:11 27:4 36:19,20
42:24 43:16 50:10
**real** 7:17
**reason** 26:6 49:3
**recall** 12:23 13:10 14:3
19:9,12 20:16 22:13,19
25:24 33:14,16 35:3,12
39:13,15 41:15,17,19
42:5 46:20,23 48:4
52:13 53:19 56:11
**recalled** 48:19
**receive** 19:4
**received** 17:9 19:21
34:21,25
**recently** 16:6 17:9
**recess** 47:21 54:11
**recognize** 23:4 31:8
**recollection** 56:17
**record** 5:9 40:18,20 41:1
47:20
**recorded** 24:11 28:15
29:14 48:25 53:17,20
**recorder** 54:1
**recording** 27:2 30:2,5
54:3
**recordings** 30:9,11 54:6
**records** 28:4 56:20
**referred** 28:16
**reflected** 42:10
**refrigerator** 43:14
**regard** 33:22 40:8
**register** 54:23 55:15,18
**registered** 55:2
**registration** 55:17
**registry** 55:10
**relations** 34:12,15
**relationship** 56:2
**released** 43:8 46:10
**remember** 10:15 12:6
13:5 18:2 19:15,16
20:20 22:2 25:14 30:12,
13 44:11,13,20 45:4
46:14 47:1 49:12 52:4
53:5,14
**remembered** 26:23
**reorganized** 47:20
**report** 23:7,18 25:14
27:4 42:10,19 43:11
49:21
**reported** 14:16 25:25
39:10 56:6,10,18

**reporter** 7:20 58:3,6
**reports** 27:16 32:3
**represent** 5:11
**request** 12:16
**requests** 7:10 12:14
**required** 11:21 17:12
**requirement** 11:24 12:2
**resides** 5:2
**responses** 7:21
**responsibilities** 14:22
**responsible** 19:25
**results** 19:22 20:6,7
**returned** 46:22
**returning** 43:9
**review** 20:8,9
**right-hand** 23:12
**rights** 50:11
**role** 9:9,16 10:16 16:10
**Rouge** 42:23
**rug** 56:3
**rules** 7:10
**RUTHERFORD** 5:7
22:25 23:20,23 26:18
31:6,7 33:11,12 34:2,17
37:14 40:1,15,19,21
41:4 47:19,22 50:5
54:8,12 56:21 57:19

### S

**S-A-N-E** 18:15
**S1** 23:3 42:19
**Saint** 15:24
**Sales** 17:4
**Saliva** 35:9
**Sam** 45:24 57:9
**SANE** 18:15,21,22,23
19:5 31:24 33:7
**scene** 11:11 22:10 34:18
**school** 5:21 16:21,22
17:2 21:22 22:6
**scope** 57:13
**section** 36:4
**secured** 43:13,15
**semen** 35:9
**separate** 31:5
**sergeant** 9:11,19,25
10:10,12 21:6 24:4 27:2
28:13,16 44:7
**sergeants** 9:13 13:20
**set** 42:2
**sex** 33:3,8,9,18,21 34:3
39:6,8,11,16,21 40:4,12
41:20 54:23 55:2
**sexual** 17:11,16,19,25
18:20,24 19:14 20:3
24:22 27:11 31:12,15,

21 34:21 39:10 42:22
43:4,7,13 54:22 55:7
56:5,13,17
**Shannon** 27:2
**sheet** 20:9
**sheriff** 10:2,4,6 14:15,
16,20,23 53:18 55:23
57:12
**sheriff's** 5:15,25 6:1,9
8:7 10:17 15:4 16:3
17:10 25:18
**shift** 9:4,5,10,11,14
13:21
**shifts** 8:11,12,16 9:10
**show** 23:2 50:16
**signature** 32:7
**similar** 37:5 38:22
**sir** 9:1 41:6,9 49:1
**sit** 35:3
**sitting** 55:1
**situation** 39:25
**sort** 12:9 25:5 36:9
**sounds** 11:8
**source** 51:19 54:13
**speak** 7:17 24:6 50:12
52:22 57:5,12,24
**specific** 20:16 29:17
41:18 49:11 56:19
**specifically** 39:18 50:20
**speculate** 27:20
**speculating** 38:5 49:18
**speculation** 49:19
**Spillman** 10:2,4
**splatter** 18:5
**spoke** 54:19
**spoken** 53:2
**spot** 41:18
**St** 5:3,23 6:7,11 15:14
**staff** 25:7,15
**stands** 18:17 23:9
**start** 26:21
**started** 5:18 10:18
**starts** 42:20 49:21
**state** 5:8 7:23 11:10
24:16 37:3,6
**stated** 26:15
**statement** 24:7,11 29:18
30:6
**statements** 30:10
**station** 49:15
**stay** 28:12
**step** 6:12
**stop** 16:24
**stopped** 16:25 44:11
52:5 53:1,6
**story** 27:1 28:24

**Street** 5:2
**stressed** 24:19,23
**stuff** 16:17
**submit** 12:14
**submitted** 12:16
**subpoena** 44:20 45:4
**subpoenaed** 44:18 47:6,
10 56:13
**subpoenas** 44:23
**subsection** 17:17
**Summary** 35:23
**supervise** 9:4,12,13
13:21
**supervisor** 13:12,14,17
14:3,9,14
**supervisors** 14:6,11
**supervisory** 9:9
**surface** 37:24
**suspect** 48:6 50:15
**suspects** 50:21
**sweat** 35:10
**swept** 56:3
**switch** 5:24
**sworn** 5:4 7:7,8 15:25
**systems** 55:12

### T

**tag** 43:12
**taking** 24:7,10
**talk** 22:12 25:12 39:23
49:6 51:7 52:8,18 55:12
**talked** 37:6 52:18
**talking** 24:12 46:24
**tape** 22:20 48:18 54:1
**taught** 34:24
**teach** 20:22
**technically** 29:15
**telling** 17:21 22:20
25:14 26:10,21 27:8,12
39:15 48:20,22
**ten** 28:2
**tenders** 23:3 30:25
40:23
**testified** 6:24 57:4
**testify** 5:5 6:21 39:3
44:16,19 45:5,18,20
47:7 56:12
**testifying** 44:13 45:8,14
47:4
**testimony** 7:8,15
**tests** 20:1
**Texas** 17:5,6,8
**then-wife** 51:12
**thigh** 41:13,24
**thighs** 25:9 26:9

**thing** 6:6 48:17 49:13
**things** 16:17,19 28:19
30:11 37:10 40:12 44:8
**thought** 48:6
**Tilley** 6:5 13:3,13,17
21:6 24:4 27:3 28:13,16
44:7 50:3,6,7,8,9
**Tilley's** 13:14 50:25
**time** 6:3,6 8:4 14:10,23
17:10,24 18:11 19:16
21:16 22:3 24:20 25:21
27:7 29:6 32:2,23 35:16
37:13 44:8 45:13 46:9
48:4 49:11 52:3,5 53:5
**timeline** 52:25
**timely** 20:5
**times** 6:16 7:1 22:12
26:19 37:16,18,19,20
41:20 47:9 52:11
**tiny** 23:12
**title** 8:6 9:18 10:9,16
**today** 7:9,13,15 9:1
15:23 16:3 35:12 57:14
**told** 13:20 25:13 26:1
35:19 36:6,15,24 38:3,6
39:8,13 42:9 45:23
46:15 48:18 49:12
50:23 51:19 54:20
**top** 25:5 31:12 32:10,23
36:18 37:2 42:20
**total** 8:12 9:6
**track** 35:18 36:5,14,23
**traffic** 6:20
**training** 10:23 11:1,2,3,
5,6,17,22 17:20,25
18:4,12,14 19:4,8,15,21
20:20 34:21,25 39:19
**trainings** 11:15 12:4,14,
17,19 17:9,14,15 18:8,
10 20:16
**transfer** 35:7,11 55:16
**trauma** 37:25
**traumatized** 33:19
**treat** 57:17
**treated** 25:10
**trials** 7:4
**trigger** 48:12
**triggered** 48:4
**true** 46:22 52:23
**truth** 48:20,22
**truthful** 7:15 26:25
**truthfulness** 7:11
**turn** 31:11 32:6 41:9
**type** 18:13 31:15
**types** 11:15 12:25

## U

**Uh-huh** 55:5
**underneath** 37:21
**understand** 8:1
**uniform** 8:21,24 9:19,24
  10:18,20 48:9
**uniformed** 8:8,10 9:7
**Unofficially** 51:17
**upset** 24:16,19,23 26:20
  27:7

## V

**vagina** 36:14
**vaginal** 33:4
**vault** 43:15,19,21
**vibrator** 36:5
**victim** 19:1 31:22 32:2
  35:1,13 39:20 40:3 43:7
**victim's** 54:19
**victims** 12:25 18:25
  24:22,23 27:11 39:9
  49:4 51:16,22 54:14

## W

**wait** 8:5
**wanting** 24:6
**warden** 22:9 55:22
**warning** 40:16
**warrant** 49:22 50:13,19,
  24 51:2
**ways** 34:5 35:4,12
**wear** 8:24
**week** 39:10
**weeks** 39:16,21 40:4,11
**weight** 41:21
**West** 5:15,24 8:7 16:22
  24:8 55:2,8 56:6
**WFPSO** 43:10,15
**wife** 22:18,22 29:6
**Wixom** 23:19 26:13
  33:10,24 34:10,15
  37:11 39:22 40:18 50:3
  56:24 58:6,8
**woman** 34:4 40:11
**women** 12:25
**words** 23:12 46:15
**work** 8:21,24 23:8 24:5
  44:10 48:5 52:5
**worked** 5:16 6:1,3 17:4
  27:15 28:7 48:9 56:9
**working** 6:6 15:12 16:5
  20:3 44:6,11 51:25 52:2

**would've** 26:16 48:10,20
**write** 37:3 43:1
**writes** 50:9
**writing** 23:25 50:8
**wrong** 25:4

## Y

**y'all** 6:6 20:9 28:25 29:8
  30:14 46:12 51:25
**y'all's** 42:3 55:10
**year** 9:17 11:22 12:4,7
  13:5 17:12,20,21 18:1
  21:23 53:9
**yearly** 17:15
**years** 5:17 10:1 13:8
  16:8 19:10,18 27:22
  48:10,14,16
**yesterday** 15:22,25
**younger** 21:25